# Exhibit 2

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

** FILED **   Env: 32527973
McHenry County, Illinois
2025MR000097
Date: 5/1/2025 2:01 PM
Katherine M. Keefe
Clerk of the Circuit Court

** FILED **   Env: 32547830
McHenry County, Illinois
2025MR000097
Date: 5/2/2025 2:37 PM
Katherine M. Keefe
Clerk of the Circuit Court

## IN THE CIRCUIT COURT OF THE 22ⁿᵈ JUDICIAL CIRCUIT
## McHENRY COUNTY ILLINOIS

| | |
|---|---|
| IN RE CIVIL MATTER OF:<br>GREGORY J. HALPERN<br>Plaintiff,<br>vs.<br><br>CITADEL SECURITIES LLC; KNIGHT SECURITIES; VIRTU FINANCIAL; CANTOR FITZGERALD; CANACCORD GENUITY; CHARLES SCHWAB & CO.; E*TRADE SECURITIES LLC; JPMORGAN CHASE & CO; GOLDMAN SACHS GROUP INC.; MERRILL LYNCH; UBS ASSET MANAGEMENT, INC.; CREDIT SUISSE INC.; DEUTSCHE BANK SECURITIES; DTCC (DEPOSITORY TRUST & CLEARING CORPORATION); HARVEY VECHERY; HAROLD BLAISURE; MICHAEL TURNER; CONSTANCE NASH; DEVINE MAFA; ALFRED HILDEBRAND; INVESTOR HUB (IHUB); YAHOO; MARY SCHAPIRO; MARY JO WHITE; JAY CLAYTON; THE SECURITIES & EXCHANGE COMMISSION; AND DOES 1-100<br>Defendants. | COMPLAINT FOR: DECLARATORY RELIEF, DAMAGES, AND DEMAND FOR A JURY TRIAL<br><br>2025MR000097<br><br>COUNT I – FRAUD<br><br>COUNT II - SECURITIES FRAUD<br><br>COUNT III – CIVIL CONSPIRACY<br>(Against All Defendants)<br><br>COUNT IV – BREACH OF FIDUCIARY DUTY<br><br>COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants)<br><br>COUNT VI – DECLARATORY RELIEF<br><br>COUNT VII –RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO)<br><br>COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

## COMPLAINT FOR DECLARATORY RELIEF, DAMAGES AND DEMAND FOR A JURY TRIAL

*(Filed under the Constitution of the United States, including Article I, Article II, the Fifth and Tenth Amendments, and the Illinois Constitution.)*

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: greghalpern1@proton.me
PHONE: (847)565-9732
Fax: (815)604-8075

**NOTICE**
THIS CASE IS HEREBY SET FOR A SCHEDULING CONFERENCE IN COURTROOM  TBD  ON
__07-31-2025__ , AT 9:00 a.m. FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED.

- 1 -

# TABLE OF CONTENTS

**I. TABLE OF AUTHORITIES – P.3**

**II. INTRODUCTION – P.6**

**III. JURISDICTION & VENUE – P.9**

**IV. PARTIES – P.10**

**V. FACTUAL ALLEGATIONS – P.17**

**V. CAUSES OF ACTION - P.23**

- **COUNT I – FRAUD P.23**

- **COUNT II – SECURITIES FRAUD P.28**

- **COUNT III – CIVIL CONSPIRACY (Against All Defendants) P.33**

- **COUNT IV – BREACH OF FIDUCIARY DUTY P.37**

- **COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants) P.41**

- **COUNT VI – DECLARATORY RELIEF P.46**

- **COUNT VII – RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO) P.50**

- **COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – P.55**

**IX. CLAIMS FOR RELIEF – P.59**

**X. PRAYER FOR RELIEF – P.63**

**XI. DEMAND FOR JURY TRIAL – P.66**

**XII. EXHIBITS – 67**

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 4 of 164 PageID #:84
Page 3 of 163

# TABLE OF AUTHORITIES

1   ◆ United States Supreme Court Cases

2   • *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

3   – Materiality and reliance in securities fraud (Rule 10b-5)

4   • *SEC v. Zandford*, 535 U.S. 813 (2002)

5   – Fraudulent conduct in connection with securities transactions

6   • *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)

7   – No First Amendment protection for defamatory falsehoods made with actual malice

8   • *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)

9   – Due process violation when judicial outcomes are tainted by external influence

10   • *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)

11   – Equal protection and unconstitutional discriminatory enforcement

12   • *Goldberg v. Kelly*, 397 U.S. 254 (1970)

13   – Due process in deprivations of property and reputation

14   • *Boyle v. United States*, 556 U.S. 938 (2009)

15   – Structure of a RICO association-in-fact enterprise

16   • *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989)

17   – Continuity and relatedness requirement in RICO pattern

18   • *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)

19   – Civil RICO: treble damages, standing, and pattern of racketeering

- 3 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 5 of 164 PageID #:85

Page 4 of 85

20 _____

21 ◆ Federal Circuit Court Case

22 • *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022)

23 – Online impersonation and deception are not protected by the First Amendment

24 _____

25 ◆ Illinois Case Law

26 • *Public Finance Corp. v. Davis*, 66 Ill. 2d 85 (1976)

27 – Elements of Intentional Infliction of Emotional Distress (IIED)

28 • *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102 (1999)

29 – Civil conspiracy elements under Illinois law

30 • *Steinmetz v. Kern*, 375 Ill. App. 3d 612 (1st Dist. 2007)

31 – Fiduciary duty standards and breach consequences

32 • *Patrick v. City of Chicago*, 2011 IL App (1st) 101388

33 – Aiding and abetting breach of fiduciary duty

34 _____

35 ◆ Statutes & Rules

36 • **18 U.S.C. §§ 1961–1964**

37 – Federal RICO Act (civil remedies, predicate acts, treble damages)

- 4 -

38 • **15 U.S.C. § 78j(b)**

39 – Securities Exchange Act of 1934 – Rule 10b-5 anti-fraud provision

40 • **815 ILCS 5/12**

41 – Illinois Securities Law (prohibited fraudulent acts)

42 • **720 ILCS 5/33G**

43 – Illinois RICO Act (criminal enterprise and pattern of activity)

44 • **735 ILCS 5/2-701**

45 – Declaratory Judgment Act – Illinois Code of Civil Procedure

46 • **17 C.F.R. § 240.10b-5**

47 – SEC Rule 10b-5 (fraud in connection with securities)

48 • **17 C.F.R. § 242.200 et seq.**

49 – Regulation SHO (naked short selling violations)

50 • **U.S. Constitution, Amendment VII**

51 – Right to jury trial in civil cases

52 • **Illinois Constitution, Art. I, § 13**

53 – Right to trial by jury

54 • **Illinois Supreme Court Rule 219**

55 – Sanctions and costs

56 • **Federal Rule of Civil Procedure 54(d)**

57 – Costs awarded to prevailing party

- 5 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

## I. INTRODUCTION

58    1.  This is not just a case — it is a **rescue operation for justice**, shareholder integrity,

59      and lawful corporate governance. Plaintiff **Gregory J. Halpern**, founder and Super

60      Majority Shareholder of **Max Sound Corporation (MAXD)**, brings this action in

61      McHenry County, Illinois, to expose and remedy a criminal conspiracy spanning Wall

62      Street brokerages, online message boards, fraudulent insiders, and complicit digital

63      platforms.

64    2.  At the center of this conspiracy is a **multi-tiered scheme** to **defraud MAXD**

65      **investors**, **seize control of Plaintiff's company, destroy American Small Business**,

66      and **manipulate public markets** using illegal tactics including naked short selling,

67      false online narratives, regulatory abuse, and insider fraud and betrayal.

68    3.  MAXD, once a promising micro-cap audio and biometric security technology

69      company, suffered a **deliberate takedown** despite its proprietary software library,

70      licensing partners, and verified intellectual property. Its founder, Plaintiff Halpern,

71      invested over **three million dollars of personal funds over several years**, only to be

72      met with betrayal by opportunists who later **weaponized the very platforms expected**

73      **to protect investors**.

74    4.  Over the course of this campaign, **Plaintiff was defamed, doxed, digitally stalked,**

75      **financially crippled, and illegally removed from corporate control** — all while

76      regulatory authorities stood down and **60,000+ defamatory posts were allowed to**

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 6 of 162

77      **circulate unchecked** on Yahoo Finance and InvestorHub (iHub), creating an online

78      feeding frenzy that crushed shareholder value.

79      These acts are not protected by the First Amendment, as the Supreme Court held in

80      *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), where it ruled that **knowingly false**

81      **speech made with actual malice is not constitutionally protected** and may form the

82      basis for civil liability.

83    5. Defendants include **Harvey Vechery**, who fraudulently reasserted control of assets he

84      bought, sold, then unilaterally destroyed, while calculatedly violating SEC insider

85      disclosure laws and orchestrating a hostile takeover without cause. Co-defendants

86      include **Harold Blaisure**, a bankrupt executive with a history of financial fraud and

87      misconduct; **Devine Mafa**, a serial scammer linked to fraudulent employment and

88      stock deals; and **Alfred Hildebrand a.k.a. Bill Nichols**, a YouTube propagandist and

89      impersonator of legal counsel with a documented record of online market

90      manipulation.

91      Furthermore, in *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022), the court clarified

92      that **false impersonation and online speech designed to deceive or harm others,**

93      **especially involving fabricated legal claims, fall outside First Amendment**

94      **protection and may constitute criminal conduct**, supporting the application of

95      RICO and IIED here.

- 7 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

96  6.  These bad actors, aided by institutional brokers including **Citadel**, **Virtu**, **Canaccord**,

97      and others, used **naked short selling to counterfeit MAXD shares**, manipulating the

98      market price down to **$0.000001**, erasing as much as **$120 million in actual**

99      **shareholder value according to peak market caps** thus devastating thousands of

100     innocent investors.

101 7.  Plaintiff now seeks relief for **fraud, securities fraud, civil conspiracy, breach of**

102     **fiduciary duty, defamation, intentional infliction of emotional distress, and RICO**

103     **violations**, along with **declaratory relief** and a **jury trial**. This complaint is supported

104     by direct evidence, sworn testimony, regulatory filings, recorded communications, and

105     whistleblower documentation.

106 8.  Plaintiff has never been accused of fraud or wrongdoing by any regulatory body in

107     over **four decades of entrepreneurial success** that created hundreds of millions of

108     dollars of *documented investor returns* and has successfully prosecuted **over 30 legal**

109     **actions** rooted in truth and law. The facts presented here demand redress not only for

110     Plaintiff, but for the public interest and every shareholder who trusted that American

111     markets still operate by rules — not by brute force, deception, and digital mob tactics.

112     The conduct described in this case mirrors patterns the courts have condemned,

113     including the **material misrepresentation and deception standard** articulated in

114     *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the **fraud-in-securities transactions**

115     **standard** affirmed in *SEC v. Zandford*, 535 U.S. 813 (2002)

- 8 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 10 of 164 PageID #:90
Page 9 of 163

116    These facts, if proven at trial, would demonstrate violations not just of statutory and

117    tort law, but of core constitutional protections, including Plaintiff's **due process rights**

118    under *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), and equal protection

119    under *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), where courts warned against judicial

120    or governmental processes tainted by external manipulation, favoritism, or systemic

121    bias.

## II. JURISDICTION AND VENUE

123    9.  This Court has **subject matter jurisdiction** over this action pursuant to the Illinois

124        Constitution, Article VI, Section 9, and applicable provisions of the Illinois Code of

125        Civil Procedure, as this case involves civil claims for **fraud, tortious misconduct,**

126        **securities violations, and RICO predicate acts** committed in part within the State of

127        Illinois and affecting Illinois residents.

128    10. **Plaintiff Gregory J. Halpern** resides in **McHenry County, Illinois**, and has

129        sustained direct economic and reputational injury within this jurisdiction. Plaintiff was

130        domiciled in McHenry County during significant times relevant to this action and

131        continues to suffer ongoing harm there.

132    11. **Venue is proper in the Circuit Court of the 22nd Judicial Circuit, McHenry**

133        **County, Illinois**, pursuant to 735 ILCS 5/2-101, as several of the acts, omissions, and

134        consequences complained of herein occurred in McHenry County. This includes the

135        economic impact of the market manipulation, the defamation circulated to Illinois-

- 9 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 11 of 164 PageID #:91
Page 11 of 105

136       based shareholders, and Plaintiff's personal and business losses arising from

137       fraudulent conduct coordinated by Defendants.

138   12. This Court also has **personal jurisdiction over all named Defendants**, including

139       non-resident individuals and corporate entities, under 735 ILCS 5/2-209, because:

140         ○  They **transacted business within Illinois**;

141         ○  They **committed tortious acts causing injury within Illinois**;

142         ○  They **conspired to interfere with Illinois residents and corporate assets**

143           **domiciled in Illinois**; and

144         ○  Their unlawful activities were **intended to cause harm to Plaintiff in this**

145           **jurisdiction**, and in fact did so.

146   13. The damages at issue exceed the jurisdictional threshold for this Court. Plaintiff

147       expressly **demands trial by jury** in McHenry County, Illinois, and further asserts that

148       no federal question is raised which would divest this Court of jurisdiction or require

149       removal.

150 ## III. PARTIES

151   14. **Plaintiff GREGORY J. HALPERN** is an individual residing in McHenry County,

152       Illinois, and is the founder, CEO, and **Super Majority Shareholder** of Max Sound

153       Corporation ("MAXD"), which was a fully reporting micro-cap audio technology

154       company until November 2022. Mr. Halpern has invested over **three million dollars**

- 10 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

155 **of his own capital** into the development of MAXD's patented audio and biometric

156 security technologies. He has never been accused of fraud or wrongdoing by any

157 regulatory authority in his 46 years of public company management or microcap

158 business dealings. In fact, Halpern is a pioneer in micro-cap capital formation and the

159 inventor of online crowdfunding, with decades of success in the Capital Markets

160 having testified before THE U.S. HOUSE OF REPRESENTATIVES on the S.E.C.'s

161 Role in Capital Formation, having influenced rule changes under Sarbanes-Oxley

162 Regulation and initial conception of The JOBS Act. For such efforts, Plaitiff has

163 received the National Small Public Company Leadership Award from the Small

164 Business Administration (SBA) for Outstanding Leadership, Service and Dedication to

165 America's Small Public Companies, with his ventures having increased by as much as

166 27,000%.

167 15. Since 2017, Halpern held controlling interest via preferred shares, properly acquired

168 and held under Delaware law and was the subject of a retaliatory and illegal hostile

169 takeover and intentional destruction orchestrated by the co-defendants. Plaintiff seeks

170 redress under common law, constitutional law, and established federal and Illinois

171 case law, including but not limited to:

172    o *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) – establishing that there is no

173       First Amendment protection for knowingly false statements made with actual

174       malice.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 11 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

175         o  *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) – confirming that false

176              impersonation and deceptive speech online are not constitutionally protected

177              and constitute criminal misconduct.

178         o  *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) – defining materiality and reliance

179              standards in securities fraud.

180         o  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) – illustrating due

181              process violations when judicial processes are manipulated by external

182              influence.

183         o  *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) – stating the equal application of law

184              is a constitutional requirement.

185         o  *SEC v. Zandford*, 535 U.S. 813 (2002) – supporting liability for deceptive

186              practices in connection with the sale of securities.

187    16. **Defendants CITADEL SECURITIES LLC**, **KNIGHT SECURITIES**, **VIRTU**

188       **FINANCIAL**, **CANTOR FITZGERALD**, **CANACCORD GENUITY, CHARLES**

189       **SCHWAB & CO., E\*TRADESECURITIES LLC, JPMORGAN CHASE & CO.,**

190       **GOLDMAN SACHS GROUP INC., MERRILL LYNCH; UBS ASSET**

191       **MANAGEMENT, INC., CREDIT SUISSE INC. AND DEUTSCHE BANK**

192       **SECURITIES** are institutional market makers and broker-dealers who collectively

193       engaged in a pattern of **naked short selling and share counterfeiting** against MAXD

194       and similarly targeted microcap stocks.

- 12 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 14 of 164 PageID #:94

195      17. **Defendant HARVEY VECHERY**, a self-styled investor with a documented history

196           of vexatious litigation abuse, insider Securities violations, and deliberate manipulation

197           of corporate control mechanisms, failing for five years to disclose a required 13D as a

198           MAXD control person.

199      18. According to records from AT&T, Vechery called Plaintiff over **16,000 times** from

200           2016 to 2021 to harass and control Halpern and MAXD. In 2021, Vechery sold his full

201           interest in the Formula 4 Protocol LLC (F4P) to Plaintiff but subsequently took the

202           bizarre position that the transaction never occurred and launched a slander campaign

203           aimed at regaining control of assets he no longer legally owned. For more than a year,

204           Vechery engaged in outrageous terrorism of Halpern's daughter, including influencing

205           Defendant Hildebrand to post death threats and knowingly false accusations of theft on

206           Yahoo Finance in criminal violation of USA vs. Yung.

207      19. Vechery vexatiously filed several actions against Halpern alleging many defamatory

208           lies that Vechery has documented he knew without question were false. Several of

209           those cases were dismissed, defaulted, or non-suited. One that survived was Vechery

210           getting the court to remove Plaintiff from MAXD for five years based on falsely

211           alleging malfeasance and by pointing to the lies crafted by Vechery that were

212           regurgitated ad nauseum on Yahoo, YouTube and IHUB chat boards for MAXD at the

213           direct and indirect influence and conspiracy between Vechery and co-defendants

214           Hildebrand, Blaisure, Turner, Nash, Mafa and others.

- 13 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

215    20. Vechery then made recorded calls where he and his sidekick Scott Kapp bragged that

216        "they had Halpern removed from MAXD." Then, however, Vechery never spent

217        another penny on the company even at Halpern's presentation of a significant revival

218        plan. In fact, Vechery shut the company and took an illegitimate multi-million-dollar

219        tax loss. Evidence includes **recorded calls, signed agreements, and a promissory**

220        **note Vechery altered dated March 30, 2022**.

221    21. **Defendant HAROLD BLAISURE** (a.k.a. John Blaisure, Harold J. Blaisure Jr.) is a

222        serial defendant litigant and bankrupt former executive, whose involvement with

223        MAXD and other ventures shows a repeated pattern of deceit and asset

224        misappropriation for decades and co-conspiratorially with defendant Vechery based on

225        their own significant digital communications compiled by Plaintiff from the period

226        between 2018 and 2022. Court records show federal litigation and bankruptcy filings

227        across multiple states, documenting a **long pattern of fraud, securities fraud, civil**

228        **disputes, and tax violations as well as 10b-5 violations under securities law for**

229        **fooling his way into an executive position at MAXD by using an alias and falsely**

230        **denying being a defendant in any pending securities fraud actions on his**

231        **Directors and Officers Questionnaire filed with the S.E.C.**

232    22. **Defendant DEVINE MAFA**, an international scam artist known for impersonation,

233        extortion forged employment claims, and multiple fraud schemes involving stock

234        manipulation. Leaked images and public reports connect him to deceptive financial

235        practices and collaboration with other co-defendants in undermining MAXD. Mafa

- 14 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

| | |
|---|---|
| 236 | filed a false employment claim against Plaintiff, despite **never having been an** |
| 237 | **employee** of MAXD, and was publicly outed through video and photographic |
| 238 | evidence as part of an international fraud ring. |
| 239 | 23. **Defendant ALFRED HILDEBRAND a.k.a. BILL NICHOLS**, a YouTube-based |
| 240 | financial manipulator, serial impersonator, extortionist, and **non-lawyer** |
| 241 | **impersonating an attorney**, whose online posts and videos were used to smear |
| 242 | Plaintiff and interfere with investor confidence. He was directly tied to market |
| 243 | manipulation via **2,000+ posts on iHub, Yahoo Finance, and YouTube videos**, |
| 244 | falsely portraying Plaintiff as a "con artist CEO" while fraudulently promoting false |
| 245 | legal remedies. Hildebrand first stated he was a MAXD investor, then posts in direct |
| 246 | contradiction that he never bought or sold a single share. Aka Nichols posts and texts |
| 247 | that he will destroy Halpern and ***makes online death threats*** against family members. |
| 248 | 24. **Defendants INVESTORSHUB (iHub)** and **Yahoo Finance** are complicit platforms |
| 249 | that hosted, and in many cases promoted, over **60,000 defamatory posts**, used by |
| 250 | short-selling conspirators and rogue insiders to discredit the company and artificially |
| 251 | depress MAXD's stock price, enabling unlawful short profits and helping cause the |
| 252 | ultimate destruction of MAXD. |
| 253 | 25. Defendant **MICHAEL TURNER**, the President of Globex Transfer, MAXD's former |
| 254 | Transfer agent, Turner was on the chat boards under the alias J. GALT bashing |
| 255 | Plaintiff with thousands of defamatory posts that had no basis in any fact. These |
| 256 | highly negative posts were used to build up Defendant Vechery's destructive |

- 15 -

257        defamation campaign. As the President of a securities transfer company, not only is

258        Turner action a major regulatory violation but it follows his long history of previously

259        being convicted and fined by FINRA for unlawful actions.

260   26. Defendant **CONSTANCE NASH**, who had sold her patented technology license for

261        Optimized Video Data Transmission to MAXD for a million dollars of cash and stock

262        up front with a 50% royalty agreement, then after Plaintiff brought her a proposed 55

263        million dollar offer from Google, she tried to extort the Company, ultimately saying

264        MAXD has no rights and that the signed agreement was void and a forgery. Vechery

265        claimed to intercede, but he helped Nash destroy the Google deal. Nash then resold the

266        same patent to another firm for another million dollars. Throughout this period, Nash

267        was on the chat boards full time for at least 5 years defaming Plaintiff without cause.

268   27. Defendant **MARY SCHAPIRO** former S.E.C. Commissioner during the periods in

269        question, was fully aware of the naked shorting problem but did nothing to stop it.

270        Rather, under the guise of investor protection, helped through fake enforcement

271        actions to destroy record numbers of small businesses.

272   28. Defendant **MARY JO WHITE**, former S.E.C. Commissioner during the periods in

273        question, was fully aware of the naked shorting problem but did nothing to stop it.

274        Rather, under the guise of investor protection, helped through fake enforcement

275        actions to destroy record numbers of small businesses.

276   29. Defendant **JAY CLAYTON**, former S.E.C. Commissioner during the periods in

277        question, was fully aware of the naked shorting problem but did nothing to stop it.

- 16 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

278    Rather, under the guise of investor protection, helped through fake enforcement

279    actions to destroy record numbers of small businesses. In fact, under Clayton's

280    leadership, Plaintiff's Auditor was enforced for committing no crime except growing

281    too much as a microcap audit firm. Plaintiff, was the character witness against the

282    S.E.C. after receiving a recording left by Clayton's enforcement department, that

283    quoted S.E.C. attorney's saying, they "hope" the bosses aren't smokin' crack."

284    30. Defendant **SECURITIES & EXCHANGE COMMISSION (SEC)** is a federal

285    agency tasked with enforcing U.S. securities laws. Despite receiving documented

286    whistleblower complaints, FOIA-backed proof, and formal requests for intervention

287    from Plaintiff, the SEC failed to act, enabling continued racketeering and investor

288    harm and ignoring the primary stated purpose of their entire existence which is to

289    "Protect Investors."

290    31. DOES 1–100 are individuals and entities not yet identified but who will be added to

291    this Complaint upon discovery. These individuals participated in the fraudulent

292    enterprise, including traders, brokers, legal facilitators, shell entities, digital smear

293    agents, corporate raiders, and platform administrators.

294    **IV. FACTUAL ALLEGATIONS**

295    32. **This case arises from a coordinated, premeditated, and fraudulent campaign** by

296    the named Defendants to unlawfully seize control of MAXD (Max Sound

- 17 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 19 of 164 PageID #:99
Page 19 of 103

297    Corporation), destroy its market value, and financially and reputationally cripple its

298    founder, CEO, and Super Majority Shareholder, Plaintiff Gregory J. Halpern.

299    33. Over the last decade, Plaintiff developed MAXD's core intellectual property,

300    including patented audio enhancement and biometric security technologies, investing

301    over **Three Million Dollars of personal capital** and devoting over 10 years to

302    transforming MAXD into a publicly traded, fully reporting microcap company.

303    34. Starting in or around 2021, a coalition of bad actors, led by Defendant **Harvey**

304    **Vechery**, engaged in a multi-pronged takedown strategy involving:

305    o   **Corporate hijacking** of Plaintiff's control shares and his leadership at MAXD;

306    o   **Online defamation warfare**;

307    o   **Regulatory misrepresentation**;

308    o   **Naked short selling** and **share counterfeiting** through platforms operated by

309        Citadel, Virtu, Knight, Canaccord, and others.

310    35. Defendant Vechery **knowingly violated insider disclosure rules**, failing to file a

311    required Schedule 13D to report his greater than 5% ownership in MAXD for nearly

312    **five years**, only filing after being publicly exposed. He was advised repeatedly by

313    Plaintiff and Securities Counsel of this obligation and ignored it until attempting to

314    seize control of the company during Plaintiff's personal bankruptcy caused primarily

315    by the chicanery of Vechery and his minions. This is a decades old pattern by this

316    defendant as proven by the public record. The concealment of insider status and

317    delayed Schedule 13D filing violates the duty to disclose material information

- 18 -

318  required under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which established that

319  omissions of material fact in connection with securities can constitute fraud when they

320  alter the "total mix" of information available to investors.

321  36. Whereas in the case of RUNFLATAMERICA, LLC, Plaintiff and Appellant, v.

322  MICHAEL MALKASIAN, et al., Defendants and Respondents. Dockets: B248002 &

323  B252766 COURT OF APPEAL OF THE STATE OF CALIFORNIA SECOND

324  APPELLATE DISTRICT DIVISION FOUR - April 3, 2015:

325  37. The first amended complaint alleged that Vechery "participated in the management of

326  RAC and served in an executive capacity." He was alleged to have engineered the

327  appointment of Malkasian/ and Taylor to RAC's board of directors, the removal of

328  Cole from all positions at RAC, and the transfer of RAC's assets to one of Vechery's

329  companies to satisfy an allegedly unenforceable promissory note. Both Cole and

330  appellant asserted claims for breach of fiduciary duty, and Cole alone asserted a claim

331  for wrongful termination. There were allegations that Vechery "exercised full control

332  over all the board members of RAC in the latter half of 2010, including Malkasian and

333  Taylor, as well as Don Mazzoni, Mitchell Lederer, and Don Mills," all of whom acted

334  at Vechery's "express instruction" in terminating Cole; and that Vechery had a

335  fiduciary duty to appellant because of his "management position a position of full

336  control over [RAC's board] by virtue of his strong business persuasion in the Los

337  Angeles community. Appellant referenced "the November 19, 2010, Board minutes"

338  as supporting the claim that the board "transferred all of the assets of RAC to

- 19 -

339       Vechery's company under the guise of satisfying an alleged $100,000 promissory note

340       between RAC and the company that had a maturity date of February 9, 2005 (i.e., well

341       over five years prior to the actual asset transfer). However, as of the date of transfer,

342       the promissory note had already been satisfied and/or the legal ability of Vechery's

343       company to collect on the note had long passed."

344  38. The conduct described mirrors the concerns in *Caperton v. A.T. Massey Coal Co.*, 556

345       U.S. 868 (2009), where the Supreme Court recognized that judicial outcomes tainted

346       by external influence or concealed relationships can constitute a due process violation.

347       Vechery's repeated use of judicial process to seize assets and corporate control

348       without full disclosure undermines the integrity of the proceedings and violates

349       Plaintiff's right to a fair hearing.

350  39. Despite **publicly affirming the complete sale of his interest in Formula 4 Protocol**

351       **LLC** to Plaintiff in 2021 — as reaffirmed in a **March 30, 2022, promissory note**

352       altered by Defendant — Vechery began spreading false claims and **funded a massive**

353       **defamation campaign** to reverse the transaction and smear Plaintiff's reputation.

354  40. Co-conspirators **Harold Blaisure**, **Devine Mafa, Constance Nash, Michael Turner**

355       and **Alfred Hildebrand a.k.a. Bill Nichols** were deployed to assist in this campaign,

356       each with a documented background of **fraud, impersonation, bankruptcy, and**

357       **litigation abuse**.

358  41. **Yahoo Finance and iHub** were weaponized with over **60,000 defamatory and**

359       **manipulative posts**, creating a hostile environment for retail investors. These posts

- 20 -

360    were **strategically timed to suppress MAXD's market price**, causing a catastrophic

361    collapse of public confidence and trade volume.

362    42. *Evidence:* The Yahoo Finance board documents **23.6K comments**, while iHub's

363    MAXD board exceeds **39K posts**, many of which can be tied directly to aliases

364    connected to the defendants.

365    43. On multiple occasions, **false rumors were spread early and often** that Plaintiff had

366    been removed from his leadership role, evicted from his home, and "embezzled" funds

367    — none of which are true. These statements were used to justify the hostile seizure of

368    MAXD assets and sow distrust among stakeholders.

369    44. Such knowingly false and reputationally damaging statements are not protected under

370    the First Amendment. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court

371    held that defamatory falsehoods made with actual malice are actionable when directed

372    at private individuals or public figures — particularly where reputational harm is

373    intentional and repeated.

374    45. Meanwhile, **naked short selling continued unchecked**, facilitated by broker-dealer

375    defendants using platforms such as E*TRADE, Schwab, Canaccord, etc. As a result,

376    MAXD's share price was **driven down to sub-penny levels**, eventually falling to

377    **\$0.000001**, with recent market caps reflecting a **99.99%+ artificial devaluation**.

378    46. Despite the attack, Plaintiff remained in compliance with all reporting requirements

379    until **temporarily designating MAXD as non-reporting** in late 2022 due to

- 21 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

380  harassment, legal attacks, and platform manipulation. Even this legal pause was falsely

381  spun as abandonment or fraud by online attackers.

382  47. In 2023, Vechery obtained a **default judgment in California** by deception,

383  misrepresentation, and concealment of key facts — including the true ownership of

384  preferred shares, SEC filings, and business operations. Plaintiff was not afforded the

385  opportunity to properly contest or respond due to improper notice and ongoing

386  harassment.

387  48. This judicial abuse is consistent with the due process failures condemned in *Goldberg*

388  *v. Kelly*, 397 U.S. 254 (1970), and *Caperton*, where courts warned that decisions based

389  on misrepresented facts, denied notice, or unfair bias violate constitutional protections

390  — especially where career reputation and property rights are at stake.

391  The collective goal of the defendants was to:

392  o **Crush MAXD's share price** to acquire control for pennies;

393  o **Silence its founder and majority shareholder** through litigation and defamation;

394  o **Seize corporate assets**, including trade secrets and IP;

395  o **Escape regulatory liability** by concealing insider actions under aliases and bad-

396  faith filings.

397  49. As a direct result of this concerted criminal conspiracy, Plaintiff has suffered:

398  o  Destruction of his life's work

399  o  Collapse of personal financial standing

- 22 -

400         ○  Devastating emotional and reputational harm

401         ○  A reduction of shareholder value exceeding **$100 million** across thousands of retail

402             investors.

403    50. The conduct of Defendants rises to the level of **securities fraud, RICO violations,**

404        **defamation, tortious interference, and intentional infliction of emotional distress**,

405        necessitating both compensatory and punitive damages, as well as declaratory relief

406        and jury adjudication.

407    51. These coordinated acts, including online harassment, impersonation, and identity

408        manipulation, fall squarely within the scope of *United States v. Yung*, 37 F.4th 70 (3d

409        Cir. 2022), which held that impersonation of legal officials and dissemination of false

410        claims for the purpose of retaliation or coercion are not protected speech and may

411        constitute criminal misconduct under federal law.

412    52. Plaintiff's allegations, supported by documentary and audio evidence, establish a

413        continuous and multi-actor enterprise acting outside the bounds of protected speech,

414        fair competition, or due process. These facts, taken as true, are sufficient under

415        *Zandford* and *Basic* to support securities and RICO fraud claims at the pleading stage.

416    **V. CAUSES OF ACTION**

417    **COUNT I – FRAUD** (Against All Defendants)

- 23 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

418   53. Plaintiff realleges and incorporates by reference all preceding paragraphs of this

419        Complaint as though fully set forth herein.

420   54. Beginning no later than 2021, and continuing to the present, Defendants — including

421        but not limited to **Harvey Vechery, Harold Blaisure, Devine Mafa, Michael**

422        **Turner, Constance Nash, Alfred Hildebrand a.k.a. Bill Nichols, Citadel Securities**

423        **llc, Knight Securities**, **Virtu Financial**, **Cantor Fitzgerald**, **Canaccord Genuity,**

424        **Charles Schwab & Co., E*Tradesecurities llc, JP Morgan Chase & Co., Goldman**

425        **Sachs Group Inc., Merrill Lynch; UBS Asset Management, Inc., Credit Suisse**

426        **Inc. and Deutsche Bank Securities and Yahoo Finance/iHub** — knowingly and

427        willfully engaged in a multi-pronged scheme to defraud Plaintiff and MAXD

428        shareholders by making **false representations**, **withholding material facts**, and

429        **executing coordinated digital and financial deception**.

430   55. The elements of fraud under Illinois law — a false statement of material fact,

431        knowledge of its falsity, intent to induce reliance, actual reliance, and damages — are

432        fully met here. As established by the Supreme Court in *Basic Inc. v. Levinson*, 485

433        U.S. 224 (1988), **material omissions and misrepresentations in a securities context**

434        **are actionable when they affect the total mix of information available to**

435        **investors**. This applies to both statements and deliberate omissions made by

436        Defendants in SEC filings, public forums, and legal pleadings.

437   56. **Defendant Harvey Vechery**:

- 24 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

438        o  Knowingly misrepresented his ownership status and regulatory compliance in

439            MAXD by **failing to file a required Schedule 13D for over five years**, thus

440            fraudulently concealing his status as a greater-than-5% shareholder.

441        o  Knowingly executed a **sale of his entire Formula 4 Protocol (F4P) investment to**

442            **Plaintiff in 2021**, then reversed course and **denied the transaction ever occurred**

443            despite signed agreements, a recorded confirmation call, and a March 30, 2022

444            **Vechery altered promissory note reaffirming the deal**. Vechery then filed a

445            vexatious and false action, that he non-suited the week of trial, while having his co-

446            conspirators endlessly bash Plaintiff on-line perpetuation of those same defamatory

447            lies.

448        o  Directed and funded **false defamatory statements** on social media and stock

449            forums to depress MAXD's share price and damage Plaintiff's reputation in

450            anticipation of seizing control.

451    57. **Defendant Devine Mafa**:

452        o  Fraudulently claimed employment at MAXD and **filed or threatened to file a**

453            **bogus wage dispute**, despite never being an employee or receiving any legitimate

454            offer letter signed by Plaintiff.

455        o  Promoted MAXD for personal gain while simultaneously working to undermine

456            Plaintiff's authority with the assistance of Defendant Vechery.

- 25 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 27 of 164 PageID #:107
Page 26 of 162

58. **Defendant Harold Blaisure**, a known bankrupt and disgraced former executive, fraudulently misrepresented his role and influence within MAXD after being **terminated for cause**. Blaisure was engaged in aiding the hostile takeover and made **false public representations** to investors and potential stakeholders.

59. **Defendant Alfred Hildebrand a.k.a. Bill Nichols**, using multiple fake identities, fraudulently posed as a licensed attorney, produced false legal commentary, **encouraged shareholders to join a baseless derivative lawsuit**, and falsely claimed Plaintiff had been removed from MAXD leadership. These statements were made **with knowledge of their falsity** and **intent to deceive and harm**.

60. These actions constitute knowing misrepresentation and public deception, and go beyond civil fraud — they rise to criminal impersonation. As held in *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022), **false impersonation of legal professionals and the dissemination of fabricated legal narratives designed to deceive and intimidate the public are not protected speech and constitute prosecutable fraud.**

61. **Defendants Yahoo and iHub** facilitated the fraud by:

   o   Allowing and promoting over **60,000 defamatory and manipulative posts**, many of which originated from known aliases tied to the other Defendants.

   o   Willfully ignoring their own community guidelines and securities fraud reporting obligations, thereby **becoming active participants in market manipulation and reputational defamation**.

- 26 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

477      62. **Broker-Dealer Defendants** including Citadel Securities llc**,** Knight Securities**,** Virtu

478          Financial**,** Cantor Fitzgerald**,** Canaccord Genuity, Charles Schwab & Co.,

479          E*Tradesecurities llc, JP Morgan Chase & Co., Goldman Sachs Group Inc., Merrill

480          Lynch; UBS Asset Management, Inc., Credit Suisse Inc. And Deutsche Bank

481          Securities**:**

482      o   Engaged in **counterfeit share creation and naked short selling**, designed to flood

483          the market with unbacked MAXD shares, collapse the share price, and profit from

484          the artificially created decline.

485      o   This conduct was done with **knowledge of Plaintiff's controlling shareholder**

486          **position** and thus constituted a coordinated effort to devalue his equity and

487          facilitate unlawful seizure.

488      63. Each of the misrepresentations, omissions, and actions was made **intentionally**,

489          **knowingly**, and with **malicious purpose** to induce reliance by investors, regulators,

490          business partners, and Plaintiff himself — all of whom **reasonably relied** on the belief

491          that the Defendants were acting in lawful, fiduciary, or regulated capacities.

492      64. In *SEC v. Zandford*, 535 U.S. 813 (2002), the Court reaffirmed that **fraud "in**

493          **connection with the sale of securities" includes schemes where investors are**

494          **misled through ongoing manipulation or omission**, and that such misconduct

495          supports liability even without face-to-face transactions. The Defendants' multi-

496          layered campaign of deception through public statements, omitted filings, and

497          impersonated authority fits squarely within this doctrine.

- 27 -

498      o  As a direct and proximate result of this systemic and orchestrated fraud, Plaintiff

499         and thousands of MAXD shareholders have sustained damages in excess of **$120**

500         **million**, including: Destruction of stock value;

501      o  Loss of corporate control;

502      o  Reputational devastation;

503      o  Personal and corporate financial losses;

504      o  Compromised investor relations and business opportunities.

505    65. Plaintiff is entitled to **compensatory damages**, **punitive damages**, and **any equitable**

506        **relief the Court deems just**, including declaratory relief confirming Plaintiff's legal

507        ownership of MAXD control shares, reversal of fraudulent corporate filings, and

508        restitution for damages suffered.

509    66. The fraud alleged here — involving deliberate market devaluation, digital

510        impersonation, regulatory deceit, and false court pleadings — satisfies both **state**

511        **common law** and **federal antifraud standards**, including those under Rule 10b-5 and

512        interpreted in *Basic* and *Zandford*. These acts were not mere negligence but deliberate,

513        sustained, and targeted attacks on MAXD and its shareholders.

## COUNT II – SECURITIES FRAUD (Violation of Section 10(b) of the Exchange Act and Rule 10b-5) (Against All Defendants)

516    67. Plaintiff realleges and incorporates by reference all preceding paragraphs of this

517        Complaint as though fully set forth herein.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

518   68. Defendants, individually and in concert, violated both **Illinois securities laws (815**

519        **ILCS 5/12)** and applicable provisions of the **Securities Exchange Act of 1934**,

520        including but not limited to **Section 10(b)** and **Rule 10b-5**, by engaging in a

521        widespread campaign of material misrepresentations, omissions, and deceptive

522        practices designed to **artificially deflate the market value of MAXD stock**, seize

523        control of the Company, and profit at the expense of Plaintiff and thousands of

524        shareholders. Defendants engaged in acts that:

525        o  **Distorted MAXD's market profile** through coordinated online defamation;

526        o  **Falsely misrepresented control and ownership** of shares in SEC filings and public

527           statements;

528        o  **Engaged in counterfeit securities issuance** via naked short selling;

529        o  **Concealed insider transactions and interests** in violation of Schedule 13D and

530           other disclosure requirements.

531   69. The core elements of securities fraud — material misstatement or omission, scienter

532        (intent), a connection with the purchase or sale of a security, reliance, economic loss,

533        and loss causation — are present here. As established in *Basic Inc. v. Levinson*, 485

534        U.S. 224 (1988), **even omissions are actionable when they significantly alter the**

535        **total mix of information available to investors**, and reliance on an efficient market is

536        presumed under the fraud-on-the-market theory.

537   70. **Defendant Harvey Vechery**:

- 29 -

538      ○   Willfully withheld material disclosures for over **five years** by failing to file a Schedule

539           13D as required by federal law once he acquired control-level ownership of MAXD

540           common stock.

541      ○   Later filed a backdated and misleading Schedule 13D in 2022, attempting to sanitize

542           his position only after attempting a hostile takeover of Plaintiff's company during

543           Plaintiff's personal bankruptcy proceedings.

544    71. **Defendants, Devine Mafa, Constance Nash, Michael Turner, Harold Blaisure,** and

545        **Alfred Hildebrand a.k.a. Bill Nichols**:

546      ○   Acted as **unlicensed promoters and de facto securities dealers**, making

547           unsubstantiated claims about MAXD's business, financials, and leadership on public

548           forums, social media, and YouTube broadcasts, thereby distorting investor perception.

549      ○   Mafa falsely claimed to be an executive of MAXD and attempted to file a wage-based

550           claim to validate that fraud, while simultaneously encouraging stock dilution schemes

551           to damage market value.

552      ○   As an admitted non-shareholder Hildebrand falsely claimed to represent shareholders

553           in a "derivative lawsuit," despite lacking standing, legal training, or any filing

554           authority, all while soliciting new investor action against Plaintiff under false

555           pretenses.

556    72. **Brokerage and Market Maker Defendants**, including but not limited to **Citadel**

557        **Securities llc**, **Knight Securities**, **Virtu Financial**, **Cantor Fitzgerald**, **Canaccord**

- 30 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

558        **Genuity, Charles Schwab & Co., E\*Trade Securities llc, JP Morgan Chase & Co.,**

559        **Goldman Sachs Group Inc., Merrill Lynch; UBS Asset Management, Inc., Credit**

560        **Suisse Inc. and Deutsche Bank Securities** engaged in:

561      o  **Naked short selling**, flooding the market with non-existent MAXD shares to

562        **manipulate the market price downward**, destroy liquidity, and enable "buy-ins" at

563        artificially depressed levels.

564      o  These acts constitute fraudulent manipulation of a security under both state and federal

565        law and directly violated their regulatory obligations under **Reg SHO** and related anti-

566        fraud provisions.

567    73. **Yahoo Finance and iHub**, while not traditional issuers or brokers, played a critical

568        role by:

569        All false statements and omissions made by the Defendants were:

570      o  **Material**, as they altered the total mix of information available to reasonable investors

571        regarding MAXD's performance, leadership, value, and legitimacy;

572      o  Made with **scienter**, as Defendants knew or were reckless in not knowing that the

573        statements were false or misleading;

574      o  **In connection with the purchase or sale of securities**, specifically MAXD common

575        stock traded publicly on the OTCPK market.

576      o  As reaffirmed by the Supreme Court in *SEC v. Zandford*, 535 U.S. 813 (2002),

577        **fraudulent conduct need not occur during a specific securities transaction but**

- 31 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

578  **includes broader deceptive schemes designed to mislead investors and manipulate**

579  **market prices**. The coordinated falsehoods and market sabotage described here

580  directly fall under this expanded interpretation of securities fraud liability.

581  74. Defendants MARY SCHAPIRO, MARY JO WHITE, and JAY CLAYTON, former

582  Chairs of the U.S. Securities and Exchange Commission (SEC), and the SEC itself,

583  failed in their regulatory duties by knowingly ignoring systemic fraud, naked short

584  selling, and coordinated market manipulation against MAXD. Their deliberate

585  inaction, despite receiving formal whistleblower complaints, FOIA-backed proof, and

586  direct outreach from Plaintiff, constitutes a **material omission and regulatory abuse**

587  in violation of the anti-fraud provisions of the Securities Exchange Act of 1934, and

588  directly contributed to the collapse of MAXD's share price and investor confidence.

589  75. As a direct and proximate result of Defendants' securities fraud, Plaintiff and the

590  Company suffered:

591  o  Over **$120 million in market capitalization losses**;

592  o  Collapse of investor confidence and inability to raise capital;

593  o  Dilution of Plaintiff's controlling stake and destruction of corporate momentum;

594  o  Permanent reputational harm to both the Company and its founder.

595  76. Plaintiff is entitled to **monetary damages**, **equitable relief**, and all other remedies

596  available under Illinois and federal securities law, including but not limited to

597  rescission, injunction, restitution, treble damages (where applicable), and referral for

- 32 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 33 of 162

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 34 of 164 PageID #:114

598    criminal investigation. Furthermore, the naked short selling practices described, by

599    flooding the market with non-existent MAXD shares and creating phantom supply,

600    violated not only anti-fraud provisions but also regulatory obligations under

601    **Regulation SHO**, which requires delivery of shares to settle trades and bars

602    manipulative failures to deliver. Such market abuse directly supports liability under

603    the Exchange Act and Rule 10b-5.

604    77. Defendants' acts, individually and collectively, constitute egregious violations of the

605    antifraud provisions of the Exchange Act and Rule 10b-5, as defined in *Basic* and

606    *Zandford*, and compounded by their systemic evasion of Regulation SHO settlement

607    obligations. Plaintiff and MAXD's shareholders have suffered direct, measurable, and

608    devastating harm as a result.

## 609    COUNT III – CIVIL CONSPIRACY (Against All Defendants)

610    78. Plaintiff realleges and incorporates by reference all preceding paragraphs of this

611    Complaint as though fully set forth herein.

612    79. This action arises from an **intentional and unlawful agreement among the**

613    **Defendants** to commit a series of wrongful acts against Plaintiff and MAXD —

614    including, but not limited to: **fraud, securities violations, defamation, market**

615    **manipulation, tortious interference**, and the unlawful seizure of corporate control.

616    Under Illinois law, a civil conspiracy arises when two or more parties agree to

- 33 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 35 of 164 PageID #:115
Page 35 of 164

617     accomplish, by concerted action, either an unlawful purpose or a lawful purpose by

618     unlawful means.

619     80. The Illinois Supreme Court recognizes that **when parties act in concert to commit**

620     **an underlying tort — such as fraud, defamation, or market manipulation — each**

621     **conspirator is jointly and severally liable for all resulting damages**. (*See McClure*

622     *v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102 (1999)).

623     81. Defendants knowingly formed and participated in a **common plan and mutual**

624     **scheme** to:

625     o   Discredit and remove Plaintiff from his rightful role as CEO and Super Majority

626         Shareholder of MAXD;

627     o   Artificially suppress the value of MAXD shares to fractional pennies through

628         defamation, naked short selling, and misinformation;

629     o   Illegally acquire corporate control, destroy intellectual property, and business

630         opportunities belonging to MAXD and Plaintiff;

631     o   Mislead investors, regulators, and courts with coordinated misrepresentations, false

632         documents, and retaliatory legal actions.

633     82. The conspiracy involved multiple **overt and covert acts**, including:

634     o   **False filings** with the SEC and courts by Defendant Harvey Vechery to conceal

635         insider status, misrepresent asset transfers, and unlawfully assert control;

- 34 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 36 of 164 PageID #:116
Page 35 of 162

636        o **Fabricated wage and employment claims** by Devine Mafa to discredit Plaintiff
637        and create false legal standing;

638        o **Defamatory videos, social media campaigns, and impersonation of legal**
639        **authority** by Alfred Hildebrand a.k.a. Bill Nichols to create the false appearance of
640        regulatory and shareholder revolt;

641        o **Tens of thousands of coordinated negative posts** on Yahoo Finance and
642        InvestorHub, used to systematically discredit MAXD and suppress investor interest;

643        o **Unlawful trading practices and price suppression** by broker-dealer Defendants
644        through naked short selling and synthetic share issuance, designed to benefit from
645        MAXD's destruction.

646 83. The conspiratorial coordination of online defamation, market sabotage, and insider
647     collusion mirrors the abuse of process described in *Caperton v. A.T. Massey Coal Co.*,
648     556 U.S. 868 (2009), where the Court warned that **judicial outcomes orchestrated by**
649     **insiders or external parties with undisclosed interests violate due process** and
650     threaten the fairness of all proceedings.

651 84. Each Defendant knew of and substantially assisted or encouraged the objectives and
652     conduct of the conspiracy, and each acted with **the intent to further the unlawful**
653     **enterprise**.

654 85. The conspiracy caused direct and measurable harm to Plaintiff and the Company,
655     including:

656        o Catastrophic devaluation of corporate stock and market cap;

- 35 -

657    o   Destruction of Plaintiff's business reputation and professional relationships;

658    o   Loss of Plaintiff's effective control and ability to raise capital or enter partnerships;

659    o   Severe emotional, reputational, and economic damages.

660    86. This pattern of coordinated action also aligns with the reasoning in *Yick Wo v.*

661    *Hopkins*, 118 U.S. 356 (1886), which condemned **the unequal application of legal**

662    **processes to target individuals for selective harm**. Defendants' actions were not

663    isolated — they were **strategically synchronized to overwhelm, isolate, and**

664    **neutralize Plaintiff through judicial, financial, and reputational ambush tactics**.

665    87. Defendants' conduct constitutes **civil conspiracy under Illinois common law**, and

666    each is jointly and severally liable for the full extent of damages flowing from the

667    wrongful acts committed in furtherance of the conspiracy.

668    88. Plaintiff seeks:

669    o   **Compensatory damages** in excess of $120 million;

670    o   **Punitive damages** based on the willful, malicious, and premeditated nature of

671    Defendants' conduct;

672    o   **Equitable relief** including the reinstatement of Plaintiff's recognized control rights

673    and reversal of all false or manipulated filings and corporate actions;

674    o   **Costs of suit and attorneys' fees**, to the extent allowed under law.

675    89. Defendants' conduct — a unified strategy of falsehoods, intimidation, and judicial

676    fraud — constitutes a textbook civil conspiracy under Illinois law and raises grave

- 36 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 38 of 164 PageID #:118
Page 37 of 162

677     constitutional concerns under *Caperton* and *Yick Wo* regarding the manipulation of

678     judicial and public systems to inflict targeted harm.

679     # COUNT IV – BREACH OF FIDUCIARY DUTY (Against

680     Defendants Harvey Vechery, Harold Blaisure, Devine Mafa,

681     Constance Nash and Michael Turner)

682     90. Plaintiff realleges and incorporates by reference all preceding paragraphs of this

683     Complaint as though fully set forth herein.

684     91. At various times relevant to this action, Defendants **Harvey Vechery, Harold**

685     **Blaisure, Devine Mafa**, **Constance Nash,** and **Michael Turner** held positions of

686     influence, control, or fiduciary obligation to MAXD and its shareholders, either as

687     officers, insiders, executive collaborators, or financial backers with operational input

688     and insider access.

689     92. As such, these Defendants owed MAXD, its shareholders, and its founder a **fiduciary**

690     **duty of care, loyalty, honesty, and good faith**, which included:

691     o   Acting in the best interest of the Company and its investors;

692     o   Avoiding self-dealing or secret transactions;

693     o   Disclosing all material conflicts of interest;

694     o   Refraining from interference or conduct designed to harm the Company's market

695     standing, governance structure, or IP integrity.

- 37 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 39 of 164 PageID #:119
Page 38 of 163

696    93. Under Illinois law, corporate officers and directors owe fiduciary duties of **loyalty,**

697    **care, honesty, and full disclosure** to the corporation and its shareholders. This duty

698    prohibits self-dealing, concealment of conflicts, or actions designed to harm the

699    corporation for personal gain. (*See Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557

700    (1984); applied in Illinois cases such as *Steinmetz v. Kern*, 375 Ill. App. 3d 612 (1st

701    Dist. 2007)). Where such duties are breached, liability attaches regardless of whether

702    the actor was a formal officer — **de facto control is enough.**

703    94. **Defendant Harvey Vechery**:

704    o   Violated his fiduciary duty by **failing to disclose material ownership interests** in

705        a timely fashion, **withholding mandatory SEC filings**, and then attempting to

706        fraudulently seize corporate control through legal manipulation during Plaintiff's

707        personal bankruptcy.

708    o   Used insider knowledge and influence to **orchestrate a smear campaign**, encourage

709        regulatory violations, and **intentionally sabotage business development** to weaken

710        the Company and force a devaluation for illegal personal tax deduction benefits.

711    o   **Reaffirmed his sale of ownership** in Formula 4 Protocol to Plaintiff, then later

712        denied the transaction and undermined F4P operations through threats and

713        defamatory claims.

714    95. This conduct is particularly egregious because it not only breached fiduciary

715        obligations, but also **triggered due process violations and potential judicial fraud**,

716        as described in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), where the

- 38 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 40 of 164 PageID #:120
Page 39 of 169

717     Court warned that fiduciaries acting under color of corporate authority while

718     simultaneously corrupting court processes **undermine fundamental fairness and**

719     **lawful governance.**

720     96. **Defendant Harold Blaisure**, a former executive, breached his fiduciary duties by:

721     o   Retaining and using corporate property and IP after his removal from the Company;

722     o   Misrepresenting his role and making unauthorized representations to partners and

723         the public;

724     o   Collaborating with Vechery and others in **defamatory public campaigns** against

725         Plaintiff and the Company.

726     97. **Defendant Devine Mafa** violated his obligations by:

727     o   Falsely presenting himself as an officer of MAXD without authorization;

728     o   Promoting himself in association with MAXD to raise his personal profile;

729     o   Filing or threatening **fraudulent legal claims, including baseless extortions** to

730         create artificial leverage against Plaintiff;

731     o   Spreading false statements about ownership and licensing agreements to investors

732         and stakeholders.

733     98. Even non-officer collaborators may be found liable for aiding and abetting breach of

734         fiduciary duty where their actions intentionally support or enable insiders in violating

735         their obligations. (*See Patrick v. City of Chicago*, 2011 IL App (1st) 101388). **Aiding**

- 39 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 41 of 164 PageID #:121
Page 40 of 162

736       **a fiduciary's scheme to defraud, extort, or destabilize a corporation imposes**

737       **liability on all participants**, regardless of their formal corporate title.

738 99. **Defendant Michael Turner**, acting in coordination with the other bad actors,

739       improperly exercised insider authority to:

740       o  Interfere with Company operations;

741       o  Collaborate on misinformation campaigns;

742       o  Promote his own interests and the interests of co-conspirators while disregarding his

743         duty to MAXD and its stakeholders.

744 100.    The collective misconduct of these Defendants was **willful, malicious, and**

745       **calculated**, aimed at **seizing control**, undermining Plaintiff's lawful authority, and

746       causing the collapse of MAXD's share value to facilitate insider enrichment and

747       retaliation.

748 101.    As a direct and proximate result of Defendants' breaches of fiduciary duty,

749       Plaintiff and MAXD have suffered:

750       o  Corporate value destruction exceeding $120 million;

751       o  Disruption of key partnerships and business deals;

752       o  Loss of shareholder confidence and market access;

753       o  Severe reputational damage and personal harm.

754 102.    Plaintiff demands:

- 40 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 42 of 164 PageID #:122
Page 42 of 164

755    o  **Restitution** of any improperly obtained assets or benefits;

756    o  **Compensatory damages** for all harms caused;

757    o  **Punitive damages** for the intentional nature of the misconduct;

758    o  **Equitable relief** restoring rightful assets control and preventing further abuse.

759    103.    In totality, Defendants' misconduct reflects a systematic betrayal of trust, abuse

760         of insider knowledge, and weaponization of corporate authority — all in violation of

761         the fiduciary standards that define lawful conduct under both state law and applicable

762         case precedent. The law is clear: fiduciaries must serve the Company, not sabotage it

763         for tax losses or personal vendettas.

## COUNT V – DEFAMATION & MARKET MANIPULATION
764
765    (Against All Defendants)

766    104.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this

767         Complaint as though fully set forth herein.

768    105.    Defendants engaged in a sustained, malicious campaign of **false statements**,

769         **character assassination**, and **manipulative trading activity** designed to damage

770         Plaintiff's personal and professional reputation, destabilize and destroy MAXD's stock

771         value, and facilitate an unlawful seizure of corporate control.

772    106.    The First Amendment does not shield knowingly false and malicious speech. In

773         *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Supreme Court held that

774         **falsehoods published with actual malice — knowledge of falsity or reckless**

775         **disregard for the truth — are actionable and fall outside constitutional**

- 41 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

776      **protection**. The volume and nature of Defendants' defamatory speech, including the

777      repetition of known lies, clearly meets this threshold.

778    107.      The **defamatory statements** made by Defendants were published to the public,

779      investors, partners, vendors, and regulators through:

780      o   Thousands of online message board posts on **Yahoo Finance and InvestorHub**

781        **(iHub)**;

782      o   **YouTube videos**, Twitter threads, and blog content orchestrated by **Alfred**

783        **Hildebrand a.k.a. Bill Nichols**, falsely labeling Plaintiff a con artist, thief, and

784        fraud;

785      o   **False legal claims** by Devine Mafa, who publicly declared he was a former

786        executive owed wage, despite never having held any legitimate employment

787        agreement with MAXD;

788      o   Repeated public statements by Harvey Vechery and associates misrepresenting

789        Plaintiff's legal standing, control of the company, mental stability, and financial

790        record — all while suppressing the fact that Vechery **sold his interest in F4P** and

791        had **no rightful standing** in MAXD's control structure.

792    108.      Defendants' **false and defamatory statements** included, but were not limited

793      to:

794      o   Accusations of embezzlement, fraud, and personal mental illness;

- 42 -

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 42 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

795        o   False claims that Plaintiff was evicted from his home, removed from MAXD, or

796            otherwise legally barred from leadership;

797        o   Assertions that Plaintiff falsified SEC filings or corporate reports — when in fact,

798            he maintained compliance for over a decade and voluntarily went non-reporting due

799            to harassment and digital attacks.

800    109.    These statements not only defame but do so in a calculated and destructive way.

801        In *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022), the court ruled that **online**

802        **impersonation and the dissemination of knowingly false legal narratives, designed**

803        **to intimidate or deceive, constitute criminal misconduct and are not protected**

804        **expression** — particularly where the target is harassed, reputationally destroyed, and

805        publicly misrepresented.

806    110.    These statements were **intentionally false**, **published with actual malice**, and

807        **made with the intent to destroy public confidence** in both Plaintiff and the

808        Company.

809    111.    Simultaneously, Defendants and co-conspirators engaged in **coordinated**

810        **market manipulation**, including:

811        o   The publication of **over 60,000 manipulative or negative posts** tied to MAXD

812            across Yahoo and iHub, as documented by screenshot evidence;

813        o   Timing of these posts to coincide with company filings, investor milestones, or

814            public announcements — creating **manufactured panic and sell-offs**;

- 43 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

815    o   Encouraging retail investors to exit the stock while insiders secretly coordinated a

816        hostile control effort behind the scenes;

817    o   Use of **synthetic share creation via naked short selling**, flooding the market with

818        phantom shares and making it **mathematically impossible** for legitimate share price

819        discovery to occur.

820    112.    Coordinated digital defamation in connection with securities transactions

821    qualifies as market manipulation. The Supreme Court in *SEC v. Zandford*, 535 U.S.

822    813 (2002), made clear that **a course of deceptive conduct affecting investor**

823    **decisions or market pricing falls within the scope of Rule 10b-5 — even without a**

824    **single fraudulent trade**, so long as it is "in connection with" the purchase or sale of

825    securities.

826    113.    These acts constitute **defamation per se**, under Illinois common law, and

827    **manipulative trading practices** under the Securities Exchange Act of 1934, Rule

828    10b-5, and state securities laws.

829    114.    The damages from this dual campaign of defamation and manipulation include:

830    o   The collapse of MAXD's share price to **$0.000001**, with over **$120 million in**

831        **lost market cap**;

832    o   Complete loss of investor confidence and brand credibility;

833    o   The inability to raise capital, execute licensing deals, or move forward with

834        product launches;

- 44 -

835     o Deep personal and reputational harm to Plaintiff, including professional

836      blacklisting and targeted harassment.

837  115.  Plaintiff is entitled to:

838     o **Compensatory damages** for reputational loss, market value destruction, and

839      business interruption;

840     o **Punitive damages** based on the willful, sustained, and malicious nature of

841      Defendants' actions;

842     o **Equitable relief** including takedown orders, content preservation demands, and

843      public retractions;

844     o A full **jury trial**, to expose the coordinated character of the misinformation and

845      deliver accountability.

846  116.  Defendants' public lies and market manipulation, when viewed together, reflect

847  a deliberate campaign of economic sabotage and reputational warfare. The

848  combination of *Gertz*, *Yung*, and *Zandford* clearly confirms that **these acts are not**

849  **protected speech, but actionable torts and securities violations punishable under**

850  **both state and federal law**.

## COUNT VI – DECLARATORY RELIEF (Against All Defendants)

851

852  117.  Plaintiff realleges and incorporates by reference all preceding paragraphs of this

853  Complaint as though fully set forth herein.

- 45 -

854      118.      A genuine, immediate, and justiciable controversy exists between Plaintiff and
855              Defendants concerning:

856          o   The **validity and enforceability of Plaintiff's controlling ownership** of
857              MAXD;
858          o   The **legal status of all preferred and common shares held by Plaintiff**;
859          o   The **lawful governance of MAXD**, including rightful officer and director
860              appointments;
861          o   The **fraudulent and void nature of recent court rulings, corporate actions,**
862              **and SEC-related filings** orchestrated by hostile actors acting in bad faith.

863      119.      Plaintiff is the **Super Majority Shareholder** of MAXD, holding **a controlling**
864          **position of preferred shares** acquired lawfully and documented in corporate records,
865          SEC filings, and shareholder resolutions going back as far as 2017. These shares
866          provide Plaintiff with:

867          o   Voting control under Delaware law;
868          o   The right to appoint officers and directors;
869          o   Final authority on significant corporate actions.

870      120.      Despite this, **Defendants have publicly and fraudulently disputed Plaintiff's**
871          **ownership** and corporate control by:

872          o   Filing false or misleading legal pleadings;

- 46 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

873    ○  Circulating defamatory claims that Plaintiff was "removed" or "terminated" from

874        MAXD;

875    ○  Attempting to override legitimate share structure via court manipulation, false

876        board appointments, and insider conspiracy;

877    ○  Failing to honor the legal and financial separation of parties — specifically **Harvey**

878        **Vechery's full divestiture from Formula 4 Protocol and MAXD**, which was

879        executed and confirmed via promissory note and recorded conversation, then

880        fraudulently altered by Defendant.

881    121.    The manipulation of legal proceedings and distortion of governance structure

882        described herein rises to a **due process violation** under *Caperton v. A.T. Massey Coal*

883        *Co.*, 556 U.S. 868 (2009), where the Court held that **judicial outcomes influenced by**

884        **concealed or corrupt motives undermine constitutional fairness** and demand

885        reversal or nullification. When insider actors hijack judicial process to achieve what

886        they could not achieve through lawful governance, declaratory relief is not only

887        warranted — it is constitutionally required.

888    122.    These false claims have caused severe uncertainty within the public markets,

889        investor community, and business ecosystem. They obstruct Plaintiff's ability to

890        operate, represent, or grow the Company and sow confusion as to:

891    ○  Who rightfully holds authority at MAXD;

892    ○  Which shares are valid and enforceable;

- 47 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

893          o   Whether third parties can transact in reliance upon agreements signed by

894              Plaintiff.

895    123.      Moreover, this scenario presents an **equal protection violation** akin to *Yick Wo*

896    *v. Hopkins*, 118 U.S. 356 (1886), where unequal application of laws or administrative

897    power **to deny a lawful owner the benefits of his rights** constitutes unconstitutional

898    discrimination. Here, the Plaintiff was singled out for misinformation, denied equal

899    legal standing, and stripped of property rights through fraud and bad-faith procedure.

900    124.      Under **735 ILCS 5/2-701**, Plaintiff seeks **a judicial declaration of rights and**

901    **status**, specifically that:

902          o   Plaintiff Gregory J. Halpern is and at all relevant times was the **lawful CEO,**

903              **controlling shareholder, and authorized representative of MAXD**;

904          o   All shares of preferred and common stock issued to Plaintiff are **valid,**

905              **enforceable, and binding**;

906          o   The attempted takeover of MAXD by any Defendant, including through

907              **fraudulent court orders or stock manipulation**, is **null and void**;

908          o   Any statements, filings, or communications suggesting otherwise are **factually**

909              **and legally false** and must be publicly corrected.

910    125.      Illinois courts have broad equitable authority under **735 ILCS 5/2-701** to issue

911    declarations of legal rights where controversies exist regarding corporate control,

912    share validity, and executive status. Declaratory judgment is especially appropriate

- 48 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

913    where, as here, the confusion and falsity are harming not just the litigant, but the entire

914    shareholder base, investor market, and governance ecosystem.

915    126.    Declaratory judgment is necessary to:

916        o   End the uncertainty and controversy surrounding MAXD's control;

917        o   Restore proper governance and protect shareholder equity;

918        o   Provide fair notice to regulators, partners, exchanges, and investors;

919        o   Prevent further unlawful interference with Plaintiff's lawful role and property

920            rights.

921    127.    Plaintiff respectfully requests that the Court issue an Order:

922        o   Declaring Plaintiff's full legal rights and authority within MAXD;

923        o   Declaring void all adverse actions taken by any Defendants against Plaintiff's

924            role, shares, or public standing;

925        o   Directing Defendants to cease and desist all further interference,

926            misrepresentation, and disruption of MAXD governance.

927    128.    Without declaratory relief, Plaintiff will remain at ongoing risk of interference,

928    defamation, and unlawful dilution — in violation of both statutory equity and

929    constitutional protections of property, reputation, and lawful standing. Courts have

930    repeatedly emphasized that **restoration of status and prevention of continued harm**

931    **are central purposes of declaratory judgment statutes** such as §2-701 and

932    constitutional safeguards under *Caperton* and *Yick Wo*.

- 49 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 51 of 164 PageID #:131
Page 50 of 162

# COUNT VII – RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) – 18 U.S.C. §§ 1961–1964
(Against All Defendants)

129.  Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

130.  This cause of action is brought pursuant to the **Illinois RICO statute (720 ILCS 5/33G)** and is intended to be fully consistent with the structure and elements of the federal **Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968)**.

131.  Defendants formed an **association-in-fact enterprise** ("the Enterprise") composed of:

- Insider saboteurs (including **Harvey Vechery**, **Harold Blaisure**, **Michael Turner**, **Devine Mafa, Constance Nash**, and **Alfred Hildebrand a.k.a. Bill Nichols**);

- Financial market enablers (including but not limited to **Citadel Securities llc, Knight Securities**, **Virtu Financial**, **Cantor Fitzgerald**, **Canaccord Genuity, Charles Schwab & Co., E*Trade Securities llc, JP Morgan Chase & Co., Goldman Sachs Group Inc., Merrill Lynch; UBS Asset Management, Inc., Credit Suisse Inc. and Deutsche Bank Securities**);

- Information warfare facilitators (**Yahoo**, **InvestorHub**, and social media platforms);

- 50 -

954        ○   Unlicensed agents posing as legal professionals, corporate officers, and

955            shareholder advocates.

956    132.        The SEC, along with former commissioners Schapiro, White, and Clayton,

957            operated as **derelict regulatory gatekeepers** within the broader RICO enterprise.

958            Their deliberate refusal to investigate or prosecute obvious fraud, naked shorting, or

959            digital manipulation — despite direct complaints from Plaintiff — allowed the

960            enterprise to flourish and function. The SEC's internal obstruction of whistleblower

961            complaints, retaliation against independent auditors, and refusal to enforce Reg SHO

962            and Rule 10b-5 **constitute obstruction of justice and concealment of predicate acts**

963            under 18 U.S.C. § 1961(1), and enabled the RICO enterprise's continued attack on

964            Plaintiff and MAXD.

965    133.        RICO enterprises may consist of both legal entities and association-in-fact

966            organizations. As defined in *Boyle v. United States*, 556 U.S. 938 (2009), an

967            association-in-fact enterprise exists when a group of individuals functions as a

968            continuing unit with a common purpose — even if informal. The structure you've

969            described here — including insiders, digital facilitators, and financial institutions

970            acting in concert — **meets the Supreme Court's test for an enterprise under 18**

971            **U.S.C. § 1961(4).**

972    134.        The Defendants **knowingly and willfully conspired**, directly and indirectly, to

973            engage in a pattern of **racketeering activity** including but not limited to:

- 51 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 53 of 164 PageID #:133

Page 52 of 162

974      o   **Securities fraud** (counterfeit share issuance, naked short selling, and false

975          filings with the SEC);

976      o   **Wire fraud** (false narratives disseminated through digital platforms to

977          manipulate public markets and investor sentiment);

978      o   **Defamation, extortion, and intimidation** (targeted at Plaintiff and supportive

979          partners, with threats of legal destruction and personal ruin);

980      o   **Obstruction of justice** (by misleading courts with fabricated filings and

981          concealing insider interests);

982      o   **Identity fraud and impersonation** (individuals falsely presenting themselves

983          as company executives, attorneys, or whistleblowers);

984      o   **Tortious interference** (with MAXD's business contracts, partnerships, and

985          capital formation channels).

986   135.      The pattern of racketeering included **multiple related acts** within a 10-year

987     period, as required by law, including:

988      o   A fraudulent Schedule 13D delay and takeover strategy by Vechery;

989      o   Thousands of coordinated defamatory posts by Hildebrand and co-conspirators;

990      o   A forged employment and wage dispute by Mafa to fabricate standing;

991      o   Manipulated securities trading by Citadel and affiliated market makers to crush

992          MAXD's value to $0.000001;

993      o   Fake derivative lawsuits and fraudulent YouTube legal commentary

994          orchestrated by unlicensed aliases.

- 52 -

995      136.      Under 18 U.S.C. § 1961(1), predicate acts include **securities fraud (under 15**

996      **U.S.C. § 78j), wire fraud (18 U.S.C. § 1343), obstruction of justice (18 U.S.C. §**

997      **1503), and extortion (18 U.S.C. § 1951)**. The coordinated dissemination of false legal

998      claims, market misinformation, impersonation of legal officers, and strategic

999      obstruction of Plaintiff's governance rights clearly satisfy this threshold. As

1000      emphasized in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985), **civil RICO**

1001      **liability does not require conviction — only proof by preponderance that a**

1002      **pattern of racketeering activity caused harm**.

1003      137.      The **purpose and effect** of the RICO enterprise was to:

1004      o    Illegally depress MAXD's stock to allow insiders and market makers to **profit**

1005      **from short positions and regain control for fractional pennies**;

1006      o    Remove Plaintiff from corporate leadership to **steal intellectual property,**

1007      **cancel preferred shares**, and nullify lawful control;

1008      o    Damage Plaintiff's public reputation and access to capital through a

1009      premeditated digital smear campaign;

1010      o    **Frustrate SEC and investor oversight** by using anonymous aliases, burner

1011      entities, and platform TOS loopholes.

1012      138.      These acts are **ongoing**, pose a **threat of continued criminal conduct**, and

1013      were conducted with **intent to defraud, extort, and misappropriate corporate**

1014      **control and equity value** from Plaintiff and shareholders. The Supreme Court has

1015      stressed that a **pattern of racketeering** requires continuity and relatedness. *H.J. Inc. v.*

- 53 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 55 of 164 PageID #:135
Page 55 of 162

1016    *Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989), held that this element is met where

1017    the racketeering acts are not isolated, but rather form a **systematic campaign with**

1018    **open-ended potential for ongoing harm**. The multiyear coordination detailed here —

1019    with continuing defamation, asset concealment, and market manipulation — fulfills

1020    the continuity requirement and establishes enterprise intent beyond doubt.

1021    139.    As a direct and proximate result of this racketeering enterprise:

1022       o  Plaintiff has suffered the loss of control and effective ownership of MAXD;

1023       o  Over **$120 million in shareholder equity** has been obliterated;

1024       o  MAXD's brand and investor trust have been materially and unlawfully

1025          damaged;

1026       o  Plaintiff has incurred costs, legal expenses, emotional trauma, and reputational

1027          devastation.

1028    140.    Plaintiff demands the following relief pursuant to Illinois and federal RICO

1029    statutes:

1030       o  **Treble damages** for all economic losses sustained;

1031       o  **Equitable relief** to dissolve the influence and mechanisms of the enterprise,

1032          including declaratory orders and platform take-downs;

1033       o  **Asset forfeiture** of any profits or holdings obtained through racketeering acts;

1034       o  **Punitive damages** for the willful and systemic nature of the criminal

1035          enterprise;

- 54 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 56 of 164 PageID #:136

Page 55 of 162

1036       o   **Attorneys' fees and costs**, including future enforcement and whistleblower

1037         protections;

1038       o   Any other relief this Court deems just and proper under law.

1039    141.      Taken together, these facts meet every legal element required for RICO liability

1040      under both Illinois and federal law: a distinct enterprise, predicate acts, continuity,

1041      injury to property and business, and causation. Where civil RICO applies, the Court

1042      must order treble damages and consider equitable remedies under *Sedima* and *H.J. Inc.*

1043      to fully dismantle the criminal apparatus and restore lawful corporate order.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against All Defendants)

1044    142.      Plaintiff realleges and incorporates by reference all preceding paragraphs of this

1045      Complaint as though fully set forth herein.

1046    143.      Defendants, individually and in coordinated effort, engaged in **extreme,**

1047      **outrageous, and malicious conduct** intentionally calculated to inflict **emotional**

1048      **distress, public humiliation, reputational destruction, and personal isolation** upon

1049      Plaintiff.

1050    144.      The misconduct at issue exceeds all bounds of decency tolerated in a civilized

1051      society and includes:

1052       o   Public accusations of **mental instability**, **criminal fraud**, and **embezzlement**

1053         — all without basis or evidence;

- 55 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 57 of 164 PageID #:137
Page 56 of 163

- **Dozens of YouTube videos**, blog posts, and social media content **accusing Plaintiff of being a con artist, liar, and scammer**, posted by known aliases including Alfred Hildebrand a.k.a. Bill Nichols, Harold Blaisure, Michael Turner, Devine Mafa and Constance Nash;

- The repeated use of **anonymous accounts on Yahoo Finance and iHub to mock, threaten, and belittle Plaintiff**, including false claims of eviction, insanity, and corporate theft — over **60,000 times**;

- **False wage claims and fake lawsuits** engineered to harass, delay, and inflict emotional pressure during moments of personal crisis and legal vulnerability;

- Misuse of court systems, including the procurement of a **fraudulent default judgment** in California based on manipulated claims of shareholder harm and altered filings;

- The ongoing disruption of Plaintiff's **ability to sleep, work, function socially, or engage with investors and colleagues without fear of defamation, sabotage, or surveillance.**

145. Defendants' conduct was **deliberate**, **targeted**, and **ongoing** — driven by greed, retaliation, and a desire to erase Plaintiff from the corporate and public landscape using a playbook of digital violence, legal manipulation, and social annihilation.

146. This was not a one-off attack. It was a **multi-year psychological campaign** marked by:

- 56 -

        ○  Over **16,000 phone call attempts** by Defendant Harvey Vechery to harass and destabilize Plaintiff;

        ○  Leaked and manipulated recordings;

        ○  The triggering of PTSD from years of litigation abuse and professional sabotage;

        ○  False narratives spread to Plaintiff's family, colleagues, and stakeholders.

147.   Plaintiff's emotional distress was further aggravated by the willful indifference and retaliatory posture of the SEC and its leadership. Despite detailed and credible complaints from Plaintiff, including recordings, data, and documentation, the SEC refused to intervene, protect investors, or stop the coordinated destruction of Plaintiff's company. This dereliction, compounded by prior enforcement against MAXD's auditor for non-existent infractions, **created a sense of helplessness, state-sanctioned betrayal, and psychological torment**, contributing directly to the lasting emotional damage described herein.

148.   Plaintiff suffered, and continues to suffer, **severe emotional distress**, including:

        ○  Anxiety, depression, and trauma;

        ○  Insomnia, physical exhaustion, and paranoia;

        ○  Reputational ostracization in both professional and personal communities;

        ○  Long-term damage to his ability to work, earn income, and maintain health.

- 57 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

1095  149.    Under Illinois law, a claim for Intentional Infliction of Emotional Distress

1096       requires:

1097       o  **Extreme and outrageous conduct**;

1098       o  Intent to cause, or reckless disregard of the probability of causing, emotional

1099          distress;

1100       o  **Actual severe emotional distress** suffered by the plaintiff.

1101  150.    Illinois courts have long held that IIED requires conduct "so extreme as to go

1102       beyond all possible bounds of decency." (*Public Finance Corp. v. Davis*, 66 Ill.2d 85

1103       (1976)). The conduct need not be physical — reputational destruction, coordinated

1104       humiliation, and digital threats that result in anguish and trauma **can constitute IIED**

1105       when designed to break a plaintiff mentally and emotionally.

1106  151.    Defendants' conduct satisfies each element of this test. The lies, manipulation,

1107       harassment, impersonations, and relentless campaign against Plaintiff were:

1108       o  **Deliberate and sadistic**;

1109       o  Without legal justification;

1110       o  Intended to **cause lasting harm** emotionally, mentally, reputationally, and

1111          professionally.

1112  152.    This campaign mirrors what the U.S. Supreme Court warned against in

1113       *Goldberg v. Kelly*, 397 U.S. 254 (1970), which recognized that reputational

1114       destruction and loss of standing, especially without due process, **violates fundamental**

- 58 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 60 of 164 PageID #:140
Page 59 of 163

1115 **liberty interests**. Emotional distress inflicted under the color of judicial manipulation

1116 and targeted harassment raises serious constitutional concerns.

1117 153.    Plaintiff is entitled to recover:

1118    o   **General damages** for mental suffering and reputational trauma;

1119    o   **Special damages** for financial losses tied directly to the campaign of

1120        harassment;

1121    o   **Punitive damages** to punish Defendants' malicious conduct and deter similar

1122        schemes from being perpetrated on others;

1123    o   **Costs of suit and such other relief as this Court deems just and proper.**

1124 154.    Defendants' coordinated efforts — including death threats, impersonation,

1125 surveillance, and reputational mutilation — are not only outrageous under Illinois law,

1126 but **raise red flags under federal constitutional standards of personal security, due**

1127 **process, and equal protection**. Where emotional destruction is a goal, not a

1128 byproduct, liability is not just civil — it's structural.

## IX. CLAIMS FOR RELIEF

1129 Plaintiff seeks relief under the following legal claims, each supported by controlling statutory

1130 and judicial authority:

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 61 of 164 PageID #:141
Page 60 of 163

1131    1. **Fraud** — for Defendants' intentional misrepresentations, omissions, and concealment

1132       of material facts, causing catastrophic financial and reputational damage.

1133       *Supported by:*

1134          ○ *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) – defining materiality and reliance

1135             in securities fraud.

1136          ○ *SEC v. Zandford*, 535 U.S. 813 (2002) – establishing liability for fraudulent

1137             schemes connected to securities.

1138    2. **Securities Fraud** — for violations of federal and Illinois securities laws through

1139       manipulation of filings, failure to disclose insider ownership, false statements, and

1140       naked short selling schemes.

1141       *Statutory Basis:*

1142          ○ Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

1143          ○ 815 ILCS 5/12 (Illinois Securities Law)

1144             *Case Law:*

1145          ○ *SEC v. Zandford*, 535 U.S. 813 (2002)

1146          ○ *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)

1147          ○ Reg SHO violations (17 C.F.R. § 242.200)

1148    3. **Civil Conspiracy** — for Defendants' collective coordination of market manipulation,

1149       defamation, and corporate sabotage to seize control and profit unlawfully.

1150       *Supported by:*

- 60 -

1151        ○  *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102 (1999) – Illinois

1152            civil conspiracy standard.

1153        ○  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) – conspiracy resulting

1154            in judicial process manipulation.

1155        ○  *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) – unequal legal enforcement as

1156            constitutional violation.

1157    4. **Breach of Fiduciary Duty** — for insiders and former officers who betrayed their

1158      obligations to MAXD and its shareholders through deception, concealment, and

1159      malicious interference.

1160      *Supported by:*

1161        ○  *Steinmetz v. Kern*, 375 Ill. App. 3d 612 (1st Dist. 2007) – fiduciary standards in

1162            Illinois.

1163        ○  *Patrick v. City of Chicago*, 2011 IL App (1st) 101388 – aiding and abetting

1164            breach of fiduciary duty.

1165    5. **Defamation & Market Manipulation** — for the public dissemination of knowingly

1166      false claims, false impersonations, and trading practices intended to destroy Plaintiff's

1167      reputation and MAXD's value.

1168      *Supported by:*

1169        ○  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) – no First Amendment

1170            protection for defamatory falsehoods.

- 61 -

1171      o   *United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) – impersonation and online

1172           deception as criminal conduct.

1173      o   *SEC v. Zandford*, 535 U.S. 813 (2002) – market-based deception as a securities

1174           violation.

1175    6. **Declaratory Relief** — to legally affirm Plaintiff's control, invalidate fraudulent

1176      filings, and confirm the true corporate structure and governance of MAXD.

1177      *Statutory Basis:*

1178      o   735 ILCS 5/2-701 (Declaratory Judgment Act)

1179           *Case Law:*

1180      o   *Caperton v. A.T. Massey Coal Co.* – invalidation of compromised legal

1181           outcomes.

1182      o   *Yick Wo v. Hopkins* – right to fair and equal application of legal process.

1183    7. **RICO Violations** — for the formation and execution of a criminal enterprise spanning

1184      securities fraud, wire fraud, intimidation, and obstruction — all designed to defraud

1185      Plaintiff and shareholders of millions.

1186      *Statutory Basis:*

1187      o   18 U.S.C. §§ 1961–1964 (federal RICO)

1188      o   720 ILCS 5/33G (Illinois RICO)

1189           *Case Law:*

1190      o   *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) – civil RICO standard.

- 62 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 64 of 164 PageID #:144

Page 63 of 163

1191          o    *Boyle v. United States*, 556 U.S. 938 (2009) – RICO enterprise structure.

1192          o    *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) – continuity of

1193            racketeering activity.

1194     8. **Intentional Infliction of Emotional Distress (IIED)** — for the long-term

1195     psychological trauma, public shaming, reputational ruin, and personal harm caused by

1196     the coordinated attacks of the Defendants.

1197     *Supported by:*

1198          o    *Public Finance Corp. v. Davis*, 66 Ill. 2d 85 (1976) – IIED elements in Illinois.

1199          o    *Goldberg v. Kelly*, 397 U.S. 254 (1970) – reputational and personal liberty

1200            interests under due process.

1201    **X. PRAYER FOR RELIEF**

1202 WHEREFORE, Plaintiff Gregory J. Halpern respectfully requests that this Court grant the

1203 following relief:

1204     1. **Compensatory damages** in excess of **$120,000,000**, representing economic losses,

1205     diminished share value, lost opportunities, and reputational harm.

1206     *Authorized under:*

1207          o    Illinois common law tort recovery

1208          o    Federal securities law (Section 10(b) and Rule 10b-5)

1209          o    Civil RICO provisions (*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985))

1210      2. **Punitive damages** in an amount sufficient to punish and deter Defendants from

1211      engaging in similar conduct.

1212      *Supported by:*

1213          o   Illinois punitive damages doctrine where malice, fraud, or willful misconduct is

1214               proven (*Public Finance Corp. v. Davis*, 66 Ill. 2d 85 (1976))

1215      3. **Treble damages** under applicable **RICO statutes and securities laws** for willful and

1216      malicious racketeering activity.

1217      *Statutory authority:*

1218          o   18 U.S.C. § 1964(c)

1219          o   720 ILCS 5/33G-6

1220          o   *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229 (1989) – pattern of racketeering

1221      4. **Declaratory relief** confirming Plaintiff's ownership, control rights, and invalidating

1222      any and all unauthorized corporate actions, filings, or judgments obtained through

1223      fraud or collusion.

1224      *Supported by:*

1225          o   735 ILCS 5/2-701 (Declaratory Judgment Act)

1226          o   *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) – reversal of

1227               compromised legal outcomes

1228      5. **Equitable relief**, including:

- 64 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 66 of 164 PageID #:146
Page 65 of 109

- o **Removal or nullification** of fraudulent court rulings and SEC filings;

- o **Orders compelling retractions or takedowns** of defamatory content;

- o **Injunctions** against ongoing harassment, manipulation, or interference.

  *Authorized under:*

- o Illinois equitable authority and Rule 65 (injunction standard)

- o *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) – right to non-discriminatory legal

  access

6. **Restitution** of all profits, shares, or benefits obtained through unlawful acts by any

   Defendant.

   *Authorized under:*

- o Illinois restitution and unjust enrichment doctrines

- o Civil RICO forfeiture and disgorgement provisions (18 U.S.C. § 1964)

7. **Attorneys' fees, expert costs, court costs**, and all litigation expenses as permitted

   under law.

   *Authorized by:*

- o 18 U.S.C. § 1964(c) (RICO)

- o Illinois Consumer Fraud and Deceptive Business Practices Act

- o Rule 54(d) and Illinois Supreme Court Rule 219

- 65 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 67 of 164 PageID #:147
Page 66 of 162

1247    8. **Any other relief** the Court deems just, proper, and necessary to restore justice,

1248      shareholder rights, and public trust in the markets.

1249      *Consistent with:*

1250        o   The Court's inherent equitable powers

1251        o   Illinois and federal standards for full remedial relief

1252  **XI. DEMAND FOR JURY TRIAL**

This demand is made pursuant to **Article I, Section 13 of the Illinois Constitution**, and the

**Seventh Amendment to the United States Constitution**, which entitles litigants to jury

adjudication in all matters involving legal damages, tort claims, fraud, or constitutional

violations. The factual complexity, volume of reputational harm, and public interest in

restoring lawful market conduct all demand full transparency through a trial by jury.

**Respectfully submitted,**

 DATED at Spring Grove, Illinois, this 1st day of May 2025.

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## XII. EXHIBITS

1253

- 1254 Plaintiff hereby incorporates the following exhibits in support of the allegations and
1255 claims stated herein:

- 1256 **Exhibit A – Whistleblower Complaint to the SEC (April 22, 2022)** Filed via the
1257 SEC's Tip, Complaint, and Referral (TCR) system, this submission includes audio
1258 recordings, emails, screenshots, and evidence of coordinated fraud, defamation, and
1259 illegal trading behavior by insiders and external actors.

- 1260 **Exhibit B – FOIA-Sourced FOCUS Reports** Documents obtained through Freedom
1261 of Information Act requests showing broker-dealer undercapitalization, unresolved
1262 fails-to-deliver, net capital violations, and SEC awareness of manipulation practices,
1263 particularly relating to MAXD.

- 1264 **Exhibit C – MAXD Form 8-K (November 21, 2022)** Public disclosure filed with the
1265 SEC detailing the campaign of racketeering, insider sabotage, false lawsuits,
1266 cyberstalking, and market manipulation targeting MAXD and its leadership.

- 1267 **Exhibit D – MAXD Short Volume & Manipulation Report (June 13, 2018)** Press
1268 release and accompanying data proving that over 8.1 billion MAXD shares were
1269 illegally shorted in a single year—exceeding 40% of all trading volume—by Citadel,
1270 Virtu, Knight, and others.

- 1271 **Exhibit E – Trump Media Short Attack Documentation (2024)** Report of short
1272 selling attack against Trump Media & Technology Group, filed by Devin Nunes and
1273 referenced in congressional inquiry, illustrating a parallel campaign of digital
1274 counterfeiting, manipulation, and SEC inaction.

- 1275 These exhibits provide indisputable evidence of fraud, coordinated manipulation,
1276 regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 69 of 164 PageID #:149
Page 68 of 162

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## IN THE CIRCUIT COURT OF THE 22nd JUDICIAL CIRCUIT
## McHENRY COUNTY ILLINOIS

| IN RE CIVIL MATTER OF: | COMPLAINT FOR: DECLARATORY |
|---|---|
| GREGORY J. HALPERN | RELIEF, DAMAGES, AND DEMAND |
| Plaintiff, | FOR A JURY TRIAL |
| vs. | |
| CITADEL SECURITIES LLC; KNIGHT | COUNT I – FRAUD |
| SECURITIES; VIRTU FINANCIAL; CANTOR | |
| FITZGERALD; CANACCORD GENUITY; | COUNT II - SECURITIES FRAUD |
| CHARLES SCHWAB & CO.; E*TRADE | COUNT III – CIVIL CONSPIRACY |
| SECURITIES LLC; JPMORGAN CHASE & CO; | (Against All Defendants) |
| GOLDMAN SACHS GROUP INC.; MERRILL | |
| LYNCH; UBS ASSET MANAGEMENT, INC.; | COUNT IV – BREACH OF FIDUCIARY DUTY |
| CREDIT SUISSE INC.; DEUTSCHE BANK | |
| SECURITIES; DTCC (DEPOSITORY TRUST | COUNT V – DEFAMATION & MARKET |
| & CLEARING CORPORATION); HARVEY | MANIPULATION (Against All Defendants) |
| VECHERY; HAROLD BLAISURE; MICHAEL | |
| TURNER; CONSTANCE NASH; DEVINE | COUNT VI – DECLARATORY RELIEF |
| MAFA; ALFRED HILDEBRAND; INVESTOR | |
| HUB (IHUB); YAHOO; MARY SCHAPIRO; | COUNT VII –RACKETEERING INFLUENCED |
| MARY JO WHITE; JAY CLAYTON; THE | CORRUPT ORGANIZATION (RICO) |
| SECURITIES & EXCHANGE COMMISSION; | |
| AND DOES 1-100 | COUNT VIII - INTENTIONAL INFLICTION |
| Defendants. | OF EMOTIONAL DISTRESS |

# EXHIBIT A

Plaintiff hereby incorporates the following Exhibit A in support of the allegations and claims stated herein:

**Exhibit A – Whistleblower Complaint to the SEC (April 22, 2022)** Filed via the SEC's Tip, Complaint, and Referral (TCR) system, this submission includes audio recordings, emails, screenshots, and evidence of coordinated fraud, defamation, and illegal trading behavior by insiders and external actors.

- 1 -

This exhibit provides indisputable evidence of fraud, coordinated manipulation, regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

# Tips, Complaints, and Referrals
## Summary Page - Submitted Externally

Submission Number 16506-804-769-653 was submitted on Friday, April 22, 2022 at 07:47:29 AM EDT

This PDF was generated on Friday, April 22, 2022 at 07:53:52 AM EDT

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

Q: Please select the option that best describes your complaint.

A: Manipulation of a security

Q: Please select the specific category that best describes your complaint.

A: Other

Q: Please provide more information.

A: Since 2021 blatant abuse on Yahoo & iHub cost millions in MAXD market cap. I've got a huge inventory of market manipulation evidence by my biggest investor pre-meditating fraud with the help of career criminals. Hundreds of text messages, recorded audio & video unwittingly provided to me to a mobile device I own while conspiring to defraud our shareholders with 100% lies. I call them out & they just double down. As the sole compliance person, I'm not entitled to a reward but can assist you as needed. MAXD began to have its first sales in 2021 with Sony, QCOM etc. My 43 years building Microcaps led to billions in commerce & large ROIs. Michael Oxley was a big advocate of mine when he was alive. As the 1998 inventor of crowdfunding, I testified to his committee in 2001, House Finance Oversight & Investigations suggesting 2 offices both formed. Ombudsman & Office of the Advocate of Small Business. This may be a text-book market manipulation case for Enforcement with a valuable ROI.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 70 of 162

Page 1 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 71 of 162

# Tips, Complaints, and Referrals
## Summary Page - Submitted Externally

Q: Is this supplemental information to a previous complaint?

A: No

Q: In your own words, describe the conduct or situation you are complaining about.

A: SUMMARY: Since early 2021 blatant abuse on Yahoo & iHub cost millions in MAXD market cap. I've got a huge inventory of market manipulation evidence by my biggest investor pre-meditating fraud with the help of career criminals. Hundreds of text messages, recorded audio & video unwittingly provided to me to a mobile device I own while conspiring to defraud our shareholders with 100% lies. I call them out & they just double down. As the sole compliance person, I'm not entitled to a reward but can assist you as needed. MAXD began to have its first sales in 2021 with Sony, QCOM etc. My 43 years building Microcaps led to billions in commerce & large ROIs. Michael Oxley was a big advocate of mine when he was alive. As the 1998 inventor of crowdfunding, I testified to his committee in 2001, House Finance Oversight & Investigations suggesting 2 offices both formed. Ombudsman & Office of the Advocate of Small Business. This may be a text-book market manipulation case for Enforcement with a valuable ROI. THE LETTER BELOW FOCUSES ON ONE OF THE TERRIBLE PEOPLE INVOLVED IN THIS FRAUD ON THE COMPANY I FOUNDED MAX SOUND OTCPK: MAXD - WE ARE FULLY REPORTING AND I AM THE CURRENT CEO. THAT MAN IS DEVINE MAFA aka DIVINE MAFA. A VERY WEALTHY SHAREHOLDER OF MAXD IS HARVEY VECHERY OF BEL AIR CALIFORNIA. HE IS AT THE HEAD OF A GROUP OF VERY BAD ACTORS TRYING FOR THE PAST YEAR TO MANIPULATE THE ONLINE BASHERS INTO DEFAMING ME AND FORCING ME OUT. VECHERY IS A 13D FILER BUT HE WAS DELINQUENT AND IGNORED MY CONSTANT EFFORTS TO GET HIM TO FILE HIS INSIDER STATUS FOR SEVERAL YEARS WHILE HE INTERFERED MASSIVELY WITH MY MANAGEMENT AS I CAME TO FIND OUT RECENTLY. HAROLD BLAISURE aka JOHN BLAISURE WAS OUR FORMER CEO AND I HAD PREVIOUSLY TEMINATED HIM FOR CAUSE IN 2019 WHEN I DISCOVERED HE LIED ON HIS D & O QUESTIONAIRRE NOT USING HIS CORRECT FIRST NAME AND NOT DISCLOSING HIS PREVIOUS SECURITIES FRAUD PROBLEMS. ANOTHER ACTOR NAMED ALFRED HILDEBRAND aka BILL NICHOLS aka WILLIAM NICHOLS aka GADARDO BIE IS A VIDEO STOCK REVIEWER WHO IS PUTTING OUT VECHERY's LIES TO HARM ME AND THE COMPANY ON A DAILY BASIS FOR ALMOST A YEAR NOW. HE RECENTLY IMPERSONATED A LAW FIRM AND SAID HE WAS A LAWYER AND IS ONLINE SAYING HE IS SUING MY AUDITOR SAYING HIS AUDITS ARE FAKE, BUT NEVER EXPLAINS WHY. THEN THERE IS BILL TORREY aka BTX ON YAHOO AND MIKE TURNER OF GLOBEX TRANSFER, A PREVIOUS SECURITIES VIOLATOR AND HIS PARENT COMPANY GLENDALE SECURITIES PREVIOUSLY OF VARIOUS FINRA PROBLEMS. MIKE SHERMAN A SMALL TIME MICROCAP VIOLATOR IS ALSO WORKING WITH VECHERY. I HAVE SO MUCH MORE PURE EVIDENCE I HAVE LEGALLY COLLECTED FROM TRACING ALL OF THE ONLINE LIES THEY ARE ALL ENGAGED IN ON A DAILY BASIS THAT THIS COULD EVOLVE INTO A VERY LARGE CASE VERY QUICKLY. MAFA IS THE FOCUS BELOW AND THERE IS A BRIEF SUMMARY OF SEVERAL OF THE OTHER CHARACTERS MENTIONED, BUT SPACE WILL SIMPLY NOT ALLOW ME TO INCLUDE THE MASSIVE COLLECTION I HAVE. THE GIST IS THAT IN THE PAST SEVERAL MONTHS, AN INSIDER OF THEIR PLOTTED CRIMES HAS USED MY SECONDARY PHONE AND NUMBER TO COLLECT DIRECT PROOF OF AN INCREDIBLE BOLD ORCHESTRATION OF SERIOUS MARKET MANIPULATION. I HAVE BEEN A FULLY REPORTING MICROCAP MANAGER FOR ALMOST 43 YEARS. I HAVE NEVER SEEN ANYTHING LIKE THIS. THE COST TO MAXD AND ITS SHAREHOLDERS IS NO LESS THAN 20 MILLION DOLLARS BUT COULD PROBABLY SHOWN BY A WELL-REGARDED EXPERT I KNOW, TO BE UP TO 3 TIMES THAT AMOUNT. WHAT IS MOST PROFOUND IS THE ENDLESS

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 72 of 159

# Tips, Complaints, and Referrals

## Summary Page - Submitted Externally

ORCHESTRATED EFFORTS FOR THIS GROUP TO GIVE OUT 100% FAKE INFORMATION WITH NO PROOF AND NO VERIFICATION AND DOUBLING DOWN ON THE LIES EVERY TIME THEY ARE CALLED OUT. HERE IS JUST ONE OF THE MANY BODIES COLLECTED OF TOTAL PROOF IN THE CON-ARTISTRY THEY ENGAGE IN - (I HAVE 100s OF EXAMPLES OF EVERY CONCEIVABLE KIND OF HARD CORE EVIDENCE - TEXTS, AUDIO MESSAGES, VIDEO MESSAGES, VIDEOS MADE AND DISTRIBUTED, PHOTO'S, SCREEN CAPTURES, EMAILS, ETC.) April 20, 2022 To whom it may concern: According to Devine Mafa's recording he unwittingly supplied to me, he has you as his attorney in an effort to file an employment-related or wages complaint against me (Greg Halpern) or my Company Max Sound Corporation. Mafa is well-established as a life-time serial con-artist and now you have been noticed. He has unsuccessfully tried to defraud many credible professionals like yourselves by simply getting the right person to listen and then turning up his charm button for a minute. But you will see that he will soon start ranting without listening like a lunatic and never stop until you wise up and eliminate him as a client. Then he will disparage you online until he finds his next target sap. This letter is a comprehensive look into Mafa's pathetic, dangerous lifestyle and bad actor method of operation. Attached is one of the various recordings Mafa made of his discussion with a lawyer from your firm discussing the supposed matter contemplated herein and what Mafa should do next. Mafa sent it to me via a friend of mine who was using a phone owned by me and a phone number in my name that I pay the bill on every month. He recorded it and sent it from a phone I purchased for $1400 a year ago from an Apple store. That phone is also owned by me. I guess that means Mafa has killed his Attorney-Client Privilege with you in this matter. Mafa setting up his next con by fooling has attorney at Adam Reisner and King. www.canva.com/design/DAEfLpXi98/yVZPmLD9eZcSDd_33Qdprw/watchutm_content=DAEfLpXi9&utm_campaign=designshare&utm_medium=link&utm_source=publishsharelink 2 Also included herewith is a series of filthy pictures of Mafa online with no clothes on, that he posted with the name of his fraudulent company Hende Moto on a pillow next to him on a couch. You may want to call an attorney out of Chicago - Jason Keck. Mafa sued Keck's client for Racism. Mafa lost badly after stiffing his own lawyer by sending her a bogus check for the retainer but was able to waste a lot of people's time money and resources. And when his attorney withdrew, Mafa threatened her all over the internet, and her family to sue her for representing him for free, whereas he was continuously doing battle with her and never listened to a word she said. Then, there are a series of links and articles of some of the people he defrauded before I met him in early 2021 and since then. These are just a small part of the numerous con games that Mr. Mafa ran in the stock industry, committing stock fraud whenever possible, by pilfering from people as much as $200,000 that is trackable, and remains to this day in pursuit by those native Zimbabwe Africans who have gone through hell and high water trying to get Mafa to make good on his fraud. I haven't seen your alleged employment claim on behalf of Mafa that your attorney talks about on the attached recording. To be clear, Mafa never worked for me, and he never worked for Max Sound Corporation. He does appear in various places on the internet displaying a forged document. That is not my signature on any document because I've never actually completed a signed document with Mafa. Prior to his arrival Mafa was referred to me by a man named Alfred Hildebrand alias Bill Nichols or Bill Nichols, William Nichols, alias Alfred Hildebrand, who is an internet video stock promoter supposedly, but in reality, he is a stock market manipulator and he and Mafa and several other people be whistle blown by me at the Securities and Exchange Commission this week where I hope for a rapid and full blown enforcement action to stop these frauds, which are numerous and rampant. Mafa never came to me as a black slave or otherwise. He was referred to me by Mr. so-called aka Hildebrand aka Nichols, as somebody who wanted me to mentor them. And when he bragged about all the people he knew in Zimbabwe and all the massive wealth that they had, I flew him in to see me just as I would any other business associate, potentially, that for 43 years I have successfully done at a very high level of building new emerging technologies. Mafa flew to me first class, I picked up the tab for that and many of his bad debts, which were numerous and endless. And the cost to me to board him in high style over about a five-month span was incredibly significant, close to $60,000. Needless to say, he lived at my home, a resort like mansion in the San Diego area near the Rancho Santa Fe part of town. Mafa lived like a prince and a king and was never asked

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 72 of 162

Page 3 of 16

to do anything. Mafa setting up his next con by fooling has attorney at Adam Reisner and King. Mafa announces how happy he is living rent-free like a king for 4 months at Greg's house in paradise. Mafa sings "I LOVE MAXD" and praises Greg Halpern as his mentor. www.canva.com/design/DAEfLpXi98/yVZPmLD9eZcSDd_33Qdprw/watchutm_content=DAEfLpXi9&utm_campaign=designshare&utm_medium=link&utm_source=publishsharelink In particular, he claimed that he wanted to be mentored, although the mentoring consisted of me sending him to Las Vegas, where I showed him what to do to win an award for a car that he claims to have designed, but actually was designed by a fellow out of the UK that I paid almost $10,000 to over a period of time, and also assisted in the design work myself, because Mafa didn't do anything more than kindergarten, coloring book type drawings which I also have in my possession. He learned my presentation verbatim and won the award 100 top leaders in Transportation and Automotive. When I say verbatim, I have the 15 minutes of video recordings I made and handed him before he went and won the award using my words to the letter. Mafa made many representations about his company in Africa, which all proved to be completely false and based on fraud and cons and 100% lies. When Mafa was at my home, all he did was smoke pot continuously and do everything in his power to get me to try to communicate a positive message about him to all the people that couldn't stand him, including his own father, who had disowned him back in Africa. Although that doesn't stop him from using all their names, as soon as he put me on the phone with these people, they were interested in what I had to say. And after Mafa left a few months later, he then called all these people and disparaged and defamed the hell out of me. I had to rebuild whatever relationships I had built myself. Fortunately for me, I have a 43-year track record of successes and even Mafa admits that on many recordings he unwittingly gave me where his plot against me with various people on numerous fronts are exposed completely. I have all of his dozens of long recorded conversations he had with people to try and extort money out of me. There are many more also of Mafa of perpetrating his frauds and planning the current fraud that he's fooled you into helping to perpetuate. I provide this to you a free of charge on the basis that you need to go back and start all over and do your research on this man, because now what I've given you is several cons that he did on other people and that he is using you for this con. I've given you a lawyer that went against him in his so-called racism case, which wasn't a racism case at all. And this is a pattern by Mr. Mafa. He really is of the lunatic fringe. He really doesn't have anything meaningful to talk about unless it is his crimes and frauds. Mafa is able to fool you initially here like he did to me last year, until by October, I was tired of having to pay his $200 a day marijuana bill because he smoked like a chimney until he coughed all day long and hacked up his guts constantly. You won't have to take my word for it. The person he thinks he's relying on is a witness for me, and my issues with Mafa. Not in reverse. That party has rightfully concurred on all of the audio recordings that they gave me. By voluntarily sending them to this other party, this other party has done an affidavit refuting everything Mafa says, especially refuting all his sexual allegations. Any sexual talk by Mafa is his own depraved disgusting fantasy. I had no physical or sexual contact with Mafa about anything other than his own obsessions with being gay except he attacked me before I booted him. Mafa hounded me continuously until I had lost over $1,000 bringing a woman to San Diego that he claimed to have become friends with in Las Vegas. She came really for a vacation, and she ignored Mafa the whole time, later confiding in me, and my other guest, who's a witness to all Mafa's lies and antics that she wasn't with him because he didn't like contact with women. Mafa claims I have drug problems. I have no drug problems and Mafa never saw me do any drugs. He did however have massive drug problems for a long time and bragged constantly about celebrities he claimed to buy drugs for. He also claimed to be engaged to Janet Jackson, however after he was gone, I confirmed with Jackson's agent she never had even heard of him. He noted that before he came here from Philadelphia, he was already flat broke, he was already in hock up to his eyeballs. And when he came to me, we never once discussed him having a paid employee position or a job of any kind. My cost boarding him and the money I paid into his account directly in the thousands and thousands of dollars relate to him needing money for endless problems, and that money would go out the window as fast as it would go into his account, there would be a shortfall because he had every kind of bill collector after him all day long, day and night. Later he conned my girlfriend out of close to $1500. He told my biggest investor that I was

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 73 of 162

Page 4 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# Tips, Complaints, and Referrals

Summary Page - Submitted Externally

trying to poison him when I would bring that person vitamins. I'm in my 60s, and that man is in his 80s. Mafa knew full well when he came to me that I was a health expert. In fact, Mafa thought he was having a heart attack all the time. But I cured him in the first two days after his arrival with some natural herbs used for heartburn, because that's what he was in realty having - acid reflux and heartburn. Mafa knows that I don't have any drug issue. He knows that he has severe drug issues. He knows that there was nothing untoward going on at the house. And he knows that he was never hired for any job. Mafa has been harassing me online over his desperate need to get money any way he can. Mafa's own friend, or supposed friend, who said he could no longer stand talking to Mafa over the last several years, was amazed at how me mentoring him even on a limited basis had helped make Mafa tolerable as a person. But forget about that man because he has already given me his statement as well. He's a native Zimbabwean who has noted that Mafa has gone off the deep end since he left, after I kicked him out. I never made him any kind of slave. After Mafa left, he did his utmost to try to harm the relationships I built from his few introductions. To get him out the door I paid him $1,200, so he could take a $300 flight back to Memphis and gave him another $1,000 in cash out of my pocket, because he claimed he needed it to go fix his roof. Then when he got back, he was telling me that I harmed him. And then he started all these lies, including going online and saying that my biggest investor was going to hire him to replace me as the CEO of the company. My biggest investor may have been working with him at that point. But my biggest investor couldn't stand him and goes back and forth between talking to him and then disparaging him. But Mafa and a few other conspirators out there on the internet are in an orchestrated campaign to tear me and my company down. And I want to make sure that you and your partners are alert to whoever's doing your due diligence and research because you haven't done that. And this will be a case of numerous shareholder complaints to the Department of registration and education or licensing in California for attorneys who don't seem to do a job, they simply just listen to whatever ranting the lunatic client says. And then they go file claims all over the place with the hope of collecting some money. That's not going to happen here. You can file whatever you want. But I'm telling you a minute later, you'll have an affidavit proving this is another premeditated fraud Mafa got them involved in. I'll make a motion for summary judgment after complaints are filed on behalf of me, my company and my shareholders. I will notify all the powers that be, and I'm well connected politically. That's not a threat. I'm just saying that I'm going to have to use my resources and waste my time on something I don't even want to do. But I'm hopeful that you guys will hear the call here and you'll do some real research on this nut job. He's a man of bizarre actions. There's so many aspects to Mafa's 100% lies. There isn't any factual basis for anything he says. And he's made a habit of chronically lying and putting this garbage out on the internet. A black slave? No. I'm the least racist person in America based entirely by my actions and my friendships and my 43 years of great business experience. I don't have a single accusation of anything even close to that and I've been taking down bullies for a good deal of my career that's been a side note to all of this. Mafa did attempt to poison me, and I have proof. He took a run at me when I wasn't looking and fortunately for me, and unfortunately for him, I'm a well-schooled, well-trained world-gold-medalist black belt, who developed my own martial arts system and train Navy SEALs here in San Diego, how to defend themselves. I trained many early MMA fighters and Ronda Rousey was at my dojo training for the Olympics in judo before she was the MMA champion. And when Mafa took a run at me, I saw in the corner of my eye, I body slammed him, choked him and put some pressure on his arm showing that I could break his arm too. After he was done crying, I let him up. And, of course, he's been running around the internet trying to tell anybody that will listen that it happened in reverse. To that I say, I made it a habit of bad people being given that challenge any place anytime they want. As long as they signed my release, they can bring nine criminals if they want, and put us all on an octagon. I've lost 22 times in 738 fights. I've never lost in my 37 street fights when it was Fight Club. He didn't do any cooking or cleaning or anything. In fact, he was a slob. He had to be cleaned up after because he was not even a little hygienic. He was a menace, really, to the whole environment. And when he had worn out his welcome, I gave him four times the money he needed in transfers, and then another $1000 on top of that, to add to the nearly $60,000 that I already spent fixing his problems and paying for his bills, and feeding him and housing him in paradise, you know, in a 6500 square

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 74 of 162

Page 5 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

foot resort, with every amenity you'll ever see in San Diego, two and a half acres of walled in amenities, so he was never a slave, he was never even helpful. He was nothing but a menace. And, meanwhile, Mafa stole money and tried to con every single person that came into my home for different business reasons. He was relentless at doing that. And he was relentless at trying to file claims. And he was relentless at lying. He may be the worst serial liar I've ever met in my entire life. And so I hope you take a hard look at the track record of this man. Because what you're embarked on is fools-play. There's been no employment and he never did a day's worth of work that anyone could ever identify for any reason. Putting people on a few phone calls with some context is not work. He wasn't hired to do that. That's what he claimed he could do to pay for his being mentored and being boarded at an extreme cost of my money. Mafa didn't have a penny to his name ever. By the way, Mafa accuses every single person of being a racist if you don't hand him money to prevent him from starving. Maybe he should just go on welfare. He's furthermore been arrested for sexual assault or sexual abuse or assault and battery to a woman who he now lives with named Lois. Now, I've notified you and provided you with substantial evidence of this man's lunacy. Should you go forward, I'm going to definitely file a complaint against your firm for whoever in California is doing licensing of attorneys. And it would be with the hope that you would receive disciplinary actions for not at least doing any research on the man you're representing. This is a very, very dangerous person. And ironically, I told you, he tried to poison me before he left. And it so happens I have anecdotes for stuff like that. And I knew within five minutes what he had done. So he was kind of surprised when I appeared 10 minutes later, appearing normal. But when he left, he told my biggest investor that I was trying to poison him over a long period of time, because as he claimed, I wanted the man dead, which is obscene. In 43 years of business in the public capital markets as a fully reporting Officer of fully reporting ventures 11 times, I have never once been pursued by any disciplinary action. And Mafa himself made a report to the SEC about me. Over the years I have worked with well with regulators to assist them in any request they have had. I'm the inventor of crowd funding, among many other things, you can see my background, just a smattering of it in the hundreds and hundreds of articles and videos and shows on national TV including Oprah and many other major shows. You can see that at GregsonTV.live As already mentioned, in 43 years of successful business, I've never had any disciplinary action or been personally sued. I certainly will hope that there will be an SEC investigation into Mafa's activities with several alleged people on the online boards, where he has tried to illegally orchestrate my takedown through market manipulation and defamation based 100% on lies. You will be peripheral to that investigation if you are helping him perpetrate his latest scam. And so good luck to you, I don't wish you any harm. I'm not here to huff and puff and blow your house down. I'm here to hopefully alert you, so you don't make the same mistake that a lot of people have made being hoodwinked by this total con-artist. I have not met one person who can stand him or that he has not attempted to con. And it's just the way it is. He's a man of great evil and tremendous con artistry. Feel free to call or text me at 847-565-9732. Best regards, Greg Greg Halpern Frank Justen Chatonda, [Oct 12, 2021 at 6:33:01 AM]: Yo Greg I hope all is well. Just heard from our brother, he is not a happy camper! I am sure you know as he is back in Memphis. I hope you find an amicable solution. I was so happy, as it looked like you both were headed towards great things, Frank www.youtube.com/watch?v=0sD5dGWB8ys Gregory Halpern, [Oct 14, 2021 at 8:52:57 PM]: Below is pure evidence of just a few of the things I built for Devine to have a real future… The things he said in these public videos, articles, shows and interviews are all engineered and paid for in their entirety by me and collectively it proves beyond any doubt that what he is telling you now are all really bold and big fat lies that are totally contradictory of any truth and based only on easily found publicly available facts. Early in 2021, Devine reached out to me, all but begging me to mentor him. I had never heard of him prior. I liked his story and saw value even though he was full of endless anguish and seemed to not be able to let go or move on from numerous past mistakes he had made for many years and unbeknownst to me Devine was still doing on a routine basis. When I flew him to me first class with my own money, it was based on him doing and saying all sorts of grand things continuing on endlessly with him quite falsely proclaiming his own wonderfulness, brilliance and success. Unfortunately, as I ultimately learned, he has primarily only a very dismal past, that involve many people saying

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 75 of 162

Page 6 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

that Devine cheated them out of a lot of money and gave them endless grief. I have well-documented Devine's difficulties and trouble making in great detail and have recently received substantially more damning information from several additional victims who are incredibly angry with him. Like me, these other people who were involved with Devine in the past, all saw hope that he had changed his ways with me holding him to a much higher standard, and I actually am the only one who took care of him in the last 5 months. I always made it clear to him that anything he was to gain from our relationship, was always contractually contingent on his positive role in each opportunity and definitively based on the performance of specific milestones beneficial to the business relationship. He never achieved the things he promised MAXD and me, so fortunately we can unwind any components necessary to the going forward business, of which many of those MAXD assets are now poised for great success thanks to the unselfish efforts of many other people. Devines equity, which he is continually lying about me supposedly not granting, was granted pursuant to a specific agreement, that is still pending, and requires performance that yields value which the company book. However, he has been on a rant recently that he is owed such interest without the required performance. There will actually be an entry in the upcoming quarterly filing, demonstrating I kept my promise just as I have without exception during my entire 42-year career in these arenas. That said, the stock will be held up indefinitely on the books of the Company, and never issued to him so that he can profit from it, if he fails to end his absurd campaign against me based solely on lies and delusions. This is my required role so that I can protect all shareholders as I have always done throughout my rich, happy and enjoyable 42-year career. At the same time, I will, if it ever becomes necessary, encourage and even join my other 20+ thousand shareholders against him, if he doesn't cease his very sad and completely self-destructive behavior pretty soon. Even though I gave Devine plenty of cash money totaling thousands and thousands of dollars, I did not actually owe him anything at all and I have hard proof of that fact. Yet simultaneously, he has no proof whatsoever of his baseless contention that I owed him anything and that was never part of the relationship except based on future success in our joint venture. Sadly, every single time I would put money in his account, it would show up as significantly less because he always carried a short fall due to money being sucked out every single week because so many people are always running after him for promises he made but never kept. I have an incredible inventory of clean documented examples of who Devine took advantage of, for how much, as well as the when, where and how details. He seems clueless as to the further shame is most definitely going to bring to himself and his family, who will be next on my list to receive this letter. Even though I have had no obligation to help him financially, I supported him in real luxury for months at my home where he lived at the highest level and it cost me well into 60k to actually create his project, win his global award titled 100 Top Leaders in Transportation and Automotive, and create an ownership interest in the joint venture that can create endless wealth for him forever. I handled for him with great success - endless personal problems with family, with love relationships he had destroyed but wanted to rekindle, legal problems of all shapes and sizes and years and years of deceptive behavior he had engaged in quite shamelessly. The cost of this is well beyond the cash outlay I invested to help this man rebuild his life who nearly all people saw as a total waste of talent. For him to now falsely and without any justification, try to blame me for his disturbed emotional state, and to wrongly try to make me his scapegoat and try to extort money out of the only person who has helped him in a long time, is a fairly remarkable turn of events bound to insure his own continued failure. I have already clearly cautioned Devine that all of his actions here, or his recipe he is using to find a solution to his endless self-created problems, is 100% self-destructive and has no chance whatsoever for success. Instead, I have advised him that it will most assuredly lead to his own sad but predictable demise. He is like the person taking poison and then expecting someone else to die from it. I have given this letter to Devine so that he knows what I am sending anyone who has questions about Devine contacting them and trying to sell him these total pack of premeditated and fraudulent lies. In each case he has annoyed those people, who have all called me thereafter and said they know beyond any doubt that Devine is acting very badly and that they have advised him against what he is doing but it is clear to them that he will not listen to any truth at all that differs with his completely false narrative. There is so much more to Devine's problems, distortions and difficulties but I keep that safely tucked away, if ever it

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 76 of 162

Page 7 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 78 of 164 PageID #:158
Page 77 of 163

should be needed, and I truly wish Devine a great outcome in all things and have the hope that he understands he will benefit if he stops his bad acting but will not if he doesn't. Gregory Halpern, [Oct 14, 2021 at 9:03:49 PM]: vimeo.com/564324930 Devine Mafa, Top 100 Leaders In Transportation & Automotive Award, conferred at ITAS held at MGM Grand, Las Vegas, NV on June 29 - July 01, 2021. www.youtube.com/watch?v=WsMhtAA60V0

Q: Are you having or have you had difficulty getting access to your funds or securities?

A: Unknown

Q: Did you suffer a loss?

A: Yes

Q: Enter amount of loss to nearest dollar without characters (e.g., 15000, not $15,000.00).

A: 20000000

Q: When did you become aware of the conduct? (mm/dd/yyyy)

A: 05/11/2021

Q: When did the conduct begin? (mm/dd/yyyy)

A: 02/21/2021

Q: Is the conduct ongoing?

A: Yes

Q: Has the individual or firm acknowledged the conduct?

A: No

Q: How did you learn about the conduct? You may select more than one answer.

A: Conversations; Internal business documents; Publicly available information; Social media (e.g., Facebook, Twitter, blogs, chat rooms, and electronic communities of interest); Stock tip sheet or newsletter

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 77 of 162

Page 8 of 16

# Tips, Complaints, and Referrals
## Summary Page - Submitted Externally

Q: Have you taken any action regarding your complaint? You may select more than one answer.

A: Complained to other

Q: Provide details.

A: The above situation I described in my own words is just a small sample of hard evidence I have been collecting from those committing the crimes and market manipulation activities literally every day. I will attach more in the about section.

## Who are you complaining about?

Subject # 1

Q: Are you complaining about a person or a firm?

A: Person

Q: Select the title that best describes the person or firm that you are complaining about.

A: Other

Q: For Other Person, please specify.

A: A VERY WEALTHY SHAREHOLDER OF MAXD IS HARVEY VECHERY OF BEL AIR CALIFORNIA. HE IS AT THE HEAD OF A GROUP OF VERY BAD ACTORS TRYING FOR THE PAST YEAR TO MANIPULATE THE ONLINE BASHERS INTO DEFAMING ME AND FORCING ME OUT. VECHERY IS A 13D FILER BUT HE WAS DELINQUENT AND IGNORED MY CONSTANT EFFORTS TO GET HIM TO FILE HIS INSIDER STATUS FOR SEVERAL YEARS WHILE HE INTERFERED MASSIVELY WITH MY MANAGEMENT AS I CAME TO FIND OUT RECENTLY. HAROLD BLAISURE aka JOHN BLAISURE WAS OUR FORMER CEO AND I HAD PREVIOUSLY TERMINATED HIM FOR CAUSE IN 2019 WHEN I DISCOVERED HE LIED ON HIS D & O QUESTIONNAIRE NOT USING HIS CORRECT FIRST NAME AND NOT DISCLOSING HIS PREVIOUS SECURITIES FRAUD PROBLEMS. ANOTHER ACTOR NAMED ALFRED HILDEBRAND aka BILL NICHOLS aka WILLIAM NICHOLS aka GADARDO BIE IS A VIDEO STOCK REVIEWER WHO IS PUTTING OUT VECHERY's LIES TO HARM ME AND THE COMPANY ON A DAILY BASIS FOR ALMOST A YEAR NOW.

Q: Where is the person that you are complaining about employed?

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 78 of 162

Page 9 of 16

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

A:  THEY ARE SMALL BUSINESS OWNERS, the leader Harvey Vechery is said to be worth $200 million

Q: Are you or were you associated with the person or firm when the alleged conduct occurred?
A:  Yes

Q: How are you or were you associated with the person or firm you are complaining about?
A:  Harvey Vechery is a large shareholder always involving himself in the challenge's we faced everyday. He seemed to always be helpful but I now am quite clear that it was a cover for him to interfere behind the scenes with plots and schemes to take over and hurt the value to discredit me. I even discovered recently he was giving people money and telling them how and when to invest in the company at market.

Q: Person's Title
A:  Mr

Q: First Name
A:  Harvey

Q: Middle Name
A:  Thomas

Q: Last Name
A:  Vechery

Q: City
A:  Bel Air

Q: State / Province
A:  CALIFORNIA

Q: Country

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 79 of 162

Page 10 of 16

**Tips, Complaints, and Referrals**

Summary Page - Submitted Externally

A:  USA

Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?

A:  No

## Which investment products are involved?

Q: Select the type of product involved in your complaint.

A:  Equities (e.g., common stock, preferred stock)

Q: Please select the category that best describes the security product.

A:  Common stock (traded over-the-counter, including microcap and penny stock)

Q: Enter the ticker symbol, if known.

A:  MAXD

Q: Enter the product name(s)

A:  MAXD-AUDO, MAXD-BIOMETRIC

## About you

Submitter # 1

Q: Are you filing this tip under the SEC's whistleblower program?

A:  Yes

Q: Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?

A:  No

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 80 of 162

Page 11 of 16

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 82 of 164 PageID #:162

Q: Title
A:  Mr

Q: First Name
A:  Gregory

Q: Middle Name
A:  J

Q: Last Name
A:  Halpern

Q: Mobile Telephone
A:  847-565-9732

Q: Email Address
A:  greg@maxsound.com

Q: What is the best way to reach you?
A:  Phone

Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?
A:  No

Q: Select the profession that best represents you.
A:  Other

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 81 of 162

Page 12 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# Tips, Complaints, and Referrals
## Summary Page - Submitted Externally

Q: For Other, please specify.

A: CEO OF OTCPK: MAXD

Q: Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?

A: No

Q: Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?

A: Yes

Q: If you answered "Yes," please provide details.

A: I HAVE SQUARED OFF WITH THE BAD ACTORS AND WARNED THEM TO STOP, OR I WILL FILE THIS COMPLAINT. ALL THEY DO IS DOUBLE DOWN, MAKE UP MORE LIES, AND KEEP SAYING ON LINE THAT I WILL BE SUED, TERMINATED AND GO TO JAIL. WHEN I ASK THEN HOW THAT WILL HAPPEN, THEY JUST MAKE MORE BLANKET STATEMENTS BASED ON MORE RIDICULOUS LIES AND KEEP SPEWING THEM MORE AND MORE AGGRESSIVELY.

Q: Has anyone taken steps to prevent you from reporting this violation to the SEC?

A: No

Q: Are documents or other information being submitted that could potentially identify the whistleblower?

A: No

Q: Does the whistleblower want to be eligible to apply for a whistleblower award?

A: Yes

Q: 1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 82 of 162

Page 13 of 16

# Tips, Complaints, and Referrals
Summary Page - Submitted Externally

Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?

A: No

Q: 2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(52))?

A: No

Q: 3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?

A: No

Q: 4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?

A: No

Q: 5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?

A: No

Q: 6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?

A: No

Q: 7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?

A: No

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 83 of 162

Page 14 of 16

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

Q: 8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?

A: No

Q: I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

A: Agree

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 84 of 162

Page 15 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# Tips, Complaints, and Referrals
## Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
| --- | --- |
| MAFAFAKECLAIM.pdf | application/pdf |
| BLAISURE.zip | application/zip |
| ALFREDLAWYERIMPERSONATOR.m4a | audio/x-m4a |
| MOREFAKELAWYER.jpeg | image/jpeg |
| HaroldB-6-aka-JohnBlaisure.pdf | application/pdf |
| JB-StockFraud.pdf | application/pdf |
| HarveyFraudNoReply.zip | application/zip |

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 85 of 162

Page 16 of 16

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 87 of 164 PageID #:167



# Damaging MAXD Shareholders

## The Vechery Attacks

**In the November 21, 2022, S.E.C. 8K filing, Halpern had stated that -** Due to the chronic and relentless interference by Vechery, and his team of lawbreakers, that's all that the Company will release on the subject at this time.

**And** The Company humbly submits that it will file its anticipated timing to return to a fully reporting status on or prior to May 19, 2023, along with updated audited accounting suitable to PCAOB rules and any other relevant regulatory compliance.

**Also, in the 8K filing, Halpern had stated** that As the company's CEO, I have consistently stated for legitimate shareholders who are interested only in reality to know the exact documented and factual truth on any matter called into question that the Company believes necessitates a response. My unblemished 43-year business track record stands the test of time. At https://ChannelGreg.com, a fraction of my large inventory of accomplishments can be viewed as a small but meaningful part of the global digital multimedia record and ecosystem, including parts that I helped create.

**Also, in the 8K filing, Halpern had stated** Harvey Vechery has a well-documented strategy, already proven by his very own digital record as premeditatedly fraudulent. It centers around Vechery trying to illegally steal my super majority preferred shares which I rightfully received from my Chapter 7 liquidation. For the past two years, Vechery has established on the record that he will spend whatever time and money that it takes to fraudulently spread lies that he knows, in fact, have already been proven 100% false by his own substantial digital trail of racketeering, orchestrated market manipulation, intentional long-term violations of insider filing requirements and while trying in vain to hide decades of his own excessive financial failures.

**Also, in the 8K filing, Halpern had stated** The Company, and I, have always followed the rules to the letter of the law and this will continue to be proven 100% true. What has also been proven, is that Vechery has hired and employed the worst of his hired kind which is beginning to result in the collective demise of Vechery and his team of paid bashers. Since they have zero truth on the side of their proven criminal records and shamelessly bizarre behavior, they are now losing the fake legal battles they previously promoted each week for more than the past year as the supposed end of my Contractual Leadership Position and Stock Ownership that I paid and invested real money to acquire at an enormous loss currently and that Vechery is on record during my personal bankruptcy stating that my preferred shares have to remain with me.

**Also, in the 8K filing, Halpern had stated** That, for all of that, he and his team have relentlessly barraged the public with knowingly false accusations, providing no legitimate evidence whatsoever and routinely demonstrating a below-kindergarten-understanding of securities law. On just the MAXD Yahoo board, there are 21,000+ posts, mostly just from a handful of the same people, primarily repeating the same no-proof general accusations and guaranteeing my demise each week during the last 18 months. Alfred states that he will not stop his criminal activity until the day he dies. Alfred recently responded to the news that Vechery's hospitality business partner, in what was billed as the biggest Ponzi scheme in the history of Las Vegas, had recently begun to serve his life in-prison sentence and that their business address had listed, among other things warrants for arrest and registered sex offenders.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 88 of 164 PageID #:168
Page 87 of 163

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## IN THE CIRCUIT COURT OF THE 22nd JUDICIAL CIRCUIT
## MCHENRY COUNTY ILLINOIS

| | |
|---|---|
| IN RE CIVIL MATTER OF:<br>GREGORY J. HALPERN<br>Plaintiff,<br>vs.<br>CITADEL SECURITIES LLC; KNIGHT SECURITIES; VIRTU FINANCIAL; CANTOR FITZGERALD; CANACCORD GENUITY; CHARLES SCHWAB & CO.; E*TRADE SECURITIES LLC; JPMORGAN CHASE & CO; GOLDMAN SACHS GROUP INC.; MERRILL LYNCH; UBS ASSET MANAGEMENT, INC.; CREDIT SUISSE INC.; DEUTSCHE BANK SECURITIES; DTCC (DEPOSITORY TRUST & CLEARING CORPORATION); HARVEY VECHERY; HAROLD BLAISURE; MICHAEL TURNER; CONSTANCE NASH; DEVINE MAFA; ALFRED HILDEBRAND; INVESTOR HUB (IHUB); YAHOO; MARY SCHAPIRO; MARY JO WHITE; JAY CLAYTON; THE SECURITIES & EXCHANGE COMMISSION; AND DOES 1-100<br>Defendants. | COMPLAINT FOR: DECLARATORY RELIEF, DAMAGES, AND DEMAND FOR A JURY TRIAL<br><br>COUNT I – FRAUD<br><br>COUNT II - SECURITIES FRAUD<br><br>COUNT III – CIVIL CONSPIRACY (Against All Defendants)<br><br>COUNT IV – BREACH OF FIDUCIARY DUTY<br><br>COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants)<br><br>COUNT VI – DECLARATORY RELIEF<br><br>COUNT VII –RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO)<br><br>COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

# EXHIBIT B

Plaintiff hereby incorporates the following Exhibit B in support of the allegations and claims stated herein:

**Exhibit B – FOIA-Sourced FOCUS Reports** Documents obtained through Freedom of Information Act requests showing broker-dealer undercapitalization, unresolved fails-to-deliver, net capital violations, and SEC awareness of manipulation practices, particularly relating to MAXD.

- 1 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

This exhibit provides indisputable evidence of fraud, coordinated manipulation, regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# FORM X-17A-5

UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FOCUS REPORT

(Financial and Operational Combined Uniform Single Report)

# PART I

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0123 |
| Expires: | August 31, 2020 |
| Estimated average burden hours per response......12.00 | |

*(Please read instructions before preparing Form.)*

| Name of Broker/Dealer | As of (Month/Day/Year) |
|---|---|
| | |

Address of Principal Place of Business

| (No. and Street) | (City) | (State) | (Zip Code) |
|---|---|---|---|

# INSTRUCTIONS
## Schedule A – Routine Report

1. **Subordinated Loan Agreements** — (As Defined in Appendix D, Rule 15c3-1) — Enter the total amount of cash obtained pursuant to subordinated loan agreements in effect at the report date. This item corresponds to the same item number in Parts II and IIA.

2. **Secured Demand Notes** — (As Defined in Appendix D, Rule 15c3-1) — Enter the total face amount of all secured demand notes in effect at report date. This item corresponds to the same item number in Parts II and IIA.

3. **Total Subordinations Allowable for Net Capital** — (Total of lines 1 and 2) — This item corresponds to the same item number in Parts II and IIA.

4. **Ownership Equity/Partnership Capital — Start of Month** — Enter here the same total amount from the prior month end (corrections of prior month should be included on line 7) as reported on Part I or II. Lines 5 through 7 reflect all changes of ownership equity qualified for inclusion in net capital from the last previously filed FOCUS Report.

5. **Unconsolidated Income/Expense for the Month**
   a. Enter the net of realized and unrealized gains (or losses) in all trading, investment and other proprietary accounts for the current reporting month. Losses should be recorded in brackets. This item corresponds to the sum of items 3950 and 3952 in Parts II and IIA.
   b. Report unconsolidated gross income for the current reporting month excluding realized or unrealized gains (or losses) reported under item 5(a) above.
   c. Enter the total unconsolidated expenses for the current reporting month. Provision for federal income taxes should not be included in this amount.
   d. Federal income taxes *to* be reported by corporations only.

6. **Net Profit (or Loss) for the Month** — Net of lines 5(a) through 5(d).

7. **Other (Exclude Non-Conforming Capital)**
   a. Additions to Capital — includes all additions to capital even though subsequently withdrawn before the end of the period. Capital additions which are not qualified for Net Capital should be excluded. Also include sale of capital stock or partners' contributions and income adjustments applicable to prior periods, or nonrecurring items not included in 5(a), (b) or (d).
   b. (Deductions) from Capital (Exclude Non-Conforming Capital) — include contributions made and withdrawn during the period, partners' capital withdrawals, retirement or repurchase of capital stock, dividends and income adjustments applicable to prior periods, or other nonrecurring items (adjusted for any related income tax provision) not included in lines 5(c) or (d).

8. **Ownership Equity/Partnership Capital — End of Month** — This item corresponds to the same item number in Parts II and IIA. Include here the total of lines 4, 6 and 7(a) less 7(b).

9. **Other (Deductions) or Allowable Credits** — This item allows for adjustments, both (deductions) and additions (such as deferred tax credits) not otherwise provided for in lines 4 to 8. These adjustments will generally arise as a result of the provisions of subparagraph (c)(2)(i) of Rule 15c3-1. Sole proprietors who are registered broker-dealers shall record on line 9 any deductions required by subparagraph (c)(2)(iii) of Rule 15c3-1.

10. **Total Capital and Allowable Subordinations** — Total (add lines 3, 8 and 9) represents the capital and subordinated liabilities which are qualified for net capital under Rule 15c3-1. This item corresponds to the same item number in Parts II and IIA.

11. **Added Charges — Customer and Non-Customer Securities and Commodity Accounts**
   a. Securities Accounts — The rule requires a deduction for deficiencies in customers' or non-customers' accounts in meeting the maintenance margin requirements set forth in Article III, Section 30, Appendix A of the Association's Rules of Fair Practice. This item corresponds to the same item number in Part II and represents charges other than amounts deducted as non-allowable assets.
   b. Commodity Accounts — This item covers charges under Appendix B to Rule 15c3-1, other than amounts deducted as non-allowable assets. It corresponds to the same item number in Part II.

12. **Operational Deductions from Net Capital** — Enter total of lines 1-7 of Operational Deductions from Net Capital (Schedule B, Line 8).

13. **Non-Allowable Assets** (Not included in lines 11 and 12) — This total amount should also exclude the value of securities borrowed under subordination agreements not in satisfactory form and the market value of memberships in exchanges contributed for use of a company and partners' securities which are included in non-allowable assets and excluded from line 10 as nonconforming capital. Also, exclude any non-allowable amounts included on line 12 as deductions.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

SEC1795 (4-03) 1 of 16

Received 05-05-2025 03:17 PM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 89 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 91 of 164 PageID #:171

Page 90 of 163

| **Schedule A** | NAME OF BROKER-DEALER | | | | | | |
|---|---|---|---|---|---|---|---|
| | NAME AND TELEPHONE NO. OF PERSON COMPLETING THIS REPORT | | | | | | |

| ID NO. | | SEC FILE NO. **98** | FOR MONTH ENDS 20___ (IN THOUSANDS — $000's OMITTED) | | | | | |
|---|---|---|---|---|---|---|---|---|

| | | ITEM | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|---|---|
| 1710 | 1. | **Subordinated Loan Agreements** — Cash | | | | | | |
| 1730 | 2. | **Secured Demand Notes** — Face Amount | | | | | | |
| 3520 | 3. | **Total Subordinations Allowable for Net Capital** | | | | | | |
| 3501 | 4. | **Ownership Equity/Partnership Capital** – Start of Month | | | | | | |
| | 5. | **Unconsolidated Income/Expense for the Month:** | | | | | | |
| 3950 | | a. Trading and Investment Account Profit or (Loss) | | | | | | |
| 4212 | | b. Other Gross Income (Loss) | | | | | | |
| 4201 | | c. Expenses | | | | | | |
| 4221 | | d. Federal Income Taxes | | | | | | |
| 4250 | 6. | **Net Profit or (Loss) for the Month** | | | | | | |
| | 7. | **Other (Exclude Non-conforming Capital)** | | | | | | |
| 4264 | | a. Additions to Capital | | | | | | |
| 4274 | | b. (Deductions) from Capital | | | | | | |
| 3500 | 8. | **Ownership Equity/Partnership Capital** — End of Month | | | | | | |
| 3525 | 9. | **Other (Deductions) or Allowable Credits** | | | | | | |
| 3530 | 10. | **Total Capital and Allowable Subordinations** | | | | | | |
| | 11. | **Added Charges — Customer and Non-Customer** | | | | | | |
| 3550 | | a. Securities Accounts | | | | | | |
| 3560 | | b. Commodity Accounts | | | | | | |
| 3575 | 12. | **Operational Deductions from Net Capital** (Sch. B, Line 8) | | | | | | |
| 3540 | 13. | **Non-Allowable Assets** (Not Includable Above) | | | | | | |
| 3600 | 14. | **Proprietary Charges on Commodities** | | | | | | |
| 3612 | 15. | **Other Charges and/or Deductions** | | | | | | |
| 3620 | 16. | **Total Deductions and/or Charges** (Lines 11 through 15) | | | | | | |
| 3640 | 17. | **Net Capital Before Haircuts on Securities Positions** | | | | | | |
| 3740 | 18. | **Haircuts on Proprietary Security Positions** | | | | | | |
| 3750 | 19. | **Net Capital** | | | | | | |
| 4880 | 20. | **Scheduled Capital Withdrawals Within 6 Months** | | | | | | |
| 4881 | 21. | **Net Capital After Withdrawals** | | | | | | |
| 1011 | 22. | **Total Equity Subordinations** | | | | | | |
| | 23. | **Aggregate Indebtedness/Aggregate Debit Items** | | | | | | |
| 3840 | | a. Aggregate Indebtedness under Rule 15c3-1 | | | | | | |
| 4470 | | b. Aggregate Debits Under Rule 15c3-3 as Adjusted | | | | | | |
| 3760 | 24. | **Minimum Capital Requirement** | | | | | | |
| | 25. | **Ratios/Excess Net Capital** | | | | | | |
| 3850 | | a. Aggregate Indebtedness to Net Capital | | | | | | |
| 3851 | | b. Net Capital to Aggregate Debit Items | | | | | | |
| 3770 | | c. Net Capital in Excess of Greater of $6^2/_3$% of Aggregate Indebtedness or Minimum Requirement | | | | | | |
| 3910 | | d. Net Capital in Excess of Greater of 2% of Aggregate Debit Items or Minimum Requirement | | | | | | |
| 3852 | | e. Option Deductions/Net Capital Ratio | | | | | | |
| 4430 | 26. | **Total Credits** — Rule 15c3-3 Reserve Formula | | | | | | |
| 4472 | 27. | **Total Debits** — Rule 15c3-3 Reserve Formula-Net | | | | | | |
| 4530 | 28. | **Amount in Reserve Bank Account** | | | | | | |
| | 29. | **Commodity Exchange Act** — Segregation Requirement | | | | | | |
| 7060 | | a. Amount Required to be Segregated | | | | | | |
| 7180 | | b. Amount Segregated | | | | | | |
| | 30. | **Firm Proprietary Positions** | | | | | | |
| 850 | | a. Long — All Securities | | | | | | |
| 1620 | | b. Short — All Securities | | | | | | |
| 841 | | c. Long — Contractual Commitments — GNMA's, etc. | | | | | | |
| 1621 | | d. Short — Contractual Commitments — GNMA's, etc. | | | | | | |
| 3551 | 31. | **Customer and Non-Customer Charges** — GNMA's, etc. | | | | | | |

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097

Page 90 of 162

2 of 15

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 92 of 164 PageID #:172

Page 91 of 163

| Schedule A | NAME OF BROKER-DEALER | | | | | |
|---|---|---|---|---|---|---|
| | NAME AND TELEPHONE NO. OF PERSON COMPLETING THIS REPORT | | | | | |

| FOR MONTH ENDS 20___ (IN THOUSANDS — $000's OMITTED) | | | ID NO. | | SEC FILE NO. | 98 |

| JUL | AUG | SEP | OCT | NOV | DEC | ITEM | |
|---|---|---|---|---|---|---|---|
| | | | | | | 1. **Subordinated Loan Agreements** — Cash | 1710 |
| | | | | | | 2. **Secured Demand Notes** — Face Amount | 1730 |
| | | | | | | 3. **Total Subordinations Allowable for Net Capital** | 3520 |
| | | | | | | 4. **Ownership Equity/Partnership Capital — Start of Month** | 3501 |
| | | | | | | 5. **Unconsolidated Income/Expense for the Month:** | |
| | | | | | |     a. Trading and Investment Account Profit or (Loss) | 3950 |
| | | | | | |     b. Other Gross Income (Loss) | 4212 |
| | | | | | |     c. Expenses | 4201 |
| | | | | | |     d. Federal Income Taxes | 4221 |
| | | | | | | 6. **Net Profit or (Loss) for the Month** | 4250 |
| | | | | | | 7. **Other (Exclude Nonconforming Capital)** | |
| | | | | | |     a. Additions to Capital | 4264 |
| | | | | | |     b (Deductions) from Capital | 4274 |
| | | | | | | 8. **Ownership Equity/Partnership Capital** — End of Month | 3500 |
| | | | | | | 9. **Other (Deductions) or Allowable Credits** | 3525 |
| | | | | | | 10. **Total Capital and Allowable Subordinations** | 3530 |
| | | | | | | 11. **Added Charges** — Customer and Non-Customer | |
| | | | | | |     a. Securities Accounts | 3550 |
| | | | | | |     b. Commodity Accounts | 3560 |
| | | | | | | 12. **Operational Deductions from Net Capital** (Sch. B, Line 8) | 3575 |
| | | | | | | 13. **Non-Allowable Assets** (Not Includable Above) | 3540 |
| | | | | | | 14. **Proprietary Charges on Commodities** | 3600 |
| | | | | | | 15. **Other Charges and/or Deductions** | 3612 |
| | | | | | | 16. **Total Deductions and/or Charges** (Lines 11 through 15) | 3620 |
| | | | | | | 17. **Net Capital Before Haircuts on Securities Positions** | 3640 |
| | | | | | | 18. **Haircuts on Proprietary Security Positions** | 3740 |
| | | | | | | 19. **Net Capital** | 3750 |
| | | | | | | 20. **Scheduled Capital Withdrawals Within 6 Months** | 4880 |
| | | | | | | 21. **Net Capital After Withdrawals** | 4881 |
| | | | | | | 22. **Total Equity Subordinations** | 1011 |
| | | | | | | 23. **Aggregate Indebtedness/Aggregate Debit Items** | |
| | | | | | |     a. Aggregate Indebtedness under Rule 15c3-1 | 3840 |
| | | | | | |     b. Aggregate Debits Under Rule 15c3-3 as Adjusted | 4470 |
| | | | | | | 24. **Minimum Capital Requirement** | 3760 |
| | | | | | | 25. **Ratios/Excess Net Capital** | |
| | | | | | |     a. Aggregate Indebtedness to Net Capital | 3850 |
| | | | | | |     b. Net Capital to Aggregate Debit Items | 3851 |
| | | | | | |     c. Net Capital in Excess of Greater of $6\frac{2}{3}\%$ of Aggregate Indebtedness or Minimum Requirement | 3770 |
| | | | | | |     d. Net Capital in Excess of Greater of 2% of Aggregate Debit Items or Minimum Requirement | 3910 |
| | | | | | |     e. Option Deductions/Net Capital Ratio | 3852 |
| | | | | | | 26. **Total Credits** — Rule 15c3-3 Reserve Formula | 4430 |
| | | | | | | 27. **Total Debits** — Rule 15c3-3 Reserve Formula-Net | 4472 |
| | | | | | | 28. **Amount in Reserve Bank Account** | 4530 |
| | | | | | | 29. **Commodity Exchange Act** — Segregation Requirement | |
| | | | | | |     a. Amount Required to be Segregated | 7060 |
| | | | | | |     b. Amount Segregated | 7180 |
| | | | | | | 30. **Firm Proprietary Positions** | |
| | | | | | |     a. Long — All Securities | 850 |
| | | | | | |     b. Short — All Securities | 1620 |
| | | | | | |     c. Long — Contractual Commitments — GNMA's, etc. | 841 |
| | | | | | |     d. Short — Contractual Commitments — GNMA's, etc. | 1621 |
| | | | | | | 31. **Customer and Non-Customer Charges** — GNMA's, etc. | 3551 |

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097

Page 91 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

| Schedule A | NAME OF BROKER/DEALER | | | | | | |
|---|---|---|---|---|---|---|---|
| | NAME AND TELEPHONE NO. OF PERSON COMPLETING THIS REPORT | | | | | | |

| ID NO. | SEC FILE NO. | | FOR MONTH ENDS 20___ (IN THOUSANDS — $000's OMITTED) | | | | |
|---|---|---|---|---|---|---|---|
| | | 98 | | | | | |

| | ITEM | JAN | FEB | MAR | APR | MAY | JUN |
|---|---|---|---|---|---|---|---|
| | **32. Security Concentration /Commodity Concentration** | | | | | | |
| 5371 | a.  Security Concentration — Firm | | | | | | |
| 5372 | b.  Security Concentration — Customer | | | | | | |
| 5375 | c.  Commodity Concentration — Firm | | | | | | |
| 5376 | d.  Commodity Concentration — Customers/Others | | | | | | |
| 4980 | **33. Total Tickets** | | | | | | |
| 5362 | **34. Aged Fails:**        a.  To Deliver | | | | | | |
| 5365 | b.  To Receive | | | | | | |
| 770 | **35. Total Fails:**        a.  To Deliver | | | | | | |
| 1505 | b.  To Receive | | | | | | |
| 114 | **36. Equity Markets:**  a.  NASDAQ | | | | | | |
| 116 | b.  Other | | | | | | |
| | **37. Clearing Agency Balances** | | | | | | |
| 810 | a.  Due from Clearing | | | | | | |
| 1560 | b.  Due to Clearing | | | | | | |
| 750 | **38. Unrestricted Cash** | | | | | | |
| | **39. Customers' Accounts** | | | | | | |
| 310 | a.  Secured Debits | | | | | | |
| 1580 | b.  Total Credits | | | | | | |
| 103 | **40. Securities Borrowed** | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 92 of 162

4 of 15

| Schedule A | NAME OF BROKER/DEALER | | | | | | |
|---|---|---|---|---|---|---|---|
| | NAME AND TELEPHONE NO. OF PERSON COMPLETING THIS REPORT | | | | | | |

| **FOR MONTH ENDS 20___** **(IN THOUSANDS — $000's OMITTED)** | | | | | | ID NO. | SEC FILE NO. |
|---|---|---|---|---|---|---|---|
| | | | | | | | **98** |

| JUL | AUG | SEP | OCT | NOV | DEC | ITEM | |
|---|---|---|---|---|---|---|---|
| | | | | | | **32. Security Concentration /Commodity Concentration** | |
| | | | | | | a. Security Concentration — Firm | 5371 |
| | | | | | | b. Security Concentration — Customer | 5372 |
| | | | | | | c. Commodity Concentration — Firm | 5375 |
| | | | | | | d. Commodity Concentration — Customers/Others | 5376 |
| | | | | | | **33. Total Tickets** | 4980 |
| | | | | | | **34. Aged Fails:** a. To Deliver | 5362 |
| | | | | | | b. To Receive | 5365 |
| | | | | | | **35. Total Fails:** a. To Deliver | 770 |
| | | | | | | b. To Receive | 1505 |
| | | | | | | **36. Equity Markets:** a. NASDAQ | 114 |
| | | | | | | b. Other | 116 |
| | | | | | | **37. Clearing Agency Balances** | |
| | | | | | | a. Due from Clearing | 810 |
| | | | | | | b. Due to Clearing | 1560 |
| | | | | | | **38. Unrestricted Cash** | 750 |
| | | | | | | **39. Customers' Accounts** | |
| | | | | | | a. Secured Debits | 310 |
| | | | | | | b. Total Credits | 1580 |
| | | | | | | **40. Securities Borrowed** | 103 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

14. **Proprietary Charges on Commodities** — See Appendix B of Rule 15c3-1 for charges applicable to proprietary commodity positions, include charges on futures, forward contracts and spot commodities.

15. **Other Charges and/or Deductions** — Include on this line all other charges and deductions to capital specified in the rule not included in lines 11 to 14. These deductions will include, but are not limited to, any secured demand note deficiency, charges related to aged fails-to-deliver or fails-to-receive, deficit in securities loaned, aged security dividends short, losses on contractual commitments, guarantees and insurance claims, etc. Also include deductions carried under Rule 15c3-1(a)(6), (a)(7) and (c)(2)(x).

16. **Total Deductions and/or Charges** — Add line items 11 through 15.

17. **Net Capital Before Haircuts on Securities Positions** — Line item 10 less line item 16. This item corresponds to the same item in Parts II and IIA.

18. **Haircuts on Proprietary Security Positions** — Report the sum of all haircuts including contractual commitments applied in the computation of net capital pursuant to subparagraphs (c)(2)(vi), (c)(2)(viii) and Appendix A of Rule 15c3-1 adjusted where applicable by the provisions of paragraph (f) when the alternative computation is elected. This item corresponds to the same item number in Parts II and IIA.

19. **Net Capital** — Line item 17 less line item 18. This item corresponds to the same item number in Parts II and IIA.

20. **Scheduled Capital Withdrawals Within 6 Months** — The amounts included herein shall include, but not be limited to, all obligations to repay, in whole or in part, within the six months subsequent to the reporting date, any Payment Obligation as defined in Appendix D to Rule 15c3-1. Also to be included are those items defined in the instructions to the schedule of capital withdrawals in Parts II or IIA. This item corresponds to the same item number in Parts II and IIA.

21. **Net Capital After Withdrawals** — Line item 19 less line item 20 — This item corresponds to the same item in Part II.

22. **Total Equity Subordinations** — Enter the total amount of approved subordination agreements which are considered equity capital pursuant to paragraph (d) of Rule 15c3-1. This item corresponds to the same item in Parts II and IIA.

23. **Aggregate Indebtedness/Aggregate Debit Items**
    a. Report the total amount of all aggregate indebtedness items, i.e., the total money liabilities of the firm exclusive of (i) through (xiii) under subparagraph (c)(1) of Rule 15c3-1; or,
    b. If the alternative method is used, report the total of all debit items computed in accordance with the Reserve Formula under Rule 15c3-3 as adjusted. NOTE: Do not reduce the aggregate debits by the 3% adjustment specified under Rule 15c3-1(f)(5)(i).

24. **Minimum Capital Requirement** — Report the greater of the dollar amount of minimum net capital required pursuant to Rule 15c3-1, i.e., $5,000, $25,000, $50,000 or $100,000; or, the amount of net capital required to support $6\frac{2}{3}$% of aggregate indebtedness or 2% of aggregate debit items if on the alternative.

25. **Ratios/Excess Net Capital**
    a. Report the percent of aggregate indebtedness (line 23(a)) to net capital, if applicable. If not, complete 25(b).
    b. Report the percent of net capital to the aggregate debit items (line 23(b)) in the Reserve Formula if the alternative computation is used.
    c. Enter the amount of net capital in excess of the greater of $6\frac{2}{3}$% of aggregate indebtedness or the minimum dollar net capital requirement. If not applicable, complete 25(d).
    d. Enter the amount of net capital in excess of the greater of 2% of aggregate debit items in the Reserve Formula or the minimum dollar net capital requirement if the alternative computation is used.
    e. Report the percent of the total options deductions under subparagraph (a)(6), (a)(7) and (c)(2)(x) of Rule 15c3-1 to net capital as of the reporting date (1,000% test).

26. **Total Credits** — Rule 15c3-3 Reserve Formula — The credit balance to be reported on this line should be identical with the Rule 15c3-3 Formula "Exhibit A" computation prepared the business day following the month end to determine the amount to be deposited as specified under subsection (e)(1) by 10:00 a.m. the next (second) business day.

27. **Total Debits** — Rule 15c3-3 Reserve Formula — The debit balance to be reported on this line should be identical with the Rule 15c3-3 Formula "Exhibit A" computation prepared the business day following the month end to determine the amount to be deposited as specified under subsection (e)(1) by 10:00 a.m. the next (second) business day. The total debits should be net of the 3% adjustment specified under Rule 15c3-1(f) or 1% specified in Note e(3) of Exhibit A.

28. **Amount in Reserve Bank Account** — Include on this line item the actual amount on deposit (or deposited) by 10:00 a.m. of the second business day following the end of the month. Include the total of both cash and qualified securities as defined under Rule 15c3-3, subparagraph (a)(6), which may be deposited in lieu of cash.

29. **Commodity Exchange Act** — Segregation Requirements
    a. Amount Required to be Segregated — This amount represents the requirements under the Commodity Exchange Act — this item corresponds to line number 5 of the Schedule of Segregation Requirements and Funds in Segregation: Customers' Regulated Commodity Futures Accounts in Part II.
    b. Amount Segregated — This is the amount actually segregated as shown in Part II, line 11 in the schedule cited under 29(a).

30. **Firm Proprietary Positions**
    a. Long — All Securities — Report at market value all long positions carried in the proprietary accounts of the firm as of the current month end reporting period, i.e., trading and investment accounts, and other proprietary accounts. Do not include secured demand note collateral. Include qualified securities held in banks pursuant to Rule 15c3-3(e)(1).
    b. Short — All Securities — Report at market value all short positions carried in the proprietary accounts of the firm as of the current month end reporting period. If market value is unavailable, the contract value is to be used.
    c. Long — Contractual Commitments — GNMA's, etc. — Include only U.S. Government Guaranteed Mortgage Backed Securities, such as GNMA securities. Report the total long positions in U.S. Government Guaranteed Mortgage Backed Securities Commitments relating to forward and standby contracts in firm accounts. The face amount of the securities under contract may be reported in lieu of market value or contract value. Please designate which value is reported.
    d. Short — Contractual Commitments — GNMAs, etc. — Include only U.S. Government Guaranteed Mortgage Backed Securities such as GNMA securities. Report the total short positions in U.S. Government Guaranteed Mortgage Backed Securities Commitments relating to forward and standby contracts in firm accounts. The face amount of the securities under contract may be reported in lieu of market value or contract value. Please designate which value is reported.

**NOTE:** 30 (5) and (6)

Include forward contracts purchased or sold for delivery after five business days from the date of the transaction. Include delayed delivery contracts such as TBAs (to be announced). Do not net forward contracts to purchase with forward contracts to sell and do not net long and short standby contracts.

Standbys for the purpose of this item are put options, i.e., the purchaser of the standby has the right to sell a security at a specified price within or at a specified time. A dealer who is obligated to buy a security under a standby contract, for which he has received a fee, should report the standby as a long position. A dealer who has paid a fee for the right to sell securities under a standby contract should report the standby as a short position.

31. **Customer and Non-Customer Charges** — GNMA's, etc. — Include only charges on forward contracts, TBAs (to be announced) and standby contracts in U.S. Government Guaranteed Mortgage Backed Securities.

32. **Security Concentration/Commodity Concentration**
    a.  Security Concentration — Firm — Report the aggregate value of all securities positions which are subject to undue concentration haircuts as specified in subparagraphs (c)(2)(vi)(M) or (f)(3)(iii) of Rule 15c3-1.
    b.  Security Concentration — Customer — Report the aggregate market value of specific securities, other than exempted securities, which exceeds 10% of the value of all securities which collateralize all margin receivables pursuant to Note E to Exhibit A of Rule 15c3-3. The percentage standard of Note E has not been changed.
    c.  Commodity Concentration — Firm — Report concentrations in commodity futures carried in trading and investment accounts calculated as follows:
        1.  Determine the greater of the total number of long or short commodity futures in each commodity. Positions representing purchases and sales of a like amount of the same commodity or hedges of spot (cash) commodities where the spot commodity is in the possession or under the control of the broker-dealer may be eliminated.
        2.  Determine the greatest original margin requirement for each commodity stipulated by a registered U.S. Commodity Exchange for speculative accounts. If the commodity exchange has no original margin requirement, use the clearing house margin requirement.
        3.  Determine the total amount of margin that would be required as per (2) above on the greater of the total number of long or short positions in each commodity as per (1) above.
        4.  For each commodity calculated as per (3) above, determine whether (3) exceeds 10% of excess net capital. For purposes of this item, excess net capital at the end of the prior month may be used.
        5.  Aggregate and report in one total on line 32(c) those amounts calculated in (3) above for each commodity which exceeds 10% of excess net capital. For purposes of this item, excess net capital at the end of the prior month may be used.
    d.  Commodity Concentrations — Customers and Others — Report concentrations in commodity futures carried for all customers, non-customers, omnibus and general partners' accounts calculated as follows:
        1.  Determine the greater of the total number of long or short commodity futures in each commodity. Positions in each account representing purchases and sales of a like amount of the same commodity or hedges of spot (cash) commodities where the spot commodity is in the possession or under the control of the broker-dealer may be eliminated.
        2.  Determine the greatest original margin requirement for each commodity stipulated by a registered U.S. Commodity Exchange for speculative accounts. If the commodity exchange has no original margin requirement, use the clearing house margin requirement.
        3.  Determine the total amount of margin that would be required as per (2) above on the greater of the total number of long or short positions in each commodity as per (1) above.
        4.  For each commodity calculated as per (3) above, determine whether it exceeds 50% of excess net capital. For purposes of this item, excess net capital as of the end of the prior month may be used.
        5.  Aggregate and report in one total on line 32(d) the amount calculated in (3) above for each commodity which exceeds 50% of excess net capital. For purposes of this item, excess net capital as of the end of the prior month may be used.

33. **Total Tickets** — Enter the total number of buy and sell tickets executed as agent and/or principal. For agency transactions, count both the street and the customer side as one transaction. Multiple executions at the same price which result in one confirmation should be counted as one transaction. In the case of principal transactions, dealer-to-dealer and retail transactions are counted separately. Firms carrying public customer accounts for other broker-dealers on a fully-disclosed basis are to include transactions emanating from those accounts in their total ticket count. Firms which introduce accounts on a fully-disclosed basis should include transactions so introduced in their ticket count. Exclude from total ticket counts transactions executed on behalf of monthly investment plans and those filed on a subscription basis wherein payment is made directly to an underwriter, sponsor or other distributor who in turn delivers the security purchased directly to the subscriber. This item corresponds to the same item number on Part II.

34. **Aged Fails** — Enter the ledger balances of (a) fails-to-deliver and (b) fails-to-receive aged eleven (11) business days or more (21 business days or more for municipal securities) following settlement date.

35. **Total Fails**
    a.  Report the total contract value of all fails to deliver. If records are maintained on a trade date basis, enter here the total amount of all broker-dealer receivables. This item corresponds to the same number on Part II.
    b.  Report the total contract value of all fails to receive. If records are maintained on a trade date basis, enter here the total amount of all broker-dealer payables. This item is equal to the sum of items 1490 and 1500 on Part II.

36. **Equity Markets**
    a.  Enter the total number of equity securities in which a market is made on NASDAQ based on the average number of such markets made during the 30 days immediately preceding the report date pursuant to Rule 15c3-1(a)(4).
    b.  Enter the total number of other equity securities in which a market is made based on the average number of such markets made during the 30 days immediately preceding the report date pursuant to Rule 15c3-1(a)(4).

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 97 of 164 PageID #:177

| Name of Broker/Dealer | | | | | | | | Schedule B |
|---|---|---|---|---|---|---|---|---|

Name and Telephone No. of Person Completing This Report

ID No.    SEC File No.

| OPERATIONAL DEDUCTIONS FROM NET CAPITAL (NOTE A) | JANUARY | | | | FEBRUARY | | | |
|---|---|---|---|---|---|---|---|---|
| | I NO. OF ITEMS | II DEBITS (SHORT VALUE) | III CREDITS (LONG VALUE) | IV** DEDUC-TIONS IN COMPU-TING NET CAPITAL | I NO. OF ITEMS | II DEBITS (SHORT VALUE) | III CREDITS (LONG VALUE) | IV** DEDUC-TIONS IN COMPU-TING NET CAPITAL |
| 1. Money suspense and balancing differences | | | | | | | | |
| 2. Security suspense and differences with related money balances     L S | | | | | | | | |
| 3. Market value of short and long security suspense and differences without related money (other than reported in item 4 below) | | | | | | | | |
| 4. Market value of security record breaks | | | | | | | | |
| 5. Unresolved reconciling differences with others | | | | | | | | |
| A. Correspondents and broker/dealers     L S | | | | | | | | |
| B. Depositories | | | | | | | | |
| C. Clearing organizations     L S | | | | | | | | |
| D. Intercompany accounts | | | | | | | | |
| E. Bank accounts and loans | | | | | | | | |
| F. Other | | | | | | | | |
| G. (Offsetting) Items A-F | | | | | | | | |
| TOTAL Line 5 | | | | | | | | |
| 6. Commodity differences | | | | | | | | |
| 7. Open transfers and reorganization account items over 40 days not confirmed or verified | | | | | | | | |
| 8. TOTAL (Lines 1 – 7) | | | | | | | | |
| 9. Lines 1-6 resolved subsequent to report date | | | | | | | | |
| 10. Has respondent completed this form in accordance with instructions of the designated examining authority? | Yes ☐     No ☐ | | | | Yes ☐     No ☐ | | | |

**     All line items (1 - 8) columns I, II, III and IV if required must be answered. If respondent has nothing to report, enter -0-.

Note A:    Include aged items which resulted in a deduction in the computation of net capital (column IV) at the report date as appropriate (Lines 1-7) whether resolved subsequently or not (see instructions). Complete columns I, II and III only if required by the "designated examining authority."

OPERATIONAL EXPOSURE ITEMS (Note B)

Note B:    The respondent's "designated examining authority" may require on a separate schedule headed "Potential Operational Deductions from Net Capital" that the same information be submitted, as formatted above, for line items 1-6 stating open items, at the report date, that were not deducted in the computation of net capital; and which were not resolved in seven (7) business days subsequent to the report date.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 96 of 162

8 of 15

| Name of Broker/Dealer | | | | | | | | | | | Schedule B |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Name and Telephone No. of Person Completing This Report |
|---|

| ID No. | | | | SEC File No. |
|---|---|---|---|---|

| MARCH | | | | APRIL | | | | MAY | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | II | III | IV** | I | II | III | IV** | I | II | III | IV** |
| NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL | NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL | NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
| Yes ☐    No ☐ | | | | Yes ☐    No ☐ | | | | Yes ☐    No ☐ | | | |

| Name of Broker/Dealer | | | | | | | | **Schedule B** |

| Name and Telephone No. of Person Completing This Report |

| ID No. | | | | SEC File No. |

| OPERATIONAL DEDUCTIONS FROM NET CAPITAL (NOTE A) | JUNE | | | | JULY | | | |
|---|---|---|---|---|---|---|---|---|
| | I NO. OF ITEMS | II DEBITS (SHORT VALUE) | III CREDITS (LONG VALUE) | IV** DEDUC-TIONS IN COMPU-TING NET CAPITAL | I NO. OF ITEMS | II DEBITS (SHORT VALUE) | III CREDITS (LONG VALUE) | IV** DEDUC-TIONS IN COMPU-TING NET CAPITAL |
| 1. Money suspense and balancing differences | | | | | | | | |
| 2. Security suspense and differences with related money balances   L   S | | | | | | | | |
| 3. Market value of short and long security suspense and differences without related money (other than reported in item 4 below) | | | | | | | | |
| 4. Market value of security record breaks | | | | | | | | |
| 5. Unresolved reconciling differences with others | | | | | | | | |
| A. Correspondents and broker/dealers   L   S | | | | | | | | |
| B. Depositories | | | | | | | | |
| C. Clearing organizations   L   S | | | | | | | | |
| D. Intercompany accounts | | | | | | | | |
| E. Bank accounts and loans | | | | | | | | |
| F. Other | | | | | | | | |
| G. (Offsetting) Items A-F | | | | | | | | |
| **TOTAL** Line 5 | | | | | | | | |
| 6. Commodity differences | | | | | | | | |
| 7. Open transfers and reorganization account items over 40 days not confirmed or verified | | | | | | | | |
| 8. TOTAL (Lines 1 − 7) | | | | | | | | |
| 9. Lines 1-6 resolved subsequent to report date | | | | | | | | |
| 10. Has respondent completed this form in accordance with instructions of the designated examining authority? | Yes ☐      No ☐ | | | | Yes ☐      No ☐ | | | |

** All line items (1 - 8) columns I, II, III and IV if required must be answered. If respondent has nothing to report, enter -0-.

Note A: Include aged items which resulted in a deduction in the computation of net capital (column IV) at the report date as appropriate (Lines 1-7) whether resolved subsequently or not (see instructions). Complete columns I, II and III only if required by the "designated examining authority."

OPERATIONAL EXPOSURE ITEMS (Note B)

Note B: The respondent's "designated examining authority" may require on a separate schedule headed "Potential Operational Deductions from Net Capital" that the same information be submitted, as formatted above, for line items 1-6 stating open items, at the report date, that were not deducted in the computation of net capital; and which were not resolved in seven (7) business days subsequent to the report date.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

| Name of Broker/Dealer | | | | | | | | | | | Schedule B |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Name and Telephone No. of Person Completing This Report |
|---|

| ID No. | | | | SEC File No. |
|---|---|---|---|---|

| AUGUST | | | | SEPTEMBER | | | | OCTOBER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | II | III | IV** | I | II | III | IV** | I | II | III | IV** |
| NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL | NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL | NO. OF ITEMS | DEBITS (SHORT VALUE) | CREDITS (LONG VALUE) | DEDUC-TIONS IN COMPU-TING NET CAPITAL |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |
| Yes ☐    No ☐ | | | | Yes ☐    No ☐ | | | | Yes ☐    No ☐ | | | |

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097

| Name of Broker/Dealer | | | | | | | | **Schedule B** |

| Name and Telephone No. of Person Completing This Report | | | | | | | | |

| ID No. | | | | SEC File No. | | | | |

| OPERATIONAL DEDUCTIONS FROM NET CAPITAL (NOTE A) | NOVEMBER | | | | DECEMBER | | | |
|---|---|---|---|---|---|---|---|---|
| | I<br>NO. OF ITEMS | II<br>DEBITS (SHORT VALUE) | III<br>CREDITS (LONG VALUE) | IV**<br>DEDUC-TIONS IN COMPU-TING NET CAPITAL | I<br>NO. OF ITEMS | II<br>DEBITS (SHORT VALUE) | III<br>CREDITS (LONG VALUE) | IV**<br>DEDUC-TIONS IN COMPU-TING NET CAPITAL |
| 1. Money suspense and balancing differences | | | | | | | | |
| 2. Security suspense and differences with related money balances  L  S | | | | | | | | |
| 3. Market value of short and long security suspense and differences without related money (other than reported in item 4 below) | | | | | | | | |
| 4. Market value of security record breaks | | | | | | | | |
| 5. Unresolved reconciling differences with others<br>A. Correspondents and broker/dealers  L  S | | | | | | | | |
| B. Depositories | | | | | | | | |
| C. Clearing organizations  L  S | | | | | | | | |
| D. Intercompany accounts | | | | | | | | |
| E. Bank accounts and loans | | | | | | | | |
| F. Other | | | | | | | | |
| G. (Offsetting) Items A-F | | | | | | | | |
| **TOTAL** Line 5 | | | | | | | | |
| 6. Commodity differences | | | | | | | | |
| 7. Open transfers and reorganization account items over 40 days not confirmed or verified | | | | | | | | |
| 8. TOTAL (Lines 1 – 7) | | | | | | | | |
| 9. Lines 1-6 resolved subsequent to report date | | | | | | | | |
| 10. Has respondent completed this form in accordance with instructions of the designated examining authority? | Yes ☐          No ☐ | | | | Yes ☐          No ☐ | | | |

**    All line items (1 - 8) columns I, II, III and IV if required must be answered. If respondent has nothing to report, enter -0-.

Note A:    Include aged items which resulted in a deduction in the computation of net capital (column IV) at the report date as appropriate (Lines 1-7) whether resolved subsequently or not (see instructions). Complete columns I, II and III only if required by the "designated examining authority."

OPERATIONAL EXPOSURE ITEMS (Note B)

Note B:    The respondent's "designated examining authority" may require on a separate schedule headed "Potential Operational Deductions from Net Capital" that the same information be submitted, as formatted above, for line items 1-6 stating open items, at the report date, that were not deducted in the computation of net capital; and which were not resolved in seven (7) business days subsequent to the report date.

37. **Clearing Agency Balances**
    a.   Report the total dollar amount due from clearing agencies on current short positions at current prices as per the clearing agency.
    b.   Report the total dollar amount due to clearing agencies on current long positions at current prices as per the clearing agency.

38. **Unrestricted Cash** — Report all cash on hand and cash in banks subject to immediate withdrawal net of overdrafts. This would exclude cash segregated in accordance with federal or state securities or commodities law.

39. **Customers' Accounts**
    a.   Report the total amount of secured debits in customer accounts as of the month end reporting date. This item corresponds to the same item number on Part II.
    b.   Enter the total amount of all customers' free and other credit balances as defined in Rule 15c3-3, subparagraphs (a)(8) and (a)(9).

40. **Securities Borrowed** — Enter the total market value of all securities borrowed from customers and non-customers including other broker-dealers and financial and non-financial institutions.

---

# INSTRUCTIONS
## Schedule B — Supplemental Report
## Operational Capital Charge Items

**General** — For reporting purposes the debit (short value) column II and credit (long value) column III should be rounded to the nearest one thousand dollars ($000 omitted). Omit pennies in column IV.

Complete columns I, II, and III of the Schedule only if required by your designated examining authority.

Include on lines 1-7 all items that are, or result in, capital charges or additions to aggregate indebtedness at the report date even if resolved subsequently. Items resolved subsequent to the report date may be shown on line 9 at the option of the respondent unless specifically required by the Examining Authority or as noted herein.

All commodity money suspense differences and uncompared and unconfirmed items should be reported on line 6 only.

If the designated examining authority requires completion of columns I, II and III, all aged operational items (lines 1-7) are reportable whether they result in a capital charge or not.

If more than one item is reportable for each line the aggregate number of items should be reported in Column I. The related aggregate amount (values) are reportable in Columns II, III and IV if required. A related money and security value should be considered as one item.

Suspense and reconciliation difference items may not be updated by transfer, journal entry or otherwise, to another account with a different nomenclature. Each item must retain its original discovery date unless clearly identified with another item.

**Suspense Differences (relative to lines 1, 2, 3 and 4)** — The net capital treatment of suspense differences is as follows:

The net capital treatment of security positions and money balances whose ultimate disposition is not known, e.g., DKs and suspense items which remain unresolved (7) business days after discovery, is as follows:

    1)   Long position and related debit balance, and short position and related credit balance — treat as proprietary commitments that cannot operate to increase net capital (see line 2 instructions);

    2)   Long position only — no deduction except as noted herein (see line 3 instructions);

    3)   Short position and breaks only — deduct current market value (Rule 15c3-I (c)(2)(v)) (see treatment of security count difference below and lines 3 and 4 instructions);

    4)   Credit balance only — include in aggregate indebtedness; and

    5)   Debit balance only — deductions (see line 1 instructions).

The resolution of suspense or difference items after the report date shall not result in a reduction of the required charge as of the report date. For example, a short security difference which is open at the report date and has been unresolved for seven (7) business days after discovery is required to be deducted even though the difference is resolved prior to the date the FOCUS Report is filed.

**Security Count Differences (relative to lines 2, 3, 4 and 5)** — Rule 17a-13 (Quarterly Security Count Requirements) requires unresolved differences to be recorded in a difference account no later than seven business days following the security count and verification. Paragraph (b)(3) of the Rule requires verification of all securities in transfer, in transit, pledged, loaned, borrowed, deposited, failed to receive and deliver or otherwise subject to the broker/dealer's control or direction but not in his physical possession where such securities have been in said status for longer than 30 days. With respect to these items requiring verification, the seven day period begins after verification takes place; that is, when a confirmation is returned indicating a discrepancy with the books and records of the broker/dealer, or where such confirmations have not been returned within a reasonable period of time (15 days) to establish the validity of the position. In instances where confirmations have been outstanding for 15 business days without return, the broker/dealer should record as a difference such securities on the 22nd business day.

**Specific Line Item Instructions**

**Line 1. Money suspense and balancing differences** (money only)

These differences shall include any amount required to balance the general ledger and unresolved differences between general ledger control accounts and subsidiary records or balancing of blotters, etc.

A "debit" difference is one that, if recorded in the general ledger, would result in a debit balance. This may result because of an amount needed to balance excess ledger credits over ledger debits or as a result of adjusting general ledger control accounts to subsidiary records. Report debit differences in columns II and IV.

A "credit" difference is one that, if recorded in the general ledger, would result in a credit balance. This may result because of an amount needed to balance excess ledger debits over ledger credits or as a result of adjusting general ledger control accounts to subsidiary records. Report credit differences in column III only.

Money suspense and balancing differences shall also include all accounts, in whole or part, containing ledger debits or credits, representing unidentified or unknown items with no related security position or an account which may contain security positions that cannot be properly related to the money ledger balances.

Money differences could include, but are not limited to the following:

   a. Unallocated receipts or disbursements.
   b. Cash Dividend Balancing Accounts (out-of-balance proofs).
   c. Money Balancing Accounts (EDP), Cage, P&S, Accounting and others.
   d. Unresolved Money Differences resulting from the comparison of detail records to control accounts for customer accounts, fail to receive, fail to deliver, stock borrowed, stock loaned, bank loans, inter-office accounts and adjustments of General Ledger control accounts to agree to subsidiary records.
   e. Any accounts utilized to balance "daily work" which contain debits or credits requiring resolution. If any such accounts exist, the ledger balance resulting from one day's "out of balance" work, shall not be netted against another day's "out of balance" work, unless related to each other.

For reporting purposes, debit and credit money differences shall not be netted.

**Line 2.    Securities differences with related money balances** — Report in Columns I, II and III all transactions in any accounts containing a long or short security position with a related ledger balance pending determination of ownership, collectibility, or deliverability, which are in doubt.

Long positions and related debits, and short positions and related credits are treated as proprietary commitments in computing net capital if they remain unresolved seven (7) business days after discovery. This requires mark to market adjustments and haircut charges computed under subparagraph (c)(2)(vi), (f)(3) or Appendix A. The aggregate total of deductions is reportable in Column IV and shall not operate to increase net capital.

**Line 3.    Market value of short and long suspense and differences without related money** — shall include all transactions in any accounts containing long and short security positions, for which no related ledger balance exists regardless of the nomenclature of the account.

Long differences are generally ignored in the capital computation process unless the securities have been sold by the broker/dealer before the differences are adequately resolved. In such instances, include the excess of the market value (Column III ) of the long securities sold over any reserve established as deductions in Column IV.

The market value of short security differences is deducted in the computation of net capital if the differences remain unresolved seven days after discovery (see Rule 15c3-1(c)(2)(v)), and should be reported in Columns II and IV.

Unrelated differences in the same security or other securities shall not be netted.

**Line 4.    Market value of security record breaks** — Security record breaks are defined as out-of-balance error conditions in the daily recording of security position changes or movements where the total longs do not equal the total shorts on a given security.

"Long" differences are the amounts needed to balance an excess of short positions over long positions. When recorded in a difference account, such would be recorded long on the stock record.

"Short" differences are the amounts needed to balance an excess of long positions over short positions. When recorded in a difference account, such would be recorded short on the stock record.

Security record breaks resulting from one day's "out of balance" shall not be netted against another day's "out of balance" work unless research specifically discloses that it is the proper resolution of particular differences.

The day of discovery for security record breaks should be the day following after any movement in a security and may not be updated by transferring the break to a suspense or difference account unless related to some other clearly indentifiable item of suspense or difference item.

The market value of long security record breaks unresolved seven business days after discovery should be reported in Column III.

The market value of short security record breaks are deductions in the computation of net capital if they remain unresolved seven days after discovery (see Rule 15c-3-1(c)(2)(v)), and should be reported in columns II and IV.

Unrelated security breaks in the same or other securities shall not be netted.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 104 of 164 PageID #:184

Line 5.    **Unresolved reconciling differences with others** — The respondent shall report in column IV the total net overall unfavorable aged reconciling differences disclosed by reconciliations (lines 5A-F) when required to be deducted in computing net capital. Each broker-dealer having any such differences shall maintain a record of the date of receipt of the pertinent statement of account or, in the absence of such record, shall compute the elapsed days (aging) from the date of the statement. The treatment of differences disclosed by reconciliations required under Rule 17a-13 shall be governed by the requirements of that Rule.

Differences which have been resolved but which have not yet been appropriately corrected in the records shall be so identified on the reconciliations and may be considered resolved for purposes of computing net capital. Unresolved favorable and unfavorable differences with the same carrying entity may be netted for purposes of determining the deductions in computing net capital.

Debit amounts and short values (Column II) or credit amounts and long values (Column III) applicable to all unresolved reconciling items should be reported broad and not netted. Offsetting favorable and unfavorable differences by the same carrying entity should be reported on line 5 G as a (deduction) in Columns II and III.

Line 6.    **Commodity suspense differences unresolved** — Report on this line all unresolved commodity differences or suspense items as a result of internal balancing of commodities, and comparison of broker-dealer's books of accounts with the records of clearing organizations and others. Such items would include:

1.    Customer, non-customer, omnibus and proprietary accounts.
2.    Ledger balances and realized and unrealized gains and losses relating to long and short positions in spot (cash) commodities, forward contracts in commodities and futures contracts.

    Report in Column II aggregate total debits, unrealized losses or short values and in Column III credits, unrealized gains or long values relating to deductions from net capital. The aggregate deduction from net capital is reportable in Column IV;  that is, losses which would be incurred to correct unresolved recordkeeping differences, including differences with other entities as of the report date which have not been resolved, within time frames required, for firm, customer, non-customer, omnibus, clearing, and contract differences accounts.

    In determining data to be included in the report, the following schedule may be used. It should be noted that this schedule may not be all-inclusive. Other suspense items not included in this schedule should also be reported on line 6.

a.    Clearing Accounts with Commodity Clearing Organizations
    1.    Number and amount of unresolved reconciling money items

|   |   | No.: | $ |
|---|---|---|---|
| a. | Debits | No.: | $ |
| b. | Credits | No.: | $ |

    2.    Gain or loss in unresolved future contract differences after comparison and balancing with proprietary and customers' positions and other positions

| a. | Gain | $ |
|---|---|---|
| b. | Loss | $ |

b.    Clearing Accounts with Commodity Brokers and Dealers
    1.    Number and amount of unresolved reconciling money items

| a. | Debits | No.: | $ |
|---|---|---|---|
| b. | Credits | No.: | $ |

    2.    Gain or loss in unresolved futures contract differences after comparison and balancing with proprietary and customers' positions

| a. | Gain | $ |
|---|---|---|
| b. | Loss | $ |

c.    Other Gains and Losses in Forward or Futures Contracts:
    Unresolved Differences

| a. | Debits | $ |
|---|---|---|
| b. | Credits | $ |

d.    Warehouse Receipts on hand:
    1.    Number of unresolved differences
    2.    Market value of unresolved differences
        Long (Short)                                             $

Line 7.    **Open transfers and reorganization items over 40 days not confirmed or verified** — The term "reorganization account" shall include, but not be limited to, transactions in the following:

(a)    "rights" subscriptions
(b)    warrants exercised
(c)    stock splits
(d)    redemptions
(e)    conversions
(f)    exchangeable securities
(g)    spin-offs

See general comment relative to the verification of transfers and reorganization items in connection with Rule 17a-13 quarterly counts and time frames for considering charges to capital.

Line 8. Total of line 1 through 7; the total in column IV should be entered here and on line 12 of Part I, page 1.

Line 9. This line item may be used, at the option of the respondent or as required by the designated examining authority, to report items (lines 1- 6) subsequently resolved up to the filing date of the FOCUS Report.

Page 104 of 162

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0123 |
| Expires: | August 31, 2020 |
| Estimated average burden hours per response.......12.00 | |

# Form
# X-17A-5

# FOCUS REPORT

## (Financial and Operational Combined Uniform Single Report)

## PART II  `11`

*(Please read instructions before preparing Form.)*

This report is being filed pursuant to (Check Applicable Block(s)):

1) Rule 17a-5(a) `16`   2) Rule 17a-5(b) `17`   3) Rule 17a-11 `18`

4) Special request by designated examining authority `19`   5) Other `26`

NAME OF BROKER-DEALER

SEC FILE NO. `14`

FIRM I.D. NO. `15`

`13`

ADDRESS OF PRINCIPAL PLACE OF BUSINESS (Do Not Use P.O. Box No.)

FOR PERIOD BEGINNING (MM/DD/YY) `24`

`20`

(No. and Street)

AND ENDING (MM/DD/YY) `25`

`21`   `22`   `23`

(City)   (State)   (Zip Code)

**NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT**   **(Area Code) — Telephone No.**

`30`   `31`

NAMES OF SUBSIDIARIES OR AFFILIATES CONSOLIDATED IN THIS REPORT:   OFFICIAL USE

`32`   `33`

`34`   `35`

`36`   `37`

`38`   `39`

DOES RESPONDENT CARRY ITS OWN CUSTOMER ACCOUNTS?   YES `40` NO `41`

CHECK HERE IF RESPONDENT IS FILING AN AUDITIED REPORT `42`

**EXECUTION:**
The registrant/broker or dealer submitting this Form and its attachments and the person(s) by whom it is executed represent hereby that all information contained therein is true, correct and complete. It is understood that all required items, statements, and schedules are considered integral parts of this Form and that the submission of any amendment represents that all unamended items, statements, and schedukes remain true, correct and complete as previously submitted.

Dated the _____ day of _____ , _____
Manual signatures of:

1) _____
Principal Executive Officer or Managing Partner

2) _____
Principal Financial Officer or Partner

3) _____
Principal Operations Officer or Partner

**ATTENTION** — Intentional misstatement or omissions of facts constitute Federal Criminal Violations. (See 18 U.S.C. 1001 and 15 U.S.C. 78:f(a))

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

SEC 1695 (11-05) 1 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# TO BE COMPLETED WITH THE ANNUAL AUDIT REPORT ONLY:

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report

NAME (If individual, state last, first, middle name)

| | 70 |
|---|---|

ADDRESS

| | 71 | | 72 | | 73 | | 74 |
|---|---|---|---|---|---|---|---|
| Number and Street | | City | | State | | Zip Code | |

CHECK ONE

☐ Certified Public Accountant     | 75 |

☐ Public Accountant     | 76 |

☐ Accountant not resident in United States     | 77 |
    or any of its possessions

**FOR SEC USE**

| | |
|---|---|

---

DO NOT WRITE UNDER THIS LINE . . . FOR SEC USE ONLY

| WORK LOCATION | REPORT DATE MM/DD/YY | DOC. SEQ. NO. | CARD | | | | |
|---|---|---|---|---|---|---|---|
| 50 | 51 | 52 | 53 | | | | |

SEC 1695 (11-05) 2 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER ▾1 | **N** **2** | | | 100 |
|---|---|---|---|---|

### STATEMENT OF FINANCIAL CONDITION

| | | |
|---|---|---|
| as of (MM/DD/YY) | _____ | 99 |
| SEC FILE NO. | _____ | 98 |
| | Consolidated | 198 |
| | Unconsolidated | 199 |

### ASSETS

| | Allowable | Non-Allowable | Total |
|---|---|---|---|
| 1. Cash ...........................................▾2 $ | _____ 200 | | $ _____ 750 |
| 2. Cash segregated in compliance with federal and other regulations ......................... | _____ 210 | | _____ 760 |
| 3. Receivable from brokers or dealers and clearing organizations: | | | |
|   A. Failed to deliver: | | | |
|     1. Includable in "Formula for Reserve Requirements" ........................... | _____ 220 | | |
|     2. Other ....................................... | _____ 230 | | _____ 770 |
|   B. Securities borrowed: | | | |
|     1. Includable in "Formula for Reserve Requirements" ........................... | _____ 240 | | |
|     2. Other ....................................... | _____ 250 | | _____ 780 |
|   C. Omnibus accounts: | | | |
|     1. Includable in "Formula for Reserve Requirements" ........................... | _____ 260 | | |
|     2. Other ....................................▾3 | _____ 270 | | _____ 790 |
|   D. Clearing organizations: | | | |
|     1. Includable in "Formula for Reserve Requirements" ........................... | _____ 280 | | |
|     2. Other ....................................... | _____ 290 | | _____ 800 |
|   E. Other ......................................... | _____ 300 | $ _____ 550 ▾7 | _____ 810 |
| 4. Receivables from customers: | | | |
|   A. Securities accounts: | | | |
|     1. Cash and fully secured accounts ............. | _____ 310 | | |
|     2. Partly secured accounts .................... | _____ 320 | _____ 560 | |
|     3. Unsecured accounts ....................... | | _____ 570 | |
|   B. Commodity accounts ........................ | _____ 330 | _____ 580 | |
|   C. Allowance for doubtful accounts ...........▾4 | ( _____ 335 ) | ( _____ 590 ) | _____ 820 |
| 5. Receivables from non-customers: | | | |
|   A. Cash and fully secured accounts ............ | _____ 340 | | |
|   B. Partly secured and unsecured accounts ...... | _____ 350 | _____ 600 | _____ 830 |
| 6. Securities purchased under agreements to resell .................................... | _____ 360 | ▾6 _____ 605 | _____ 840 |
| 7. Securities and spot commodities owned, at market value: | | | |
|   A. Bankers acceptances, certificates of deposit and commercial paper ........... | _____ 370 | | |
|   B. U.S. and Candaian government obligations ................................ | _____ 380 | | |
|   C. State and municipal government obligations ................................ | _____ 390 | | |
|   D. Corporate obligations .....................▾5 | _____ 400 | | |

OMIT PENNIES

SEC 1695 (11-05) 3 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 108 of 164 PageID #:188
Page 107 of 162

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### STATEMENT OF FINANCIAL CONDITION

#### ASSETS

| | Allowable | Non-Allowable | Total |
|---|---|---|---|
| E. Stocks and warrants ..............................9 $ | 410 | | |
| F. Options ........................................... | 420 | | |
| G. Arbitrage ......................................... | 422 | | |
| H. Other securities .................................. | 424 | | |
| I. Sport commodities ................................ | 430 | $ | 850 |
| 8. Securities owned not readily marketable: | | | |
| A. At Cost ..... 8 $ 130 | 440 | $ 610 | 860 |
| 9. Other investments not readily marketable: | | | |
| A. At Cost ..... $ 140 | | | |
| B. At estimated fair value ......................... | 450 | 620 | 870 |
| 10. Securities borrowed under subordination agreements and partners' individual and capital securities accounts, at market value: | | | |
| A. Exempted securities .. $ 150 | | | |
| B. Other ........ $ 160 10 | 460 | 630 | 880 |
| 11. Secured demand notes- market value of collateral: | | | |
| A. Exempted securities .. $ 170 | | | |
| B. Other ....... $ 180 | 470 | 640 | 890 |
| 12. Memberships in exchanges: | | | |
| A. Owned, at market value ........ $ 190 | | | |
| B. Owned at cost ............................... | | 650 | |
| C. Contributed for use of company, at market value ........................................ 12 | | 660 | 900 |
| 13. Investment in and receivables from affiliates, subsidiaries and associated partnerships | 480 | 670 14 | 910 |
| 14. Property, furniture, equipment, leasehold improvements and rights under lease agreements: At cost (net of accumulated depreciation and amortization)............................. | 490 | 680 | 920 |
| 15. Other Assets: | | | |
| A. Dividends and interest receivable .............. | 500 | 690 | |
| B. Free shipments .............................. | 510 | 700 | |
| C. Loans and advances ........................... | 520 | 710 | |
| D. Miscellaneous ........................... 11 | 530 | 720 | 930 |
| 16. TOTAL ASSETS .................................... $ | 540 13 $ | 740 $ | 940 |

OMIT PENNIES

SEC 1695 (11-05) 5 of 28

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

BROKER OR DEALER                                                          as of _____

### STATEMENT OF FINANCIAL CONDITION

### LIABILITIES AND OWNERSHIP EQUITY (continued)

| | A.I. Liabilities* | Non-A.I. Liabilities* | Total |
|---|---|---|---|
| **Liabilities** | | | |
| 17. Bank loans payable: | | | |
| A. Includable in "Formula for Reserve Requirements" | $ [1030] | $ [1240] | $ [1460] |
| B. Other | [1040] | $ [1250] | $ [1470] |
| 18. Securities sold under repurchase agrement.... | | [1260] | [1480] |
| 19. Payable to brokers or dealers and clearing organizations: | | | |
| A. Failed to receive: | | | |
| 1. Includable in "Formula for Reserve Requirements" | [1050] | [1270] | [1490] |
| 2. Other | [1060] | [1280] | [1500] |
| B. Securities loaned: | | | |
| 1. Includable in "Formula for Reserve Requirements" | [1070] | | [1510] |
| 2. Other | ▼16 [1080] | ▼21 [1290] | [1520] |
| C. Omnibus accounts: | | | |
| 1. Includable in "Formula for Reserve Requirements" | [1090] | | [1530] |
| 2. Other | [1095] | ▼19 [1300] | [1540] |
| D. Clearing organizations: | | | |
| 1. Includable in "Formula for Reserve Requirements" | [1100] | | [1550] |
| 2. Other | [1105] | [1310] | [1560] |
| E. Other: | [1110] | [1320] | [1570] |
| 20. Payable to customers: | | | |
| A. Securities accounts-including free credits of ▼19 $ [950] | [1120] | ▼22 [1580] | |
| B. Commodities accounts | ▼17 [1130] | [1330] | [1590] |
| 21. Payable to non customers: | | | |
| A. Securities accounts | [1140] | [1340] | [1600] |
| B. Commodities accounts | [1150] | [1350] | [1610] |
| 22. Securities sold not yet purchased at market value-including arbitrage of $ [960] | | [1360] | [1620] |
| 23. Accounts payable and accrued liabilities and expenses: | | | |
| A. Drafts payable | [1160] | | [1630] |
| B. Accounts payable | [1170] | | [1640] |
| C. Income taxes payable | [1180] | ▼23 [1650] | |
| D. Deferred income taxes | ▼20 | [1370] | [1660] |
| E. Acrued expenses and other liabilities | [1190] | | [1670] |
| F. Other | ▼18 [1200] | [1380] | [1680] |

OMIT PENNIES

*Brokers or Dealers electing the alternative net capital requirement method need not complete these columns.

SEC 1695 (11-05) 7 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 110 of 164 PageID #:190

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### STATEMENT OF FINANCIAL CONDITION

### LIABILITIES AND OWNERSHIP EQUITY (continued)

| | A.I. Liabilities* | Non-A.I. Liabilities* | Total |
|---|---|---|---|
| **Liabilities** | | | |
| **24. Notes and mortgages payable:** | | | |
| A. Unsecured ........................................... | $ [1210] | $ [1390] | [1690] |
| B. Secured .............................................. | ▼25 [1211] $ | | [1700] |
| 25. Liabilities subordinated to claims of general creditors: | | | |
| A. Cash borrowings: ........................... ▼24 $ [970] | | [1400] | [1710] |
| 1. from outsiders | | | |
| 2. Includes equity subordination (15c3-1(d)) of ....... $ [980] | | | |
| B. Securities borowings, at market value ..... from outsiders $ [990] | | [1410] | [1720] |
| C. Pursuant to secured demand note collateral agreements ................................ | | [1420] ▼27 | [1730] |
| 1. from outsiders $ [1000] | | | |
| 2. Includes equity subordination (15c3-1(d)) of ....... $ [1010] | | | |
| D. Exchange memberships contributed for use of company, at market value ....................... | ▼26 [1430] | | [1740] |
| E. Accounts and other borrowings not qualified for net capital purposes ..................... | [1220] | [1440] | [1750] |
| 26. TOTAL LIABILITIES ....................................... | $ [1230] | $ [1450] | $ [1760] |
| | | | |
| **Ownership Equity** | | | |
| 27. Sole Proprietorship ................................................... | | $ | [1770] |
| 28. Partnership-limited partners ........................................ | $ [1020] | $ | [1780] |
| 29. Corporation: | | | |
| A. Preferred stock .............................................. | | | [1791] |
| B. Common stock ............................................... | | ▼28 | [1792] |
| C. Additional paid-in capital ..................................... | | | [1793] |
| D. Retained earnings ........................................... | | | [1794] |
| E. Accumulated other comprehensive income................ | | | [1797] |
| F. Total .............................................................. | | | [1795] |
| G. Less capital stock in treasury ................... | | ( ) | [1796] |
| TOTAL OWNERSHIP EQUITY ...................... | | $ | [1800] |
| 30. | | | |
| 31. TOTAL LIABILITIES AND OWNERSHIP EQUITY ...... | | $ | [1810] |

OMIT PENNIES

*Brokers or Dealers electing the alternative net capital requirement method need not complete these columns.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 111 of 164 PageID #:191

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### COMPUTATION OF NET CAPITAL

1. Total ownership equity from Statement of Financial Conditon - Item 1800 ................................................. $ _____ | 3480
2. Deduct Ownership equity not allowable for Net Capital .................................................................................... ( _____ ) | 3490
3. Total ownership equity qualified for Net Capital ................................................................................................ _____ | 3500
4. Add:
   A.  Liabilities subordinated to claims of general creditors allowable in computation of net capital ................... _____ | 3520
   B.  Other (deductions) or allowable credits (List) ............................................................................ 33 ▾ $ _____ | 3525
5. Total capital and allowable subordinated liabilities ........................................................................................ $ _____ | 3530
6. Deductions and/or charges:
   A.  Total nonallowable assets from
       Statement of Financial Condition (Notes B and C) ...................................... $ _____ | 3540
       1.  Additional charges for customers' and
           non-customers' security accounts ............................................... $ _____ | 3550
       2.  Additional charges for customers' and
           non-customers' commodity accounts ................................................. _____ | 3560
   B.  Aged fail-to-deliver .................................................................................... _____ | 3570
       1.  Number of items .................................... 29 ▾ _____ | 3450
   C.  Aged short security differences-less
       reserve of ........................................... $ _____ | 3460    30 ▾ _____ | 3580
       number of items ................................................ _____ | 3470
   D.  Secured demand note deficiency ............................................................ _____ | 3590
   E.  Commodity futures contracts and spot commodities
       - proprietary capital charges ...................................................... _____ | 3600
   F.  Other deductions and/or charges .................................................... _____ | 3610
   G.  Deductions for accounts carried under Rule 15c3-1(a)(6), (a)(7) and (c)(2)(x) ................... _____ | 3615
   H.  Total deductions and/or charges .......................................................................................... ( _____ ) | 3620
7. Other additions and/or allowable credits (List) ............................................................................ _____ | 3630
8. Net capital before haircuts on securities positions .................................................................... $ _____ | 3640
9. Haircuts on securities: (computed, where applicable, pursuant to 15c3-1(f)):
   A.  Contractual securities commitments .................................................................... $ _____ | 3660
   B.  Subordinated securities borrowings ...................................................................... _____ | 3670
   C.  Trading and investment securities:
       1.  Bankers' acceptances, certificates of deposit and commercial paper .......................... 31 ▾ _____ | 3680
       2.  U.S. and Canadian government obligations ................................................ _____ | 3690
       3.  State and municipal government obligations ................................................ _____ | 3700
       4.  Corporate obligations .................................................................... _____ | 3710
       5.  Stocks and warrants ...................................................................... _____ | 3720
       6.  Options .................................................................................. _____ | 3730
       7.  Arbitrage ................................................................................ _____ | 3732
       8.  Other securities ........................................................... 32 ▾ _____ | 3734
   D.  Undue Concentration ...................................................................................... _____ | 3650
   E.  Other (List) .................................................................................. _____ | 3736    ( _____ ) | 3740

10. Net Capital ......................................................................................................................... $ _____ | 3750

OMIT PENNIES

SEC 1695 (11-05) 11 of 28

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 110 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 112 of 164 PageID #:192

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
# PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### COMPUTATION OF BASIC NET CAPITAL REQUIREMENT

**Part A**

11. Minimum net capital required (6⅔% of line 19) ......................................................................... $ _____ | 3756 |
12. Minimum dollar net capital requirement of reporting broker or dealer and minimum net capital requirement
of subsidiaries computed in accordance with Note (A) ............................................................ $ _____ | 3758 |
13. Net capital requirement (greater of line 11 or 12) ................................................................. $ _____ | 3760 |
14. Excess net capital (line 10 less 13) ...................................................................................... $ _____ | 3770 |
15. Excess net capital at 1000% (line 10 less 10% of line 19) ........................................35 $ _____ | 3780 |

### COMPUTATION OF AGGREGATE INDEBTEDNESS

16. Total A.I. liabilities from Statement of Financial Condition ................................................ $ _____ | 3790 |
17. Add:
   A. Drafts for immediate credit ...........................................................34 $ _____ | 3800 |
   B. Market value of securities borrowed for which no equivilent value
     is paid or credited .........................................................$ _____ | 3810 |
   C. Other unrecorded amounts (List) ...............................$ _____ | 3820 | $ _____ | 3830 |
18. Deduct: Adjustment based on deposits in Special Reserve Bank Accounts (15c3-1(c)(1)(vii)) .......... $ _____ | 3838 |
19. Total aggregate indebtedness ............................................................................................. $ _____ | 3840 |
20. Percentage of aggregate indebtedness to net capital (line 19 ÷ by line 10) ............................... % _____ | 3850 |
21. Percentage of aggregate indebtedness to net capital *after* anticipated capital withdrawals
(line 19 ÷ by line 10 less Item 4880 page 25) ........................................................................ % _____ | 3853 |

### COMPUTATION OF ALTERNATE NET CAPITAL REQUIREMENT

**Part B**

22. 2% of combined aggregate debt items as shown in Formula for Reserve Requirements pursuant to Rule 15c3-3
prepared as of date of the net capital computation including both brokers or dealers and consolidated subsidiaries' debits ..............36 $ _____ | 3870 |
23. Minimum dollar net capital requirement of reporting broker or dealer and minimum net capital requirement of
subsidiaries computed in accordance with Note (A) ............................................................... $ _____ | 3880 |
24. Net capital requirement (greater of line 22 or 23) ................................................................ $ _____ | 3760 |
25. Excess net capital (line 10 less 24) ..................................................................................... $ _____ | 3910 |
26. Percentage of Net Capital to Aggregate Debits (line 10 ÷ by line17 page **8**) ........................... % _____ | 3851 |
27. Percentage of Net Capital, *after* anticipated capital withdrawals, to Aggregate Debits
(line 10 less item 4880 page 11 ÷ by line 17 page **8**) ........................................................... % _____ | 3854 |
28. Net capital in excess of the greater of:
   A. 5% of combines aggregate debit items or $120,000 ......................................................... $ _____ | 3920 |

### OTHER RATIOS

**Part C**

29. Percentage of debt to debt-equity total computed in accordance with Rule 15c3-1(d) ................. % _____ | 3860 |
30. Options deductions/Net Capital ratio (1000% test) total deductions exclusive of liquidating equity under
Rule 15c3-1(a)(6), (a)(7) and (c)(2)(x) ÷ Net Capital .......................................................... % _____ | 3852 |

**NOTES:**

(A) The minimum net capital requirement should be computed by adding the minimum dollar net capital requirement of the reporting broker dealer and, for each
subsidiary to be consolidated, the greater of:
1. Minimum dollar net capital requirement , or
2. 6⅔% of aggregate indebtedness or 2% of aggregate debits if alternative method is used.

(B) Do not deduct the value of securities borrowed under subordination agrements or secured demand notes covered by subordination agrements not in satisfactory form
and the market values of memberships in exchanges contributed for use of company (contra to item 1740) and partners' securities which were included in non-allowable
assets.

(C) For reports filed pursuant to paragraph (d) of Rule 17a-5, respondent should provide a list of material non-allowable assets.

SEC 1695 (11-05) 13 of 28

# PART II - FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT

| BROKER OR DEALER | | |
|---|---|---|
| | For the period (MMDDYY) from | 3932 | to | 3933 |
| | Number of months included in this statement | | 3931 |

## STATEMENT OF INCOME (LOSS) or STATEMENT OF COMPREHENSIVE INCOME (as defined in §210.1-02 of Regulation S-X), as applicable

### REVENUE

1. Commissions:
   a. Commissions on transactions in listed equity securities executed on an exchange .......... $ | 3935
   b. Commissions on transactions in exchange listed equity securities executed over-the-counter .......... | 3937
   c. Commissions on listed option transactions .......... | 3938
   d. All other securities commissions .......... | 3939
   e. Total securities commissions .......... | 3940
2. Gains or losses on firm securities trading accounts
   a. From market making in over-the-counter equity securities .......... | 3941
      1. Includes gains or (losses) OTC market making in exchange listed equity securities .......... | 3943
   b. From trading in debt securities .......... | 3944
   c. From market making in options on a national securities exchange .......... | 3945
   d. From all other trading .......... | 3949
   e. Total gains or (losses) .......... | 3950
3. Gains or losses on firm securities investment accounts
   a. Includes realized gains (losses) .......... | 4235
   b. Includes unrealized gains (losses) .......... | 4236
   c. Total realized and unrealized gains (loses) .......... | 3952
4. Profits or (losses) from underwriting and selling groups .......... | 3955
   a. Includes underwriting income from corporate equity securities .......... | 4237
5. Margin interest .......... | 3960
6. Revenue from sale of investment company shares .......... | 3970
7. Fees for account supervision, investment advisory and administrative services .......... | 3975
8. Revenue from research services .......... | 3980
9. Commodities revenue .......... | 3990
10. Other revenue related to securities business .......... | 3985
11. Other revenue .......... | 3995
12. Total revenue .......... $ | 4030

### EXPENSES

13. Registered representative's compensation .......... $ | 4110
14. Clerical and administrative employees' expenses .......... | 4040
15. Salaries and other employment costs for general partners, and voting stockholder officers .......... | 4120
    a. Includes interest credited to General and Limited Partners capital accounts .......... | 4130
16. Floor brokerage paid to certain brokers (see definition) .......... | 4055
17. Commissions and clearance paid to all other brokers (see definition) .......... | 4145
18. Clearance paid to non-brokers (see definition) .......... | 4135
19. Communications .......... | 4060
20. Occupancy and equipment costs .......... | 4080
21. Promotional costs .......... | 4150
22. Interest expense .......... | 4075
    a. Includes interest on accounts subject to subordination agreements .......... | 4070
23. Losses in error account and bad debts .......... | 4170
24. Data processing costs (including service bureau service charges) .......... | 4186
25. Non-recurring charges .......... | 4190
26. Regulatory fees and expenses .......... | 4195
27. Other expenses .......... | 4100
28. Total expenses .......... $ | 4200

### NET INCOME / COMPREHENSIVE INCOME

29. Income (loss) before Federal income taxes and items below (Item 12 less Item 28) .......... | 4210
30. Provision for Federal income taxes (for parent only) .......... | 4220
31. Equity in earnings (losses) of unconsolidated subsidiaries not included above .......... | 4222
    a. After Federal income taxes of .......... | 4238
32. [RESERVED]
    a. [RESERVED]
33. [RESERVED]
34. Net income (loss) after Federal income taxes .......... $ | 4230
35. Other comprehensive income (loss) .......... | 4226
    a. After Federal income taxes of .......... | 4227
36. Comprehensive income (loss) .......... | 4228

### MONTHLY INCOME

37. Income (current month only) before provision for Federal income taxes .......... $ | 4211

SEC 1695 (11-05) 15 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 114 of 164 PageID #:194

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### COMPUTATION FOR DETERMINATION OF RESERVE REQUIRTEMENTS
### FOR BROKER-DEALERS UNDER RULE 15c3-3
### (See Rule 15c3-3, Exhibit A and Related Notes)

**CREDIT BALANCES**

1. Free credit balances and other credit balancesin customers' security accounts (see Note A, Exhibit A, Rule 15c3-3) ........................................ [46] $ _____ | 4340 |

2. Monies borrowed collateralized by securities carried for the accounts of customers (see Note B) .......................................................... _____ | 4350 |

3. Monies payable against customers' securities loaned (see Note C) ............................. _____ | 4360 |

4. Customers' securities failed to receive (see Note D) ........................................ _____ | 4370 |

5. Credit balances in firm accounts which are attributable to principal sales to customers ............... _____ | 4380 |

6. Market value of stock dividends, stock splits and similar distributions receivable outstanding over 30 calendar days .......................................................... _____ | 4390 |

7. **Market value of short security count differences over 30 calendar days old .................. _____ | 4400 |

8. **Market value of short securities and credits (not to be offset by logs or by debits) in all suspense accounts over 30 calendar days ........................................ [47] _____ | 4410 |

9. Market value of securities which are in transfer in excess of 40 calendar days and have not been confirmed to be in transfer by the transfer agnet or the issuer during the 40 days ......................... _____ | 4420 |

10. Other (List) ................................................................. _____ | 4425 |

11. TOTAL CREDITS ................................................................ $ _____ | 4430 |

**DEBIT BALANCES**

12. **Debit balances in customers' cash and margin accounts excluding unsecured accounts and accounts doubtful of collection net of deductions pursuant to Note E, Exhibit A, Rule 15c3-3 ....... $ _____ | 4440 |

13. Securities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver ........................................... _____ | 4450 |

14. Failed to deliver of customers' securities not older than 30 calendar days ........................... _____ | 4460 |

15. Margin required and on deposit with Options Clearing Corporation for all option contracts written or purchased in customer accounts (see Note F) .......................................... _____ | 4465 |

16. Other (List). ................................................................. [48] _____ | 4469 |

17. **Aggregate debit items ........................................................... $ _____ | 4470 |

18. **Less 3% (for alternative method only–see Rule 15c3-1(f)(5)(i) ................................. ( _____ ) | 4471 |

19. **TOTAL 14c3-3 DEBITS ........................................................... $ _____ | 4472 |

**RESERVE COMPUTATION**

20. Excess of total debits over total credits (line 19 less line 11) ...................................... [49] $ _____ | 4480 |

21. Excess of total credits over total debits (line 11 less line 19) ...................................... _____ | 4490 |

22. If computation permitted on a monthly basis, enter 105% of excess of total credits over total debits ................. _____ | 4500 |

23. Amount held on deposit in "Reserve Bank Account(s)," including value of qualified securities, at end of reporting period ................. _____ | 4510 |

24. Amount of deposit (or withdrawal) including $ _____ | 4515 | value of qualified securities .......................... _____ | 4520 |

25. New amount in Reserve Bank Account(s) after adding deposit or subtracting withdrawal including $ _____ | 4525 | value of qualified securities ................. $ _____ | 4530 |

26. Date of deposit (MMDDYY) ........................................................... _____ | 4540 |

**FREQUENCY OF COMPUTATION**

27. Daily [50] _____ | 4332 |   Weekly _____ | 4333 |   Monthly _____ | 4334 |

** In the event the Net Capital Requirement is computed under the alternative method, this "Reserve Formula" shall be prepared in accordance with the requirements of paragraph (f) of Rule 15c3-1.

SEC 1695 (11-05) 17 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 114 of 162

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 115 of 164 PageID #:195

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### COMPUTATION FOR DETERMINATION OF RESERVE REQUIRTMENTS
### FOR BROKER-DEALERS UNDER RULE 15c3-3 (continued)

**EXEMPTIVE PROVISIONS**

28. If an exemption from Rule 15c3-3 is claimed, identify below the section upon which such exemption is based (check only one)

    A.  (k)(1) — $2,500 capital category as per Rule 15c3-1 ........................................................................... [52] $ _____ 4550

    B.  (k)(2)(A) — "Special Account for the Exclusive Benefit of customers" maintained .......................................... _____ 4560

    C.  (k)(2)(B) — All customer transactions cleared through another broker-dealer on a fully disclosed basis.

        Name of clearing firm [51] | 4335 | _____ 4570

    D.  (k)(3) — Exempted by order of the Commission ....................................................................................... _____ 4580

### Information for Possession or Control Requirements Under Rule 15c3-3

State the market valuation and number of otems of:

    1.  Customers' fully paid securities and excess margin securities not in the respondent's posession or control as of the report date (for which instructions to reduce to possession or control had been issued as of the report date) but for which the required action was not taken by respondent within the time frame specified under Rul 15c3-3. Notes A and B ...................................... $ _____ 4586

        A.  Number of items .................................................................................................................................. _____ 4587

    2.  Customers' fully paid securities and excess margin securities for which instructions to reduce possession or control had not been issued as of the report date, excluding items arising from "temporary lags which result from normal business operations" as permitted under Rule 15c3-3. Notes B, C and D ................................................................................... $ _____ 4588

        A.  Number of items ............................................................................................................................. [53] _____ 4589

        OMIT PENNIES

    3.  The system and procedures utilitzed in complying with the requirement to maintain physical possession or control of customers' fully paid and excess margin securities have been tested and are functioning in a manner adequate to fulfill the requirements of Rule 15c3-3 .......................................... Yes _____ 4584   No _____ 4585

**NOTES**

A—Do not include in item one customers' fully paid and excess margin securities required by Rule 15c3-3 to be in possession or control but for which no action was required by the respondent as of the report date or required action was taken by respondent with the time frames specified under Rule 15c3-3.

B—State separately in response to items one and two whether the securities reported in response thereto were subsequently reduced to possession or control by the respondent.

C—Be sure to include in item two only items not arising from "temporary lags which result from normal business operations" as permitted under Rule 15c3-3.

D—Item two must be responded to only with report which is filed as of the date selected for the broker's or dealer's annual audit of financial statements, whether or not such date is the end of a calendar quarter. The response to item two should be filed within 60 calendar days after such date, rather than with the remainder of this report. This information may be required on a more frequest basis by the Commission or the designated examining authority in accordance with Rule 17a-5(a)(2)(iv).

SEC 1695 (11-05) 19 of 28

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 114 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 115 of 162

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 116 of 164 PageID #:196

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
# PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### SCHEDULE OF SEGREGATION REQUIREMENTS AND FUNDS IN SEGREGATION

### CUSTOMER'S REGULATED COMMODITY FUTURES ACCOUNTS

**SEGREGATION REQUIREMENTS**

1. Net ledger balance:
   A. Cash ........................................................................................................................... | 7010
   B. Securities (at market) .................................................................................................. | 7020
2. Net unrealized profit (loss) in open futures contracts traded on a contract market .......... | 7030
3. Exchange traded options:
   A. Add: Market Value of an open option contracts purchased on a contract market ........ | 7032
   B. Deduct: Market Value of an open option contracts granted (sold) on a contract market ... | 7033
4. Net equity (deficit) (total of 1, 2 and 3) ........................................................................ | 7040
5. Add accounts liquidating to a deficit and accounts with debit balances with no open trades ... | 7050
6. Amount required to be segregated (total of 5 and  4) ...................................................... | 7060

**FUNDS ON DEPOSIT IN SEGREGATION**

7. Deposited in segregated funds bank accounts:
   A. Cash ........................................................................................................................... | 7070
   B. Securities representing investments of customers' fund (at market) ............................. | 7080
   C. Securities held in particular customers or option customers in lieu of cash (at market) ... | 7090
8. Margin on deposits with clearing organizations of contract markets:
   A. Cash ........................................................................................................................... | 7100
   B. Securities representing investments of customers' fund (at market) ............................. | 7110
   C. Securities held in particular customers or option customers in lieu of cash (at market) ... | 7120
9. Settlement due from (to) clearing organizations of contract markets .............................. | 7130
10. Exchange traded options:
   A. Add: Unrealized receivables for option contracts purchased on contract markets ....... | 7132
   B. Deduct: Unrealized obligations for option contracts granted (sold) on contract markets ... | 7133
11. Net equities with other FCMs .......................................................................................... | 7140
12. Segregated funds on hand:
   A. Cash ........................................................................................................................... | 7150
   B. Securities representing investments of customers' funds (at market) ............................ | 7160
   C. Securities held for particular customers in lieu of cash (at market) ............................. | 7170

13. Total amount in segregation *total of 7 through 12) ...................................... $ | 7180
14. Excess (insufficiency) funds in segregation (13 minus 6) .............................. $ | 7190

SEC 1695 (11-05) 21 of 28

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

**Ownership Equity and Subordinated Liabilities maturing or proposed to be withdrawn within the next six months and accruals, (as defined below), which have not been deducted in the computation of Net Capital.**

| Type of Proposal Withdrawal or Accrual See below for code to enter | Name of Lender or Contributor | Insider or Outsider? (In or Out) | Amount to be Withdrawn (cash amount and/or Net Capital Value of Securities) | (MMDDYY) Withdrawal or Maturity Date | Expect to Renew (Yes or No) |
|---|---|---|---|---|---|
| 54 [4600] | [4601] | [4602] $ | [4603] | [4604] | [4605] |
| 55 [4610] | [4611] | [4612] | [4613] | [4614] | [4615] |
| 56 [4620] | [4621] | [4622] | [4623] | [4624] | [4625] |
| 57 [4630] | [4631] | [4632] | [4633] | [4634] | [4635] |
| 58 [4640] | [4641] | [4642] | [4643] | [4644] | [4645] |
| 59 [4650] | [4651] | [4652] | [4653] | [4654] | [4655] |
| 60 [4660] | [4661] | [4662] | [4663] | [4664] | [4665] |
| 61 [4670] | [4671] | [4672] | [4673] | [4674] | [4675] |
| 62 [4680] | [4681] | [4682] | [4683] | [4684] | [4685] |
| 63 [4690] | [4691] | [4692] | [4693] | [4694] | [4695] |

Total $ 64 _____ [4699]*

OMIT PENNIES

\* To agree with the total on Recap (Item No. 4880)

Instructions: Detail Listing must include the total of items maturing during the six month period following the report date, regardless of whether or not the capital contribution is expected to be renewed. The schedule must also include proposed capital withdrawals scheduled within the six month period following the report date including the proposed redemption of stock and payments of liabilities secured by fixed assets (which are considered allowable assets in the capital computation pursuant to Rule 15c3-1(c)(2)(iv)), which could be required by the lender on demand or in less than six months.

**WITHDRAWAL CODE:**

| | **DESCRIPTIONS** |
|---|---|
| 1. | Equity Capital |
| 2. | Subordinated Liabilities |
| 3. | Accruals |
| 4. | 15c3-1(c)(2)(iv) Liabilities |

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 118 of 164 PageID #:198

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## Capital Withdrawals
## PART II

| BROKER OR DEALER | as of _____ |
| --- | --- |

### RECAP
**Ownership Equity and Subordinated Liabilities maturing or proposed to be withdrawn within the next six months and accruals, (as defined below), which have not been deducted in the computation of Net Capital.**

1. **Equity Capital**
   A. Partnership Capital:
      1. General Partners ............................................................................ $ [65] | 4700
      2. Limited .......................................................................................... | 4710
      3. Undistributed Profits ................................................................... | 4720
      4. Other (describe below) ................................................................ | 4730
      5. Sole Proprietorship ..................................................................... | 4735
   B. Corporation Capital:
      1. Common Stock .............................................................................. | 4740
      2. Preferred Stock ............................................................................ | 4750
      3. Retained Earnings (Dividends and Other) ................................. [66] | 4760
      4. Other (describe below) ................................................................ | 4770
2. **Subordinated Liabilities**
   A. Secured Demand Notes ....................................................................... | 4780
   B. Cash Subordinates .............................................................................. | 4790
   C. Debentures ......................................................................................... | 4800
   D. Other (describe below) ........................................................................ | 4810
3. **Other Anticipated Withdrawals**
   A. Bonuses ............................................................................................... | 4820
   B. Voluntary Contributions to Pension or Profit Sharing Plans ........... [67] | 4860
   C. Other (describe below) ....................................................................... | 4870
   Total ...................................................................................................... $ | 4880
4. **Description of Other**
   _____
   _____
   _____

### STATEMENT OF CHANGES IN OWNERSHIP EQUITY
### (SOLE PROPRIETORSHIP, PARTNERSHIP OR CORPORATION)

1. Balance, beginning of period ............................................................ $ | 4240
   A. Net income (loss) ............................................................................. | 4250
   B. Additions (includes non-conforming capital of $ | 4263 | [68] | 4260
   C. Deductions (includes non-conforming capital of $ | 4272 | 4270
2. Balance, end of period (From Item 1800) ............................................ $ | 4290

### STATEMENT OF CHANGES IN LIABILITIES SUBORDINATED
### TO CLAIMS OF GENERAL CREDITORS

3. Balance, beginning of period ............................................................ $ | 4300
   A. Increases .......................................................................................... | 4310
   B. Decreases .......................................................................................... ( | 4320
4. Balance, end of period (From Item 3520) ............................................ $ | 4330

OMIT PENNIES

SEC 1695 (11-05) 25 of 28

# FINANCIAL AND OPERATIONAL COMBINED UNIFORM SINGLE REPORT
## PART II

| BROKER OR DEALER | as of _____ |
|---|---|

### FINANCIAL AND OPERATIONAL DATA

| | | Valuation | | Number |
|---|---|---|---|---|
| 1. Month end total number of stock record breaks unresolved over three business days | | | | |
| A. breaks long .......................................................................................... $ | | 4890 | | 4900 |
| B. breaks short ........................................................................................ ▾72 $ | | 4910 | ▾74 | 4920 |

2. Is the firm in compliance with Rule 17a-13 regarding periodic count and verification
of securities positions and locations at least once in each calendar quarter?
(Check one)     Yes [ 4930 ]      No [ 4940 ]

| | | |
|---|---|---|
| 3. Personnel employed at end of reporting period: | | |
| A. Income producing personnel ................................................................................... | | 4950 |
| B. Non-income producing personnel (all other) ............................................................. | | 4960 |
| C. Total ......................................................................................................................... | | 4970 |
| 4. Actual number of tickets executed during current month of reporting period ..................... | | 4980 |
| 5. Nuber of corrected customer confirmations mailed after settlement date .......................... | | 4990 |

| | No. of Items | Debit (Short Value) | No. of Items | Credit (Long Value) |
|---|---|---|---|---|
| 6. Money differences ................................. ▾89 | 5000 | $ 5010 | 5020 ▾75 | $ 5030 |
| 7. Security suspense accounts .................. | 5040 | $ 5050 | 5060 | $ 5070 |
| 8. Security difference accounts ................. | 5080 | $ 5090 | 5100 | $ 5110 |
| 9. Commodity suspense accounts .............. | 5120 | $ 5130 | 5140 | $ 5150 |
| 10. Open transactions with correspondents, other brokers, clearing organizations, depositories and interoffice and inter-company accounts which could result in a charge — unresolved amounts over 30 calendar days ................................ | 5160 | $ 5170 | 5180 | $ 5190 |
| 11. Bank account reconciliations — unresolved amounts over 30 calendar days .............. | 5200 ▾71 | $ 5210 ▾73 | 5220 | $ 5230 |
| 12. Open transfers over 40 calendar days, not confirmed .. ....................................... | 5240 | $ 5250 | 5260 | $ 5270 |
| 13. Transactions in reorganization accounts — over 60 calendar days ...................... ▾70 | 5280 | $ 5290 | 5300 ▾76 | $ 5310 |
| 14. Total .................................................... | 5320 | $ 5330 | 5340 | $ 5350 |

| | No. of Items | Leger Amount | Market Value |
|---|---|---|---|
| 15. Failed to deliver 11 business days or longer (21 Business Days or longer in the case of Municipal Securities) ...................... | 5360 | $ 5361 | 5362 |
| 16. Failed to receive 11 business days of longer (21 business Days or longer in the case of Municipal Securities) ...................... | 5363 | $ 5364 | 5365 |

| | | |
|---|---|---|
| 17. Security concentrations (See instructions in Part I): | | |
| A. Proprietary positions .......................................................................................... $ | | 5370 |
| B. Customers' accounts under Rule 15c3-3 ............................................................. $ | | 5374 |
| 18. Total of personal capital borrowings due within six months ............................................ $ | | 5378 |
| 19. Maximum haircuts on underwriting commitments during the period ............................. ▾77 $ | | 5380 |
| 20. Planned capital expenditures for business expansion during next six months ................ $ | | 5382 |
| 21. Liabilities of other individuals or organizations guaranteed by respondent .................... $ | | 5384 |
| 22. Lease and rentals payable within one year .................................................................. $ | | 5386 |
| 23. Aggregate lease and rental commitments payable for entire term of the lease | | |
| A. Gross ................................................................................................................. $ | | 5388 |
| B. Net .................................................................................................................... $ | | 5390 |

OMIT PENNIES

SEC 1695 (11-05) 27 of 28

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0123 |
| Expires: | August 31, 2020 |
| Estimated average burden hours per response......12.00 | |

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM X-17A-5 PART II
# (FOCUS Report)

## GENERAL INSTRUCTIONS

This FOCUS Report (Form X-17A-5) constitutes the basic financial and operational report required of those brokers or dealers subject to any minimum net capital requirement set forth in Rule 15c3-1. The instructions issued from time-to-time must be used in preparing this report and are considered integral part of this report.

The report shall be filed with the regulatory organization designated as the Examining Authority for the broker or dealer. The name of the broker or dealer and date of report shall be repeated on each sheet of the report submitted. If no response is made to an item or subdivision on thereof it shall constitute a representation that the broker or dealer has nothing to report.

The designated Examining Authority may at any time or from time-to-time in the case of a particular broker or dealer, subject to applicable rules or regulations, prescribe more frequent filing requirements than those prescribed herein.

Foreign currency may be expressed in terms of United States dollars at the current rate of exchange and where carried in conjunction with the United States dollar balances for the same customer may be consolidated with United States dollar balances and the gross or net position reported in its proper classification, provided the foreign currency is not subject to any restriction as to conversion. If the foreign currency position so treated is substantial, some indication of its size shall be given.

Aggregate Indebtedness and Net Capital are defined terms, which must be referred to in the applicable capital requirements rule. Accompanying the FOCUS Report are instructions relating to specific items which must be followed. Any deviations from these specific instructions must be clearly explained in footnotes to the report.

If the broker or dealer is a sole proprietor, all securities owned and all accounts carried for it by other brokers, dealers, or others which contain money balances and/or securities shall be reported, as appropriate.

"Exempted Securities" are those securities defined as such under the provisions of Section 3(a)(12) of the Securities Exchange Act of 1934 other than securities designated for exemption by action of the Commission.

The term "contractual commitments" shall include underwriting, when issued, when-distributed and delayed delivery contracts, the writing or endorsement of puts and calls and combinations thereof, commitments in foreign currencies and spot (cash) commodity contracts, but shall not include future commodity contracts and un-cleared "regular way" purchases and sales of securities. A series of contracts of purchase or sale of the same security conditioned, if at all, only upon issuance may be treated as an individual commitment.

"Securities which are not readily marketable" shall be so designated. The term "securities not readily marketable" includes, but is not limited to: (a) securities for which there is no "ready market"; (b) securities, except "exempted securities," for which there is no market on a securities exchange or no independent publicly quoted market; (c) securities which cannot be publicly offered or sold unless registration has been effected under the Securities Act of 1933 (or the conditions of an exemption, such as Regulation A, under Section 3(b) of such Act have been complied with); (d) securities which have cannot be publicly offered or sold because of statutory, regulatory or contractual arrangement or other restrictions.

The term "ready market" shall include a recognized established securities market in which there exists independent bona-fide offers to buy and sell so that a price reasonably related to the last sales price or current bona-fide competitive bid and offer quotations can be determined for a particular security almost instantaneously and where payment will be received in settlement of a sale at such price within a relatively short time conforming to trade custom.

A "ready market" shall also be deemed to exist where such securities have been accepted as collateral for a loan by a bank as defined in Section 3(a)(6) of the Securities Exchange Act of 1934 and where the broker or dealer demonstrates to its Examining Authority that such securities adequately secure such loans.

Indebtedness shall be deemed to be adequately collateralized or secured when the excess of the market value of the collateral over the amount of indebtedness is sufficient to make the loan acceptable as a fully secured loan to banks regularly making secured loans to brokers or dealers.

The term "Examining Authority" of a broker or dealer shall mean the national securities exchange or national securities association of which the broker or dealer is a member or, if the broker or dealer is a member of more than one such self-regulatory organization, the organization designated by the Commission as the Examining Authority for such broker or dealer, or if the broker or dealer is not a member of any such self-regulatory organization, the Regional Office of the Commission where such broker or dealer has its principal place of business.

**Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.**

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 119 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 121 of 164 PageID #:201

The term "customer" and "non-customer" is defined as set forth in Rule 15c3-1(c)(6) and (7).

In order to expedite the preparation of the financial data called for in the report, fractions *may be* dropped from the prices in determining *any* or *all-long* valuations. (No price should be used which is higher than the actual market price, i.e., 17 7/8 use 17 but not 18. However, if fractions are not used for *any* or *all short* valuations use the higher price, i.e., 18 1/8 use 18 but not 17. Money amounts should be expressed in whole dollars.

Financial statements shall be prepared in conformity with generally accepted accounting principles (except where otherwise requested) applied on a basis consistent with that of the preceding report and shall include, in the basic statement or accompanying footnotes, all informative disclosures necessary to make the statement a clear expression of the organization's financial and operational condition. The broker or dealer must report all data after proper accruals have been made for income and expense not recorded in the books of account and adequate reserves have been provided for deficits in customer or broker accounts, unrecorded liabilities, security differences, dividends and similar items.

The amount of terms (including commitment fees and the conditions under which lines may be withdrawn) of unused lines of credit for short-term financing shall be disclosed, if significant, in notes to the financial statements.

Retain for at least 3 years a copy of each FOCUS Report filed, along with all the working papers and memoranda used in the preparation of each FOCUS Report. (Refer to Rule 17a-4.) Working papers, etc. must be made available for review by a representative of the designated Examining Authority.

**Filing Requirements for Part II**

Part II shall be filed quarterly by firms not clearing or carrying customer accounts, and those firms which are subject to the requirements of Rule 15c3-1(a)(2) and (3). Part II shall be filed monthly by such of these firms which receive written notice pursuant to Rule 17a-5(a)(2)(iv) that they have exceeded parameters set by the self-regulators.

STATEMENT OF FINANCIAL CONDITION

**Cash**

Cash in banks subject to withdrawal restrictions such as time deposits not subject to Regulation Q of the Federal Reserve System and deposits of foreign currency with exchange or transfer restrictions of funds held in escrow shall be shown as "Other assets – Non-Allowable."

State separately (a) restricted deposits held as compensating balances against borrowing arrangements; (b) funds subject to repayment on call or immediately after the date of the balance sheet required to be files; and (c) other funds, the amounts of which are known to be subject to withdrawal or usage restrictions, e.g., special purpose funds. The general terms and nature of such repayment provisions in (b) and withdrawal or usage restrictions in (c) shall be described in a note referred to herein. In cases where compensating balance arrangements exist but are not agreements which restrict the use of cash amounts shown on the balance sheet, describe these arrangements and the amounts involved, if determinable, in the notes to the financial statements. Compensating balances that are maintained under an agreement to assure future credit availability shall be separately disclosed in the notes to the financial statements along with the amount and terms of such agreement.

Bank overdrafts are not to be netted against balances in unrelated bank depositories. They shall be included in "Bank loans payable" as "A. I. Liabilities."

**Cash segregated in compliance with federal and other regulations**

Include in the above category and cash segregated under the Commodity Futures Trading Commission Act, cash segregated under provisions of Rule 15c3-3 – Special Reserve Bank Account for the Exclusive Benefit of Customers and funds segregated pursuant to regulations of any agency of the federal government, any state and national securities exchange or national securities association.

See Rule 15c3-1(c)(2)(iv)(E) as to the proper classification of funds on deposit in a "segregated trust account" in accordance with Rule 27d-1 under the Investment Company Act of 1940.

**Receivable from brokers or dealers and clearing organizations**

The following accounts carried by other brokers or dealers shall be included in "Omnibus accounts" in the appropriate subsection:

1. Accounts secured by, or containing collateral.
2. Receivables for regulated and non-regulated commodities futures' accounts liquidating to a deficit on the respondent's books of account.

Regarding item 2, the amount (receivable) included in the "Omnibus account" shall include net ledger balances and losses and gains on commodities future contracts.

SEC1695A (11-05) 2 of 17

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 120 of 162

Amounts receivable (net) from a clearing organization utilizing a continuous net settlement system shall be included in the category – "Clearing organizations" in the appropriate subsection.

## Receivables from customers

See the general instructions for definitions of the terms "customer" and "non-customer." Receivables from those indicated, as "non-customers" shall be shown in their respective categories in the Statement of Financial Condition.

All accounts (other than regulated commodity accounts) of any one customer may be combined and reported under any appropriate classification other than cash accounts. Customers' accounts related by bona-fide written guarantees maybe combined.

Net ledger balances and losses and gains in commodity futures accounts liquidating to a deficit, rather than only ledger balance may be included in this section.

The amount reported as an allowable asset represents those portions of partly secured amounts which are deemed to be fully secured. The remaining portion of the ledger debit balance shall be considered as non-allowable. The haircuts on the long and/ or short securities in partly secured accounts are included in the Computation of Net Capital below "Haircuts on securities."

Include in the allowable column the debit balance relative to secured commodity accounts with spot (cash) commodity positions which (a) resulted from a tender made on a futures contract within the past 90days and (b) are evidenced by a warehouse receipt(s) issued by a warehouse licensed by a commodity exchange. Include the debit balance in the non-allowable column if there is any deviation from (a) or (b).

Partly secured accounts with spot (cash) commodity positions shall be reported in the manner described above for partly secured accounts except that haircuts on market values shall be included in the Computation of Net Capital in the following category – "Additional charge for customers' and non-customers' commodity accounts."

## Receivables from non-customers

The amount reported as an allowable asset represents those portions of partly secured accounts which are deemed to be fully secured. The remaining portion of the ledger debit balance shall be considered as non-allowable. The haircuts on the long and/ or short securities in partly secured accounts are included in the Computation of Net Capital below "Haircuts on securities."

Partly secured accounts with spot (cash) commodity positions shall be reported in the manner described above for partly secured accounts except that haircuts on market values shall be included in the Computation of Net Capital in for following category – "Additional charge for customers' and non-customers commodity accounts."

## Securities purchased under agreement to resell

Report in this section reverse repurchase agreements for securities. Report the cost of securities which have been purchased as principal under an agreement to resell securities to the seller. These transactions result in the broker or dealer having a secured receivable from the borrower of funds from him and the net capital treatment is to deduct the deficiency, if any, in the security collateralizing the receivable.

## Securities and spot commodities owned, at market value

Security and spot (cash) commodity valuations as well as losses and gains in future commodity contracts shall be based upon market prices as at the date of the statement of financial condition; fractions and accrued interest with respect to securities may be omitted except where such procedure in the case of short positions would have a material effect on Net Capital.

For the purpose of this report securities sold as principal: under a repurchase agreement shall be deemed to be securities owned by the broker or dealer and the market value shall be included in this section. The proceeds of sale shall be included as a credit in the Statement of Financial Condition under "Securities sold under repurchase agreements."
Joint trading and investment accounts in which the reporting broker or dealer has an interest shall be reported as follows:

a) Accounts carried by the reporting broker or dealer – For those accounts carried by the reporting broker or dealer include its applicable portion of the market value or marketable securities and spot commodities, in the appropriate item. The reporting broker or dealer's related portion of unrealized gain or loss shall be reflected in the appropriate statements. The other participant(s)' interest in the joint account shall be treated as a non-customer's account and included as a receivable from or payable to non-customer as applicable. A margin deposit by the other participant shall be included when determining the other participant(s)' interest. If the other participant(s)' interest is in deficit, then the same treatment given to all partly secured or unsecured non-customer accounts in the Computation of Net Capital shall apply. If the other participant(s)' equity is not sufficient to meet margin requirements and no exemption has been granted by the designated Examining Authority, the amount of the cash margin deficiency shall be included as a charge in the determination of Net Capital. The other participant(s)' interest in realized gains and losses and miscellaneous income and expense items related to the joint account are not to be reflected in the reporting broker or dealer's profit and loss accounts but should be reflected as due to or due from the other participant(s).

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 123 of 164 PageID #:203

b) Accounts carried by others – For those accounts carried by others, the reporting broker or dealer will include his portion of the market value of marketable securities and spot commodities in the appropriate item. A margin deposit by the reporting broker or dealer is an allowable asset in the computation of Net Capital. The reporting broker or dealer's portion of all realized gains and losses and miscellaneous income and expense items, related to the joint account shall be reflected in the appropriate statement with the contra being due to or due from the other participant(s). The interest of other participant(s) should not be included in this report.

c) Joint foreign and domestic arbitrage accounts in which the reporting broker or dealer has an interest – Money balances and securities positions carried by the reporting broker or dealer and by a participant shall be combined and considered on a net basis (offsetting positions in the same security shall be netted). Adjustments may be made where different clearance dates apply to transactions made on the same day in the same security.

The reporting broker's or dealer's portion of any net debit or credit balance shall be considered in determining losses or gains and in marking positions to the market. The reporting broker or dealer's interest in any long and/or short security positions should be at market value. However, consideration should be given to setting up an appropriate reserve for any deficit in the participant's interest. The participant's share of any credit balances carried on the respondent's books for these accounts is to be included in Aggregate Indebtedness.

d) If the joint account nets a credit balance or is a free credit balance, include in "Payable to non-customers" (A. I. Liabilities) the amount of such balance multiplied by the participant's percentage of the account. Any margin deposits received regarding the above would be included in "Payable to brokers or dealers – Other" (A. I. Liabilities).

e) If the joint accounts nets to a secured debit balance and the participant's percentage times such balance equals an amount less than the participant's margin deposit, then the difference (amount) between the two shall be included in "Payable to brokers or dealers – Other" (A. I. Liabilities) and the remainder of the deposit shall be included as a non-A. I. Liabilities. The participant's portion of the net debit balance in the joint account shall be included in "Receivables non-customers."

Include in the "Options" category the market value of all long listed options. The market value of all short listed options shall be included in the liability section in "Securities sold not yet purchased at market value." Unrealized gains and/or losses shall be reflected in the appropriate statement since all such positions shall be marked-to-the- market.

Regarding unlisted options, the following treatment for financial statement purposes is to be followed:

*Unlisted call options* – regarding such long options include unrealized profits where the market value of the underlying security exceeds the exercise value of the respective option. For such short options, include unrealized losses where the market value of the underlying security exceeds the exercise value of the respective option.

*Unlisted put options* – regarding such long options include unrealized profits where the market value of the underlying security is less than the exercise value of the respective option. For such short options, include unrealized losses where the market value of the underlying security is less than the exercise value of the respective option.

Unrealized profits and/or losses included in net worth on unlisted options shall be increased or decreased by the write-off of any un-amortized cost of the long options or recognition of any un-amortized proceeds from the writing or sale of such options.

See Rule 15c3-1, Appendix A, paragraph (a) for the definition of listed and unlisted options.

Positions in a broker or dealer's (trading) error account should be marked-to-the-market and the value of the security positions reported in the appropriate item. Positions long in suspense or difference accounts without a related money balance should not be included herein. Refer to Rule 15c3-1(c)(2)(v) as to the treatment of short security differences.

Accrued interest receivable and payable in the broker or dealer's readily marketable securities in its accounts may be added to the market value of the respective securities. The interest is subject to the same haircut as the security to which it pertains.

**Securities not readily marketable, at estimated fair value**

See the general instructions and Rule 15c3-1(c)(2)(iv) (K-L), (c)(2)(vii) and (c)(11).

**Other investments not readily marketable**

The amount reported as an allowable asset represents that portion which would otherwise be considered non-allowable except for the fact that it adequately secures indebtedness. (See Rule 15c3-1(c)(2)(iv) and (c)(1)(viii).

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 124 of 164 PageID #:204
Page 123 of 162

**Secured demand notes – satisfactory subordination agreements**

Subordination agreements must conform with the minimum requirements of Rule 15c3-1 Appendix D in order that the respective amounts may be included in Net Capital (satisfactory subordination agreements). See Appendix D, (c)(7) regarding subordination agreements in effect prior to adoption of Rule 15c3-1. Subordinations which are not covered by satisfactory subordination agreements will be included as non-allowable assets.

The collateral contained in each secured demand note collateral account shall relate only to the specific demand note that it collateralizes. The excess collateral value in one account shall not be applied to the deficiency in another account. No collateral value shall be given for secured demand note collateral which has no ready market.

**Investment in and receivables from affiliates, subsidiaries and associated partnerships**

Bona-fide transactions between brokers or dealers and guaranteed subsidiaries – un-subordinated amounts due from a guaranteed subsidiary, provided that the books and records of the guaranteed subsidiary reflect the same exact liability to the parent, shall be allowable assets. This applies when there is no consolidation of assets and liabilities for Net Capital purposes as stipulated in Rule 15d3-1 Appendix C.

**Property, furniture, equipment, leasehold improvements and rights under lease agreements, at cost**

Report as allowable amounts of fixed assets and assets which cannot readily be converted into cash, equal to any indebtedness adequately secured thereby. Such allowability is for those assets acquired for use in the ordinary course of the trade or business of a broker or dealer. Also report as allowable in the amount of the liability, those assets not readily convertible into cash wherein such assets are the sole recourse of the creditor for the non-payment of the related liability. Report as non-allowable any remainder and/or asset which do not conform with the above provisions. See Rule 15c3-1(c)(2)(iv) and (c)(2)(viii).

**Other Assets – Dividends and interest receivable**

The amount reported as an allowable asset represents that portion of dividends receivable not outstanding longer than 30 days from the payable date, and interest receivable not outstanding longer than 30 days from the date it arises. Dividends receivable and payable are not to be netted; they are to be recorded in separate accounts

In addition, in cases where dividends are declared for the same security but at different intervals (i.e., quarterly dividends), the claims for the different intervals shall not be netted.

**Other Assets – Free Shipments**

Receivables relating to free shipments of securities (other than mutual fund redemptions) in excess of $5,000 per shipment are non-allowable assets. All free shipments, including mutual fund redemptions, are non-allowable assets if outstanding more than 7 business days. See Rule 15c3-1(c)(2)(iv)(B).

**Other Assets – Loans and Advances**

Report amounts related to employees as allowable assets if secured by readily marketable securities and meet the margin requirements of the designated Examining Authority. Loans and advances to partners, directors, officers and subordinated lenders are to be included in the "Receivables from non-customers."

**Other Assets – Miscellaneous**

Insurance claims receivable – report as non-allowable asset if (1) after 7 business days from date of discovery not covered by opinion of outside counsel that claim is valid and covered by insurance policies presently in effect; (2) after 20 business days from date of discovery claim is not acknowledged in writing as due and payable by the insurance carrier; or (3) claim is not paid within 20 business days following date of such acknowledgement by the carrier. See Rule 15c3-1(c)(2)(iv)(D).

Mutual fund concessions receivable and management fees receivable from registered investment companies – report as non-allowable assets if outstanding for more than 30 days from the date they arise. See Rule 15c3-1(c)(2)(iv)(C).

Future income tax benefits arising as a result of unrealized losses may be recognized only to the extent such benefits do not exceed the amount of income tax liabilities accrued on the books and records of the broker or dealer and only to the extent such benefits could have been applied to reduce accrued tax liabilities on the date of the capital computation had the related unrealized losses been realized on that date. Any other benefits of this type recorded on the books which do not conform with the above shall be included as a non-allowable asset. See Rule 15c3-1(c)(2)(iv)(D).

Cash Surrender Value of Life Insurance Policies – report as an allowable asset if the cash surrender value and face value are payable (1) to the estate of the sole proprietor – broker or dealer or (2) to the broker or dealer if a partnership or corporation.

Syndicate profits receivable shall be considered as unsecured receivables and therefore included as non-allowable. See Rule 15c3-1(c)(2)(iv)(C).

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 125 of 164 PageID #:205
Page 124 of 162

Funds on deposit in a "Segregated Trust Account" in accordance with Rule 27d-1 under the Investment Company Act of 1940 shall be considered as non-allowable to the extent that the amount of deposit in such Segregated Trust Account exceeds the amount of liability reserves established and maintained for refunds of charges required by Section 27(d) and 27(f) of The Investment Company Act of 1940. See Rule 15c3-1(c)(2)(iv)(E).

Accrued interest and commissions on customers' fully margined account; cash securities accounts and accrued commissions on properly margined commodity accounts are to be reported as allowable assets. Accrued interest and commissions on partly secured or unsecured customers' securities accounts and accrued commissions on customers' commodity accounts which are not properly margined are to be reported as non-allowable assets.

Notes receivable payable on demand secured by readily marketable securities and meeting the margin requirements of the designated Examining Authority are to be reported as allowable assets. Unsecured notes receivable are to be reported as non-allowable assets.

Good faith deposits are to be reported as non-allowable assets if outstanding longer than 11 business days from the settlement of the respective underwriting. See Rule 15c3-1(c)(2)(iv)(C).

The following cash deposits and other related type deposits in the broker or dealer's account shall be considered as allowable:

(a)  Guaranty deposits with Commodity Exchange Clearing Associations.

(b)  Contributions to clearing organizations incident to member ship.

Rent, airline and utility deposits are to be reported as non-allowable assets.

Settlement balances with clearing associations shall be included as allowable assets.

Other miscellaneous assets such as deferred organization expense, prepaid expenses, deferred charges, goodwill, service fee receivable, accrued income receivable, intangible assets and postage inventory shall be included as non-allowable. Subscriptions receivable for capital stock shall be included as a deduction in computing net worth.

Unsecured advances to municipalities for public improvements are to be reported as non-allowable assets.

## Bank loans payable:

### Secured by customer' exempted securities
In lieu of including the above in aggregate indebtedness, the broker or dealer may, at its option, deduct 4% of the amount of any indebtedness secured by exempted securities not carried long in the proprietary or other accounts of the broker or dealer or representing exempted securities failed to deliver. If such option is taken, the indebtedness shall be included in the subsection "Includable in Formula for Reserve Requirements – Non .AI. Liabilities" and the appropriate charge included in the Computation of Net Capital in the category – "Other deductions and/or charges."

### Secured by marketable securities and spot commodities owned or held pursuant to subordination agreements
Securities and spot commodities collateral which are carried long and have not been sold by the broker or dealer are required, in order that the respective indebtedness, be included in the subsection "Other – Non-A.I. Liabilities."

## Securities sold under repurchase agreements

For purposes of this report securities sold as principal under a repurchase agreement are deemed to be securities owned by the respondent and the market value is included under "Securities and spot commodities owned, at market value." The proceeds of sale relating to securities sold under repurchase agreements are to be reported under this section.

Payable to brokers or dealers and clearing organizations

The following accounts carried by other brokers or dealers shall be included in "Omnibus accounts" in the appropriate subsection:

1.  Accounts secured by or containing collateral.

2.  Payables for regulated and non-regulated commodities futures accounts liquidating to an equity on the respondent's book of record.

Regarding Item 2, the amount (payable included in the "Omnibus account" shall include net ledger balances, and gains and losses on commodities future contracts.

Amounts payable (net) to clearing organizations utilizing a continuous net settlement system shall be included in the category – "Clearing organizations" in the appropriate subsection.

Other payables to brokers or dealers (for floor brokerage, commissions, etc.) shall be included in the category "Other – A.I. Liabilities."

Regarding failed to receive, refer to Rule 15c3-1(c)(1)(iii) and (iv) as to inclusion and exclusion in the determination of Aggregate Indebtedness.

Regarding securities loaned (firm), exclude from Aggregate Indebtedness the ledger amount relative to securities which are carried long by the broker or dealer and which have not been sold. See Rule 15c3-1(c)(1)(ii).

SEC1695A (11-05) 6 of 17

**Payables to customers – Commodities accounts**

The following commodity accounts shall be included in Aggregate Indebtedness:

A.  Net ledger balances, and gains and losses in commodity future non-regulated accounts liquidating to an equity.

B.  Free credit balances in customers' non-regulated commodity accounts.

C.  Credit balances in customers' accounts with spot (cash) commodity positions.

Regarding Items A and B, the respective amounts for regulated commodity accounts shall be excluded from Aggregate Indebtedness.  Such represent amounts to be segregated pursuant to the Commodity Futures Trading Commission Act.  The following represents funds actually segregated pursuant to the Act.

1.  Funds in banks segregated under the Act (cash and market value of U.S. Government Securities – Firm owned).

2.  Margin deposits with and receivable from commodity exchange associations for regulated commodities (cash and market value of  U.S. Government Securities – Firm owned).

3.  Receivable from brokers or dealers for customers' regulated commodity future accounts – included in "Omnibus accounts" under "Receivables from brokers and clearing organizations."

**Payables to non-customers**

See Rule 15c3-1(c)(1), (c)(1)(v) and (c)(1)(xii) to determine classification of amounts included and excluded from Aggregate Indebtedness.

**Accounts payable and accrued liabilities and expenses – Other**

Estimated liabilities shall be established for, but not limited to, security dividends receivable, short security differences, unsecured or partly secured short positions, or other deficits in customers' accounts, and "aged" transfer positions.  Such liabilities shall be included in Aggregate Indebtedness.  The contra of the liability shall be a charge to a profit and loss account.

**Notes and mortgages payable – secured**

See instructions under "Property, furniture, equipment, leasehold improvements and rights under lease agreements."  Include in A.I. Liabilities, in the subsection "Unsecured," any fixed liabilities which do not conform with the exclusions stated in the instructions.

**Borrowings not qualified for Net Capital purposes**

Include herein liabilities which are subordinated to the claims of creditors but which are not covered by satisfactory subordination agreements as defined in Appendix D of Rule 15c3-1. See Rule 15c3-1(c)(1)(xi) as to which subordinated liabilities may be excluded from Aggregate Indebtedness. It should be noted that such subordinations by customers may be excluded from Aggregate Indebtedness only if approved by the Examining Authority for such broker or dealer.

Indicate separately those satisfactory subordination agreements which are considered as equity capital for purposes of debt-equity requirements.  Such are reported in subordinated liability section of the Statement of Financial Condition.  See Rule 15c3-1(d) for the various requirements for such agreements.

**Special Requirements as to Consolidated Financial Statements and Statements of 50% or Less Owned Persons and Certain other Persons.**

The inclusion of exclusion of subsidiaries in Consolidated Financial Statements shall be in accordance with the following requirements:

(a)  Consolidated Financial Statements of registrant shall include the statements of any subsidiary whose obligations or liabilities are guaranteed, endorsed or assumed directly or indirectly by registrant.

(b)  Consolidated Financial Statements of registrant may include the statements of any other subsidiary.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 127 of 164 PageID #:207
Page 126 of 162

(c) If the effect of the consolidation provided for in paragraph (a) or (b) above results in the increase of the registrant's net capital and/or decrease in the registrant's ratio of aggregate indebtedness to net capital or increases registrant's net capital and/or decreases the minimum net capital requirement called for by the subparagraph (f)(2) of Rule 15c3-3, then such benefits shall not be recognized unless an opinion of counsel is obtained containing the representations as to the availability of the portion of net assets related to registrant's interest prescribed in Rule 15c3-1, Appendix C, subparagraph (b)(2).

(d) Subsidiaries which do not meet the requirements of paragraph (c) above shall not be consolidated.

(e) Financial statements of any 50 percent or less owned person or other affiliate, whose obligations or liabilities are not guaranteed, endorsed or assumed directly or indirectly by registrant shall be included in a note.

(f) Opinions of counsel concerning the availability of net assets to registrant shall be filed with each annual report under Rule 17a-5.

Registrants shall indicate whether the financial statements and schedules are consolidated or unconsolidated by checking the appropriate box at the top of the Statement of Financial Condition.

## COMPUTATION OF NET CAPITAL AND AGGREGATE INDEBTEDNESS

### Ownership equity not allowable for Net Capital

Deduct any capital accounts included as part of ownership equity on the Statement of Financial Condition which are not allowable in the determination of Net Capital.

### Liabilities subordinated to claims of general creditors allowable in computation of Net Capital

Appendix D to Rule 15c3-1 sets forth minimum and nonexclusive requirements for satisfactory subordination agreements. The self-regulatory organization which has been designated as the Examining Authority for the broker or dealer may require, or the broker or dealer may include, such additional provisions as they deem necessary or appropriate to the extent such provisions are not inconsistent with the provisions of Rule 15c3-1.

### Secured demand note collateral accounts

Securities contained in collateral, not accounts, shall be considered to have no value unless in bearer form, or registered in the name of the broker or dealer or the name of its nominee or custodian.

The collateral contained in each secured demand note collateral account shall relate only to the specific demand note that it collateralizes. The excess collateral value in one account shall not be applied to the deficiency in another account.

Two or more demand notes of the same individual should not be combined.

Only cash and securities which are fully paid for and which may be publicly offered or sold without registration under the Securities Act of 1933, and the offer, sale and transfer of which are not otherwise restricted, may be pledged as collateral to secure a secured demand note.

### Other (deductions) or Credits

Sole proprietors (individual members) who are not associated with a broker or dealer who is a member of a national exchange shall record here:

1. The total of any liabilities incurred in the course of business which are not reported in the Statement of Financial Condition and which would have a material effect on Net Capital.

2. The excess of liabilities which have not been incurred in the course of business as a broker or dealer over assets not used in the business.

### Deductions and/or charges:

### Customer Commodity accounts – deductions

30% of the market value of spot commodities long or short in customers and non-customers' accounts liquidating to a deficit; provided, that the deduction shall be 10% of the market value of the spot commodities to the extent they are hedged by future commodity contracts or forward spot commodity contracts in the same commodity.

The total of credit lines granted on open commodity contracts in "trade" accounts with net long positions or in "trade" accounts with net short positions, whichever is greater, plus any credit lines granted on open commodity contracts in "trade" accounts with no net long or net short positions.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 126 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

This amount is determined by multiplying the number of contracts in an account, on which credit has been granted, by the amount of credit granted on each such open contract. From the amount so determined deduct the equity or deficit in that account after application of margin calls, marks-to-market, or other required deposits outstanding 5 business days or less. The deduction, however, cannot exceed the amount of credit granted.

After the amount of credit granted has been determined for each account, the amounts are totaled for accounts which have net long positions and separately for accounts which have net short positions. The amount required by the accounts with net longs or with net shorts, whichever amount is greater, is used. To this amount is added the amount determined for accounts with no net positions.

If an account has open positions in only one commodity, the number of contracts determines the net position. If it has a net long position in one commodity and a net short position in a different commodity, the market value determines the net position.

The total amount by which the daily limit fluctuation of all future commodity contracts carried for a customer's or a non-customer's account or accounts controlled by such persons exceeds 15% of the debt-equity total of the broker or dealer.

The amount which the daily limit fluctuations of all future commodity contracts carried for a customer's or non-customer's account exceeds 15% of the debt-equity total of the broker or dealer may be determined by eliminating from each customer's and non-customer's account or group of accounts controlled by such persons, purchases of a commodity in one contract month and sales of a like amount of the same commodity in a different contract month provided such contracts were made in the same market. The daily limit fluctuation for futures contracts affected in foreign markets is to be considered the same as if such contracts had been affected in a domestic market.

After such eliminations, the remaining number of contracts long and short is multiplied by the amount of the daily limit fluctuation prescribed by the pertinent commodity exchange for each contract in the respective commodity.

The amount of the charge is the excess of the amount of the daily limit fluctuation over 15% of the debt-equity total as in the following example:

### Account of John Smith

| | Number of Contracts | | Daily Limit Fluctuation | |
|---|---|---|---|---|
| | Long | Short | Per Contract | Total |
| Cocoa | 1,000 | | 300 | $  300,000 |
| Cotton | 700 | | 1,000 | 700,000 |
| Soybean Oil | 500 | | 600 | 600,000 |
| Sugar | 300 | | 560 | 168,000 |
| Wheat | 300 | | 500 | 150,000 |
| | | | | $1,618,000 |
| 15% of $10,000,000 – Debt Equity Total | | | | 1,500,000 |
| Amount of Charge | | | | $  118,000 |

A deduction to provide for the amount required to restore the original margin required by the pertinent commodity exchange or the clearing house requirement, per contract, if the commodity exchange has no original margin requirement, when the original margin has been depleted by 50% on all future commodity contracts in each customer's and non-customer's account. Cash required should be exclusive of liquidating deficits and after application of calls for margin, marks-to-market, or other posits which are outstanding 5 business days or less.

A deduction, exclusive of liquidating deficits deducted under other provisions of Rule 15c3-1, of cash required to provide margin equal to 20% of the market value in each customer's and non-customer's account in equity, after application of calls for margin, marks to market, or other require deposits outstanding 5 business days or less, containing spot commodity positions, evidenced by warehouse receipts, issued by a warehouse licensed by a commodity exchange, which are the result of future contracts tendered through an exchange within the past 90 days, but not hedged by future contracts in the same commodity.

A deduction of cash required to provide margin equal to 10% of market value in each customer's and non-customer's combined account in equity, after application of calls for margin, marks-to-market, or other required deposits outstanding 5 business days or less, when such account contains spot commodity positions, evidenced by warehouse receipts issued by a warehouse licensed by a commodity exchange, which are the result of future contracts tendered through an exchange within the past 90 days, and hedged by future contracts in the same commodity.

Deduct the debit balance in each customer's or non-customer's spot (cash) commodity account (i) other than the result of a tender made on a futures contract within the past 90 days and (ii) not evidenced by warehouse receipts issued by a warehouse licensed by a commodity exchange.

½% of the market values of the greater of either the total long or total short future contracts in each commodity carried for customers and non-customers. This may be determined by eliminating from each customer and non-customer's account those contracts representing spreads or straddles in the same commodity and contracts offsetting or hedging any "spot" commodity positions. After such eliminations, the total market values of the remaining contracts are determined separately for each commodity. The greater of the long value or short value of each commodity enters into the computation of ½% of the market values as in the following example

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 127 of 162

**Market Value**

|  | Long | Short | Greater of Long or Short |
|---|---|---|---|
| Coffee | $ 200,000 | $ 100,000 | $ 200,000 |
| Cotton | 1,500,000 | 1,000,000 | 1,500,000 |
| Sugar | 300,000 | 200,000 | 300,000 |
| Corn | 500,000 | 700,000 | 700,000 |
| Oats | 150,000 | 150,000 | 150,000 |
| Wheat | 1,000,000 | 1,300,000 | 1,300,000 |
|  |  |  | $4,150,000 |
| Amount Required ½% of Total |  |  | 20,750 |

**Customer maintenance margin deficiencies**

Deduct the amount of cash required in each customer's and non-customer's securities account to meet the maintenance margin requirements of the regulatory or self-regulatory authority designed as the Examining Authority for the broker or dealer, after application of calls for margin, marks-to-the market, or other required deposits which are outstanding 5 business days or less.

**Aged fails to deliver**

Deduct the percentages of the market value of each failed to deliver contract which is outstanding 15 business days or longer which would be required by application of the deduction required by subparagraph (c)(2)(vi), or, where appropriate, paragraph (f) of Rule 15c3-1, on the underlying security. Provided, that such deduction shall be increased by any excess of the contract price of the fail to deliver over the market value of the underlying security position or reduced by any excess of the market value of the underlying security over the contract value of the fail but not to exceed the amount of the deduction. Effective January 1, 1977, this charge shall be applied to each fail to deliver contract outstanding 11 business days or longer.

**Aged short security differences**

Deduct the market value of all short securities differences unresolved for 7 business days after discovery and the market value of any long security differences where such securities have been sold by the broker or dealer until they are adequately resolved, less any reserves established therefor.

**Secured demand note deficiency**

If the value of securities and cash collateralizing a secured demand note contributed for purposes of capital under Rule 15c3-1 after application of the deductions specified in subparagraph (c)(2)(vi) of Rule 15c3-1 is less than the unpaid principal amount of the secured demand note, such deficiency shall be deducted.

**Haircuts**

Undue concentration – Basic Net Capital Computation under Rule 15c3-1.

In the case of money market instruments or securities of a single class or series of an issuer, including any option written, endorsed or held to purchase or sell securities of such a single class of series of an issuer (other than "exempted securities"), which are long or short in the proprietary, or other accounts of a broker or dealer for more than 11 business days, and which have a market value of more than 10% of the "net capital" of a broker or dealer before the application of subparagraph (c)(2)(vi) or Appendix A to Rule 15c3-1, there shall be an additional deduction from net worth equal to 50% of the percentage deductions otherwise provided by subparagraph (c)(2)(vi) or Appendix A to Rule 15c3-1 on that portion of the securities position in excess of 10% of the "Net Capital" of the broker or dealer before the application of subparagraph (c)(2)(vi) or Appendix A to Rule 15c3-1. (See subparagraph (c)(2)(vi)(M) of Rule 15c3-1 for further provisions).

**Contractual commitments**

Deduct, in the case of a broker or dealer who has open contractual commitments (other than option positions treated in Appendix A to Rule 15c3-1), the respective deductions as specified in subparagraph (c)(2)(vi) or Appendix B to Rule 15c3-1 (in the case of a broker or dealer electing to operate pursuant to paragraph (f) of Rule 15c3-1, the percentage deduction for contractual commitments in securities described in subparagraph (f)(3)(ii) shall be 30%) from the value (which shall be the market value whenever there is a market) of each net long and each net short position contemplated by any existing contractual commitment in the proprietary and other accounts of the broker or dealer. (See subparagraph (c)(2)(viii) of Rule 15c3-1 for further provisions).

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 130 of 164 PageID #:210
Page 123 of 562

**Firm security and commodity accounts**

Deduct the percentages specified in subdivisions (A) to (M) of subparagraph (c)(2)(vi) or the deductions prescribed for securities positions set forth in Appendix A to Rule 15c3-1 or, where appropriate, paragraph (f) of Rule 15c3-1 of the market values of all securities, money market instruments or options in the proprietary and other accounts of the broker or dealer. The capital charge (haircut) on future commodity contracts is 30% of the market value of all "long" and all "short" future contracts other than those contracts representing spreads and straddles in the same commodity and those contracts offsetting or hedging any "spot" commodity positions in proprietary or other accounts of the broker or dealer.

**Straddle or Spread**

These terms mean the same thing, but in practice the grain trade uses the term "spread", whereas the other commodity interests use the term "straddle." A spread may be defined as the purchase of one future against the sale of another future of the same commodity or a related commodity in the same or different market. The Commodity Futures Trading Commission Act defines spreading only in terms of the same commodity, whereas exchanges define it to also include different but related commodities.

Deduct 30% of the market value of "spot" commodities long or short in the proprietary and other accounts of the broker or dealer to the extent that such positions are not hedged by future commodity contracts or forward spot commodity contracts in the same commodity. 10% of the market value shall be deducted on fully hedged positions.

## COMPUTATION OF CAPITAL REQUIREMENTS AND NET CAPITAL
## UNDER THE ALTERNATIVE METHOD

**Capital requirements**

Capital requirements under the alternative method are the greater of $100,000 or 4% or the total debit items in the "Formula for Determination of Reserve Requirements for Brokers and Dealers" as set forth in Exhibit A to Rule 15c3-3. It should be noted, however, that the brokers or dealers operating under the alternative method must make the "Formula for Determination of Reserve Requirements for Brokers and Dealers" computation on a weekly basis and *in lieu* of the 1% reduction of total debit balances in customers' cash and margin accounts included in the formula under Item 10 thereof:

    (a) reduce the total debits in the formula by 3%, and

    (b) include in Items 7 and 8 of the formula the market value of short security count difference over 7 business days old and the market value of short securities (not be offset by long or by debits) in all suspense accounts over 7 business days.

    (c) exclude from the formula credit balances in accounts representing amounts payable for government securities, commercial paper, bankers' acceptances and certificates of deposit (as described in Rule 15c3-1(c)(2)(iv)(A) and (E)) not yet received from the issuer or its agent of any related debit items for three business days.

As to a broker or dealer who has consolidated a subsidiary pursuant to Appendix C of Rule 15c3-1, such broker's or dealer's capital requirements under the alternative method are the sum of:

    (a) such broker's or dealer's capital requirements under Rule 15c3-1(f), and

    (b) the individual capital requirement(s) of the consolidated subsidiary(ies). Each consolidated broker or dealer subsidiary may elect to compute its capital requirement pursuant to Rule 15c3-1(a) or Rule 15c3-1(f).

It should be further noted that when a broker or dealer (including a broker or dealer included as a consolidated subsidiary by a parent broker or dealer) elects to compute its capital requirements under the provisions of the alternative method such election is binding until such time as the Commission, upon application of the broker or dealer, approves a change.

**Net capital computation**

The determination of net capital under the alternative method follows the same basic rule under Rule 15c3-1 with the substitution of revised haircut percentages for convertible debt securities, risk arbitrage positions, other securities and the additional charge for undue concentration.

In the case of convertible debt securities not in default, where the market value is 100% or more of the face value, the haircut is:

    (i) 15% of the market values of the long position, plus

    (ii) 30% of the market value of that portion of the short positions which exceeds 25% of the market value of the long positions.

SEC1695A (11-05) 11 of 17

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 129 of 162

The above charge is computed on the aggregate market values in the category and not on an item-by-item basis.

In the case of convertible debt securities not in default, where the market value is less than face value, the haircuts are the same as for non-convertible debt securities in the basic net capital computation ( See Rule 15c3-1(c)(2)(iv)(F)) provided the securities are rated as required by such sub-division.

As regards to other securities, as defined in Rule 15c3-1(f)(3)(ii), the haircut shall be:

(i)   15% of the market value of the long positions, plus

(ii)  30% of the market value of that portion of the short position which is in excess of 25% of the market value of the long position.

No deduction need be taken on

(i)   Securities long and short which are convertible or exchangeable, without restriction, within 90 days, or

(ii)  A security which has been called redemption within 90 days.

Also, in regard to open contractual commitments on other securities the haircut is 30%.

Positions arising as a result of risk arbitrage transactions, as defined in Rule15c3-1(c)(2)(vi)(I), may at the option of the broker or dealer be combined with other securities for the purpose of determining the haircut charge, if such treatment results in a lower charge than that computed for risk arbitrage position under the basic rule.

Appendix A to Rule15c3-1 contains certain provisions for different haircuts on options and related positions when using the alternative net capital requirement.

The additional charge for undue concentration is based upon securities (including options) of a single class or series or an issuer and is generally equal to 50% of the applicable rate on that amount in excess of 10% of net capital before haircuts.  Such additional charge does not apply to:

(1)  Exempted securities.

(2)  Positions arising from under-writings not held for more than 11 business days.

(3)  Securities which are convertible or exchangeable, without restriction, within 90 days.

### STATEMENT OF INCOME (LOSS) or STATEMENT OF COMPREHENSIVE INCOME (as defined in §210.1-02 of Regulation S-X), as applicable

If there are no items of other comprehensive income in the period presented, the broker or dealer is not required to report comprehensive income.

### Commissions

Commission earned on non-member and intra-member equity, debt and commodity transactions including non-inventory principal transactions.  Commission earned on introduced accounts carried by other brokers and on omnibus accounts carried for other brokers should be reported net.

**Principal Transaction Including**
**Unrealized Gains and Losses**

Report realized and unrealized gains and losses from securities and from future and spot commodities in trading and investment accounts.

**Underwriting**

Gross profit from underwriting transactions shall be determined as the difference between the proceeds of securities sold and their purchase price adjusted for discounts, commissions and allowances received from or given to other brokers.

Any direct expense which can be associated with a specific underwriting may also be considered as a cost in determining gross profit or loss.  In determining gross profit or loss any unrealized loss on securities unsold at the time the underwriting account was closed shall be considered as a deduction from the proceeds of securities sold.

In addition, report all fees earned from private placements, mergers and acquisitions and any other underwriting activity.

**Interest and Dividends**

Report interest and dividend income earned on firm trading and investment accounts.  Also report gross interest earned on customers' securities and commodities accounts.

SEC1695A (11-05) 12 of 17

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

**Income from Sale of Investment Company Shares**

Include income from sale of open-end investment company shares as retailer and as an underwriter including sales of periodic payment plans of the installment type and face amount certificates. Exclude income from sale and underwriting of shares of closed-end investment companies.

**Other Income**

Report all other income including sale of investment company securities, investment advisory fees, proxy solicitation fees, service charges (including custodial fees), fees in connection with option transactions not excluded on an exchange, fees for solicitation of tenders on exchanges of securities, income from sale of insurance policies and all other income not specified above.

**Employee Compensation and Benefits**

Report all salaries, commissions, bonuses, profit sharing contributions, payroll taxes and benefits paid to or incurred for all employees of the reporting organization.

**Commissions and Floor Brokerage**

Include security and commodity commissions paid to others; clearance fees paid to clearing corporations, associations and depositories; fees paid to exchanges and floor brokerage paid to other brokers.

**Communications**

Include the cost of telephones and leases wires, tickers and quotation equipment, postage, stationery, office supplies and forms.

**Occupancy and Equipment Rental**

Enter the cost of rent, heat, light and maintenance; depreciation and amortization; EDP equipment, rental and service bureau charges; all other equipment rental and general insurance.

**Interest**

Include interest paid to banks and on customers' accounts; on all other un-subordinated and subordinated borrowings.

**Taxes Other Than Income Taxes**

Include real estate taxes, personal property taxes, commercial rent and occupancy taxes, etc.

**Other Operating Expenses**

Report cost incurred for advertising, sales literature and promotional activities; travel and entertainment; subscriptions to periodicals, dues and assessments, losses in error accounts and bad debt, professional fees and all other expenses not specified above.

**Income Taxes**

Include all unincorporated business taxes, franchise taxes, state and local income taxes and Federal income taxes paid, accrued or refunded.

**Equity in Earnings of Unconsolidated Subsidiaries**

The amount reported shall be stated net of any applicable tax provisions.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 131 of 162

## STATEMENT OF CHANGES IN OWNERSHIP EQUITY
## (SOLE PROPRIETORSHIP, PARTNERHIP OR CORPORATION)

**Balance, Beginning and End of Month**

The amounts reported should agree with related Statements of Financial Condition.

**Net Income (Loss) For Period**

Report the amount of net income (loss) for the period reported on the Statement of Income (Loss) or Statement of Comprehensive Income, as applicable.

**Additions and Deductions**

State separately net income (loss) for the period and each addition and each deduction such as sale of capital stock, retirement or repurchase of capital stock, dividends, partners capital contributed or partners capital withdrawn.

## STATEMENT OF CHANGES IN LIABILITIES
## SUBORDINATED TO CLAIMS OF GENERAL CREDITORS

**Balance, Beginning and End of Period**

The amount reported should agree with the sum of subordinated liabilities which have been approved for inclusion in net capital as shown in the Statement of Financial Condition at the end of each of the respective periods.

**Additions**

Report the gross amount of increases in secured capital demand notes and subordinated loans and accounts which have been approved for inclusion of net capital.

**Deductions**

Report the gross amount of decreases in secured capital demand notes and subordinated loans and accounts which have been approved for inclusion of net capital.

## COMPUTATION FOR DETERMINATION OF
## RESERVE REQUIREMENTS FOR
## BROKER DEALERS UNDER RULE 15C3-3

Definitions: The definitions given in Rule 15c3-3 and Release 34-9922, dated January 2, 1973, shall apply for customer securities, qualified security bank, free credit balance, other credit balance, funds carried for account of any customer, and "customer funds," (Note: Release 34-9922 explains conditions under which account of partners, officers or stockholders are to be considered as customer accounts).

**Free Credit Balances and Other Credit Balances in Customers' Security Accounts**

The credit balance used under this Item is interpreted to include the net balances due to customers in non-regulated commodity accounts reduced by any deposits of case or securities with any clearing organization or clearing broker in connection with the open contracts in such accounts.

Also include in this Item all outstanding drafts payable to customers which have been applied against free credit balances or other credit balances as well as checks drawn in excess of bank balances per firm's records.

*Monies payable against customers' securities loaned . . . . . . Securities borrowed to effectuate short sales by customers and securities borrowed to make delivery on customers' securities failed to deliver . . . . . . Failed to deliver of customers' securities not older than 30 calendar days . . . . . . Customers' securities failed to receive . . . .*
.
**These items are applicable to customer transactions**

If it is impractical or unduly burdensome to determine which fail to receive contracts and fail to deliver contracts relate to proprietary accounts versus customer accounts and which securities loaned and securities borrowed are for proprietary accounts or customer accounts, an appropriate allocation may be made on a conservative basis to accomplish maximum protection for customers. If an allocation is used with regard to the foregoing items, the broker or dealer should be able to demonstrate that the results so obtained regarding designations of customer versus proprietary positions would be comparable to those which would

be obtained if the respective positions had been developed without the use of allocations.  If an allocation is necessary to determine proprietary versus customer positions, the broker or dealer should make and maintain a record of each such allocation and preserve it in accordance with Rule 17a-4.

**Debit Balances in Customers' Cash and Margin Accounts Excluding Unsecured Accounts and Accounts Doubtful of Collection (See Note B, Exhibit A Rule 15c3-3)**

Debit balances in margin accounts are reduced by the amount by which a specific security, (other than an exempted security) which is collateral for margin accounts, exceeds in aggregate value 15% of the aggregate value of all securities which collateralize all margin accounts receivable; provided, that the required reduction is not in excess of the amount of the debit balance required to be excluded because of this concentration rule.  A specified security is deemed to be collateral for a margin account only to the extent it represents in value not more than 140% of the customer debit balance in a margin account.

Debit balances in customers' case and margin accounts included in the formula under this item are to be reduced by and amount equal to 1% of their aggregate value.  It should be noted, however, that brokers or dealers operating under the alternative method (Rule15c3-1(f)) would reduce total debits in the formula by 3% in lieu of the aforementioned 1%.  See respective Rule for other requirements regarding the alternative method.

The debit balance under this item shall include the debit in a related draft receivable when immediate credit has not been received on draft shipments of securities purchased by customers, provided that the debit in the customer's account for the purchase of the securities so drafted has been eliminated.

**Failed to Deliver to Customers' Securities Not Older Than 30 Calendar Day**

The debit balance under this item shall include the debit balance in a related draft receivable when immediate credit has not been received on shipments to other brokers with draft attached, provided that the debit in the broker's fail to deliver account has been eliminated.

**Frequency of Computation**

Computations may be made monthly if the broker or dealer's Net Capital ratio is not over 800% and the total of free credit and other credit balances carried for the accounts of customers does not exceed $1,000,000.  A weekly computation is required for brokers or dealers adopting the alternative method under Rule 15c3-1(f).

## FINANCIAL AND OPERTIONAL DATA

**Stock Record Brakes**

Stock record breaks are defined as out-of-balance error conditions in the daily recording of security position changes or movements where total debit entries (longs) do not equal total credit entries (short) within a given security position reflected on the daily stock record.

"Long" differences are the amounts needed to balance an excess of short positions over long positions.
 When recorded in a difference account, such would be recorded long on the stock record.

"Short" differences are the amounts needed to balance an excess of long positions over short positions.
 When recorded in a difference account, such would be recorded short on the stock record.

**Tickets**

See Part I of the FOCUS Report for the definition of tickets.

**Corrected Customer Confirmations**

As stated, include only customer confirmations – exclude broker-to-broker comparisons except where the contra-broker is considered a customer (Section 220.4(b) of Reg. T).  In addition, include confirms where the incorrect original was mailed to the customer and count multiple corrections on confirms individually.

**Money Differences**

The term "money differences," shall include all respective accounts containing ledger debits or credits representing unidentified or unknown items, with no related security positions or which contain security positions that cannot be promptly related to ledger balances or any account required to balance the general ledger, except for items promptly resolved.

This category could include, but not be limited to, the following:

SEC1695A (11-05) 15 of 17

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

(a) Unallocated receipts or disbursements.

(b) Cash Dividend Balancing Accounts (out-of-balance proofs).

(c) Money Balancing Accounts (EDP Cage P & S, Accounting and others). Adjustments of General Ledger control accounts to agree to subsidiary records.

(d) Unresolved Money Differences as a result of comparison of detail in bank accounts to bank statements.

(e) Unresolved Money Differences resulting from the comparison of detail records to control accounts for customer accounts, fail to receive, fail to deliver, stocks borrowed, stock loaned, bank loans, etc.

(f) Any accounts utilized to balance "daily work" which contain debits or credits requiring resolution. If any such accounts exist, the ledger balancing resulting from one days "out of balance" shall not be netted against another days work unless it is related to such "out of balance".

For reporting purposes, debit and credit money differences shall not be netted.

Ledger debits shall be considered non-allowable assets in the computation of Net Capital and ledger credits shall be included in Aggregate Indebtedness.

Any unresolved differences, as of the date of this report, between general ledger control accounts, balancing of blotters, etc., shall be included in these accounts. Any debit balance for which resolution is considered unlikely shall be written off to profit and loss, or an adequate reserve shall otherwise be provided.

## Security Suspense Accounts

The term "security suspense accounts" shall indicate all transactions in any accounts containing a long or short security position with a related ledger balance pending determination of their ultimate disposition because of doubtful ownership, collect ability, or deliverability, except for transactions promptly resolved.

Security suspense accounts not promptly resolved should be considered security difference accounts where appropriate.

## Security Difference Accounts

The term "security difference accounts," shall include all transactions in any accounts containing long and/or sort security positions, for which no related ledger balance exists.

## Commodity Suspense Accounts

In determining data to be included in the report, the following schedule may be used. It should be noted that this schedule is not all-inclusive and other suspense items should be indicated in the report.

   a.  Warehouse Receipts on hand:

       1.  Date counted and compared to records            _____

       2.  Number of unresolved differences            _____

       3.  Market value of unresolved differences – Long (Short)     $_____

   b.  As to Direct Clearing with Commodity Exchanges:

       1.  Latest date which all settlement sheets have been reconciled     _____

       2.  Number and amount of unresolved reconciling money items:
           a.  Debits             No.:_____          $_____
           b.  Credits          No.:_____          $_____

       3.  Market value of unresolved future contract differences after comparisons and balancing with proprietary and customers' positions

           a.  Long                           $_____
           b.  Short                        $_____

   c.  As to Clearing Accounts with Commodity Brokers:

       1.  Date which statements were last received         _____

       2.  Date of last reconcilement of accounts         _____

SEC1695A (11-05) 16 of 17

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 136 of 164 PageID #:216

3. Number and amount of unresolved reconciling money items
   a. Debits              No.:_____
      $_____
   b. Credits             No.:_____
      $_____

4. Market Value of unresolved future contract differences after comparison and balancing with proprietary and customers' positions

    a. Long                                   $_____
   
    b. Short                                  $_____

d. Gains and Losses in Future Contracts

1. Latest date reconciled with Difference Accounts         _____

2. Unresolved Differences

    a. Debits                              $_____
   
    b. Credits                            $_____

## Bank accounts reconciliation

Debit and credit amounts applicable to unresolved reconciling items should be shown separately. They should not be netted and shown as a single amount.

## Reorganization Account

The term "reorganization accounts" shall include, but not be limited to, transactions in the following:

(a  "rights" subscriptions

(b  warrants exercised

(c)  stock splits

(d)  redemptions

(e)  conversions

(f)  exchangeable securities

(g)  spin-offs

## Personal capital borrowings

Enter any borrowings of cash or securities included in amounts and valuations reported in the computation of net capital as proprietary capital or subordinated debt.

## Maximum haircuts on underwriting commitments

The above is based on the largest net long and/or short position (contingent and actual) in each security at any time during the month, whether or not a net long and/or short position exists at the close of business on the last day at month end.

## Lease and rentals payable within one year; Aggregate lease and rental commitments payable for entire term of the lease

The amounts reported should be the total amount required to be reported in financial statements pursuant to Regulations S-X (See Regulation S-X, Article 3, Rule 3016q, General Notes to Financial Statements – Leases assets and lease commitments).

State in a footnote a description of any assets, liabilities and accountabilities, actual or contingent, which are not reported on the Statement of Financial Condition. Only such items which in the aggregate are material in relation to net capital need be reported. Contingent liabilities may include lawsuits pending against the respondent, accommodation endorsements, rediscounted notes and guarantees of accounts of others.

SEC1695A (11-05) 17 of 17

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 137 of 164 PageID #:217

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## IN THE CIRCUIT COURT OF THE 22nd JUDICIAL CIRCUIT
## McHENRY COUNTY ILLINOIS

| | |
|---|---|
| IN RE CIVIL MATTER OF:<br>GREGORY J. HALPERN<br>Plaintiff,<br>vs.<br>CITADEL SECURITIES LLC; KNIGHT SECURITIES; VIRTU FINANCIAL; CANTOR FITZGERALD; CANACCORD GENUITY; CHARLES SCHWAB & CO.; E*TRADE SECURITIES LLC; JPMORGAN CHASE & CO; GOLDMAN SACHS GROUP INC.; MERRILL LYNCH; UBS ASSET MANAGEMENT, INC.; CREDIT SUISSE INC.; DEUTSCHE BANK SECURITIES; DTCC (DEPOSITORY TRUST & CLEARING CORPORATION); HARVEY VECHERY; HAROLD BLAISURE; MICHAEL TURNER; CONSTANCE NASH; DEVINE MAFA; ALFRED HILDEBRAND; INVESTOR HUB (IHUB); YAHOO; MARY SCHAPIRO; MARY JO WHITE; JAY CLAYTON; THE SECURITIES & EXCHANGE COMMISSION; AND DOES 1-100<br>Defendants. | COMPLAINT FOR: DECLARATORY RELIEF, DAMAGES, AND DEMAND FOR A JURY TRIAL<br><br>COUNT I – FRAUD<br><br>COUNT II - SECURITIES FRAUD<br><br>COUNT III – CIVIL CONSPIRACY (Against All Defendants)<br><br>COUNT IV – BREACH OF FIDUCIARY DUTY<br><br>COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants)<br><br>COUNT VI – DECLARATORY RELIEF<br><br>COUNT VII –RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO)<br><br>COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

# EXHIBIT C

Plaintiff hereby incorporates the following Exhibit C in support of the allegations and claims stated herein:

**Exhibit C – MAXD Form 8-K (November 21, 2022)** Public disclosure filed with the SEC detailing the campaign of racketeering, insider sabotage, false lawsuits, cyberstalking, and market manipulation targeting MAXD and its leadership.

This exhibit provides indisputable evidence of fraud, coordinated manipulation, regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

- 1 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 1:25-cv-02319 Document # : 12 Last Modified: Page 138 of 164 PageID #:218

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

# FORM 8-K
CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported) **November 21, 2022**

**Commission file number 000-51886**

# MAX SOUND CORPORATION

(Exact Name of Registrant as Specified in Charter)

| Delaware | 26-3534190 |
|---|---|
| (State of Other Jurisdiction of Incorporation) | (I.R.S. Employer Identification No.) |

**3525 Del Mar Heights Road # 802, San Diego, California, 92130**
(Address of principal executive offices including zip code)

**310-775-0058**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

This disclosure relates to Max Sound Corporation (the "Company")

**Item 8.01 Other Events**

**Action by the Company due to extraordinary circumstances to function as non-Reporting for a period no less than three calendar months and no greater than six calendar months from today's filing date of November 21, 2022.**

(1) Max Sound Corporation (the "Company") relied on the typical allowed extension of up to 5 days after its normal calendar Q3 filing due date of November 14, 2022;

(2) After its requested extension, the Company had planned to file its 3rd quarter 10Q on November 21, 2022. However, after thoughtful consideration of extraordinary circumstances as memorialized in detail below, the Company has made the decision that the most beneficial action for all legitimate investing shareholders of record as a collective group, is to be non-Reporting for a brief period of time;

(3) As mentioned previously in the Company's 8K filing on September 2, 2022 - any important news the company deems relevant under REG FD, has already been, and will continue to be, posted timely at the web site of MAXDandBeyond.com.

(4) The Company, and its CEO, have attracted a group of bad actors, led by one MAXD shareholder - Harvey Vechery. Vechery's self-declared mission is to destroy the Company, its CEO, and all of the shareholder value at all costs. Read more on Vechery's well-documented strategy below in (9) Letter.

(5) The Company made a forecast earlier in 2022 projecting a year-end run-rate of $100 million annual going forward. This would require total income of at least $8.5 million for the month of December. Any number of combined events currently in play lead to the conclusion that the forecast is attainable. Due to the chronic and relentless interference by Vechery and his team of lawbreakers, that's all that the Company will release on the subject at this time.

(6) The status of the Company's professional and securities counsel is available based on county files. Hiring replace legal counsel it would be an unnecessary expense. Simultaneously, local Securities Counsel superstars are considering contingent cases that would include an already-created, multi-million-dollar, win-big damage model prepared for us with the help of a top Damage Expert in the Microcap space. For the period of nonreporting discussed herein, the Company's Auditor is expected to resign at their own convenience. The Company's CEO has personally paid a majority of previous bills for the Company's accounting and audit work over the past several years. Prior to the Company's future effort to return to reporting status, the CEO personally guarantees to pay to the current auditor any due balance existing and/or necessary to transition to another PCAOB qualified auditor with such having already been identified as the potential successor. The Company's CEO has also personally paid a majority of previous bills for legal services related to Vechery's fraudulent attacks which is now in excess of $100,000 invested towards such legal work. The CEO has and will continue to provide additional personal guarantees to certain attorneys as necessary, until the take down of Vechery and his team is complete and all professional bills are paid in full either by the CEO or the Company, or any combination of both.

(7) The Company humbly submits that it will file its anticipated timing to return to a fully reporting status on or prior to May 19, 2023, along with updated audited accounting suitable to PCAOB rules and any other relevant regulatory compliance.

(8) Letter: Attention MAX-D Shareholders.

As the company's CEO, I have consistently stated for legitimate shareholders who are interested only in reality, to know the exact documented and factual truth on any matter called into question that the Company believes necessitates a response. My unblemished 43-year business track record stands the test of time. At https://ChannelGreg.com, a fraction of my large inventory of accomplishments can be viewed as a small but meaningful part of the global digital multimedia record and ecosystem including parts of which I helped to create.

Harvey Vechery has a well-documented strategy, already proven by his very own digital record as premeditatedly fraudulent. It centers around Vechery trying to illegally steal my super majority preferred shares which I rightfully received from my Chapter 7 liquidation. For the past two years, Vechery has established on the record that he will spend whatever time and money that it takes to fraudulently spread lies, that he knows in fact have already been proven 100% false by his own substantial digital trail of racketeering, orchestrated market manipulation, intentional long-term violations of insider filing requirements and while trying in vain to hide decades of his own excessive financial failures. While these strategies can succeed against microcaps who generally have little resources to combat them, with managers who can become exposed, fearful, or just plain worn out, this is not the case here. The Company, and I, have always followed the rules to the letter of the law and this will continue to be proven 100% true. What has also been proven, is that Vechery has hired and employed the worst of his kind which is beginning to result in the collective demise of Vechery and his team of paid bashers. Since they have zero truth on the side of their proven criminal records and shamelessly bizarre behavior, they are now losing the fake legal battles they previously promoted each week for more than the past year as the supposed end of my Contractual Leadership Position and Stock Ownership that I paid and invested real money to acquire at an enormous loss currently and that Vechery is on record during my personal bankruptcy stating that my preferred shares have to remain with me. Yet, for all of that he and his team have relentlessly barraged the public completely and knowingly false general accusations providing no legitimate evidence whatsoever and routinely demonstrating a below-kindergarten-understanding of securities law.

As Vechery's failing efforts are beginning to backfire on him and his team at a very high level, the actions taken by the company hereunder are the best possible way to stay focused on building the business and restoring future value to legitimate MAXD investors. As a result, Vechery has more recently shifted his team to an alternate strategy that involves relentlessly barraging the Company and its CEO on all stock board platforms and social media with the goal being to waste so much time, money, and resources, that dealing with their frauds becomes the full-time purpose and activity of the Company. Much more is disclosed herein and far greater detail will be added to the shareholders publicly available site at MAXDandBeyond.com.

Certain police reports have been filed recently and yielded state and federal laws, independently cited by law-enforcement officials on the reports themselves, while providing a clear path to felony criminal prosecution and punishment of Vechery, and his entire team, orchestrating daily attacks of cyber-bullying, harassment, and stalking that they have all been engaged in at Vechery's direction for the better part of 18 months. Based on preliminary responses, from law enforcement in the judicial system in more than one state , I confidently expect criminal actions will be put into play fairly soon against all of those involved in the Vechery strategy. Also, the company has prepared and expects that within the next several days subpoenas for all posters we'll be filed to reveal all of the identities behind every single post of the past year on all of the main chat boards and social media. This will prove once and for all that I am not on any chat board and never have been in any capacity and end the lawsuits, derivative or otherwise, filed by Vechery's entertainment attorney as nothing but well-paid legal malpractice and fraud perpetuated as in every case by Vechery premeditating 100% lies to all of his attorneys which helps to explain why he has to keep changing them. There is no information and belief. Vechery knowingly lies to each successive law firm while demonstrating the lies as truth by pointing to his Team of online defamers as proof that their lies are truth, hence "on information and belief". All attorneys have an actual duty to research these claims, but it is certainly understandable when some guy is crying wolf, waving huge bags of cash around and taking his Prey out for $1000 lunches.

It is important to mention here, in the filings, and wherever else relevant, that ALL of these lies put out as "information" is only to cause harm and is coming directly from Vechery. No one else has any information on these matters.  The online alias "Alfred/Bill" is a conduit for everything that Vechery wants to put out online.

On just the MAXD yahoo board there are 21,000+ posts, mostly just from a handful of the same people primarily repeating the same no proof general accusations and guaranteeing my demise each week during the last 18 months. Alfred states that he will not stop his criminal activity until the day he dies. Alfred recently responded to the news that Vechery's hospitality business partner, in what was billed as the biggest Ponzi scheme in the history of Las Vegas, had recently began to serve his life in prison sentence and that their business address had listed among other things warrants for arrest and registered sex offenders. Screen captures have been saved with Alfred offering an extreme number in the millions of dollars as a reward to anyone that can prove that he and Vechery are pedophiles. Alfred goes on to explain how nobody should assume he is such, just because he lives across the street from a school of very young children that he claims somebody may have seen in the background of one of his fraudulent videos. Alfred is a man who has many aliases, is

being pursued by dozens of clients of his insurance company along other things. While both recordings are catching the company's auditor, where he is impersonating an attorney that he is not, representing his own non-existent fake law firm which never existed.

To clarify more of the record, all 10 million of my preferred shares were acquired by me for seven figures of cash loans that the company could never afford to pay me back. Half of those, or 5 million shares, I acquired on an emergency basis at four cents, during a hostile takeover attempt. All of the 10 million shares, are underwater at least 99% from what I paid as my actual cash cost. Regulatory requirement of any reporting company requires that there is at least one executive receiving or accruing salary. While I rightfully receive accrued salary, Vechery is completely aware that the company, has been unable to pay me an actual salary and that for the past five years, I have received zero income, and this is reflected on all of my corresponding tax returns. There has never been any pump and dump. That is just a term of art created by large investment banks to sell short during any run and make little companies look bad every time. During every period where that phrase is thrown out and in the ridiculous and highly illegal dismissed derivative lawsuits, the stock went down in value and in trading volume because I deliberately made no effort to even keep investor enthusiasm in play. A simple review of those facts as well as every other general accusation these criminals make are easily reviewed and confirmed as absurd and false on every level.

Vechery knows for a fact that the $17,000 was legitimately loaned by the business to buy back in full one of my cars from my estate and that the same amount was deducted from the enormous money the company still owes me but has been unable to pay. Vechery also knows that I paid 11 of 12 monthly mortgage payments from the unlicensed loan shark that was provided to me from Vechery's criminal contacts and delivered with a bait and switch from 4% to 11% at the closing. Vechery also knows I spent $60,000 of my own cash filing against the lender which the trustee was able to leverage into a savings benefit of at least four times that amount used in the closing of the estate under Chapter 7.

Devine Mafa, is a personal referral from Alfred, who came with Alfred's high praise until I had to literally throw Mafa out of my home when he went wacko and tried to extort massive money from me that he clearly was never owed and never promised. Vechery then assisted Mafa in securing a suburban Los Angeles law firm to file a demented and perverse unemployment claim filled with a completely fabricated story he unwittingly recorded. As in all of these related matters, we just neatly pack up the truth as provided unwittingly, and as soon as the evidence against them, created by them, is received, we never hear from that attorney again.

In summary, Harvey Vechery is an 88-year-old mean-spirited unhappy person who has committed numerous blatant intentional securities violations wrapped in a variety of pre-meditated fraudulent acts. He has been getting away with doing the same things to others for many years, while mismanaging and losing the majority of his wife's $190 million dollars estate. I'm the first small business entrepreneur he's worked with that has caught on and uncovered his very dark secrets. I've uncovered all of the direct links between all of it thanks in large part to a Trojan horse inside his organization by way of a digital phone account that he and his Associates thought was friendly to their plans but legally tracked every move they made. This has caused them to unwittingly provide me their own digital communications of all sorts, and over a long period of time, outlining and memorializing the crimes they have planned and ultimately committed. Vechery once told me he enjoyed tearing down people's stuff.

At ChannelGreg.com you can see about 20% of the nearly 1000 features on me in nine industries spanning my long career. They include appearances on Oprah and every major network, a cover story on Forbes, and many recent appearances with top millennial podcasters and so much more. There are many immediately accessible positive endorsements of me and the ventures I have brought to market in several industries as Form 10 Microcaps using 15c211's with one market maker to begin otc trading. I've raised now nearly 200 million dollars over 4 decades and according to Bloomberg, Reuters, and Russell, the past 28 years of these endeavors have resulted in nearly a billion dollars of returns to long market investors. All my ventures combined over those four plus-decades have resulted in billions of dollars of small business commerce for others which is something I'm most proud of.

Along the way, I've invested close to $14 million dollars of my own winnings into my own deals usually as the lead. My best deal went up more than 28,000% over 13 months and the fastest deal I was in the forefront of, increased more than 19,000% over a ten-week test period. I invented online crowdfunding in 1998, receiving three million dollars in about a week in a self-directed Regulation A. I have affected law changes and testified upon request to House Oversight, Investigations and Finance and became good friends until his passing in 2016 with that Committee Chairman - Congressman Michael Oxley. He said I was the only true small business bi-partisan and the SEC in the past few years opened two new offices following the nearly exact outlines I provided in my 2001 Testimony titled The S.E.C.'s Role in Capital Formation: Help or Hindrance.

Over the course of my career, I have been unjustly treated from time to time and this caused me to take up arms in a legal sense and has resulted for me and my ventures more than $10 million dollars, when combining cash settlements and judgments in 27 cases. During my 43 years of business pioneering, I have never been accused, prosecuted, or adjudged by any agency. Truth, honesty and always following the rules has served me well. Those who I have gone after didn't believe rules apply to them and I attribute my success in legal matters to having all of the truth on my side. Harvey Vechery is an outlier, unique in his methods compared to everyone I've ever met in 43 years of small business. He has reinvented how to harm those he invests in by enticing financially motivated attorneys with completely fake stories, who are only hired if Vechery is convinced that they will find ways to abuse the legal system to help Vechery wear opponents down. I have collected with pain staking research and private investigations a nearly three-decade history of his pure unadulterated fraud and hoodwinkery.

Vechery passed out money to certain people who went online and tried to manipulate stock in MAXD. They promised other investors it would go up, and later that it would go down. While interfering with large potential customers of the company, Vechery attempted to steal technology that MAXD owns. Vechery has been teamed up with the Company's former CEO Harold Blaisure, who I terminated for cause, having worked together for several years and still possessing stolen equipment assets that I demanded back but that they continually refuse to respond to. BTX Bill Torre has a chronically sociopathic habit of sending gay phobic slurs to me, which Vechery has a long and well documented habit of doing also to anyone he feels will listen to him when he talks. Youtuber Alfred has multiple aliases and identities. He is being pursued not only for Insurance Fraud, but for making up one story after another that attributes the 100% fake stories to Vechery and that he knows for a fact are already proven 100% false. Indeed, Vechery created all of these lies and he knows he was recorded saying he would do these things. There's literally a giant inventory of perfect incriminating trails of digital messaging that he has unwittingly provided already to the company's benefit. With the help of an entertainment attorney Larry Russ, Vechery came up with what he calls the derivative lawsuit but his team refuses to admit that he had to withdraw his claim because it was illegal and his YouTuber Alfred helped somebody file a clone of the same set of lies that he spews online stating that attorney Larry Russ helped him prepare it at Vechery's direction, but Alfred simultaneously refuses to admit that his filing was illegal and that it has long since been defaulted on my lawsuit against him. With most everything in the legal system working with the truth in our favor and our takedown of these bad actors well on its way to completion in no more than an estimated 3 to 4 months. I expect we will benefit financially as we end the reign of terror for good and can reemerge for long-term success and value growth.

If you didn't know the basic Nancy point No. 1 and do me one more review, but while considering that I have many high-level positive accomplishments that are well documented year after year for decades, wow nearly every good person I've ever formed a bond with likes me and will work with me based on a simple phone call.

At the same time, I can promise you that my enemies have zero credibility on any subject throughout the course of their entire lives. Combine all of their lives and you still get nothing good and everything bad.

Greg brief bullet bio - or go to https://ChannelGreg.com

The Inventor of Crowd Funding in 1998, Greg Halpern was an International Gold Medalist in Judo & an Author in the late 70's, spending more than 40 years since pioneering emerging technologies where he played the critical role bringing them from concept to reality providing savvy management, infrastructure, funding & intellectual capital to bring life-changing innovations to market.

Halpern has raised & invested now nearing 200 million dollars yielding fast approaching almost a billion dollars in open market returns for long investors. According to Bloomberg, Halpern's Circle Group Holdings was the top gainer in Illinois in 2003 at 6533% before quadrupling in 2004 for a 13 month return of over 28,000%.

In the 80's, Halpern appeared in Omni Science and Venture among many media features pioneering Computer Animated Imaging & Electronic Anesthesia where he received patents & trademarks & was on the Oprah show. In the 90's Halpern developed the first search engine reverse algorithm software and successfully launched the first ever crowd funding - raising three million dollars online in a week. The S.E.C. cleared offering was featured on CNN.

Since 2000, Halpern was the Principal owner of CGI Capital an NASD Broker Dealer, Chairman & CEO of Circle Group Holdings (AMEX: CXN) and Z-Trim Holdings (AMEX: ZTM) where he designed & built a green plant to produce a USDA food ingredient breakthrough featured on Neal Cavuto dozens more syndicated human-interest stories appeared on most every major TV network

Halpern also developed Fairplay, a DRM component of Veridisc, which was sold to Apple as an original piece of their entire media ecosystem.

Halpern has been featured on most major TV networks & in many major publications including books by celebrities such as Dr. Oz. More than 100 Leaders in several industries have glowingly endorsed and worked with Halpern and his emerging ventures - a few of which are Steve Forbes, Al Gore, General Wes Clark, Steadman Graham, George Foreman, Larry King, Mick Fleetwood, Pitbull, SBA Chief Hector Barreto, Congressman Michael Oxley & Congresswoman Sue Kelly who brought him to congress to testify on ways to improve small business in America. These activities led to regulatory innovations, rule changes and two new offices at the S.E.C. including the Office of the Ombudsman and Office of the Advocacy for Small Business Capital Formation. Halpern has worked successfully with agencies such as the FDA, USDA, USPTO, FCC, DOE, DOD & SEC & is an inventor on several patents issued or pending since 1987.

As MAX-D's Founder, Chairman, CEO, CFO, and Super Majority Shareholder, I always hope for the greatest win of my lifetime which I truly believe this could be, even considering the extreme challenges I've had to take on to get this far down the road. Over the course of my 4+ decades career I have always taken on all responsibility to pay in full all of the bills of the company for every service we need just to operate. While there are very few bills left of significance, I include being personally responsible for even this filing to the small recent Discount Edgar, and a past-due balance for the previous quarter. They have truly been the best filing experience during the Company's long history.

Finally, most small microcaps today have one or two key people operating the daily business year-round due to limited funding and uninsured officer and director risk exposure. If you have followed my 43-year career of monumental technology paradigm shifts, then at the least you know by now, I have always been a fighter for the little guy. I am the underdog. We are the Underdogs. I can now clearly see this final leg of the long strange and beautiful journey. I see it as a really fun fight, and I am confident we are already winning and will win it all in the end.

Truly Yours,

Gregory J. Halpern

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MAX SOUND CORPORATION**

Date: November 21, 2022

By:     /s/ Greg Halpern
Name:   Greg Halpern
Title:   Chief Executive Officer

# EDGAR SUBMISSION SUMMARY

VIEW ALL
COMMENTS

| | |
|---|---|
| Submission Type | 8-K |
| Live File | On |
| Return Copy | On |
| Exchange | NONE |
| Confirming Copy | Off |
| Filer CIK | 001353499 |
| Filer CCC | xxxxxxxx |
| Period of Report | 11-21-2022 |
| Item IDs | Item 8.01 (Other Events (The registrant can use this Item to report events that are not specifically called for by Form 8-K, that the registrant considers to be of importance to security holders.)) |
| Emerging Growth Company | No |
| Notify via Filing website Only | Off |
| Emails | file@discountedgar.com |

## Documents

| Form Type | File Name | Description |
|---|---|---|
| 8-K | maxd_8k.htm | FORM 8-K |

## Module and Segment References

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported) **November 21, 2022**

**Commission file number 000-51886**

## MAX SOUND CORPORATION

(Exact Name of Registrant as Specified in Charter)

| **Delaware** | **26-3534190** |
|---|---|
| (State of Other Jurisdiction of Incorporation) | (I.R.S. Employer Identification No.) |

**3525 Del Mar Heights Road # 802, San Diego, California, 92130**
(Address of principal executive offices including zip code)

**310-775-0058**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

This disclosure relates to Max Sound Corporation (the "Company")

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 144 of 164 PageID #:224

Page 143 of 162

**Item 8.01 Other Events**

**Action by the Company due to extraordinary circumstances to function as non-Reporting for a period no less than three calendar months and no greater than six calendar months from today's filing date of November 21, 2022.**

(1) Max Sound Corporation (the "Company") relied on the typical allowed extension of up to 5 days after its normal calendar Q3 filing due date of November 14, 2022;

(2) After its requested extension, the Company had planned to file its 3rd quarter 10Q on November 21, 2022. However, after thoughtful consideration of extraordinary circumstances as memorialized in detail below, the Company has made the decision that the most beneficial action for all legitimate investing shareholders of record as a collective group, is to be non-Reporting for a brief period of time;

(3) As mentioned previously in the Company's 8K filing on September 2, 2022 - any important news the company deems relevant under REG FD, has already been, and will continue to be, posted timely at the web site of MAXDandBeyond.com.

(4) The Company, and its CEO, have attracted a group of bad actors, led by one MAXD shareholder - Harvey Vechery. Vechery's self-declared mission is to destroy the Company, its CEO, and all of the shareholder value at all costs. Read more on Vechery's well-documented strategy below in (8) Letter.

(5) The Company made a forecast earlier in 2022 projecting a year-end run-rate of $100 million annual going forward. This would require total income of at least $8.5 million for the month of December. Any number of combined events currently in play lead to the conclusion that the forecast is attainable. Due to the chronic and relentless interference by Vechery and his team of lawbreakers, that's all that the Company will release on the subject at this time.

(6) The status of the Company's professionals are as follows: Securities Counsel is available based on hourly rates. Presently, we feel it would be an unnecessary expense. Simultaneously, local Securities Counsel superstars are considering contingent cases that would include an already-created, multi-million-dollar, win-big damage model prepared for us with the help of a top Damage Expert in the Microcap space. For the period of nonreporting discussed herein, the Company's Auditor is expected to resign at their own convenience. The Company's CEO has personally paid a majority of previous bills for the Company's accounting and audit work over the past several years. Prior to the Company's future effort to return to reporting status, the CEO personally guarantees to pay to the current auditor any due balance existing and/or necessary to transition to another PCAOB qualified auditor with such having already been identified as the potential successor. The Company's CEO has also personally paid a majority of previous bills for legal services related to Vechery's fraudulent attacks which is now in excess of $100,000 invested towards such legal work. The CEO has and will continue to provide additional personal guarantees to certain attorneys as necessary, until the take down of Vechery and his team is complete and all professional bills are paid in full either by the CEO or the Company, or any combination of both.

(7) The Company humbly submits that it will file its anticipated timing to return to a fully reporting status on or prior to May 19, 2023, along with updated audited accounting suitable to PCAOB rules and any other relevant regulatory compliance.

(8) Letter: Attention MAX-D Shareholders.

As the company's CEO, I have consistently stated for legitimate shareholders who are interested only in reality, to know the exact documented and factual truth on any matter called into question that the Company believes necessitates a response. My unblemished 43-year business track record stands the test of time. At https://ChannelGreg.com, a fraction of my large inventory of accomplishments can be viewed as a small but meaningful part of the global digital multimedia record and ecosystem including parts of which I helped to create.

2

Harvey Vechery has a well-documented strategy, already proven by his very own digital record as premeditatedly fraudulent. It centers around Vechery trying to illegally steal my super majority preferred shares which I rightfully received from my Chapter 7 liquidation. For the past two years, Vechery has established on the record that he will spend whatever time and money that it takes to fraudulently spread lies, that he knows in fact have already been proven 100% false by his own substantial digital trail of racketeering, orchestrated market manipulation, intentional long-term violations of insider filing requirements and while trying in vain to hide decades of his own excessive financial failures. While these strategies can succeed against microcaps who generally have little resources to combat them, with managers who can become exposed, fearful, or just plain worn out, this is not the case here. The Company, and I, have always followed the rules to the letter of the law and this will continue to be proven 100% true. What has also been proven, is that Vechery has hired and employed the worst of his kind which is beginning to result in the collective demise of Vechery and his team of paid bashers. Since they have zero truth on the side of their proven criminal records and shamelessly bizarre behavior, they are now losing the fake legal battles they previously promoted each week for more than the past year as the supposed end of my Contractual Leadership Position and Stock Ownership that I paid and invested real money to acquire at an enormous loss currently and that Vechery is on record during my personal bankruptcy stating that my preferred shares have to remain with me. Yet, for all of that he and his team have relentlessly barraged the public completely and knowingly false general accusations providing no legitimate evidence whatsoever and routinely demonstrating a below-kindergarten-understanding of securities law.

As Vechery's failing efforts are beginning to backfire on him and his team at a very high level, the actions taken by the company hereunder are the best possible way to stay focused on building the business and restoring future value to legitimate MAXD investors. As a result, Vechery has more recently shifted his team to an alternate strategy that involves relentlessly barraging the Company and its CEO on all stock board platforms and social media with the goal being to waste so much time, money, and resources, that dealing with their frauds becomes the full-time purpose and activity of the Company. Much more is disclosed herein and far greater detail will be added to the shareholders publicly available site at MAXDandBeyond.com.

Certain police reports have been filed recently and yielded state and federal laws, independently cited by law-enforcement officials on the reports themselves, while providing a clear path to felony criminal prosecution and punishment of Vechery, and his entire team, orchestrating daily attacks of cyber-bullying, harassment, and stalking that they have all been engaged in at Vechery's direction for the better part of 18 months. Based on preliminary responses, from law enforcement in the judicial system in more than one state , I confidently expect criminal actions will be put into play fairly soon against all of those involved in the Vechery strategy. Also, the company has prepared and expects that within the next several days subpoenas for all posters we'll be filed to reveal all of the identities behind every single post of the past year on all of the main chat boards and social media. This will prove once and for all that I am not on any chat board and never have been in any capacity and that my entertainment attorney is nothing but well-paid legal malpractice and fraud perpetuated as in every case by Vechery premeditating 100% lies to all of his attorneys which helps to explain why he has to keep changing them. There is no information and belief. Vechery knowingly lies to each successive law firm while demonstrating the lies as truth by pointing to his Team of online defamers as proof that their lies are truth, hence "on information and belief". All attorneys have an actual duty to research these claims, but it is certainly understandable when some guy is crying wolf, waving huge bags of cash around and taking his Prey out for $1000 lunches.

It is important to mention here, in the filings, and wherever else relevant, that ALL of these lies put out as "information" is only to cause harm and is coming directly from Vechery. No one else has any information on these matters. The online alias "Alfred/Bill" is a conduit for everything that Vechery wants to put out online.

On just the MAXD yahoo board there are 21,000+ posts, mostly just from a handful of the same people primarily repeating the same no proof general accusations and guaranteeing my demise each week during the last 18 months. Alfred states that he will not stop his criminal activity until the day he dies. Alfred recently responded to the news that Vechery's hospitality business partner, in what was billed as the biggest Ponzi scheme in the history of Las Vegas, had recently began to serve his life in prison sentence and that their business address had listed among other things warrants for arrest and registered sex offenders. Screen captures have been saved with Alfred offering an extreme number in the millions of dollars as a reward to anyone that can prove that he and Vechery are pedophiles. Alfred goes on to explain how nobody should assume he is such, just because he lives across the street from a school of very young children that he claims somebody may have seen in the background of one of his fraudulent videos. Alfred is a man who has many aliases, is being pursued by claimed victims of his Insurance Scam among other things. Alfred left recordings threatening the Company's auditor, where he is impersonating an attorney which he is not, representing his own non-existent fake law firm which never existed.

To clarify more of the record, all 10 million of my preferred shares were acquired by me for seven figures of cash loans that the company could never afford to pay me back. Half of those, or 5 million shares, I acquired on an emergency basis at four cents, during a hostile takeover attempt. All of the 10 million shares, are underwater at least 99% from what I paid as my actual cash cost. Regulatory requirement of any reporting company requires that there is at least one executive receiving or accruing salary. While I rightfully receive accrued salary, Vechery is completely aware that the company, has been unable to pay me an actual salary and that for the past five years, I have received zero income, and this is reflected on all of my corresponding tax returns. There has never been any pump and dump. That is just a term of art created by large investment banks to sell short during any run and make little companies look bad every time. During every period where that phrase is thrown out and in the ridiculous and highly illegal dismissed derivative lawsuits, the stock went down in value and in trading volume because I deliberately made no effort to even keep investor enthusiasm in play. A simple review of those facts as well as every other general accusation these criminals make are easily reviewed and confirmed as absurd and false on every level.

3

Vechery knows for a fact that the $17,000 was legitimately loaned by the business to buy back in full one of my cars from my estate and that the same amount was deducted from the enormous money the company still owes me but has been unable to pay. Vechery also knows that I paid 11 of 12 monthly mortgage payments from the unlicensed loan shark that was provided to me from Vechery's criminal contacts and delivered with a bait and switch from 4% to 11% at the closing. Vechery also knows I spent $60,000 of my own cash filing against the lender which the trustee was able to leverage into a savings benefit of at least four times that amount used in the closing of the estate under Chapter 7.

Devine Mafa, is a personal referral from Alfred, who came with Alfred's high praise until I had to literally throw Mafa out of my home when he went wacko and tried to extort massive money from me that he clearly was never owed and never promised. Vechery then assisted Mafa in securing a suburban Los Angeles law firm to file a demented and perverse unemployment claim filled with a completely fabricated story he unwittingly recorded. As in all of these related matters, we just neatly pack up the truth as provided unwittingly, and as soon as the evidence against them, created by them, is received, we never hear from that attorney again.

In summary, Harvey Vechery is an 88-year-old mean-spirited unhappy person who has committed numerous blatant intentional securities violations wrapped in a variety of pre-meditated fraudulent acts. He has been getting away with doing the same things to others for many years, while mismanaging and losing the majority of his wife's $190 million dollars estate. I'm the first small business entrepreneur he's worked with that has caught on and uncovered his very dark secrets. I've uncovered all of the direct links between all of it thanks in large part to a Trojan horse inside his organization by way of a digital phone account that he and his Associates thought was friendly to their plans but legally tracked every move they made. This has caused them to unwittingly provide me their own digital communications of all sorts, and over a long period of time, outlining and memorializing the crimes they have planned and ultimately committed. Vechery once told me he enjoyed tearing down people's stuff.

At ChannelGreg.com you can see about 20% of the nearly 1000 features on me in nine industries spanning my long career. They include appearances on Oprah and every major network, a cover story on Forbes, and many recent appearances with top millennial podcasters and so much more. There are many immediately accessible positive endorsements of me and the ventures I have brought to market in several industries as Form 10 Microcaps using 15c211's with one market maker to begin otc trading. I've raised now nearly 200 million dollars over 4 decades and according to Bloomberg, Reuters, and Russell, the past 28 years of these endeavors have resulted in nearly a billion dollars of returns to long market investors. All my ventures combined over those four plus-decades have resulted in billions of dollars of small business commerce for others which is something I'm proud of.

Along the way, I've invested close to $14 million dollars of my own winnings into my own deals usually as the lead. My best deal went up more than 28,000% over 13 months and the fastest deal I was in the forefront of, increased more than 19,000% over a seven-month test period. I invented online crowdfunding in 1998, receiving three million dollars in about a week in a self-directed Regulation A. I have affected law changes and testified upon request to House Oversight, Investigations and Finance and became good friends until his passing in 2016 with that Committee Chairman - Congressman Michael Oxley. He said I was the only true small business bi-partisan and the SEC in the past few years opened two new offices following the nearly exact outlines I provided in my 2001 Testimony titled The S.E.C.'s Role in Capital Formation: Help or Hindrance.

Over the course of my career, I have been unjustly treated from time to time and this caused me to take up arms in a legal sense and has resulted for me and my ventures more than $10 million dollars, when counting cash settlements and judgments in 27 cases. During my 43 years of business pioneering, I have never been accused, prosecuted, or adjudged by any agency. Truth, honesty and always following the rules has served me well. Those who I have gone after didn't believe rules apply to them and I attribute my success in legal matters to having all of the truth on my side. Harvey Vechery is an outlier, unique in his methods compared to everyone I've ever met in 43 years of small business. He has reinvented how to harm those he invests in by enticing financially motivated attorneys with completely fake stories, who are only hired if Vechery is convinced that they will find ways to abuse the legal system to help Vechery wear opponents down. I have collected with pain staking research and private investigations a nearly three-decade history of his pure unadulterated fraud and hoodwinkery.

Vechery passed out money to certain people who went online and tried to manipulate stock in MAXD. They promised other investors it would go up, and later that it would go down. While interfering with large potential customers of the company, Vechery attempted to steal technology that MAXD owns. Vechery has been teamed up with the Company's former CEO Harold Blaisure, who I terminated for cause, having worked together for several years and still possessing stolen equipment assets that I demanded back but that they continually refuse to respond to. BTX Bill Torre has a chronically sociopathic habit of sending gay phobic slurs to me, which Vechery has a long and well documented habit of doing also to anyone he feels will listen to him when he talks. Youtuber Alfred has multiple aliases and identities. He is being pursued not only for Insurance Fraud, but for making up one story after another that attributes the 100% fake stories to Vechery and that he knows for a fact are already proven 100% false. Indeed, Vechery created all of these lies and he knows he was recorded saying he would do these things. There's literally a giant inventory of perfect incriminating trails of digital messaging that he has unwittingly provided already to the company's benefit. With the help of an entertainment attorney Larry Russ, Vechery came up with what he calls the derivative lawsuit but his team refuses to admit that he had to withdraw his claim because it was illegal and his YouTuber Alfred helped somebody file a clone of the same set of lies that he spews online stating that attorney Larry Russ helped him prepare it at Vechery's direction, but Alfred simultaneously refuses to admit that his filing was illegal and that it has long since been defaulted on my lawsuit against him. With most everything in the legal system working with the truth in our favor and our takedown of these bad actors well on its way to completion in no more than an estimated 3 to 4 months. I expect we will benefit financially as we end the reign of terror for good and can reemerge for long-term success and value growth.

4

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 147 of 164 PageID #:227

If you didn't know my basic bullet point bio, I offer you for more review, but while considering that I have many high-level positive accomplishments that are well documented year after year for decades, while nearly every good person I've ever formed a bond with likes me and will work with me based on a simple phone call. At the same time, I can promise you that my enemies have zero credibility on any subject throughout the course of their entire lives. Combine all of their lives and you still get nothing good and everything bad.

Greg brief bullet bio - or go to https://ChannelGreg.com

The Inventor of Crowd Funding in 1998, Greg Halpern was an International Gold Medalist in Judo & an Author in the late 70's, spending more than 40 years since pioneering emerging technologies where he played the critical role bringing them from concept to reality providing savvy management, infrastructure, funding & intellectual capital to bring life-changing innovations to market.

Halpern has raised & invested now nearing 200 million dollars yielding fast approaching almost a billion dollars in open market returns for long investors. According to Bloomberg, Halpern's Circle Group Holdings was the top gainer in Illinois in 2003 at 6533% before quadrupling in 2004 for a 13 month return of over 28,000%.

In the 80's, Halpern appeared in Omni Science and Venture among many media features pioneering Computer Animated Imaging & Electronic Anesthesia where he received patents & trademarks & was on the Oprah show. In the 90's Halpern developed the first search engine reverse algorithm software and successfully launched the first ever crowd funding - raising three million dollars online in a week. The S.E.C. cleared offering was featured on CNN.

Since 2000, Halpern was the Principal owner of CGI Capital a NASD Broker Dealer, Chairman & CEO of Circle Group Holdings (AMEX: CXN) and Z-Trim Holdings (AMEX: ZTM) where he designed & built a green plant to produce a USDA food ingredient breakthrough featured on Neal Cavuto  and dozens more syndicated human-interest stories appeared on most every major TV network

Halpern also developed Fairplay, a DRM component of Veridisc, which was sold to Apple as an original piece of their entire media ecosystem.

Halpern has been featured on most major TV networks & in many major publications including books by celebrities such as Dr. Oz. More than 100 Leaders in several industries have glowingly endorsed and worked with Halpern and his emerging ventures - a few of which are Steve Forbes, Al Gore, General Wes Clark, Steadman Graham, George Foreman, Larry King, Mick Fleetwood, Pitbull, SBA Chief Hector Barreto, Congressman Michael Oxley & Congresswoman Sue Kelly who brought him to congress to testify on ways to improve small business in America. These activities led to regulatory innovations, rule changes and two new offices at the S.E.C. including the Office of the Ombudsman and Office of the Advocacy for Small Business Capital Formation. Halpern has worked successfully with agencies such as the FDA, USDA, USPTO, FCC, DOE, DOD & SEC & is an inventor on several patents issued or pending since 1987.

As MAX-D's Founder, Chairman, CEO, CFO, and Super Majority Shareholder, I always hope for the greatest win of my lifetime which I truly believe this could be, even considering the extreme challenges I've had to take on to get this far down the road. Over the course of my 4+ decades career I have always taken on all responsibility to pay in full all of the bills of the company for every service we need just to operate. While there are very few bills left of significance, I include being personally responsible for even this filing to the small recent Discount Edgar, and a past-due balance for the previous quarter. They have truly been the best filing experience during the Company's long history.

Finally, most small microcaps today have one or two key people operating the daily business year-round due to limited funding and uninsured officer and director risk exposure. If you have followed my 43-year career of monumental technology paradigm shifts, then at the least you know by now, I have always been a fighter for the little guy. I am the underdog. We are the Underdogs. I can now clearly see this final leg of the long strange and beautiful journey. I see it as a really fun fight, and I am confident we are already winning and will win it all in the end.

Truly Yours,

Gregory J. Halpern

5

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MAX SOUND CORPORATION**

Date: November 21, 2022

By:    */s/ Greg Halpern*

Name:  Greg Halpern

Title:   Chief Executive Officer

6

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Page 149 of 162

THIS PAGE IS INTENTIONALLY LEFT BLANK
IT IS NOT A PART OF EDGAR SUBMISSION

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 150 of 164 PageID #:230



## ➢ Damaging MAXD Shareholders

## ➢ The Vechery Attacks

*In the November 21, 2022, S.E.C. 8K filing, Halpern had stated that -* Due to the chronic and relentless interference by Vechery, and his team of lawbreakers, that's all that the Company will release on the subject at this time.

*And* The Company humbly submits that it will file its anticipated timing to return to a fully reporting status on or prior to May 19, 2023, along with updated audited accounting suitable to PCAOB rules and any other relevant regulatory compliance.

*Also, in the 8K filing, Halpern had stated* that As the company's CEO, I have consistently stated for legitimate shareholders who are interested only in reality to know the exact documented and factual truth on any matter called into question that the Company believes necessitates a response. My unblemished 43-year business track record stands the test of time. At https://ChannelGreg.com, a fraction of my large inventory of accomplishments can be viewed as a small but meaningful part of the global digital multimedia record and ecosystem, including parts that I helped create.

*Also, in the 8K filing, Halpern had stated* Harvey Vechery has a well-documented strategy, already proven by his very own digital record as premeditatedly fraudulent. It centers around Vechery trying to illegally steal my super majority preferred shares which I rightfully received from my Chapter 7 liquidation. For the past two years, Vechery has established on the record that he will spend whatever time and money that it takes to fraudulently spread lies that he knows, in fact, have already been proven 100% false by his own substantial digital trail of racketeering, orchestrated market manipulation, intentional long-term violations of insider filing requirements and while trying in vain to hide decades of his own excessive financial failures.

*Also, in the 8K filing, Halpern had stated* The Company, and I, have always followed the rules to the letter of the law and this will continue to be proven 100% true. What has also been proven, is that Vechery has hired and employed the worst of his kind which is beginning to result in the collective demise of Vechery and his team of paid bashers. Since they have zero truth on the side of their proven criminal records and shamelessly bizarre behavior, they are now losing the fake legal battles they previously promoted each week for more than the past year as the supposed end of my Contractual Leadership Position and Stock Ownership that I paid and invested real money to acquire at an enormous loss currently and that Vechery is on record during my personal bankruptcy stating that my preferred shares have to remain with me.

*Also, in the 8K filing, Halpern had stated* That, for all of that, he and his team have relentlessly barraged the public with knowingly false accusations, providing no legitimate evidence whatsoever and routinely demonstrating a below-kindergarten-understanding of securities law. On just the MAXD Yahoo board, there are 21,000+ posts, mostly just from a handful of the same people, primarily repeating the same no-proof general accusations and guaranteeing my demise each week during the last 18 months. Alfred states that he will not stop his criminal activity until the day he dies. Alfred recently responded to the news that Vechery's hospitality business partner, in what was billed as the biggest Ponzi scheme in the history of Las Vegas, had recently begun to serve his life in-prison sentence and that their business address had listed, among other things warrants for arrest and registered sex offenders.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 151 of 164 PageID #:231

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## IN THE CIRCUIT COURT OF THE 22ⁿᵈ JUDICIAL CIRCUIT
## MCHENRY COUNTY ILLINOIS

| | |
|---|---|
| IN RE CIVIL MATTER OF:<br>GREGORY J. HALPERN<br>Plaintiff,<br>vs.<br><br>CITADEL SECURITIES LLC; KNIGHT SECURITIES; VIRTU FINANCIAL; CANTOR FITZGERALD; CANACCORD GENUITY; CHARLES SCHWAB & CO.; E*TRADE SECURITIES LLC; JPMORGAN CHASE & CO; GOLDMAN SACHS GROUP INC.; MERRILL LYNCH; UBS ASSET MANAGEMENT, INC.; CREDIT SUISSE INC.; DEUTSCHE BANK SECURITIES; DTCC (DEPOSITORY TRUST & CLEARING CORPORATION); HARVEY VECHERY; HAROLD BLAISURE; MICHAEL TURNER; CONSTANCE NASH; DEVINE MAFA; ALFRED HILDEBRAND; INVESTOR HUB (IHUB); YAHOO; MARY SCHAPIRO; MARY JO WHITE; JAY CLAYTON; THE SECURITIES & EXCHANGE COMMISSION; AND DOES 1-100<br>Defendants. | COMPLAINT FOR: DECLARATORY RELIEF, DAMAGES, AND DEMAND FOR A JURY TRIAL<br><br>COUNT I – FRAUD<br><br>COUNT II - SECURITIES FRAUD<br><br>COUNT III – CIVIL CONSPIRACY (Against All Defendants)<br><br>COUNT IV – BREACH OF FIDUCIARY DUTY<br><br>COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants)<br><br>COUNT VI – DECLARATORY RELIEF<br><br>COUNT VII –RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO)<br><br>COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

# EXHIBIT D

Plaintiff hereby incorporates the following Exhibit E in support of the allegations and claims stated herein:

**Exhibit D – MAXD Short Volume & Manipulation Report (June 13, 2018)** Press release and accompanying data proving that over 8.1 billion MAXD shares were illegally shorted in a single year—exceeding 40% of all trading volume—by Citadel, Virtu, Knight, and others.

This exhibit provides indisputable evidence of fraud, coordinated manipulation, regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

- 1 -



*Source:* *Max Sound Corporation*

*June 13, 2018 21:54 ET*

# Max Sound Corporation Announces Short Squeeze Situation On Its Stock

Explains Illegal Naked Shorting Being Perpetrated By Major Market Makers on MAXD Shares

8,117,878,650 shares shorted in the past year, which is more than 40% of MAXD's total trading volume

SAN DIEGO, June 13, 2018 (GLOBE NEWSWIRE) -- MAXD (OTC PK:MAXD) / Max Sound Corporation. Max Sound Corporation has engaged a leading provider of Regulation SHO compliance monitoring, short sale trading statistics and market integrity surveillance related to substantial short selling of its stock. Regulation SHO requires bona-fide market-making activities to include making purchases and sales in roughly comparable amounts. The Securities and Exchange Commission has stated that bona-fide market-making DOES NOT include activity that is related to speculative selling strategies for investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security. Likewise, where a market maker posts continually at or near the best offer, but does not also post at or near the best bid, the market maker's activities do not qualify as bona-fide market making. Moreover, a market maker that continually executes short sales away from its posted quotes is not considered to be engaged in bona-fide market making.

MAXD market makers have been monitored daily for compliance with Reg SHO and Fair Market-Making Requirements.  Here is a trading analysis of MAXD.  BuyVol = real buyers at offer.  SellVol = real sellers at bid. ShortVolume = short sale trade identifiers for both EXEMPT (market makers) and NON-EXEMPT (everyone else) shorts sales. The short selling as a percentage of daily trading volume in MAXD by your firm is abnormally high; the market-making math related thereto does not reconcile and is not at all compliant with Federal Securities Laws.

As is common during these orchestrated short selling campaigns, bad actors with no real interest in MAXD's success, or any small public company for that matter, has consistently engaged in false accusations and libel on the Company's stock chat boards in attempts to scare and demoralize MAXD's legitimate shareholders. It is noteworthy that as soon as Max Sound sent this report to the market makers perpetrating the naked short sales on the company, the

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Print - Max Sound Corporation Announces Short Squeeze Situation On Its Stock

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 153 of 164 PageID #:233

1/28/21, 10:05 AM

bad actors disappeared at least for the time being.

Here is a primer on the subject at hand http://counterfeitingstock.com/CounterfeitingStock.html and here is a powerful article put into actual practice https://theintercept.com/series/penny-stock-chronicles/

ANALYSIS and ACTION

We have analyzed the last year of daily short volume data and correlated it to recent market making activity in MAXD. In 27 of the past 31 trading days, 87% of the time, the combined selling and short selling in MAXD has far exceeded the amount of buying (See NetNet column below). Market makers, by definition, are required to PROVIDE LIQUIDITY not extract or remove liquidity. The math provided below demonstrates that instead of matching orders, market makers, Knight/Virtu, Cantor Fitzgerald, Canaccord Genuity, Citadel, eTrade/G1 are heavily shorting MAXD stock BOTH on the offer and on the bid, which by definition means they have a "speculative short selling strategy" running on MAXD. They are carrying net short positions overnight and continuing to claim the market maker's exemption, which is in VIOLATION of the Fair Market Making Requirements of Regulation SHO. We are able to mathematically prove this because there is not enough BuyVol (buy volume) to match the amount of selling and short selling. The chart below identifies the top 5 market makers, in MAXD for May 2018 (highlighted below) accounting for 2,257,870,595 shares of trading, or 88.22% of total trading volume in May.

| Total Volume (Last Month) | Name |
|---|---|
| 643,662,180 | Knight/Virtu, |
| 154,447,100 | Cantor Fitzgerald, |
| 203,762,081 | Canaccord Genuity, |
| 769,731,954 | Citadel, |
| 247,276,817 | Trade/G1 |

Highlighting these Market Makers abusive activities in-concert with each other for just the one month of May, allows regulators, the SEC, FINRA, the U.S. Attorney as well as the media to easily identify the manipulative trading activity and counterfeiting of MAXD shares engaged in by their traders for the past year and well beyond. When overlaid for the entire year (back to June 1, 2017) the math is shocking. 8,117,878,650 total shares have been shorted representing in excess of 40% of MAXD's total trading volume and it demonstrates that these market makers have knowingly participated in manipulative trading practices and counterfeiting of MAXD shares.

We provide the following data in this report:

DAILY TOTAL SHARES SHORTED (volume and price), which includes all shares shorted even by exempt institutions such as market makers.

FAILURES TO DELIVER (naked shorts).

MARKET MAKER SHARE VOLUME (exposing exactly how many shares are being traded and the name of the market making firm traded through).

MARKET MAKER DATA (showing whether or not a fair market is being made in each trading day).

CUMULATIVE TOTAL SHARES SHORTED data showing large short positions and the volume weighted average price that a short squeeze will start.

| Date | ShortVolume | Total Volume | Percent | Squeeze Trigger | $Value |
|------|-------------|--------------|---------|-----------------|--------|
| 6/8/2018 | 15,701,300 | 107,574,934 | 14.60% | $0.0004 | $6,281 |
| 6/7/2018 | 53,355,529 | 165,271,184 | 32.28% | $0.0004 | $21,342 |
| 6/6/2018 | 648,355,630 | 1,238,570,544 | 52.35% | $0.0005 | $324,178 |
| 6/5/2018 | 65,351,875 | 96,413,875 | 67.78% | $0.0004 | $26,141 |
| 6/4/2018 | 46,779,267 | 107,384,333 | 43.56% | $0.0004 | $18,712 |
| 6/1/2018 | 289,758,138 | 362,031,358 | 80.04% | $0.0003 | $86,927 |
| 5/31/2018 | 4,949,999 | 112,476,935 | 4.40% | $0.0003 | $1,485 |
| 5/30/2018 | 116,156,059 | 380,530,660 | 30.52% | $0.0003 | $34,847 |
| 5/29/2018 | 19,961,309 | 54,883,438 | 36.37% | $0.0002 | $3,992 |
| 5/25/2018 | 1,514,244 | 33,174,777 | 4.56% | $0.0003 | $454 |
| 5/24/2018 | 8,870,000 | 40,350,000 | 21.98% | $0.0003 | $2,661 |
| 5/23/2018 | 64,000,850 | 112,982,073 | 56.65% | $0.0003 | $19,200 |
| 5/22/2018 | 4,093,333 | 7,003,931 | 58.44% | $0.0003 | $1,228 |
| 5/21/2018 | 3,230,900 | 19,691,678 | 16.41% | $0.0003 | $969 |
| 5/18/2018 | 83,819,569 | 207,235,030 | 40.45% | $0.0003 | $25,146 |
| 5/17/2018 | 117,944,438 | 261,529,492 | 45.10% | $0.0003 | $35,383 |
| 5/16/2018 | 31,857,477 | 82,434,227 | 38.65% | $0.0003 | $9,557 |
| 5/15/2018 | 17,602,398 | 40,532,801 | 43.43% | $0.0003 | $5,281 |
| 5/14/2018 | 59,639,388 | 160,659,434 | 37.12% | $0.0003 | $17,892 |
| 5/11/2018 | 4,345,525 | 45,242,353 | 9.60% | $0.0003 | $1,304 |
| 5/10/2018 | 9,486,439 | 12,293,638 | 77.17% | $0.0003 | $2,846 |
| 5/9/2018 | 73,012,030 | 209,322,909 | 34.88% | $0.0003 | $21,904 |
| 5/8/2018 | 117,699,386 | 183,193,959 | 64.25% | $0.0003 | $35,310 |
| 5/7/2018 | 13,376,500 | 31,810,960 | 42.05% | $0.0003 | $4,013 |
| 5/4/2018 | 23,450,725 | 52,153,194 | 44.97% | $0.0003 | $7,035 |
| 5/3/2018 | 17,529,266 | 27,504,964 | 63.73% | $0.0003 | $5,259 |
| 5/2/2018 | 18,156,576 | 54,003,987 | 33.62% | $0.0003 | $5,447 |
| 5/1/2018 | 145,586,693 | 428,196,155 | 34.00% | $0.0003 | $43,676 |
| 4/30/2018 | 25,360,367 | 74,589,316 | 34.00% | $0.0003 | $7,608 |
| 4/27/2018 | 68,975,488 | 202,869,083 | 34.00% | $0.0004 | $27,590 |
| 4/26/2018 | 30,661,676 | 90,181,401 | 34.00% | $0.0004 | $12,265 |
| 4/25/2018 | 29,057,092 | 85,462,035 | 34.00% | $0.0005 | $14,529 |
| Total | 8,117,878,650 | 19,886,222,304 | 40.82% | $0.0008 | $6,178,916 |

*Total includes data back to 6-1-17. Chart truncated for viewing.

The below data is used to calculate if a fair market is being made in the shares of MAXD.

| Date | Change | BuyVol | SellVol | NetVol |
|------|--------|--------|---------|--------|
| 6/8/2018 | $0.0000 | 17,239,100 | 90,335,834 | -73,096,734 |
| 6/7/2018 | -$0.0001 | 34,585,376 | 130,685,709 | -96,100,333 |
| 6/6/2018 | $0.0001 | 718,621,354 | 520,049,090 | 198,572,264 |
| 6/5/2018 | $0.0000 | 19,290,250 | 77,123,600 | -57,833,350 |
| 6/4/2018 | $0.0000 | 9,789,292 | 97,595,041 | -87,805,749 |
| 6/1/2018 | $0.0001 | 346,326,535 | 15,704,771 | 330,621,764 |
| 5/31/2018 | $0.0000 | 6,762,532 | 105,714,403 | -98,951,871 |
| 5/30/2018 | $0.0000 | 496,000 | 304,034,660 | -303,538,660 |
| 5/29/2018 | -$0.0001 | 21,441,309 | 33,442,129 | -12,000,820 |
| 5/25/2018 | $0.0000 | 6,960,433 | 26,214,344 | -19,253,911 |
| 5/24/2018 | $0.0000 | 16,320,000 | 14,030,000 | 2,290,000 |
| 5/23/2018 | $0.0000 | 52,786,898 | 60,195,110 | -7,408,212 |
| 5/22/2018 | $0.0000 | 6,153,265 | 850,666 | 5,302,599 |
| 5/21/2018 | -$0.0002 | 6,545,966 | 13,145,712 | -6,599,746 |
| 5/17/2018 | $0.0001 | 191,564,349 | 54,965,143 | 136,599,206 |
| 5/16/2018 | $0.0000 | 32,444,345 | 49,989,882 | -17,545,537 |
| 5/15/2018 | $0.0000 | 18,047,797 | 22,485,000 | -4,437,203 |
| 5/14/2018 | $0.0000 | 61,868,765 | 98,790,669 | -36,921,904 |
| 5/11/2018 | $0.0000 | 9,802,358 | 35,439,995 | -25,637,637 |
| 5/10/2018 | $0.0000 | 7,024,956 | 5,268,682 | 1,756,274 |
| 5/9/2018 | -$0.0001 | 91,600,582 | 92,722,293 | -1,121,711 |
| 5/8/2018 | $0.0001 | 141,953,079 | 20,916,000 | 121,037,079 |
| 5/7/2018 | $0.0000 | 15,236,500 | 16,574,460 | -1,337,960 |
| 5/4/2018 | $0.0000 | 32,000,946 | 20,152,248 | 11,848,698 |
| 5/3/2018 | $0.0000 | 19,550,266 | 4,000,698 | 15,549,568 |
| 5/2/2018 | $0.0000 | 23,776,487 | 30,227,500 | -6,451,013 |
| 5/1/2018 | $0.0000 | 92,767,740 | 279,428,348 | -186,660,608 |
| 4/30/2018 | $0.0000 | 19,343,405 | 55,245,911 | -35,902,506 |
| 4/27/2018 | $0.0000 | 39,658,700 | 125,210,383 | -85,551,683 |
| 4/26/2018 | -$0.0001 | 20,298,214 | 69,883,185 | -49,584,971 |
| 4/25/2018 | $0.0000 | 10,472,153 | 74,989,882 | -64,517,729 |
| 4/24/2018 | $0.0000 | 27,222,242 | 102,120,578 | -74,898,336 |
| 4/23/2018 | $0.0000 | 189,184,851 | 309,886,738 | -120,701,887 |
| 4/20/2018 | $0.0001 | 532,198,608 | 308,760,532 | 223,438,076 |
| 4/19/2018 | -$0.0001 | 55,461,550 | 187,511,107 | -132,049,557 |

MAXD is making this report available to the investment world to create a substantial short squeeze opportunity with the goal to return to its shareholders the massive amount of equity stolen by unscrupulous market makers.

**About Max Sound Corporation:** As creators of the acclaimed MAXD HD Audio, Max Sound can provide a better solution for Audio, Video and Data transmissions. Max Sound Corporation is an owner of the Optimized Data Transmission Technology patent portfolio. Max Sound®, MAXD® and MAXD Audio Perfected® and HD Audio® are registered trademarks. All other

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 154 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795
Print - Max Sound Corporation Announces Short Squeeze Situation On Its Stock

trademarks are the property of their respective owners.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995:** Statements in this press release which are not purely historical, including statements regarding Max Sound's intentions, beliefs, expectations, representations, projections, plans or strategies regarding the future are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. The forward-looking statements involve risks and uncertainties including, but not limited to, the risks associated with the effect of changing economic conditions, trends in the products markets, variations in the company's cash flow or adequacy of capital resources, market acceptance risks, technical development risks and other risk factors. The company cautions investors not to place undue reliance on the forward-looking statements contained in this press release. Max Sound disclaims any obligation and does not undertake to update or revise any forward-looking statements in this press release. Expanded and historical information is made available to the public by Max Sound Corporation and its Affiliates on its website http://maxd.audio or at http://www.sec.gov.

info@maxsound.com
SOURCE Max Sound Corp.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 155 of 162

GREGORY J HALPERN, PRO SE
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

## IN THE CIRCUIT COURT OF THE 22ⁿᵈ JUDICIAL CIRCUIT
## MCHENRY COUNTY ILLINOIS

| | |
|---|---|
| IN RE CIVIL MATTER OF:<br><br>GREGORY J. HALPERN<br>Plaintiff,<br>vs.<br><br>CITADEL SECURITIES LLC; KNIGHT SECURITIES; VIRTU FINANCIAL; CANTOR FITZGERALD; CANACCORD GENUITY; CHARLES SCHWAB & CO.; E*TRADE SECURITIES LLC; JPMORGAN CHASE & CO; GOLDMAN SACHS GROUP INC.; MERRILL LYNCH; UBS ASSET MANAGEMENT, INC.; CREDIT SUISSE INC.; DEUTSCHE BANK SECURITIES; DTCC (DEPOSITORY TRUST & CLEARING CORPORATION); HARVEY VECHERY; HAROLD BLAISURE; MICHAEL TURNER; CONSTANCE NASH; DEVINE MAFA; ALFRED HILDEBRAND; INVESTOR HUB (IHUB); YAHOO; MARY SCHAPIRO; MARY JO WHITE; JAY CLAYTON; THE SECURITIES & EXCHANGE COMMISSION; AND DOES 1-100<br>Defendants. | COMPLAINT FOR: DECLARATORY RELIEF, DAMAGES, AND DEMAND FOR A JURY TRIAL<br><br>COUNT I – FRAUD<br><br>COUNT II - SECURITIES FRAUD<br><br>COUNT III – CIVIL CONSPIRACY<br>(Against All Defendants)<br><br>COUNT IV – BREACH OF FIDUCIARY DUTY<br><br>COUNT V – DEFAMATION & MARKET MANIPULATION (Against All Defendants)<br><br>COUNT VI – DECLARATORY RELIEF<br><br>COUNT VII –RACKETEERING INFLUENCED CORRUPT ORGANIZATION (RICO)<br><br>COUNT VIII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |

# EXHIBIT E

Plaintiff hereby incorporates the following Exhibit E in support of the allegations and claims stated herein:

**Exhibit E – Trump Media Short Attack Documentation (2024)** Report of short selling attack against Trump Media & Technology Group, filed by Devin Nunes and referenced in congressional inquiry, illustrating a parallel campaign of digital counterfeiting, manipulation, and SEC inaction.

- 1 -

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

This exhibit provides indisputable evidence of fraud, coordinated manipulation, regulatory negligence, and the broader RICO enterprise alleged in this Complaint.

Received 05-05-2025 08:17 AM / Circuit Clerk Accepted on 05-05-2025 11:23 AM / Transaction #32547830 / Case #2025MR000097
Page 157 of 162

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 159 of 164 PageID #:239
Page 159 of 169



Newsroom     Services     Contact Us     English ⌄

# Trump Media Alerts SEC to Potential Manipulation of DJT stock

April 17, 2025 08:51 ET     | Source: [Trump Media & Technology Group](#)     [Follow]

Share



SARASOTA, Fla., April 17, 2025 (GLOBE NEWSWIRE) -- Trump Media and Technology Group Corp. (Nasdaq, NYSE Texas: DJT) ("TMTG" or "the Company"), operator of the social media platform Truth Social, the streaming platform Truth+, and the FinTech brand Truth.Fi, sent the following memo to the U.S. Securities and Exchange Commission:

MEMO: Suspicious Trading Activity of DJT Stock

To: Mark Uyeda, Acting Chairman, U.S. Securities and Exchange Commission
From: Trump Media & Technology Group

Date: April 17, 2025
Subject: Potential Illegal Naked Short Selling and Market Manipulation of DJT Stock

CC: Financial Industry Regulatory Authority (FINRA); Nasdaq; New York Stock Exchange

This letter serves to inform you of suspicious activity related to a disclosure filed in Germany by the U.K.-based hedge fund Qube Research & Technologies ("Qube"). The following data points raise critical questions about the timing and methods used in Qube's trading activities:

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

- On April 10, 2025, Qube disclosed a nearly six-million share short position in Trump Media & Technology Group Corp ("TMTG") (NASDAQ, NYSE Texas: DJT). Thus, a U.K.-based entity, with a data center in Iceland, only disclosed these short sales in Germany.

- According to Nasdaq, the total short interest in DJT as of March 31, 2025, was 10.7 million shares (see attached chart). Third party sources inform TMTG that the total short interest as of April 16, 2025, is virtually unchanged—approximately 11 million shares.

- Neither Nasdaq, NYSE Texas, nor any other source has been able to confirm when the trades disclosed by Qube were conducted or if they were conducted at all.

The above factors, especially when combined with the history of suspicious trading surrounding DJT stock—including DJT appearing on Nasdaq's Regulation SHO Threshold Security List continuously for more than two months in 2024—could be indications of the illegal naked short selling of DJT shares.

We urge you to immediately investigate this suspicious trading and report your findings back to TMTG and any relevant civil and criminal authorities. American equities exchanges should be operated with full transparency and maximum efficiency, not as an opaque free-for-all reminiscent of a third-world casino.

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 161 of 164 PageID #:241

DJT / Short Interest

# Trump Media & Technology Group Corp. Common Stock (DJT) Short Interest

| Settlement Date | Short Interest | Avg. Daily Share Volume | Days to Cover |
|---|---|---|---|
| 03/31/2025 | 10,702,096 | 4,177,920 | 2.561585 |
| 03/14/2025 | 12,064,325 | 3,412,566 | 3.535265 |
| 02/28/2025 | 11,530,389 | 4,648,504 | 2.480452 |
| 02/14/2025 | 11,724,819 | 4,070,721 | 2.880281 |
| 01/31/2025 | 12,316,616 | 13,976,265 | 1 |
| 01/15/2025 | 11,446,657 | 13,646,904 | 1 |
| 12/31/2024 | 9,075,110 | 8,765,344 | 1.03534 |
| 12/13/2024 | 9,243,390 | 13,760,953 | 1 |
| 11/29/2024 | 12,688,970 | 17,194,970 | 1 |
| 11/15/2024 | 17,550,534 | 78,941,618 | 1 |
| 10/31/2024 | 16,968,657 | 70,971,363 | 1 |
| 10/15/2024 | 13,178,015 | 36,741,815 | 1 |
| 09/30/2024 | 11,436,841 | 16,328,009 | 1 |
| 09/13/2024 | 14,453,532 | 11,266,350 | 1.282894 |
| 08/30/2024 | 13,014,185 | 5,618,636 | 2.316253 |
| 08/15/2024 | 10,241,877 | 3,915,409 | 2.615787 |
| 07/31/2024 | 8,282,108 | 6,504,801 | 1.27323 |
| 07/15/2024 | 7,034,290 | 12,804,831 | 1 |
| 06/28/2024 | 5,219,586 | 15,146,924 | 1 |
| 06/14/2024 | 5,845,695 | 2,709,933 | 2.157136 |
| 05/31/2024 | 4,529,602 | 2,878,048 | 1.573845 |
| 05/15/2024 | 4,590,602 | 5,573,344 | 1 |
| 04/30/2024 | 5,347,471 | 9,705,647 | 1 |
| 04/15/2024 | 4,588,053 | 6,982,870 | 1 |

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Source: https://www.nasdaq.com/market-activity/stocks/djt/short-interest

About TMTG

The mission of TMTG is to end Big Tech's assault on free speech by opening up the Internet and giving people their voices back. TMTG operates Truth Social, a social media platform established as a safe harbor for free expression amid increasingly harsh censorship by Big Tech corporations, as well as Truth+, a TV streaming platform focusing on family-friendly live TV channels and on-demand content. TMTG is also launching Truth.Fi, a financial services and FinTech brand incorporating America First investment vehicles.

Investor Relations Contact

Shannon Devine (MZ Group │ Managing Director - MZ North America)
Email: shannon.devine@mzgroup.us

Media Contact

press@tmtgcorp.com

A photo accompanying this announcement is available at

https://www.globenewswire.com/NewsRoom/AttachmentNg/3c8f2402-0646-41da-8dd3-3556ca84e408

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

Case: 3:25-cv-50269 Document #: 1-2 Filed: 06/20/25 Page 163 of 164 PageID #:243
Page 162 of 162



# Recommended Reading

April 15, 2025 08:00 ET | Source: Trump Media & Technology Group

## Trump Media Launches Separately Managed Accounts

New Partnership Debuts America-First Themed Investment Vehicles SARASOTA, Fla., April 15, 2025 (GLOBE NEWSWIRE) -- Trump Media and Technology Group Corp. (Nasdaq, NYSE Texas: DJT) ("TMTG" or "the...

Read More

April 11, 2025 17:00 ET | Source: Trump Media & Technology Group

## TMTG Form S-3 Registration Statement Becomes Effective

SARASOTA, Fla., April 11, 2025 (GLOBE NEWSWIRE) -- Trump Media and Technology Group Corp. (Nasdaq, NYSE Texas: DJT) ("TMTG" or the "Company"), operator of the social media platform Truth Social,...



Read More

CERTIFIED COPY - McHenry County Circuit Clerk - PETITION - AMENDED - 06/10/2025 - 12:21:35 PM - 2025MR000097 - Transaction 1024795

STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE 22nd JUDICIAL CIRCUIT

McHENRY COUNTY

HALPERN, GREGORY J

vs.

CITADEL SECURITIES LLC, ET                    Case Number    2025MR000097

Document Date:        5/2/2025

Document Type:        PETITION - AMENDED

Number of Pages:      163

## CERTIFICATION

I, Katherine M. Keefe, Clerk of the 22nd Judicial Circuit Court, McHenry County, Illinois, do hereby certify the attached correct copy as it appears from the records and files in my office.

IN WITNESS WHEREOF, I have hereunto set my hand and caused to be affixed the Seal of the said Court.

DATE _____ June 10, 2025 _____

_Katherine M. Keefe_

KATHERINE M. KEEFE
Clerk of the Circuit Court
22nd Judicial Circuit
McHenry County, Illinois