

**FILED**

**JKS**

11/21/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

|  |  |  |
|---|---|---|
| GREGORY J. HALPERN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 C 50269 |
| v. | ) | |
| | ) | Judge Pallmeyer |
| CITADEL SECURITIES LLC; KNIGHT | ) | |
| SECURITIES; VIRTU FINANCIAL; CANTOR | ) | |
| FITZGERALD; CANACCORD GENUITY; | ) | |
| CHARLES SCHWAB & CO.; E*TRADE | ) | |
| SECURITIES LLC; JP MORGAN CHASE & CO.; | ) | |
| GOLDMAN SACHS GROUP INC.; MERRILL | ) | |
| LYNCH; UBS ASSET MGMT, INC.; CREDIT | ) | |
| SUISSE INC.; DEUTSCHE BANK SECURITIES; | ) | |
| DEPOSITORY TRUST AND CLEARING CORP.; | ) | |
| HARVEY VECHERY; YAHOO INC.; ADVFN | ) | |
| INVESTORSHUB; MICHAEL TURNER; | ) | |
| HAROLD BLAISURE; DEVINE MAFA; | ) | |
| ALFRED HILDEBRAND a.k.a. BILL NICHOLS; | ) | |
| CONSTANCE NASH | ) | |
| | ) | |
| Defendants. | ) | |

---

# SECOND AMENDED COMPLAINT

### (FOR FRAUD, ILLINOIS SECURITIES VIOLATIONS, DEFAMATION, CIVIL CONSPIRACY, FIDUCIARY BREACH, ILLINOIS RICO, IIED, AND DECLARATORY RELIEF)

## JURY TRIAL DEMANDED
### (Illinois Constitution, Art. I, §13)

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 5

I.    PARTIES ................................................................................................ 5

    A. Plaintiff ........................................................................................... 5

    B. Institutional Defendants ................................................................. 6

    C. Individual Defendants ..................................................................... 6

    D. Platform Defendants ....................................................................... 6

II.   JURISDICTION & VENUE (STATE COURT ONLY) ....................... 7

III.  FACTUAL BACKGROUND ................................................................ 7

    A. MAXD, Its Technology, and Plaintiff's Role .................................. 7

    B. The Coordinated Market Attack on MAXD .................................... 8

    C. Industry-Recognized Market Manipulation .................................... 9

    D. Counterfeit Share Creation and Market Supply Manipulation ....... 11

    E. Integration of Manipulation and Online Disinformation ................ 13

    F. The Insider Breach and Corporate Sabotage .................................. 14

    G. The Defamation and Reputation-Destruction Campaign ............... 15

    H. The Hostile Takeover Attempt ....................................................... 17

    I. Demonstrated Market Value and Expert-Supported Damages ........18

      1. MAXD's Market Capitalization During Manipulation ............... 18

      2. Historical Growth and Investor Demand .................................... 19

      3. Level 2 Trading Screenshots ...................................................... 20

4. Independent Expert Testimony (Dirks) ........................................................ 21

5. Independent Expert Recognition of MAXD's Damages ............................ 22

6. Foreseeability and Causation ...................................................................... 23

J. Harm to Plaintiff ................................................................................................ 24

K. Harvey Vechery's Orchestrated Sabotage and Takeover .............................. 25


IV.  CAUSES OF ACTION (Illinois-Only) ............................................................ 32

COUNT I — Fraud ............................................................................................. 32

COUNT II — Illinois Securities Fraud (815 ILCS 5/12) ................................. 35

COUNT III — Civil Conspiracy ....................................................................... 40

COUNT IV — Breach of Fiduciary Duty ......................................................... 44

COUNT V — Defamation .................................................................................. 48

COUNT VI — Declaratory Relief (735 ILCS 5/2-701) ................................... 53

COUNT VII — Illinois RICO (720 ILCS 5/33G) ............................................ 56

COUNT VIII — IIED ........................................................................................ 61


IX.   PRAYER FOR RELIEF .................................................................................. 64

X.    JURY DEMAND .............................................................................................. 67

XI.   CERTIFICATION REGARDING FEDERAL CLAIMS ............................... 67

CERTIFICATE OF SERVICE .................................................................................. 69

# TABLE OF AUTHORITIES (ILLINOIS-ONLY)

Illinois Statutes

735 ILCS 5/2-701 (Illinois Declaratory Judgment Act) ......................................... 53–56

720 ILCS 5/33G (Illinois RICO Statute) ................................................. 56–61

815 ILCS 5/12 (Illinois Securities Law of 1953) .................................................. 35–40


Illinois Constitution

Ill. Const. Art. I, § 13 (Right to Jury Trial) ............................................................. 64


Illinois Common Law Authorities

Fraud — Common law definition and actionable elements .................................. 32–35

Defamation — Per se categories under Illinois law ............................................. 48–52

Intentional Infliction of Emotional Distress — Elements under Illinois law ......... 61–64

Civil Conspiracy — Common law elements .......................................................... 40–43

Breach of Fiduciary Duty — Illinois common law standards ............................... 44–47


Other References (Cited as factual authorities, not legal authorities)

Investopedia — Stock Basher Definition (Industry Source) ................................... 9

Counterfeiting Stock 2.0 (Industry Analysis) ....................................................... 11–14

TipRanks Investor Sentiment Report ..................................................................... 19

Declaration of Martin Dirks, June 1, 2021 (Expert Valuation) .............................. 21–23

Shareholder Complaint Letter (October 3, 2023) .................................................. 29

# PRELIMINARY STATEMENT

Plaintiff Gregory J. Halpern brings this action under **Illinois common law** and **Illinois statutory law only**.

All federal defendants — including the SEC and its former officials — have been voluntarily dismissed under **Rule 41(a)(1)(A)(i)**.

All Doe Defendants have been dismissed.

All federal theories, references, statutes, and claims have been expressly withdrawn.

Plaintiff proceeds solely on **Illinois law causes of action** against **private, non-federal defendants**, and expressly **disclaims any federal claim or theory**.

This Second Amended Complaint is filed at the direction of the U.S. District Court to clarify precisely which defendants and claims remain — and to eliminate any basis for federal-question jurisdiction so that the case can be **remanded to Illinois state court where it properly belongs**.

## I. PARTIES

**Plaintiff**

1. **Gregory J. Halpern**, resident of McHenry County, Illinois, Founder and Super Majority Shareholder of Max Sound Corporation (MAXD).

**Defendants — Institutional**

2–14. Citadel Securities; Knight/Virtu; Cantor Fitzgerald; Canaccord Genuity; Schwab;
E*TRADE; JP Morgan; Goldman Sachs; Merrill Lynch; UBS; Credit Suisse; Deutsche
Bank, Depository Trust and Clearing Corp. — each engaged in trading activity in Illinois
affecting Plaintiff and Illinois shareholders.

**Defendants — Individuals**

**15. Harvey Vechery** — mastermind of the hostile takeover, defamation campaign, and
coordinated market suppression.

16. **Harold Blaisure** — disgraced former MAXD executive.

17. **Devine Mafa** — serial impersonator and fraud actor.

18. **Alfred Hildebrand a.k.a. Bill Nichols** — YouTube fraud analyst & impersonator.

19. **Constance Nash** — IP saboteur & repeated defamer.

20. **Michael Turner** — former transfer agent president involved in defamation and share
manipulation.

**Defendants — Platforms**

22. **Yahoo Inc.**

23. **ADVFN (iHub, InvestorHub)**

Platforms used to publish and amplify massive volumes of defamatory content
harming Plaintiff and Illinois investors.

## II. JURISDICTION & VENUE (STATE COURT ONLY)

24. Plaintiff withdraws any federal jurisdictional basis.

25. Jurisdiction lies under **Illinois Constitution, Art. VI**, and the **Illinois Code of Civil Procedure**.

26. Venue is proper in McHenry County because Plaintiff resides here, the harm was suffered here, and Defendants' actions caused injury in Illinois.

## III. FACTUAL BACKGROUND

### A. MAXD, Its Technology, and Plaintiff's Role

27. Plaintiff **Gregory J. Halpern** ("Plaintiff") is the founder, creator, majority shareholder, and primary force behind **Max Sound Corporation (MAXD)**, a California-based technology licensing company whose intellectual property and audio/video enhancement technologies were recognized throughout the industry.

28. For more than a decade, Plaintiff built MAXD's technology, partnerships, and shareholder base, investing his own substantial money, resources, time, and professional reputation.

29. MAXD's technologies were reviewed, adopted, or tested by major industry players, and were positioned for licensing deals capable of generating substantial revenue and shareholder gains.

30. As MAXD grew and Plaintiff's ownership position solidified, various outside actors began taking interest in MAXD, its technology, and its market float — not for investment purposes, but for **control, manipulation, and personal gain**.

## B. The Coordinated Market Attack on Gregory Halpern of MAXD

31. Beginning no later than 2018 and continuing through the present, numerous broker-dealers, market-making firms, liquidity providers, and trading platforms — including several defendants in this case — engaged in a coordinated and sustained **manipulative trading campaign** involving MAXD shares.

32. The trading pattern exhibited classic hallmarks of **market suppression**, including:

    a. artificially created volume,

    b. repeated bid-whacking,

    c. pegged pricing patterns inconsistent with supply/demand,

    d. sale of shares that were not legally or actually available, and

    e. circulation of false market data that did not reflect true shareholder activity.

33. This manipulation was not accidental. It was designed to destroy Plaintiff's reputation, depress MAXD's share price, collapse investor confidence, and set the stage for a broader hostile takeover and defamation campaign.

34. On information and belief, several trading defendants profited directly from the artificial suppression of MAXD shares by short-selling, routing, or reporting

shares **they did not actually possess**, thereby expanding the float illegally and collapsing MAXD's true market value.

35. These manipulative practices occurred repeatedly, systematically, and with the assistance of multiple coordinated entities.

## C. Industry-Recognized Mechanics of Market Manipulation Through "Short and Distort" Attacks

36. The coordinated market attack on MAXD reflected the well-documented pattern of a **"short and distort"** operation, also known in industry literature as **stock bashing**, **pump-basher activity**, or **counterfeit share expansion**.

37. According to widely recognized financial explanations, a **stock basher** is an individual or group who **manipulates the market to cause a stock price to fall** by disseminating false or exaggerated negative information designed to devalue the security and induce panic selling.

38. This common pattern is documented in materials such as *Stock Basher: What It Is, How It Works, and Examples* (Investopedia), which describes how bashers "spread misinformation… to devalue a stock," often using online forums and social channels to do so.

39. Industry analysis further explains that "paid bashers" are frequently deployed by brokers, market makers, or hedge funds during a short-selling campaign to **create artificial downward pressure** on a target company's stock.

As described in "Confessions of a Paid Stock Basher," bashers utilize fake

identities, coordinated scripts, and continuous posting to undermine investor confidence and simulate real shareholder sentiment.

40. These coordinated bashing campaigns are not independent chatter. They work as the psychological component of a broader manipulation structure:

a. **Negative rumors** are injected repeatedly to overwhelm investor sentiment.

b. **False allegations** of fraud, incompetence, or imminent collapse are circulated to destroy confidence.

c. **Bashers impersonate investors** to create the illusion of consensus.

d. **Online message boards** such as Yahoo Finance and iHub are used as the primary distribution hub.

e. **Volume of misinformation** is intentionally high to drown out any rebuttal.

f. **The objective** is to drive share price downward so that manipulators may profit.

41. This pattern precisely matches the conduct undertaken by Defendants Vechery, Blaisure, Mafa, Nash, Hildebrand a.k.a. "Bill Nichols," Turner, and their associated online proxies, who collectively posted tens of thousands of false statements concerning Plaintiff and MAXD.

42. The behavior of these individuals mirrored textbook bashing behaviors described in industry publications, including:

- impersonating shareholders,

- alleging nonexistent corporate fraud,

- fabricating insider information,

- predicting collapse based on invented "facts," and

- coordinating timing of posts to coincide with market events.

43. These actions were designed to cause panic selling, suppress MAXD's valuation, and create the false appearance of widespread negative sentiment.

**D. Counterfeit Share Creation and Market Supply Manipulation**

45. The market manipulation affecting MAXD also involved the creation and use of **counterfeit shares**, or shares sold into the market without any actual borrowed or authorized shares behind them.

46. Industry analysis recognizes that this form of manipulation — commonly described as **counterfeiting stock**, **naked shorting**, or **fails-to-deliver manipulation** — creates artificial supply that overwhelms legitimate market activity.

This mechanism is described in detail in *Counterfeiting Stock 2.0* (Citizens for Securities Reform), which documents how:

- counterfeit shares artificially inflate supply,

- share prices collapse under selling pressure,

- market makers exploit exemptions to fail to deliver shares,

- retail investors unknowingly purchase phantom shares,

- the company's market cap is diluted,

- and long-term investors are financially harmed.

47. The report also explains that market makers and broker-dealers such as those named as defendants — including Citadel Securities, Knight/Virtu, Canaccord, Cantor, Schwab, E*TRADE, JP Morgan, Goldman Sachs, Merrill, UBS, Credit Suisse, Deutsche Bank, Depository Trust and Clearing Corporation — have historically participated in schemes involving the sale of shares that do not exist ("counterfeit shares").

48. These practices directly correspond to MAXD's observed trading patterns, which included:

a. substantial daily trading volume far exceeding legitimate float;

b. Level-2 identifiers confirming participation by defendants (e.g., CDEL, NITE, VIRT, CANT, CANA);

c. repeated cycles of selling pressure without corresponding buy-side relief;

d. wide discrepancies between reported short interest and actual market behavior;

e. persistent downward ladders matching described "short down ladder" tactics.

49. These manipulative supply-side tactics are described in industry documentation as tools used to "crash" a company's stock, often reducing the share price by 20–35% within days or weeks.

50. MAXD was subjected to this pattern repeatedly:

on company news days, during product developments, and during periods when shareholder interest was rising.

## E. Integration of Market Manipulation and Online Disinformation Campaign

51. The bashing and counterfeit share manipulation did not occur in isolation. They operated as **two synchronized halves of a coordinated scheme**.

52. Counterfeit share dumping and Level-2 market maker participation created artificial downward pressure on the share price.

53. Simultaneously, Defendants Vechery, Blaisure, Mafa, Nash, Hildebrand, and Turner flooded Yahoo, iHub, YouTube, and other platforms with defamatory statements designed to:

- escalate panic,

- validate price drops,

- create the appearance of insider warnings,

- discredit Plaintiff as MAXD's leader,

- undermine MAXD's business prospects, and

- discourage shareholder support.

54. This combined approach mirrors the "psychological plus mechanical" structure documented in industry analyses of stock manipulation campaigns, which explain that:

"Paid bashers will invade message boards to persuade or panic small investors into selling into the manipulation."

— *Counterfeiting Stock 2.0*, Appendix P (Confessions of a Paid Basher).

55. Through this combined strategy, Defendants created an ecosystem of:

- artificial price suppression,

- artificial sentiment suppression,

- artificial share supply,

- fabricated corporate narratives,

- false impersonations of insiders,

- and coordinated misinformation.

56. The combined impact was to sabotage MAXD's valuation, interfere with partnerships, undermine Plaintiff's reputation, and facilitate a broader takeover attempt.

## F. The Insider Breach and Corporate Sabotage

57. While MAXD was under external attack, several individuals — including **Harvey Vechery**, **Harold Blaisure**, **Devine Mafa**, **Constance Nash**, **Alfred Hildebrand**, and **Michael Turner** — began working collectively to undermine MAXD internally.

58. These individuals sought to seize control of MAXD's narrative, corporate communications, and investor information flow in order to pressure Plaintiff, destabilize MAXD, and mislead investors and regulators.

59. Their conduct included:

a. spreading false statements about MAXD's ownership and governance,

b. creating fabricated "boards," "groups," or "reorganizations,"

c. issuing fake public information,

d. misrepresenting MAXD's share structure, and

e. falsely claiming that Plaintiff had been removed, replaced, or stripped of authority.

60. None of these statements were true. Plaintiff remained at all times the lawful controlling shareholder.

61. These individuals' actions were not independent; they mutually reinforced each other's statements, reposted each other's defamation, and coordinated online activity to magnify perceived legitimacy.

62. Their collective objective was to weaken Plaintiff's position, confuse the shareholder community, and pave the way for a hostile takeover or personal enrichment.

**G. The Defamation and Reputation-Destruction Campaign**

63. As MAXD's value was being artificially suppressed in the market, the individual defendants launched a massive **defamation campaign** targeting Plaintiff personally.

64. This campaign spanned **tens of thousands of posts, comments, emails, and videos**, disseminated primarily through:

a. **Yahoo Finance** message boards,

b. **InvestorsHub (iHub)** forums operated by ADVFN,

c. YouTube channels controlled by or associated with defendants,

d. private chat groups,

e. email blasts,

f. and proxy accounts used to circumvent bans.

65. Defendants repeatedly published false statements accusing Plaintiff of:

a. committing fraud,

b. stealing funds,

c. fabricating technology,

d. running scams,

e. forging documents,

f. criminal activity, and

g. being replaced or removed from MAXD.

66. These statements were **false, malicious, and made with full knowledge of their falsity**.

67. Several defendants also impersonated Plaintiff, misrepresented corporate documents, fabricated shareholder letters, or falsely claimed to be speaking on behalf of MAXD.

68. This coordinated smear campaign caused severe reputational harm to Plaintiff, collapsing trust among investors, partners, and vendors.

69. Yahoo and ADVFN/iHub facilitated the spread of this defamation by failing to moderate clear violations of their own policies and by allowing repeated reposting, replication, and amplification of defamatory content.

## H. The Hostile Takeover Attempt

70. The defamation campaign served a deeper strategy: clearing the runway for a **back-door takeover** of MAXD by individuals who had no lawful claim to ownership or authority.

71. Defendants attempted to:

a. fabricate substitute ownership records,

b. interfere with MAXD's share ledger,

c. pressure transfer agents,

d. publish false "corporate updates,"

e. and intimidate shareholders into believing Plaintiff lacked authority.

72. Defendant **Harvey Vechery** played a central role in orchestrating and funding components of this takeover attempt.

73. Defendant **Michael Turner**, a former transfer agent president, used his position and industry familiarity to lend false credibility to fabricated claims about MAXD's structure.

74. These efforts failed, but they caused substantial economic, operational, and reputational damage.

## I. Demonstrated Market Value, Historical Growth, and Expert-Supported Damages to Plaintiff

75. MAXD was not a dormant or valueless company at the time defendants began their coordinated market manipulation, defamation, and takeover efforts. MAXD had a demonstrable market value supported by company filings, historical performance, third-party analytics, investor behavior, and expert testimony recognized in formal proceedings.

## 1. MAXD's Documented Market Capitalization During Severe Manipulation

76. MAXD's own Audited Annual Report filed March 30, 2021, stated that the market value of MAXD's non-affiliate common equity—which **_excludes_** Plaintiff's holdings— was **$64,134,060.52** as of the filing date.

77. Plaintiff owned approximately **66.67%** of the outstanding MAXD common equity at the time (a Super Majority under Delaware Corporate law). Based on the above market

capitalization, Plaintiff's ownership stake alone exceeded **$120 million** in value. MAXD's realistic total market capitalization therefore exceeded **$180 million** at the time defendants coordinated misconduct accelerated.

78. This valuation was not speculative; it was grounded in the Company's audited filings and reflected the actual market value of shares held by non-affiliates.

**2. MAXD's Historical Growth and Investor Demand**

79. MAXD historically demonstrated strong upward trading performance, including multi-year surges documented in Plaintiff's records. These included significant price escalations of **8,000% to 12,000%**, confirming that when MAXD was not under attack, its stock price responded dramatically to interest, news, licensing activity, and technological developments.

80. Third-party analytics confirmed the same. TipRanks investor sentiment for MAXD indicated:

- **Very Positive investor behavior**,

- an **805.5% increase** in portfolio holdings over 30 days, and

- strong accumulation patterns among retail investors.

81. MAXD's market movements consistently showed that shareholder interest and normal market conditions would yield substantial increases in valuation absent manipulation, defamation, and coordinated suppression.

**3. Level 2 Trading Screenshots Confirming Manipulative Activity by Defendants**

82. Plaintiff retains Level-2 trading records and screenshots from January 2019 onward demonstrating that the same market makers named as defendants—including **Knight/NITE**, **Citadel (CDEL)**, **Virtu/VFIN**, **Canaccord (CANA/CSTI)**, **Cantor (CANT)**, **ETRF**, and others—were placing **extraordinary multi-million-share bids and asks**, often exceeding **30–70 million shares** at a time, despite MAXD's legitimate float being orders of magnitude smaller. (See screenshots attached in Exhibit ___.)

83. These screenshots reflect classic signs of artificial price control, including:

a. heavy bid stacking at extremely low prices;

b. rapid bid-ask shifts inconsistent with true supply;

c. posted ask walls of 2,000–50,000,000 shares;

d. one-share and ten-share "print" manipulations to reset price;

e. market makers trading among themselves (matched MPID prints);

f. absence of natural spread movement despite news and buyer accumulation.

84. These market maker identifiers directly match the defendants named in this action, confirming their participation in the suppression of MAXD's stock price as alleged in earlier sections.

**4. Independent Expert Testimony Confirming MAXD's Vulnerability and Damage**

85. Expert witness **Martin Dirks**, a Harvard MBA, former hedge fund portfolio manager for Harvard University's endowment, and nationally recognized microcap analyst, provided sworn testimony in a related court proceeding that MAXD was:

- a legitimate microcap company;

- with legitimate technology assets;

- whose valuation was highly sensitive to false statements and manipulation; and

- whose decline could be directly tied to coordinated attacks on credibility and information flow.

  (See *Declaration of Martin Dirks*, June 1, 2021)

86. In direct communications with Plaintiff, Dirks confirmed that microcap stocks such as MAXD are **uniquely susceptible to manipulation**, and that **false news or negative sentiment can collapse a microcap stock far more than a larger, stable company**.

87. Dirks further explained that microcaps often rely on **future cash-flow potential**, meaning that defamation, market suppression, and false statements about leadership or corporate direction can decimate valuation even without fundamental changes to the business.

88. In his sworn declaration, Dirks estimated MAXD's fair market value after the attacks at approximately **$20–$25 million**, reflecting a **catastrophic impairment** from the prior

valuation of roughly $180 million. The declaration confirms that MAXD lost well over $120 million in value during the same period that defendants executed their coordinated defamation, manipulation, and takeover efforts.

**5. Independent Expert Recognition of MAXD's Damages and Fair Market Value**

89. Independent expert analysis by nationally recognized microcap valuation specialist Martin Dirks confirms that MAXD had substantial, measurable value prior to the coordinated manipulation, defamation, and takeover efforts described in this Complaint. Dirks has served as a hedge fund manager, advisor to institutional investors, and a valuation expert for technology and micro-cap enterprises.

90. After reviewing MAXD's financial records, trading behavior, market history, technology assets, and the pattern of negative external events corresponding to the defendants' coordinated misconduct, Dirks estimated MAXD's fair market value — even after the attacks — at approximately $20–$25 million. Prior to the manipulation and corporate sabotage, MAXD's demonstrable valuation exceeded $180 million, based on market capitalization. Dirks' valuation confirms both MAXD's vulnerability and the scale of economic loss caused by defendants' actions.

91. Dirks further observed that MAXD's valuation decline matched classic indicators of coordinated market suppression and reputational assault, explaining that microcap issuers are uniquely sensitive to misinformation, artificial selling pressure, and loss of leadership credibility — precisely the tactics defendants employed. His independent valuation

analysis corroborates Plaintiff's damages, which exceed $120 million, and confirms that MAXD's loss of value was the predictable, natural consequence of defendants' manipulative trading behavior, defamation, and fraudulent takeover efforts.

## 6. MAXD's Damages Were Foreseeable and the Natural Result of Defendants' Actions

92. Taken together, the audited filings, valuation history, Level 2 data, expert testimony, and investor behavior demonstrate the following:

a. MAXD had a documented market value between **$120–$180 million** prior to defendants' scheme.

b. MAXD had historical upward momentum that had repeatedly produced exceptional returns.

c. MAXD was extraordinarily vulnerable to reputational and market manipulation— precisely the tactics used by defendants.

d. Defendants' actions predictably collapsed MAXD's valuation to **$20–$25 million**, a decline exceeding **$120 million**.

e. Defendants' conduct was the direct and proximate cause of Plaintiff's financial, reputational, and business losses.

93. This quantifiable collapse in value—corroborated by multiple sources—constitutes the damages element for all applicable counts, including Fraud, Illinois Securities Fraud, Civil Conspiracy, Breach of Fiduciary Duty, Defamation, Illinois RICO, and IIED.

**J. The Harm to Plaintiff**

94. The combined effect of:

- market manipulation,

- insider sabotage,

- public defamation,

- fabricated narratives,

- impersonation,

- and takeover attempts

resulted in massive financial losses to Plaintiff, collapse of key partnerships, destruction of business value, reputational injury, and severe emotional and psychological distress.

95. Plaintiff suffered quantifiable financial damages exceeding $120 million, as well as ongoing harm from false public statements still circulating to this day.

96. Plaintiff continues to face defamation, harassment, impersonation, and market suppression stemming from defendants coordinated actions.

97. All wrongful conduct described herein was done intentionally, maliciously, and in concert, constituting a continuing pattern of racketeering activity under Illinois law.

**K. Harvey Vechery's Orchestrated Sabotage, Fraudulent Takeover, and Post-Takeover Destruction of MAXD**

98. In addition to external market manipulation and coordinated online defamation, Plaintiff was subjected to an extensive internal campaign of sabotage led by Defendant **Harvey Vechery**, who played a central and indispensable role in enabling, financing, directing, and executing efforts to seize control of MAXD for his personal benefit while destroying millions of dollars of shareholder value.

**1. Vechery's Use of Predatory Lending to Create Financial Vulnerability**

99. In 2018, at a critical moment in MAXD's growth, Defendant Vechery arranged for Plaintiff to receive a predatory mortgage loan on Plaintiff's $3 million residence. The loan — represented as an ordinary 4% mortgage — was, at the moment of signing, changed to a **12% balloon loan**, dramatically inflating monthly payments and exposing Plaintiff to sudden foreclosure risk.

100. This predatory loan was arranged through Vechery's own contacts. Plaintiff relied on Vechery's representative that the rate would be corrected "within a few months." It never was.

101. After Plaintiff balked at continuing payments on the usurious loan, Plaintiff was served with a **four-day foreclosure notice** in early 2020, during the onset of the pandemic shutdown, when courts and professional services were closed.

102.    This predatory conduct pushed Plaintiff into a severe financial emergency, requiring immediate legal intervention to prevent the forced sale of Plaintiff's home and assets.

103.    During this financial crisis, Vechery and his associates falsely claimed that MAXD had 'no value,' even though they simultaneously leveraged Plaintiff's MAXD legal claims to negotiate a substantial reduction of debt — demonstrating that those claims held real monetary value.

104.    These events positioned Plaintiff in financial distress precisely when Vechery began his takeover efforts.

## 2. Vechery's Use of Fabricated Claims to Initiate a Fraudulent Derivative Action

105.    While publicly funding and encouraging online attacks through associates (including Blaisure, Mafa, Turner, and Hildebrand), Vechery simultaneously used these defamatory statements as the alleged "basis" for a derivative lawsuit aimed at removing Plaintiff from MAXD leadership.

106.    The allegations in the derivative complaint were copied directly from online posts made by Vechery's own team — including anonymous message board aliases such as "Alfred/Bill" and "Jay Gould." These individuals publicly stated facts and accusations that originated with Vechery, then Vechery cited those same posts in court filings as "evidence."

107.    In one recorded communication, Defendant Michael Turner confirmed that the alias "Jay Gould" was himself — proving the direct link between Vechery's insiders and the defamatory online narrative.

108.    In many other recorded communications that still exist on YouTube channels, Alfred Hildebrand (as Alias Bill Nichols) admitted he was working with Vechery to get Halpern removed from MAXD.

109.    To ensure continuous harm to Plaintiff's reputation, Defendant Vechery filed several other nuisance lawsuits that were all dismissed or non-suited. Derivative suits by others at the direction of Vechery and his attorney were later **withdrawn or dismissed**, and a copycat derivative action filed by a proxy "shareholder" was also rejected. The filings contained Vechery's list of fabricated statements, misrepresented financials, and accusations already debunked.

110.    Plaintiff never received notice of the ex parte hearing in which Vechery obtained a fraudulent removal order. Plaintiff later discovered the order only after it had been entered.

## 3. The April 2023 Takeover Order Obtained Through Concealment and False Statements

110.    In April 2023, Vechery obtained a state court order purporting to "remove" Plaintiff from MAXD management during Plaintiff's non-reporting quiet period. This order was obtained:

a. without notice to Plaintiff,

b. through false statements to the court,

c. based entirely on defamatory online content created by Vechery's team,

d. without any valid corporate authority,

e. and without providing Plaintiff the opportunity to be heard.

111.   The takeover order did not affect Plaintiff's **66.67% super-majority ownership**, only management functions — and was later used by Vechery to represent to shareholders that "He (Vechery) got Plaintiff out of the company."

112.   Vechery placed phone calls to numerous investors asserting he had "kicked Halpern out," despite having no lawful basis to do so.

## 4. Vechery's Total Failure to Perform After Seizing Control

113.   After taking control, Defendant Vechery took **no action whatsoever** to advance MAXD's business, corporate filings, partnerships, or technology — despite claiming to shareholders that he had "saved the company."

114.   Despite Plaintiff's efforts to mitigate the damage by reaching out to Vechery, and offering to help Vechery push MAXD forward, all of the evidence demonstrates that:

a. MAXD's Delaware corporate filings lapsed;

b. no annual meetings were called;

c. no proxy statements were issued;

d. no Form 10-Q or 10-K was ever filed;

e. the transfer agent was not updated;

f. no technology updates were made;

g. no business operations occurred;

h. no shareholder communications were issued.

115. According to shareholders' written complaints (see *Shareholder Complaint*, Exhibit F), Vechery refused to answer any inquiries regarding MAXD's future, failed to provide any direction, and allowed the company to collapse.

116. Vechery ultimately allowed MAXD to become inactive, non-reporting, and eventually delisted — destroying all remaining shareholder value. Vechery removed the Plaintiff from MAXD which obligated Vechery to operate the MAXD enterprise.

**5. Vechery's Suspected Tax-Loss Benefits and Financial Motives**

117. Documentation indicates that Vechery took a **tax-loss deduction** on his MAXD investment after obtaining control and preventing the company from filing, functioning, or operating.

118. Vechery's post-takeover actions (or inaction) were consistent with:

- intentionally destroying corporate and shareholder value,

- evading taxes by claiming a substantial tax loss,

- avoiding reporting requirements,

- evading scrutiny of insider transactions and failure to report his role in MAXD.

119.   These actions constitute a conflict of interest, as Vechery could only benefit from MAXD's destruction if it resulted in a tax-loss advantage.

120.   This behavior supports Plaintiff's allegation that destroying MAXD was not incidental — it was Vechery's intended outcome after decades of practicing the same scheme on several other companies.

**6. Coordination With Defamatory Actors and Market Manipulators**

121.   As documented in Plaintiff's 8-K filed on November 21, 2022, Vechery was directly tied to:

- orchestrated market manipulation,

- insider filing violations,

- coordination with online defamers,

- harassment,

- stalking, and

- repeated attempts to undermine MAXD's business.

122.   The 8-K further states that Vechery "passed out money to certain people who went online and tried to manipulate stock in MAXD," confirming his financial connection to the defamatory and manipulative campaign.

123.   Vechery's associates impersonated attorneys, filed false documents, threatened auditors, and made thousands of defamatory posts — all reinforcing Vechery's takeover effort.

**7. Vechery's Actions Proximately Caused Massive Damage to Plaintiff and MAXD**

124.     As demonstrated in Sections III.I–III.J, MAXD's documented value

exceeded $180 million prior to the coordinated attack.

125.     After Vechery's takeover, MAXD's value was destroyed:

- partnership opportunities collapsed,

- all reporting ceased,

- operations ended,

- the corporation lapse led to delisting,

- assets were abandoned,

- Plaintiff and investors suffered complete loss.

126.     These injuries were the natural, foreseeable result of Vechery's intentional

sabotage, fraudulent takeover, defamation, and market manipulation.

127.     Vechery's conduct — when integrated with the actions of co-defendants —

forms a continuous pattern of unlawful conduct constituting:

- fraud,

- breach of fiduciary duty,

- conspiracy,

- intentional infliction of emotional distress,

- Illinois securities fraud,

- and Illinois RICO predicate acts.

128.  Plaintiff incorporates this section for all applicable Counts in Section IV.

## IV. CAUSES OF ACTION (Illinois-Only)

### COUNT I — FRAUD (Illinois Common Law)

*(Against All Defendants Unless Otherwise Specified)*

(Elements: (1) false statements or concealment of material facts; (2) knowledge of falsity; (3) intent to induce reliance; (4) actual reliance; (5) resulting damages.)

### A. False Statements and Concealment

1. Plaintiff realleges and incorporates by reference Paragraphs 1 through 31 as though fully set forth herein.

2. Defendants, individually and collectively, made numerous **false statements of material fact** concerning Plaintiff, MAXD, MAXD's ownership structure, MAXD's technology, MAXD's financial condition, and Plaintiff's role as controlling shareholder.

3. Defendants also **concealed material facts**, including but not limited to:

   a. the true origin of fabricated corporate documents,

   b. the coordinated nature of the defamation campaign,

   c. manipulative trading behavior involving shares that did not legally exist, and

   d. the existence of a coordinated plan to undermine Plaintiff's ownership and control.

4.  Defendants' statements were disseminated through message boards, trading platforms, forums, social media channels, and industry contacts in order to create the false appearance of legitimacy and consensus.

## B. Knowledge of Falsity

5.  Defendants knew their statements were false when made.

    Each defendant either:

    a. personally created the falsehood,

    b. reposted or amplified statements they knew were untrue, or

    c. acted with reckless disregard for the truth of the statements.

6.  Defendants engaged in deliberate coordination, including repeated cross-posting, synchronized messaging, and the use of multiple accounts or aliases, demonstrating calculated intent rather than error or misunderstanding.

7.  Defendants' conduct was not a mistake, opinion, or misunderstanding — it was a **knowing, strategic disinformation campaign**.

## C. Intent to Induce Reliance

8.  Defendants intended for Plaintiff, MAXD shareholders, MAXD partners, and MAXD's business contacts to rely on their false statements.

9.  The purpose of this fraudulent campaign was to:

    a. depress MAXD's share price,

    b. collapse market confidence,

c. undermine Plaintiff's credibility,

d. facilitate a hostile takeover attempt,

e. interfere with MAXD's partnerships and licensing opportunities, and

f. enrich various defendants through manipulative trading or personal advancement.

10. Defendants intended for these statements to cause Plaintiff to lose control of MAXD, to weaken MAXD's market presence, and to create the false impression that Plaintiff was unfit, illegitimate, or criminal.

## D. Actual Reliance

11. Plaintiff reasonably relied on defendants' representations and omissions in multiple ways, including:

a. responding to fabricated claims to protect MAXD shareholders,

b. addressing false public narratives intended to destabilize MAXD,

c. allocating time, resources, and corporate efforts to combat fraudulent claims, and

d. engaging in corrective measures to protect MAXD's reputation and operations.

12. MAXD's shareholders, partners, and potential licensees also relied on these false statements, leading to reduced confidence, termination of negotiations, loss of opportunities, and withdrawal of support.

13. Market participants, including brokers, traders, and analysts, were influenced by defendants' coordinated falsehoods, contributing to the artificially depressed share price.

**E. Damages**

14. As a direct and proximate result of defendants' fraudulent conduct, Plaintiff

    suffered damages including, but not limited to:

    a. loss of business value,

    b. loss of investor confidence,

    c. loss of corporate opportunities,

    d. collapse of key partnerships,

    e. destruction of Plaintiff's professional reputation,

    f. severe emotional and psychological distress, and

    g. quantifiable financial losses of actual market cap exceeding $120 million.

15. Plaintiff continues to suffer ongoing damages because the defamatory and

    fraudulent statements remain publicly visible and continue to be recirculated.

**F. Punitive Damages**

16. Defendants' conduct was willful, malicious, intentional, and in reckless disregard

    of Plaintiff's rights, entitling Plaintiff to punitive damages under Illinois law.

**COUNT II — ILLINOIS SECURITIES FRAUD**
**(Under 815 ILCS 5/12)**
**Against All Defendants Engaged in Manipulative Trading, Misrepresentation, or**
**Deceptive Securities Practices**

**(Elements: (1) Sale or offer of securities; (2) false statements or omissions; (3)**
**knowledge; (4) intent to induce action; (5) reliance; (6) damages.)**

**A. Incorporation**

17. Plaintiff realleges and incorporates by reference Paragraphs 1 through 16 as though fully set forth herein.

**B. Defendants Engaged in the Sale, Distribution, Routing, or Manipulation of MAXD Securities**

18. MAXD common stock is a "security" within the meaning of the Illinois Securities Law of 1953.

19. Defendants **Citadel Securities**, **Knight/Virtu**, **Canaccord Genuity**, **Cantor Fitzgerald**, **Charles Schwab**, **E*TRADE**, **JP Morgan**, **Goldman Sachs**, **UBS**, **Credit Suisse**, **Deutsche Bank**, and related trading entities participated directly or indirectly in the sale, routing, execution, clearing, or reporting of MAXD securities.

20. These defendants exercised control over data feeds, execution systems, market-making functions, reporting channels, and investor-facing platforms affecting MAXD trades in Illinois.

**C. False Statements, Omissions, and Deceptive Practices in Connection with Securities Activity**

21. The Illinois Securities Law prohibits the use of **any device, scheme, or artifice to defraud** in connection with the purchase or sale of securities.

22. Defendants engaged in deceptive practices including, but not limited to:

    a. selling or reporting the sale of shares that did not exist;

    b. artificially manufacturing supply through undisclosed synthetic or derivative mechanisms;

    c. routing trades in ways designed to suppress price;

    d. disseminating false price and volume information;

    e. concealing internal conflicts of interest;

    f. creating the appearance of downward price pressure; and

    g. participating in or enabling coordinated false information campaigns relating to MAXD.

23. These manipulative practices created the **illusion of market activity** that did not reflect actual demand, actual inventory, or legitimate trading volume.

24. Defendants' actions materially misrepresented the true number of MAXD shares available, the true price discovery process, and the true trading interest of the market.

25. These misrepresentations and omissions were directly connected to and executed through the defendants' Illinois-based trading, routing, or platform operations.

## D. Knowledge and Intent

26. Defendants knew or reasonably should have known that the above-described trading conduct and public representations were false, misleading, and deceptive.

27. Defendants had access to accurate internal data that contradicted their public execution reports, trade confirmations, settlement instructions, and market-facing statements.

28. The deceptive practices were not random glitches or errors; they were the result of **coordinated strategy**, algorithmic execution designed to suppress prices, and deliberate concealment of true market conditions.

29. Individual defendants — including Vechery, Blaisure, Mafa, Nash, Hildebrand, and Turner — further **reinforced** this deception by flooding public channels with false information about MAXD's financial condition, leadership, technology, and corporate governance.

30. All defendants acted with the intent to mislead investors, sabotage MAXD's valuation, and interfere with Plaintiff's ownership, investment, and leadership position.

## E. Reliance

31. Investors, brokers, partners, market participants, and Plaintiff himself reasonably relied on the accuracy and legality of the defendants' trading data, public statements, and market-facing conduct.

32. Defendants intended such reliance, knowing that their misstatements and omissions would:

a. distort MAXD's price,

b. undermine investor confidence,

c. impair MAXD's ability to raise capital,

d. invalidate Plaintiff's leadership credibility,

e. and facilitate the broader takeover effort executed by the individual defendants.

33. Plaintiff relied on defendants' misrepresentations in making operational, corporate, and strategic decisions for MAXD, including efforts to stabilize the company and correct false narratives created by defendants.

## F. Damages

34. As a direct and proximate result of defendants' violations of 815 ILCS 5/12, Plaintiff suffered significant financial losses including:

a. multi-year collapse in MAXD's trading value;

b. loss of business relationships and opportunities;

c. reputational harm;

d. loss of shareholder confidence;

e. diminished corporate viability;

f. diversion of time and resources to combat misinformation;

g. loss of market access and potential partnerships; and

h. damages exceeding $120 million.

35. Illinois law provides for rescissionary damages, actual damages, punitive damages, and all other remedies available at law or equity for securities fraud.

## G. Entitlement to Relief

36. Defendants' conduct was willful, malicious, intentional, and in reckless disregard for the truth.

37. Plaintiff is entitled to compensatory and punitive damages under 815 ILCS 5/12 and related provisions of Illinois law.

## COUNT III — CIVIL CONSPIRACY
**(Illinois Common Law)**
**Against All Defendants**

*(Elements: (1) Agreement or understanding among two or more persons; (2) to accomplish an unlawful purpose or a lawful purpose by unlawful means; (3) one or more overt acts in furtherance; (4) damages.)*

### A. Incorporation of Prior Allegations

38. Plaintiff realleges and incorporates by reference Paragraphs 1 through 37 as though fully set forth herein.

### B. Agreement and Coordination Among Defendants

39. At all relevant times, defendants — including the trading defendants, the individual defendants, and the platform defendants — **knowingly entered into agreements, understandings, and coordinated arrangements** designed to harm Plaintiff and Max Sound Corporation ("MAXD").

40. These agreements were not expressed in formal documents but manifested through consistent, repeated, and synchronized acts that no reasonable inference attributes to coincidence.

41. Defendants shared the common objective of:

    a. suppressing MAXD's share price;

    b. discrediting Plaintiff as MAXD's founder and controlling shareholder;

    c. fabricating false narratives of corporate restructuring, removal, or wrongdoing;

    d. flooding investor forums with false information;

    e. enabling or participating in unauthorized takeover attempts;

    f. manipulating the investor float and market perception of MAXD; and

    g. enriching themselves or their affiliates through artificial market conditions.

42. The degree of coordination — including simultaneous postings, cross-platform amplification, repeated narrative alignment, and complementary trading activity — demonstrates a unified scheme.

## C. Unlawful Purpose or Lawful Purpose by Unlawful Means

43. Defendants' conspiracy sought to accomplish **unlawful purposes**, including:

    a. fraud;

    b. manipulation of securities;

    c. defamation;

    d. interference with Plaintiff's business;

    e. identity misrepresentation;

    f. falsification of corporate claims; and

    g. intimidation and harassment.

44. Even to the extent any defendant believed they were pursuing a "lawful purpose," they employed **unlawful means**, including:

a. knowingly false statements;

b. coordinated misinformation campaigns;

c. dissemination of fabricated documents;

d. market manipulation;

e. unauthorized interference with MAXD's share ledger or corporate governance; and

f. impersonation of Plaintiff or MAXD insiders.

45. These unlawful actions formed part of a **common design** and operated as an integrated strategy to achieve defendants' objectives.

## D. Overt Acts in Furtherance of the Conspiracy

46. In furtherance of the conspiracy, defendants committed numerous overt acts, including but not limited to:

a. Publishing tens of thousands of false statements about Plaintiff and MAXD across message boards and forums;

b. Coordinating defamatory posts between defendants Vechery, Blaisure, Mafa, Hildebrand, Nash, Turner, and others;

c. Amplifying each other's statements to create the false impression of widespread consensus;

d. Manipulating MAXD's trading activity to artificially suppress the price;

e. Disseminating fabricated ownership claims, forged records, and false "corporate updates";

f. Contacting MAXD partners, investors, and third parties with false representations;

g. Pressuring or misleading transfer agents;

h. Maintaining multiple online identities to hide coordinated origins;

i. Blocking Plaintiff's own corrective communications while allowing defamatory content to proliferate.

47. Each overt act advanced the conspiracy's objectives and magnified the resulting damage.

48. No defendant sought to stop or correct the wrongful conduct of the others, further demonstrating mutual reinforcement and shared purpose.

## E. Damages to Plaintiff

49. As a direct and proximate result of defendants' conspiracy, Plaintiff suffered severe and ongoing damages, including:

a. loss of reputation;

b. loss of business opportunities;

c. destruction of MAXD's market value;

d. loss of investor confidence;

e. lost contracts or partnerships;

f. significant emotional and psychological distress;

g. diversion of resources to combat false claims; and

h. total financial damages exceeding $120 million.

50. Defendants' coordinated actions continue to cause harm, as the false narratives remain public, searchable, and repeatedly recirculated to investors and industry participants.

## F. Entitlement to Relief

51. Defendants' conduct was willful, malicious, intentional, and executed with conscious disregard for Plaintiff's rights.

52. Plaintiff is entitled to compensatory damages, punitive damages, and all other relief allowed under Illinois law.

## COUNT IV — BREACH OF FIDUCIARY DUTY
**(Illinois Common Law)**
**Against Defendants Harvey Vechery, Harold Blaisure, Devine Mafa, Constance Nash, and Michael Turner**
*(Elements: (1) fiduciary duty; (2) breach of that duty; (3) damages resulting from the breach.)*

## A. Incorporation of Prior Allegations

53. Plaintiff realleges and incorporates by reference Paragraphs 1 through 52 as though fully set forth herein.

**B. Existence of Fiduciary Duties Owed to Plaintiff and MAXD**

54. Defendants **Harvey Vechery**, **Harold Blaisure**, **Devine Mafa**, **Constance Nash**, and **Michael Turner** held positions of authority, influence, insider knowledge, or trust-based access regarding MAXD, its operations, its technology, its shareholder communications, and its internal affairs.

55. These defendants possessed insider information, historical access, shareholder relationships, or roles that placed them in positions of **confidence and reliance**, giving rise to fiduciary duties under Illinois law.

56. As insiders, former officers, significant business participants, or persons who undertook to act on behalf of MAXD or its shareholders, these defendants owed duties including, but not limited to:

a. duties of loyalty;

b. duties of honesty;

c. duties of good faith;

d. duties to avoid self-dealing;

e. duties to refrain from harming MAXD or its leadership;

f. duties to disclose material information truthfully; and

g. duties to refrain from misrepresenting corporate authority or ownership.

57. Plaintiff, as MAXD's founder, controlling shareholder, and the target of defendants' coordinated conduct, was owed reciprocal fiduciary protections from these defendants.

## C. Breaches of Fiduciary Duty

58. Defendants breached their fiduciary duties by deliberately engaging in conduct that harmed Plaintiff and MAXD, including:

a. disseminating false information regarding MAXD's ownership, leadership, and governance;

b. falsely claiming that Plaintiff had been removed, replaced, or stripped of authority;

c. fabricating or circulating forged corporate documents;

d. encouraging or participating in a coordinated takeover attempt;

e. misrepresenting their own authority to third parties;

f. sabotaging MAXD's reputational standing;

g. interfering with MAXD's shareholder relationships and corporate communications;

h. exploiting insider knowledge to advance false narratives; and

i. aiding or amplifying defamatory attacks designed to cripple MAXD and Plaintiff.

59. These actions were knowing, intentional, and executed for the defendants' personal benefit or to assist other conspirators.

60. None of these defendants acted in Plaintiff's or MAXD's best interests; instead, each knowingly participated in conduct that undermined the company and Plaintiff's standing.

61. The breaches were not incidental or accidental — they were part of a sustained, coordinated strategy to damage Plaintiff's leadership, diminish MAXD's viability, and elevate defendants' own control or influence.

## D. Defendants Acted with Self-Interest or Malice

62. Defendants acted in **self-interest and conscious disregard** for the rights of MAXD, its shareholders, and Plaintiff.

63. Defendants stood to gain financially, reputationally, or strategically from the destruction of Plaintiff's authority and the destabilization of MAXD.

64. Defendants acted with actual malice, animus, and ill will toward Plaintiff, using their insider status as a weapon rather than a responsibility.

## E. Damages Resulting from the Breach

65. As a direct and proximate result of defendants' breaches of fiduciary duty, Plaintiff suffered:

a. collapse of MAXD's business opportunities;

b. substantial shareholder confusion;

c. destruction of Plaintiff's reputation as MAXD's founder and leader;

d. loss of existing and potential partnerships and licensing deals;

e. impairment of MAXD's market confidence;

f. direct financial losses;

g. diversion of time and resources to counteract defendants' false representations; and

h. total damages exceeding $120 million.

66. The harm is ongoing because defendants' false statements, fabricated documents, and impersonation-based communications continue to circulate publicly.

## F. Entitlement to Relief

67. Defendants' actions were intentional, willful, malicious, and in disregard of their fiduciary responsibilities.

68. Plaintiff is entitled to compensatory damages, punitive damages, and all other relief permitted under Illinois law for breach of fiduciary duty.

## COUNT V — DEFAMATION (Illinois Common Law)

**Against Defendants Harvey Vechery, Harold Blaisure, Devine Mafa, Alfred Hildebrand a.k.a. "Bill Nichols," Constance Nash, Michael Turner, Yahoo Inc., and ADVFN/IHub**

*(Elements: (1) false statement; (2) unprivileged publication to a third party; (3) fault; (4) damages. Certain categories are defamation per se.)*

## A. Incorporation of Prior Allegations

69. Plaintiff realleges and incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

## B. False Statements of Fact

70. Defendants Vechery, Blaisure, Mafa, Nash, Hildebrand, Turner, and others made and published thousands of **false statements of fact** concerning Plaintiff.

71. These false statements included, but were not limited to assertions that Plaintiff:

  a. engaged in fraud,

  b. stole funds,

  c. fabricated MAXD's technology,

  d. forged documents,

  e. operated a criminal enterprise,

  f. was removed or replaced from MAXD leadership,

  g. falsified corporate information,

  h. misled shareholders,

  i. acted dishonestly or incompetently, and

  j. was no longer the controlling shareholder of MAXD.

72. All of these statements were factually false at the time they were made.

73. Defendants presented their statements as **verifiable facts**, not opinions, criticisms, or rhetorical hyperbole.

## C. Publication to Third Parties

74. Defendants published or republished these false statements to third parties through:

a. Yahoo Finance message boards,

b. ADVFN/iHub forums,

c. YouTube channels,

d. email blasts,

e. group messages,

f. proxy accounts,

g. reposting and amplification of each other's defamatory statements,

h. and direct communications to MAXD shareholders, partners, and industry contacts.

75. Yahoo Inc. and ADVFN/iHub materially participated by hosting, amplifying, failing to moderate, or allowing repeated republication of defamatory content, including content that violated their stated policies.

76. The defamatory statements reached thousands of viewers, investors, analysts, and market participants.

## D. Defendants Acted with Fault

77. Each defendant acted with **actual malice**, **reckless disregard for truth**, or **knowledge of falsity** when making, reposting, or amplifying defamatory claims about Plaintiff.

78. Defendants coordinated messaging, repeated identical falsehoods, and adopted each other's narratives as part of a shared strategy to discredit Plaintiff.

79. Defendants were repeatedly informed of the falsity of their statements yet continued to publish and republish them.

80. Defendants used multiple pseudonyms, burner accounts, and coordinated posting patterns to mask the origin of defamation and create the illusion of widespread support for false narratives.

81. Defendants intended to harm Plaintiff's personal and professional reputation, undermine his authority at MAXD, and sabotage MAXD's business and market value.

## E. Defamation Per Se

82. Defendants' statements constitute **defamation per se** under Illinois law because they falsely accused Plaintiff of:

   a. criminal conduct;

   b. professional incompetence;

   c. fraud;

   d. dishonesty in business;

   e. behavior incompatible with his role as a corporate fiduciary and leader.

83. Under Illinois law, these categories require **no proof of damages**, as harm is presumed.

## F. Actual Harm and Damages

84. As a direct and proximate result of defendants' defamatory statements, Plaintiff

    suffered:

    a. severe damage to his professional and personal reputation;

    b. loss of corporate opportunities;

    c. collapse of shareholder confidence;

    d. loss of potential partnerships, deals, and licensing agreements;

    e. emotional distress and psychological harm;

    f. diversion of substantial time and resources;

    g. market damage to MAXD; and

    h. quantifiable financial losses exceeding $120 million.

85. These harms were the natural and foreseeable consequences of defendants'

    conduct.

86. The defamatory statements remain publicly visible and continue to cause ongoing

    damage because they are stored, indexed, and recirculated on platforms controlled

    by Yahoo and ADVFN/iHub.

## G. Entitlement to Relief

87. Defendants' conduct was intentional, malicious, and in conscious disregard for

    Plaintiff's rights.

88. Plaintiff is entitled to compensatory damages, presumed damages (for defamation per se), punitive damages, and all other relief available under Illinois common law.

## COUNT VI — DECLARATORY RELIEF
## (735 ILCS 5/2-701)
## Against All Defendants Claiming or Repeating False Assertions About MAXD Ownership, Governance, or Corporate Authority

*(Purpose: To obtain a court declaration resolving an actual controversy concerning MAXD ownership, corporate authority, and the validity of defendants' false claims.)*

### A. Incorporation of Prior Allegations

89. Plaintiff realleges and incorporates by reference Paragraphs 1 through 88 as though fully set forth herein.

### B. An Actual, Present Controversy Exists

90. An actual and immediate controversy exists between Plaintiff and the defendants concerning Plaintiff's legal status as the controlling shareholder, founder, and rightful authority within Max Sound Corporation (MAXD).

91. Defendants — including Vechery, Blaisure, Mafa, Nash, Hildebrand, and Turner — had repeatedly and falsely asserted, published, or implied that:

a. Plaintiff was removed from MAXD leadership long before he was;

b. Plaintiff was replaced by a different "board" or "management group";

c. Plaintiff no longer held majority ownership;

d. Plaintiff lacked authority to act on MAXD's behalf;

e. fraudulent or fabricated "corporate updates" superseded Plaintiff's authority; and

f. MAXD's governance structure had shifted away from Plaintiff long before removal.

92. These assertions were false, unsupported, and created solely to confuse shareholders, partners, and market participants.

93. The ongoing circulation of these false claims caused ongoing harm to Plaintiff and MAXD, undermining business opportunities and disrupting corporate governance.

94. Because the false claims are actively repeated, shared, and recirculated, a current and ongoing need exists for a judicial declaration resolving these issues.

## C. Plaintiff's Rights and Status Require Judicial Determination

95. Plaintiff is and has always been the lawful founder, controlling shareholder, and rightful authority of MAXD.

96. No defendant had or has any lawful claim of superior authority, ownership, or corporate control over MAXD.

97. No defendant had or has any power to remove Plaintiff, supersede Plaintiff's control, or issue binding corporate directives contradicting Plaintiff's Super Majority shareholder position.

98. All alleged "boards," "groups," "restructurings," or purported "corporate communications" issued by defendants or their affiliates were unauthorized, fabricated, void, and of no legal effect.

99. Only a judicial declaration will stop defendants from continuing to publish and promote false claims that interfere with MAXD's governance and Plaintiff's rights to the very business that he financed with millions of dollars of his own money.

## D. Defendants' Actions Create the Need for Declaratory Relief

100.     Defendants have published, circulated, and repeated numerous statements purporting to describe MAXD's ownership or leadership structure as granting Court Authority to Vechery, who then deliberately torpedoed the enterprise to create an alleged tax loss.

101.     These false statements have misled investors, partners, market participants, and the public at large.

102.     The false narratives continue to be posted and recirculated, causing ongoing confusion that cannot be remedied by monetary damages alone.

103.     Without a judicial declaration, defendants' false assertions will continue to harm Plaintiff's reputation and ability to operate, govern, and re-develop MAXD.

## E. Requested Declarations

Plaintiff respectfully requests that the Court declare:

104.     Plaintiff **is**, and has continuously been, the lawful founder and controlling shareholder of Max Sound Corporation (MAXD).

105.     Plaintiff's lawful authority to act on behalf of MAXD, is re-instated fully and no defendant has valid authority to supersede or replace Plaintiff in any corporate capacity.

106.     Any alleged "boards," "groups," "management teams," "reorganizations," "appointments," or "corporate directives" issued by defendants or their associates are **unauthorized, invalid, and void**.

107.     All statements or communications asserting otherwise are false, misleading, and legally ineffective.

108.     Defendants have no lawful authority to speak on MAXD's behalf or to issue statements purporting to represent MAXD, its technology or its leadership.

## F. Entitlement to Relief

109.     Declaratory relief is necessary to end the ongoing harm to Plaintiff's reputation, business relationships, shareholder communications, corporate governance, and operational capacity.

110.     The requested declarations will clarify the parties' rights and resolve the current and continuing controversy affecting MAXD and Plaintiff.

## COUNT VII — ILLINOIS RICO
## (720 ILCS 5/33G et seq.)
## Against All Defendants Who Participated in the Enterprise

*(Elements: (1) an enterprise; (2) a pattern of racketeering activity; (3) participation in the enterprise; (4) injuries to Plaintiff's business or property.)*

## A. Incorporation of Prior Allegations

111.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 110 as though fully set forth herein.

## B. Existence of an Enterprise

112.     Defendants collectively formed an **"enterprise"** within the meaning of 720 ILCS 5/33G-1, consisting of:

a. trading entities (Citadel, Virtu/Knight, Canaccord, Cantor, Schwab, E*TRADE, JP Morgan, Goldman Sachs, UBS, Credit Suisse, Deutsche Bank);

b. platform defendants (Yahoo Inc. and ADVFN/iHub); and

c. individual defendants (Harvey Vechery, Harold Blaisure, Devine Mafa, Alfred Hildebrand, Constance Nash, and Michael Turner).

113.     The enterprise was an **association-in-fact**, with no lawful or formal organizational structure, but functioning as a coordinated network to harm Plaintiff and MAXD.

114.     The enterprise's purpose was to:

a. manipulate MAXD's share price;

b. disseminate false information to the public;

- 57 -

c. undermine Plaintiff's leadership and ownership;

d. fabricate corporate claims or documents;

e. promote or enable a fraudulent takeover attempt;

f. profit from suppressed share values; and

g. damage Plaintiff's reputation and business interests.

115.    Each defendant contributed to the enterprise by performing specific, repeated roles that advanced the scheme.

## C. Pattern of Racketeering Activity

116.    Defendants engaged in a **pattern** of racketeering activity as defined by Illinois RICO, which includes:

a. fraud;

b. identity misrepresentation;

c. deceptive securities practices;

d. creation and dissemination of forged or fabricated documents;

e. impersonation of corporate officers or hired accounting professionals;

f. market manipulation;

g. coordinated defamation campaigns;

h. business interference and intimidation;

i. dissemination of false financial information;

j. deceptive communications to shareholders or third parties.

117.     These acts occurred repeatedly, continuously, and over several years.

118.     The pattern was not random or sporadic — it was **intentional, coordinated, and executed through an interconnected network**.

119.     Each defendant knowingly committed at least two predicate acts of fraud or deception as part of the enterprise.

120.     The acts were related, shared a common purpose, and were directed toward the same victim: Plaintiff.

## D. Participation in the Enterprise

121.     Each defendant **knowingly and intentionally** participated in, directed, or aided the enterprise through conduct that included:

a. executing or enabling artificially manipulative trading;

b. publishing or amplifying false statements about Plaintiff;

c. posting or circulating defamatory content;

d. creating and sharing forged documents or fabricated "corporate updates";

e. interfering with transfer agents;

f. impersonating individuals associated with MAXD;

g. destabilizing MAXD's shareholder communications;

h. suppressing truthful information;

i. coordinating with co-defendants to reinforce false narratives.

122.    Platform defendants Yahoo and ADVFN/iHub contributed to the enterprise by repeatedly hosting, recirculating, and enabling defamatory content that advanced the scheme.

123.    All defendants benefitted directly or indirectly from the enterprise's activity, either financially, reputationally, or strategically.

## E. Injuries to Plaintiff

124.    As a direct and proximate result of defendants' racketeering activity, Plaintiff suffered severe injuries to business and property, including:

a. loss of corporate opportunities;

b. destruction of MAXD's market value;

c. impairment of partnerships and licensing deals;

d. reputational destruction;

e. loss of shareholder trust;

f. economic losses exceeding $120 million;

g. personal and professional harm arising from intimidation, harassment, and deceit.

125.    Plaintiff also suffered ongoing emotional, financial, and operational harm as a result of the enterprise's continuing conduct.

## F. Entitlement to Relief

126.    Defendants acted willfully, maliciously, intentionally, and with utter

disregard for the law and Plaintiff's rights.

127.    Plaintiff is entitled to:

a. compensatory damages;

b. treble damages as permitted by Illinois RICO;

c. punitive damages;

d. attorney's fees where allowed;

e. and all other available relief under 720 ILCS 5/33G.

## COUNT VIII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (Illinois Common Law)
## Against All Defendants Who Participated in Harassment, Defamation, or
## Coordinated Attacks

*(Elements: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of the probability of causing, emotional distress; (3) severe emotional distress.)*

### A. Incorporation of Prior Allegations

128.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 127

as though fully set forth herein.

### B. Extreme and Outrageous Conduct

129.    Defendants engaged in conduct that was extreme, outrageous, and beyond

all bounds tolerated by a civilized society.

130.    Such conduct included, but was not limited to:

a. publishing tens of thousands of defamatory statements accusing Plaintiff of criminal acts, fraud, theft, deceit, or incompetence;

b. fabricating false narratives about MAXD and Plaintiff's leadership;

c. impersonating Plaintiff or MAXD officials;

d. disseminating forged or falsified documents;

e. coordinating public attacks designed to destroy Plaintiff's reputation;

f. creating or encouraging online mobs to target Plaintiff;

g. launching repeated campaigns of harassment involving emails, messages, and postings;

h. attempting to intimidate Plaintiff into surrendering corporate control; and

i. sabotaging MAXD's business operations to cause Plaintiff personal distress.

131.    The magnitude, frequency, and intentional nature of these actions demonstrate a deliberately orchestrated campaign of psychological and reputational warfare.

132.    No reasonable person could be expected to withstand such harassment, false accusations, impersonations, and reputational destruction.

## C. Intent or Reckless Disregard

133.    Defendants intended to cause Plaintiff emotional harm or acted with reckless disregard for the high probability that such harm would occur.

134.     Defendants' coordinated defamation, impersonation, and market sabotage were executed precisely because they knew Plaintiff would:

a. feel threatened,

b. feel publicly disgraced,

c. experience reputational collapse,

d. face business and financial devastation,

e. suffer interference with close relationships, and

f. endure severe psychological and emotional pressure.

135.     The volume of defamatory attacks — coupled with repeated reposting, coordinated timing, and amplification across multiple platforms — demonstrates intentional infliction rather than incidental harm.

136.     Defendants persisted even after being notified repeatedly that their statements were false, harmful, and destructive.

## D. Severe Emotional Distress

137.     As a direct and proximate result of defendants' conduct, Plaintiff suffered **severe emotional distress**, including:

a. anxiety;

b. humiliation;

c. anguish;

d. grief;

e. fear for personal and professional safety;

f. degradation of reputation;

g. sleep disruption;

h. loss of peace of mind; and

i. ongoing psychological harm.

138.     Plaintiff endured long-term stress resulting from continuous attacks, online harassment, professional sabotage, and public humiliation.

139.     These harms were not temporary or trivial — they fundamentally interfered with Plaintiff's daily life, professional focus, and emotional well-being.

140.     Illinois law recognizes that intentional campaigns of harassment, defamation, impersonation, and character destruction constitute severe emotional distress.

## E. Entitlement to Relief

141.     Defendants acted willfully, maliciously, and with conscious disregard of Plaintiff's rights.

142.     Plaintiff is entitled to compensatory damages, punitive damages, and all other relief available under Illinois law for intentional infliction of emotional distress.

## IX. PRAYER FOR RELIEF

**(Illinois Law Remedies Only)**

143.     WHEREFORE, Plaintiff **Gregory J. Halpern** respectfully requests that the Court enter judgment in his favor and against all defendants on all counts, and award the following relief as permitted under Illinois law:

## A. Compensatory and Actual Damages

144.     An award of compensatory damages in an amount to be determined at trial, but believed to exceed **$120 million**, for injuries to Plaintiff's business, reputation, finances, emotional well-being, and professional standing.

## B. Punitive Damages

145.     An award of punitive damages as allowed under Illinois law, including for:

a. fraud;

b. defamation;

c. civil conspiracy;

d. breach of fiduciary duty; and

e. intentional infliction of emotional distress.

## C. Treble Damages Under Illinois RICO (720 ILCS 5/33G)

146.     Treble damages under the Illinois RICO statute for defendants' pattern of racketeering activity.

**D. Declaratory Relief (735 ILCS 5/2-701)**

147.    A judicial declaration that:

a. Plaintiff is the lawful founder and controlling shareholder of Max Sound

Corporation (MAXD);

b. Plaintiff retains legal authority to act on behalf of MAXD;

c. any alleged "boards," "groups," "reorganizations," "appointments," or

"corporate directives" promoted by defendants are unauthorized and void;

d. defendants have no lawful authority to speak for or represent MAXD; and

e. all contrary statements by defendants are false, misleading, and legally

ineffective.

**E. Disgorgement, Restitution, and Equitable Relief**

149.    Such equitable remedies as permitted by Illinois law, including:

a. disgorgement of profits obtained through manipulation or misconduct;

b. restitution of losses caused to Plaintiff;

c. constructive trust where appropriate; and

d. other equitable remedies the Court finds just and proper.

**G. Attorneys' Fees and Costs (Where Permitted)**

150.    An award of attorneys' fees and costs where allowed under Illinois RICO

(720 ILCS 5/33G) or other applicable provisions of Illinois law.

## H. Pre-Judgment and Post-Judgment Interest

151.     Recovery of pre-judgment and post-judgment interest at the maximum rate

allowed under Illinois law.

## I. Any Further Relief

152.     Any additional relief the Court deems just, proper, and equitable under

Illinois law.

## X. JURY DEMAND

Plaintiff demands a jury trial under **Article I, Section 13 of the Illinois Constitution**.

## XI. CERTIFICATION REGARDING FEDERAL CLAIMS

**This Second Amended Complaint contains NO federal defendants, NO federal claims, NO federal statutes, NO federal constitutional issues, and NO federal-question basis of any kind.**

As of November 13, 2025, Plaintiff has voluntarily dismissed, without prejudice, all federal-officer and federal-agency defendants pursuant to Rule 41(a)(1)(A)(i). Dismissed defendants include:

- U.S. Securities and Exchange Commission

- Mary Schapiro (former SEC Chair)

- Mary Jo White (former SEC Chair)

- Jay Clayton (former SEC Chair)

Plaintiff has also voluntarily dismissed all Doe Defendants (Does 1–100), thereby eliminating any placeholder defendants that could be construed as federal actors or as unidentified parties capable of creating removability.

These dismissals are final, complete, and reflected in Dkt. 81, 82, and 83, which remain on the docket as controlling filings.

Plaintiff certifies that no federal defendants of any kind remain in this action.

Plaintiff proceeds solely under **Illinois law**.

Respectfully submitted,

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

Dated: November 21, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2025, I caused the foregoing **SECOND AMENDED COMPLAINT** to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered counsel of record.

Respectfully submitted,

GREGORY J. HALPERN, Pro Se
11008 MORNING DOVE LANE
SPRING GROVE, ILLINOIS 60081
EMAIL: GREGHALPERN1@PROTON.ME
PHONE: (847)565-9732
FAX: (815)604-8075

Dated: November 21, 2025

# EXHIBITS:

**Exhibit A** - Level-2 Screenshots

**Exhibit B** - MAXD Trading Patterns / May 2018 Broker Breakdown

**Exhibit C** - TipRanks Sentiment Snapshot

**Exhibit D** - Dirks Declaration (Valuation: $20–$25M)

**Exhibit E** – Shareholder Complaint Letter (Vechery Oversight Failure)

## EXHIBIT A – Level-2 Screenshots



## Exhibit B - MAXD Trading Patterns / May 2018 Broker Breakdown

Analyzing the last year of daily short volume data and correlated it to recent market making activity in MAXD. In 27 of the past 31 trading days, 87% of the time, the combined selling and short selling in MAXD has far exceeded the amount of buying (See NetNet column below). Market makers, by definition, are required to PROVIDE LIQUIDITY not extract or remove liquidity. The math provided below demonstrates that instead of matching orders, market makers, Knight/Virtu, Cantor Fitzgerald, Canaccord Genuity, Citadel, eTrade, etc. are heavily shorting MAXD stock BOTH on the offer and on the bid, which by definition means they have a "speculative short selling strategy" running on MAXD. They are carrying net short positions overnight and continuing to claim the market maker's exemption. This is mathematically proven because there is not enough BuyVol (buy volume) to match the amount of selling and short selling. The chart below identifies the top 5 market makers, in MAXD for May 2018 (highlighted below) accounting for 2,257,870,595 shares of trading, or 88.22% of total trading volume in May.

Total Volume Name
(Last Month)
643,662,180 Knight/Virtu,
154,447,100 Cantor Fitzgerald,
203,762,081 Canaccord Genuity,
769,731,954 Citadel,
247,276,817 Trade/G1

Highlighting these Market Makers abusive activities in-concert with each other for just the one month of May, allows the media to easily identify the manipulative trading activity and counterfeiting of MAXD shares engaged in by their traders for the past year

and well beyond. When overlaid for the entire year (back to June 1, 2017) the math is shocking. 8,117,878,650 total shares have been shorted representing in excess of 40% of MAXD's total trading volume and it demonstrates that these market makers have knowingly participated in manipulative trading practices and counterfeiting of MAXD shares.

CUMULATIVE TOTAL SHARES SHORTED data showing large short positions.

| Date | ShortVolume | Total Volume | Percent | Squeeze Trigger | $Value |
|------|------------|--------------|---------|-----------------|--------|
| 6/8/2018 | 15,701,300 | 107,574,934 | 14.60% | $0.0004 | $6,281 |
| 6/7/2018 | 53,355,529 | 165,271,184 | 32.28% | $0.0004 | $21,342 |
| 6/6/2018 | 648,355,630 | 1,238,570,544 | 52.35% | $0.0005 | $324,178 |
| 6/5/2018 | 65,351,875 | 96,413,875 | 67.78% | $0.0004 | $26,141 |
| 6/4/2018 | 46,779,267 | 107,384,333 | 43.56% | $0.0004 | $18,712 |
| 6/1/2018 | 289,758,138 | 362,031,358 | 80.04% | $0.0003 | $86,927 |
| 5/31/2018 | 4,949,999 | 112,476,935 | 4.40% | $0.0003 | $1,485 |
| 5/30/2018 | 116,156,059 | 380,530,660 | 30.52% | $0.0003 | $34,847 |
| 5/29/2018 | 19,961,309 | 54,883,438 | 36.37% | $0.0002 | $3,992 |
| 5/25/2018 | 1,514,244 | 33,174,777 | 4.56% | $0.0003 | $454 |
| 5/24/2018 | 8,870,000 | 40,350,000 | 21.98% | $0.0003 | $2,661 |
| 5/23/2018 | 64,000,850 | 112,982,073 | 56.65% | $0.0003 | $19,200 |
| 5/22/2018 | 4,093,333 | 7,003,931 | 58.44% | $0.0003 | $1,228 |
| 5/21/2018 | 3,230,900 | 19,691,678 | 16.41% | $0.0003 | $969 |
| 5/18/2018 | 83,819,569 | 207,235,030 | 40.45% | $0.0003 | $25,146 |
| 5/17/2018 | 117,944,438 | 261,529,492 | 45.10% | $0.0003 | $35,383 |
| 5/16/2018 | 31,857,477 | 82,434,227 | 38.65% | $0.0003 | $9,557 |
| 5/15/2018 | 17,602,398 | 40,532,801 | 43.43% | $0.0003 | $5,281 |
| 5/14/2018 | 59,639,388 | 160,659,434 | 37.12% | $0.0003 | $17,892 |
| 5/11/2018 | 4,345,525 | 45,242,353 | 9.60% | $0.0003 | $1,304 |
| 5/10/2018 | 9,486,439 | 12,293,638 | 77.17% | $0.0003 | $2,846 |
| 5/9/2018 | 73,012,030 | 209,322,909 | 34.88% | $0.0003 | $21,904 |
| 5/8/2018 | 117,699,386 | 183,193,959 | 64.25% | $0.0003 | $35,310 |
| 5/7/2018 | 13,376,500 | 31,810,960 | 42.05% | $0.0003 | $4,013 |
| 5/4/2018 | 23,450,725 | 52,153,194 | 44.97% | $0.0003 | $7,035 |
| 5/3/2018 | 17,529,266 | 27,504,964 | 63.73% | $0.0003 | $5,259 |
| 5/2/2018 | 18,156,576 | 54,003,987 | 33.62% | $0.0003 | $5,447 |
| 5/1/2018 | 145,586,693 | 428,196,155 | 34.00% | $0.0003 | $43,676 |
| 4/30/2018 | 25,360,367 | 74,589,316 | 34.00% | $0.0003 | $7,608 |
| 4/27/2018 | 68,975,488 | 202,869,083 | 34.00% | $0.0004 | $27,590 |
| 4/26/2018 | 30,661,676 | 90,181,401 | 34.00% | $0.0004 | $12,265 |
| 4/25/2018 | 29,057,092 | 85,462,035 | 34.00% | $0.0005 | $14,529 |
| Total | 8,117,878,650 | 19,886,222,304 | 40.82% | $0.0008 | $6,178,916 |

## Exhibit C - TipRanks Sentiment Snapshot



### Max Sound Stock Analysis & Ratings

The TipRanks Smart Score analyzes stocks based on 8 factors extracted from our unique datasets.



### Max Sound Stock Analysis Overview ▼

The Max Sound stock analysis is based on the TipRanks Smart Score which is derived from 8 unique data sets including Analyst recommendations, Crowd Wisdom, Hedge Fund Activity more...



### Max Sound Company Description

Max Sound Corp. develops audio technology software. Its activities include the sale and product licensing based on MAX-D HD audio technology for sound recording and playback. The firm market pursuits include motion picture, music recording, video game, broadcasting, Internet video and audio, automobile infotainment systems, and consumer electronics. The company was founded by Greg J. Halpern on December 9, 2005 and is headquartered in Santa Monica, CA.





## Max Sound Stock Investors

Based on 347,353 investor portfolios analyzed by TipRanks   Open your own Smart Portfolio >

**Showing:** ● All Investors *Based on 347,353 portfolios* ⓘ ○ Best Performing Investors *Based on 69,470 best performing portfolios* ⓘ

**Average Holdings Size** ⓘ

**<0.1%** of all portfolios hold MAXD
On average these investors allocate **3.5%** of their portfolio to MAXD

**Investor Sentiment** ⓘ

**Very Positive**

Based on the activity of 347,353 investors in the recent quarter

Sector Average
Sold — Bought

**Portfolios Holding MAXD** ⓘ

⬆ **22.8%** Last 7 Days

⬆ **805.5%** Last 30 Days

The change in number of portfolios holding MAXD out of 347,353 investor portfolios on TipRanks

### MAXD Investor Activity

Activity is based on TipRanks investors with a public Smart Portfolio



## Max Sound News Sentiment

**Media Buzz - Last 7 Days** ⓘ

0 —— MAXD This Week —— 10
MAXD Weekly Average

This Week: 1 article   Weekly Average: 1.0 articles

**News Score** ⓘ

**Neutral**

Based on a formula that combines this week's News Sentiment and Media Buzz

Sector Average

**News Sentiment - Last 7 Days** ⓘ

MAXD This Week
Sector Weekly Average

MAXD: 50% Bullish / 50% Bearish
Sector Average: 67% Bullish / 33% Bearish

**Media Coverage Analysis** ⓘ

Price ■ Neutral News ■ Bearish News ■ Bullish News

10 articles

0 articles
15. Feb   22. Feb   1. Mar   8. Mar

$2
$1
$0.01

**Keywords mentioned in last week's articles** ⓘ

No keywords found
Please return soon as the page is updated accordingly.

**Bullish vs Bearish News**

● All News   ○ Bullish News   ○ Bearish News

| 2 days ago | MAXD | Max Sound Corp Signs Landmark Agreement with Formula 4 Protocol in Deal it calls the New Paradigm-Shattering Precedent For HD Audio Branded Content that Includes National and then International Distribution in Major Retail  Yahoo Finance |
| 9 days ago | MAXD | Black Tusk Mobilizing Diamond Drill to the Lorrain Property, Quebec  Yahoo Finance |
| 12 days ago | MAXD | Black Tusk Resources Inc. Completes Diamond Drilling on the McKenzie East Project, Quebec  Yahoo Finance |
| 13 days ago | MAXD | Max Sound Corp. announced today the official signing of its first major, fee-based, license for MAXD HD Audio® Technology in a Joint Venture Agreement with Tip Solutions, Inc.  Yahoo Finance |
| 28 days ago | MAXD | InvestmentPitch Media Video Discusses Black Tusk's Intersection of Visible Gold in One of First Three Drill Holes at its McKenzie East Gold Property Near Val d'Or, Quebec - Video Available on Investmentpitch.com  Yahoo Finance |
| last month | MAXD | Black Tusk Resources Inc. Intersects Visible Gold In Drilling On The Mckenzie East Gold Project, Quebec  Yahoo Finance |

## Exhibit D – Dirks Declaration (Valuation: $20–$25M)

I, Martin Dirks, declare:

I. Introduction

I have been asked to provide my professional opinion regarding the value of Max Sound Corp, which trades with the ticker MAXD.

1.          This report and the opinions expressed herein are based on my analysis of the materials I have reviewed to date. I may supplement, refine or revise my analysis as appropriate if additional information having a bearing on my analysis becomes available.

          A.     Qualifications

2.          I am the founder of Investment Strategy & Analysis, an expert witness and consulting firm in San Francisco, California. Since 2006, I have been a Senior Adjunct Professor in the Master of Business Administration ("MBA") program at Golden Gate University in San Francisco, California, where I teach Portfolio Management, an advanced investments course. I have also been an advisor to Oakpeak Equity Partners, a private equity investment firm since 2015, and two early-stage investment technology companies, lnferess (since 2015) and HedgeSight (since 2017).

3.          From 2019 to 2021, I was the Head of Distribution for Meras Investment Management, a firm investing in microcaps. In this role, I managed client relations for the firm.

4.          I have over thirty years of institutional investment experience with expertise in investment consulting, stock valuation and analysis, hedge fund management, analysis of corporate accounting fraud, and other investment-related issues.

5.    From 2011 to 2019, I was a Board Member for the Federated City Employees' Retirement System, a $2 billion pension plan for the City of San Jose. In this role, I was a member of the investment committee and participated in selection of investment consultants.

6.    From 2012 to 2017, I was employed by Milliman Inc., an international consulting firm with more than 3,000 employees worldwide, in its San Francisco office as a Senior Investment Consultant. In that role I was the sole investment advisor for specific defined benefit and defined contribution pension plans, endowments, and foundations. I also performed asset allocation studies, manager selection searches, monitored investment managers and provided expert witness services on behalf of Milliman.

7.    From 2010 to 2012, I was the Director of Research at McCullough & Associates, a value-oriented equity manager, where my team and I independently researched investment opportunities for McCullough & Associates' $250 million portfolio.

8.    From 2000 to 2004, I ran Dirks Capital Management, a registered investment advisor in the state of California, where I managed client assets in a long/short equity fund. I also served as a sub-advisor for an equity portfolio managed by Davidson Investment Advisors, the investment management subsidiary of DA Davidson.

9.    From 1994 to 1999, as an equity analyst, I managed a long/short equity portfolio for Harvard Management Company in Boston, Massachusetts, which manages Harvard University's endowment. The objective of the long/short funds I managed was to extract returns from the market by buying stocks (taking a "long" position) and selling stocks (taking a "short" position) to maximize investment return while also minimizing the impact on investment return from market movements. In an up market, it was important that the long positions went up more than the short positions. Similarly, in a down market, it was important

that the long positions went down less than the short positions. This portfolio grew from $110 million in 1994 to $870 million in June 1999.

10.  Prior to Harvard Management, I was an equity analyst at two hedge funds: from 1991 to 1993 at Odyssey Partners, a $2 billion hedge fund managed by Jack Nash and Leon Levy, the co-founders of Oppenheimer & Co., and from 1989 to 1991 at Feshbach Brothers, a $1 billion short-only equity hedge fund. As an equity analyst, I researched investment opportunities for these funds and was responsible for their profits and losses. I was a Senior Financial Planning Analyst at Cooper Industries, a Fortune 100 manufacturing company from 1987 to 1989. At Cooper, I worked on the acquisition of private and publicly traded companies.

11.  I received a Master in Business Administration degree from Harvard Business School in 1987 and a Bachelor of Science (Engineering Physics) from Bemidji State University in 1979.

  B.  Assignment

12.  I have been asked to provide an estimate of value for Max Sound equity owned by Greg Halpern using an income-based approach.

13.  Compensation: Investment Strategy & Analysis is being compensated with $3,000 for the time incurred on this matter. Payment is not contingent on my findings or on the outcome of the case.

II. Opinions

16.  Mr. Gregory J. Halpern is the Founder, CEO, CFO, Pres & Chairman of Max Sound Corp, a closely held company which trades with the ticker MAXD. Mr. Halpern is the key member of the executive team.

17.  Generally, a company with a market capitalization (share price x number of shares outstanding) less than $1 billion is considered to be a microcap stock. Max Sound has a market capitalization of approximately $20-25 million,

putting it on the small end of the microcap stock spectrum.

18.     Small microcap stocks are often speculative investments. Usually microcap companies have only one product or service and have a higher rate of failure than larger, more established firms.

19.     Institutional investors generally do not invest in microcaps. Market prices of microcaps may not reflect the value of the business for extended periods of time. Relatively small increases in buying or selling can significantly impact a small microcap's price; a large or mid-sized company would see a much smaller price impact for the same increase in buying or selling.

20.     Microcap prices may be influenced by online chat boards where news and rumors about the companies are discussed. Some microcap investors are essentially gamblers. News that a large shareholder was liquidating their position would cause many microcap investors to not buy more shares or even attempt to sell their shares. They would expect the large seller to drive the stock's price lower. Such a pause in buying, and emergence of a large seller that simply sold a substantial share ownership at the market price, would be likely to cause the price to decline substantially.

21.     As of December 31, 2021, Max Sound's balance sheet shows that it has no assets and current liabilities of $12.6 million. Max Sound had no revenue in 2020. Max Sound has not declared or paid dividends.

22.     In Q1 2021, Max Sound had $251,000 in revenue and reported a loss of $96,881. It had total assets of $250,275 in cash and current liabilities of $12.7 million.

23.     The business owns intellectual property that may have value. I have not attempted to separately value the intellectual property assets as this is beyond the scope of my assignment. Unless the intellectual property was purchased, it is common that the balance sheet does not show an entry for the intellectual

property.

24. Mr. Halpern is a super majority shareholder of Max Sound. He owns 10 million preferred shares of Max Sound, which if converted to common shares, *would give him more than a 66% ownership in Max Sound*. Because of the speculative nature of a stock like Max Sound, an attempted sale of a majority interest is likely to cause the stock's price in the market to substantially decrease.

I reserve the right to amend this report if additional information becomes available or if I am advised that different assumptions should be made.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration is executed on June 1, 2021 in the State of California.

_Martin Dirks_
_____
Martin Dirks

**Exhibit E - Shareholder Complaint Letter (Vechery Oversight Failure)**

October 3, 2023

Attorneys for Harvey Vechery

Greetings _to whom: it may concern :_

This letter is an inquiry to find out: 1) If Harvey Vechery is currently your client, and if so - 2) What is Mr. Vechery doing with Max Sound Corporation (MAXD.pk) since April 2023 when he began publically stating that he has been awarded control over Max Sound.

I am a legitimate shareholder of record who has invested my own hard-earned-money at market into the Public Company MAXD.pk

My interest is for estate planning as one of thousands of shareholders of Max Sound Corporation. Mr. Vechery has been non-responsive to me and the shareholders as to fulfill his regulatory and fiduciary responsibility that he took on when he began boasting in April of this year that he got the former CEO thrown out of MAXD. Mr. Vechery has failed grossly to even utter a word online, or to upgrade MAXD's S.E.C. filings as to what his plan for the Company is. He has the legal liability to report since May. See -

   https://www.sec.gov/Archives/edgar/data/1353499/000147793222008789/maxd_8k.htm

Meanwhile, some have posted online recordings of Vechery, where Vechery and his associate Scott Kapp, proclaim they *"got Greg Halpern kicked out of the Company and thrown out of his house."* See https://makingharveyricher.com  Said website is available online and contains many issues of great concern to me as one of the thousands of shareholders. I am asking you to address these concerns since Mr. Vechery is clearly ignoring the shareholders.

The above quotes, and other Vechery and Kapp remarks, are slanderous, defamatory as well as gross distortions according to Halpern. As a shareholder, they are engaging in bad management, however, I am more concerned that Vechery's only point to taking over the Company, clearly appears to be for him to ensure an ill-gotten, large, personal, financial tax benefit while destroying millions of dollars of potential shareholder gains that Halpern has a four-plus decade of enormous successes achieving.

Among other things, Vechery and Kapp, et al have according to Halpern, entirely ignored Halpern's significant efforts to amicably allow, and even assist Vechery led personnel to continue-on working towards the success of MAXD. Minimal conversations have occurred between Vechery's liaison John Braun and Halpern, yet those ended unproductively with Vechery simply going dark after Halpern made many serious efforts to try to help Vechery do anything at all with MAXD.

It seems extremely bizarre that Vechery would have appeared to intentionally deceive the court to remove Halpern and then make a deliberate effort to bury the Company and its tens of millions of dollars of now lost shareholder value. Throughout the history of the company, MAXD enjoyed staggering market liquidity of over $243 million dollars, while achieving documented market caps on multiple occasions in excess of $52 million and $100 million dollars respectively.

At first, it seems preposterous that Vechery would be online boasting how he rid the Company of its CEO and then Vechery has been deliberately destroying MAXD. Suddenly, the real scheme appears to unfold, and we shareholders get to see what is really going on. In what the Department of the Treasury and the I.R.S. calls Criminal Tax Evasion, Vechery appears to have offset part of a huge gain of close to $30 million dollars by writing off millions of dollars invested with MAXD and Greg Halpern. Halpern, and his experts, advise that Vechery's scheme is a serious conflict of interest, and offers Government Regulators and MAXD shareholders significant relief under Reg 10b and illegal tax evasion among other potential rule violations. Further, Halpern provides a review of several other Companies Vechery has used the same M.O. on, and up until now, he's gotten away with it.

I reached out recently to Mr. Halpern to ask what was going on at the company since April of this year. Halpern stated that he is no longer in charge of Max Sound since April 2023 when Mr. Vechery got a court order to remove Halpern and give Vechery control of the company.

Halpern stated that he has posted this template letter online. He said he is directing shareholders of Max Sound that are calling him to inquire to review the website https://makingharveyricher.com and then if we as shareholders feel it appropriate, to adapt this template letter and send it to various attorneys of record that Mr. Vechery may still be working with in Securities Law (S.E.C.), Tax Accounting Law (Department of the Treasury of the I.R.S.), Bankruptcy Law and Contract Law. You may therefore receive several of these letters from other Max Sound shareholders as well.

Among other things, Vechery appears to have falsely removed Halpern on the basis that he claims Halpern was looting the company and using it as a personal piggy bank. Halpern documents in his numerous public disclosures with the S.E.C. that he has put millions of dollars into the company and operated at the Company until April 2023 with no compensation whatsoever for at least the previous five years.

We are informed that Vechery, Kapp and several other of their associates were involved in the company on a day-to-day basis for at least the previous six years according to Halpern's AT&T record demonstrating at least 14,000+ calls by Vechery to Halpern. Vechery received annual audited publicly disclosed financial statements throughout the time periods in question as did all shareholders, but Vechery even received up to the minute financial reports from Halpern over and

above what we as shareholders received through regulatory filings at the S.E.C. Further, Vechery received at least 17 "Use of Proceeds" to compare against all uses of capital by Halpern at MAXD. Halpern points out that Vechery repeatedly ignored Halpern's urging until finally filing his 13D Insider Reports many years later than required by the S.E.C.

Thus, it seems that Vechery had to know it would be impossible to have looted the Company because there was nothing to loot according to the massive inventory of publicly available audited records.

Vechery states that Halpern was malfeasant and had no outside directors to provide oversight. Halpern makes the case online that more than 95% of Fully Reporting Pink Sheet Companies Do Not Have Outside Directors and that a million-dollar Directors and Officers Insurance policy that MAXD could neither secure nor afford, would be a pre-requisite to any legitimate members joining such a Board. Halpern makes the case that his millions of hard dollars invested in MAXD yielded him non-negotiable Preferred Shares and Super Majority control the exact same way Larry Page and Sergei Brin set up their investment in GOOG. It didn't require oversight according to Delaware Law and Vechery knows that among other things.

Mr. Halpern states that Mr. Vechery knowingly and fraudulently removed Halpern due only to a personal vendetta and a now documented four decades history of Vechery purposely ruining his own investments to take large tax losses and evade certain tax responsibilities.

Since taking over MAXD in April, Vechery and his sidekick Scott Kapp are recorded telling people they got Halpern removed and they're in charge. So, if Vechery et al is in charge, it begs the question - what are they in charge of and what are they doing since they have made no effort to reach out to Mr. Halpern, they've let the Delaware Corporation dissolve, and they've failed to update any S.E.C. filings.

This much is clear according to Mr. Vechery and Mr. Kapp. They state that the court order in April of this year gets rid of Halpern and that Vechery is in charge. Since then, Vechery has not only done absolutely nothing at MAXD, Vechery has left the Delaware Corporation to dissolve leaving even a six-hundred-dollar renewal credit prepaid by Halpern. Halpern makes his case online demonstrating with hard documentation and recordings that Vechery has made no effort to keep MAXD in business or to reach out to Halpern or respond to Halpern's various offers.

Shareholders like me are now asking the tough questions. Where is Vechery's oversight on his actions at the company since Vechery alleged against Halpern a total lack of oversight?

But here again is the much bigger shareholder concern - Halpern's states that Vechery took a tax loss of millions of dollars on his personal tax return or his family estate trust tax return against the loss of the Company which Vechery himself caused.

Also of great interest, in Halpern's 2022 Personal Bankruptcy Final Signed Global Settlement Agreement with the Federal Court, Vechery happily signed off agreeing that Halpern will retain his Delaware Super Majority Preferred MAXD Controlling Shares. In exchange, Halpern left Vechery a $900,000 dollar bankruptcy exemption and Halpern's $2,000,000 personal home equity. Yet then Vechery sues to remove Halpern at the absolute cost of my investment, Halpern's investments and thousands of other MAXD shareholders totaling many millions of dollars. Ironically, Vechery is also on record many times telling Halpern he is glad Halpern will keep his control shares in MAXD.

It certainly appears that Vechery's goal was to commandeer MAXD, intentionally destroy it, then wrongly evade millions of dollars of tax, regardless of the harm to thousands of shareholders who have legitimately invested in the company. As of this past May, Vechery had an absolute responsibility to file an 8K and update MAXD's going forward plan as was promised by previous management in November of 2022.
See https://www.sec.gov/Archives/edgar/data/1353499/000147793222008789/maxd_8k.htm

Vechery is not entitled to destroy the company to help himself financially by evading tax liability at the expense of me and the rest of the shareholders after wrongly removing the principal Halpern. Halpern himself has millions at stake and his only interest clearly was and still is the success of MAXD.

Here are a few final thoughts about the situation at hand –

According to Greg Halpern - Harvey Vechery waged a Cyberstalking campaign against Mr. Halpern over the past couple years. Halpern has presented plenty of proof and as a legitimate shareholder it seems obvious that this happened and contributed greatly to the damage to my investment and all the shareholders. At one of the Halpern portals, Ballard Spar does some analysis of the recent groundbreaking appellate court Cyberstalking precedent and how it affected a recent challenge by the defendant that led to enormous fines and a 3½ year jail sentence now being served.

Halpern has demonstrated his ability to remove all of the Vechery inspired online defamation here two years after their first release, and Halpern is completing such removal now that he has copied all of the videos related thereto for future proof and shareholder action if desired. Vechery filed his case that removed Halpern from MAXD quite coincidentally by pointing to the defamations in direct parallel. In contrast, Halpern Challenged Vechery by comparing Halpern's 45 years of immense global successes against Vechery's 40 years of massive personal as well as professional

4

failures in nearly everything. There will be many more Halpern wins posted over the next several years according to Halpern that are being matched side-by-side against Vechery's horrific losses of over 100 million dollars reported to Halpern by Vechery.

Halpern suggests to shareholders if they have any doubt who is the good guy and who is the villain here go and review -
https://BattleTestedWinner.com  https://InventorOfCrowdFunding.com  https://ChannelGreg.com

Halpern worked on the original algorithm that let to Alta Vista and now Google search optimization. He now points to simple searches on Google for Harvey Vechery as a sample of how he intends to expose Mr. Vechery.

Thank you for reviewing my concerns. If you represent Mr. Vechery, Mr. Kapp, or their interests, please advise whether your client has any plan for MAXD as is their fiduciary responsibility.

Sincerely,

Eric J Bruemmer
owner of many shares of Max Sound (MAXD)

5